## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

TEVA PHARMACEUTICALS USA, INC.,    )
                                  )

          Plaintiff,             )

          v.                           )     Case No. 08-cv-395 (RCL)

MICHAEL O. LEAVITT, Secretary of    )
Health and Human Services,          )

ANDREW C. VON ESCHENBACH,     )
Commissioner of Food and Drugs, and  )

U.S. FOOD AND DRUG ADMINISTRATION, )

          Defendants,         )

MYLAN PHARMACEUTICALS INC.,    )

          Intervenor-Defendant.   )
_____)

## MYLAN PHARMACEUTICALS INC.'S OPPOSITION TO
## TEVA'S MOTION FOR A PRELIMINARY INJUNCTION

William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
Lara E. FitzSimmons
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Intervenor-Defendant,*
*Mylan Pharmaceuticals Inc.*

Dated: March 26, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 3

I.      The NDA Product. ......................................................................................................... 3

II.     Teva's Paragraph IV ANDA And Petition To FDA. ......................................................... 4

III.    Mylan's ANDA For Risperidone. ................................................................................... 6

ARGUMENT ............................................................................................................................. 7

I.      Teva Has No Likelihood Of Succeeding On The Merits. .................................................. 8

II.     The Balance of Harms Weighs Heavily In Favor Of Denying Injunctive Relief. ............ 15

CONCLUSION ......................................................................................................................... 17

## TABLE OF AUTHORITIES

### Federal Cases

\* *Apotex Inc. v. FDA*,
  449 F.3d 1249 (D.C. Cir. 2006)......................................................................... 7, 15

*Apotex Inc. v. FDA*,
  508 F. Supp. 2d 78 (D.D.C. 2007).......................................................................... 7

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995).................................................................................. 7

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004)................................................................................ 7

\* *Dodd v. Fleming*,
  223 F. Supp. 2d 15 (D.D.C. 2002).......................................................................... 7

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975).............................................................................. 15

\* *Mazurek v. Armstrong*,
  520 U.S. 968 (1997)................................................................................................ 7

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d. 30 (D.D.C. 2000)......................................................................... 15

*Newdow v. Bush*,
  355 F. Supp. 2d 265 (D.D.C. 2005)...................................................................... 15

*Ranbaxy Labs. Ltd. v. Leavitt*,
  469 F.3d 120 (D.C. Cir. 2006).............................................................................. 14

*Ranbaxy Labs., Ltd. v. Leavitt*,
  459 F. Supp. 2d 1 (D.D.C. 2006).......................................................................... 14

*Serono Labs., Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998).............................................................................. 7

*Tenacre Found. v. INS*,
  78 F.3d 693 (D.C. Cir. 1996).................................................................................. 8

### Federal Statutes

21 U.S.C. § 355(j)(5)(B)(iv) ................................................................................. 13

\* *Authorities marked with an asterisk indicate those on which counsel chiefly rely.*

**Federal Regulations**

21 C.F.R. § 314.53(e)...................................................................................................... 11

21 C.F.R. § 314.53(f) ...................................................................................................... 12

Intervenor-Defendant, Mylan Pharmaceuticals Inc. ("Mylan"), respectfully submits this memorandum in opposition to Teva's Motion for a Preliminary Injunction.

## INTRODUCTION

Teva seeks a preliminary injunction delaying the launch of every other generic version of Janssen's branded Risperdal® (risperidone) tablets, while Teva enjoys so-called "180-day exclusivity" for its generic risperidone products. As FDA already ruled, Teva's motion must be denied given the governing statute and agency regulations. Indeed, the statute and regulations support no other conclusion.

Years ago, Janssen submitted U.S. Patent No. 5,158,952 ("the '952 patent") to FDA as covering Risperdal® tablets, and FDA subsequently listed that patent in its "Orange Book." Later, Janssen realized that the '952 patent could not lawfully be so listed because, as Janssen itself has admitted, the '952 patent does not claim the drug risperidone or a method of using that drug. Consequently, Janssen had a legal obligation to have it removed (or "delisted") from the Orange Book, and Janssen complied with that obligation by asking FDA not once, but twice, to remove that patent from the Orange Book. FDA complied with Janssen's requests and delisted the '952 patent prior to the submission of any abbreviated new drug application ("ANDA")—including, as Teva readily concedes, Teva's risperidone tablet ANDA.

Despite the fact that the '952 patent no longer appeared in the electronic version of the Orange Book when Teva submitted its ANDA, Teva nevertheless included a paragraph IV certification to that patent in its application. FDA, of course, correctly refused to allow such a certification and thus refused to accept Teva's ANDA filing. Teva subsequently removed the paragraph IV certification, acknowledging (as it had to) that the '952 patent had been "officially delisted" from the Orange Book before Teva had submitted its ANDA.

Despite these uncontested facts, Teva asks this Court to order FDA to re-list the '952 patent so that Teva can enjoy the 180-day generic exclusivity period Congress created to reward companies only when the statutory requirements have been satisfied. Teva's request should be denied. This not only is FDA's position, but the one Teva itself voiced years before. Specifically, two ANDA applicants for generic simvastatin submitted the first paragraph IV certifications to two patents appearing in the Orange Book at the time of ANDA submission, and FDA accepted those applications for filing. FDA subsequently delisted those patents at the request of the brand company, and when the ANDA applicants petitioned FDA to re-list them, Teva vigorously opposed that request, declaring: "Ivax's and Ranbaxy's Petitions are without merit and should be denied, because the patents at issue were improperly listed in the first instance as they do not claim the listed drug." (*See* Rakoczy Decl. Ex. A, 2005P-0008 Teva 6/8/05 Opposition Comments at 1.)[1]  Indeed, Teva felt these generic applicants were "merely seeking to gain a specific benefit to which they were not lawfully entitled – i.e., a 180-day exclusivity period based on patents that do not qualify for listing in the Orange Book, and to force upon FDA and the generic industry a rule that makes no sense and which would lead to absurd results." (*Id.*)  While times, it would seem, have changed at Teva, the law has not.

The statute has *never* allowed a company to obtain 180-day generic exclusivity when its application failed to contain the first paragraph IV certification to a properly listed patent. Nor has the statute ever allowed a company to obtain generic exclusivity when a patent was listed in the Orange Book at some point during ANDA development, but removed from the Orange Book prior to ANDA submission. The statute, instead, awards exclusivity only to the first applicant to have an ANDA accepted for filing by FDA that contains a paragraph IV

---

[1] All references to "Rakoczy Decl." herein are to the Declaration of William A. Rakoczy, submitted concurrently herewith.

certification to a *currently-listed* patent.  Contrary to Teva's assertions, and as discussed fully below, the D.C. Circuit's 2006 decision in *Ranbaxy v. Leavitt* does not hold otherwise.  Teva's motion thus must be denied because it has no chance of success on the merits and the balance of harms weighs heavily in favor of affirming the Agency's well-founded administrative ruling.

## BACKGROUND

This case arises under the generic drug-approval provisions of the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 301 *et seq.* (1999), as amended by the Hatch-Waxman Amendments, codified in part at 21 U.S.C. § 355.[2]

## I.    The NDA Product.

The reference-listed drug upon which both Teva and Mylan have based their respective ANDAs is Janssen's antipsychotic medication, Risperdal® (risperidone) Tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg, and 4 mg, first approved by FDA over 14 years ago.  Risperdal® Tablets command a $2.5 billion market that currently is protected by a period of pediatric exclusivity that expires on June 29, 2008.

Janssen initially submitted information to FDA on two patents for listing in FDA's Orange Book in connection with Risperdal® Tablets:  U.S. Patent No. 4,804,663 ("the '663 patent") and the '952 patent.  (*See* Teva Mem. Ex. 2, FDA C.P. Denial at 4.)  According to FDA, on April 4, 2001, Janssen requested that FDA remove the '952 patent from the Orange Book listing for 1 mg, 2 mg, 3 mg, and 4 mg Risperdal® Tablets.  (*See id.*)  Two months later, on June 11, 2001, Janssen requested that the '952 patent also be delisted in connection with the 0.25 and 0.5 mg tablet strengths.  (*See id.*)  That same day, "FDA modified its patent listing database . . . to remove the '952 patent from the entries for Risperdal tablets."  (*Id.*)  Therefore, by no later

---

[2] FDA's opposition brief addresses the relevant Hatch-Waxman statutory framework.  Mylan will not repeat that explanation here, but rather only will set forth those facts most pertinent to FDA's February 26, 2008 administrative decision and Mylan's risperidone ANDA.

than June 11, 2001, the '663 patent was (and remains today) the only patent that remains listed in the Orange Book in connection with Risperdal® Tablets. The '663 patent expired on December 29, 2007, but its associated period of pediatric exclusivity does not expire until June 29, 2008. (*See id.*)

## II.    Teva's Paragraph IV ANDA And Petition To FDA.

On or about August 28, 2001, Teva submitted an ANDA (No. 76-228) for risperidone tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg, and 4 mg, containing a paragraph III certification to the '663 patent and a paragraph IV certification to the '952 patent. (*See* Teva Mem. at 12.) Because the '952 patent was not listed in the Orange Book on the date of Teva's ANDA submission, FDA refused to accept the ANDA and contacted Teva, requesting that Teva remove its paragraph IV certification to the '952 patent. (*See* Teva Mem. Ex. 2, FDA C.P. Denial at 5.) Teva did so on October 22, 2001. (*See id.*; *see also* FDA Mem. Ex. A.) In its letter to FDA, Teva acknowledged that "[the '952 patent] has been officially delisted from the Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book)." (FDA Mem. Ex. A.) Only *after* FDA received Teva's corrected patent certification did the Agency accept Teva's ANDA for filing. (*See* Teva Mem. Ex. 2, FDA C.P. Denial at 5.)

On August 3, 2007, nearly 6 years after Teva withdrew its paragraph IV certification to the '952 patent, Teva submitted a citizen petition to FDA requesting that the Agency re-list the '952 patent for the 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg, and 4 mg strengths of Risperdal® Tablets, and confirm Teva's eligibility for 180-day exclusivity for its risperidone ANDA. (*See* Teva Mem. Ex. 1, Teva C.P.) According to Teva, it is entitled to such relief because the '952 patent appeared in the annual paper edition of the Orange Book at the time that Teva submitted its ANDA. (*See id.* at 1-2; *see also* Teva Mem. Ex. 2, FDA C.P. Denial at 1.) Teva argued that the D.C. Circuit's 2006 decision in *Ranbaxy Laboratories Ltd. v. Leavitt*, 469

F.3d 120 (D.C. Cir. 2006), supports its request because that case purportedly "prevent[s] FDA from effectuating the delisting of a patent following the submission of a paragraph IV certification as to that patent."  (*See* Teva Mem. Ex. 1 at 3.)  Teva is mistaken and thus FDA not surprisingly denied Teva's citizen petition.

According to its February 26, 2008 ruling, FDA denied Teva's petition because "the '952 patent was delisted before Teva submitted ANDA 76-228 to FDA."  (Teva Mem. Ex. 2, FDA C.P. Denial at 1.)  FDA is correct.  As the Agency explained, FDA had "modified its patent listing database on June 11, 2001, to remove the '952 patent from the entries for Risperdal tablets . . . in response to [Janssen's] requests."  (*Id*. at 4.)  The electronic Orange Book reflected this delisting "shortly after June 29, 2001, and no later than July 20, 2001, the date of the next database update.  An applicant searching the publicly available, electronic Orange Book after July 20, 2001, would have found that only the '663 patent was listed for Risperdal tablets."  (*Id*. at 4-5.)  Consequently, "[t]he '952 patent was delisted for Risperdal tablets before *any* applicant, including Teva, submitted an ANDA referencing that drug."  (*Id*. at 8) (emphasis added).  FDA thus correctly concluded that, "[a]s the '952 patent was no longer listed for the reference listed drug when Teva's ANDA 76-228 was submitted, a certification to the '952 patent was neither necessary nor permitted."  (*Id.* at 7.)  As a result, "[t]he Teva ANDA, as received by [the Agency], did not contain a paragraph IV certification to any listed patent for Risperdal tablets," and thus the Agency refused to relist the '952 patent.  (*Id*. at 5-6.)

FDA's administrative ruling also explained why the *Ranbaxy* decision does not support Teva's request.  Specifically, "the factual predicate upon which the *Ranbaxy* decision was based is absent from Teva's risperidone ANDA."  (Teva Mem. Ex. 2, FDA C.P. Denial at 8.)  As FDA noted, "[i]n *Ranbaxy*, the patents had been listed for Zocor (simvastatin) at the time

Ranbaxy and Ivax . . . submitted their paragraph IV certifications." (*Id.*) Indeed, "[t]he NDA holder's request to delist the patents for simvastatin came almost 2 years *after* the Ranbaxy ANDA was submitted and almost 3 years *after* the Ivax ANDA was submitted." (*Id.*) "In contrast, [Janssen] requested that the '952 patent for Risperdal be delisted 2 to 4 months *before* Teva's ANDA for risperidone was submitted. Moreover, the fact of patent delisting was available in the electronic Orange Book at least 1 month before Teva submitted its application." (*Id.*) Consequently, FDA concluded that, "[b]ecause the '952 patent was properly delisted and Teva's ANDA could not contain a paragraph IV certification for that patent, *Teva is not eligible for 180-day exclusivity* for ANDA 76-228." (*Id.* at 9) (emphasis added).

Teva's suit challenges this February 26, 2008 administrative decision.

### III.    Mylan's ANDA For Risperidone.

Like Teva, Mylan filed an ANDA (No. 76-288) for risperidone tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg, and 4 mg. As required under the FFDCA and FDA's regulations, Mylan searched FDA's Orange Book, including the electronic Orange Book, prior to submitting its ANDA to ascertain which patents were listed for Janssen's Risperdal® Tablet NDA, and found that only the '663 patent was listed at the time. (*See* Rakoczy Decl. Ex. B, Harper Decl. ¶ 7.) Mylan's original ANDA thus contained a paragraph III certification to the '663 patent, and no other certifications. (*See id.*)[3]

On March 31, 2004, FDA awarded Mylan tentative approval for its risperidone ANDA, indicating that Mylan's ANDA product is safe and effective for use consistent with Mylan's proposed labeling, and that the only impediment to final Agency approval is Risperdal's remaining period of pediatric exclusivity. (*See id.* ¶ 8; *see also* Rakoczy Decl. Ex. C,

---

[3] Mylan subsequently submitted a paragraph IV certification to the '663 patent, but this is not relevant here and so is not discussed further.

Drugs@FDA Listing for Risperidone.)  Mylan thus is entitled to, and expects to receive, final approval as soon as Janssen's pediatric exclusivity period expires on June 29, 2008.  (*See* Rakoczy Decl. Ex. B, Harper Decl. ¶ 8.)  An order granting Teva's requested injunctive relief would strip Mylan of the timely final approval to which it is statutorily entitled.

## ARGUMENT

A motion for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *accord Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  Where, as here, the Court is entertaining "a plaintiff's motion for preliminary injunctive relief . . . the requirement for substantial proof is much higher." *Mazurek*, 520 U.S. at 972.  To prevail, the moving party must establish: (1) a substantial likelihood of success on the merits; (2) that irreparable harm will result in absence of the relief sought; (3) that injunctive relief, if granted, would not harm other interested parties; and (4) that the issuance of an injunction is in the public interest.  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *accord CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995); *Apotex Inc. v. FDA*, 508 F. Supp. 2d 78, 82 (D.D.C. 2007).  The Court must consider the strength of the movant's arguments in each of the required areas, but should deny injunctive relief altogether if the movant fails to show a substantial likelihood of success on the merits.  *See Apotex Inc. v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006) (summarily affirming the denial of a preliminary injunction solely because the movant had "little likelihood of success on the merits of its claim"); *see also Dodd v. Fleming*, 223 F. Supp. 2d 15, 20 (D.D.C. 2002) (stating that "absent a 'substantial indication' of likely success on the merits, 'there would be no justification for the court's intrusion into the ordinary processes of administrative and judicial review'" (citation omitted)).

Here, Teva has not, and indeed cannot, show that it is likely to succeed on the merits, and significant irreparable harm will befall every other approvable risperidone tablet applicant, including Mylan, if an injunction is issued.  Teva's motion, therefore, must be denied.

**I.    Teva Has No Likelihood Of Succeeding On The Merits.**

Where there "is no basis for a judgment" that the movant "is likely to succeed on the merits of any of its claims . . . it is clear that a preliminary injunction is unwarranted." *Tenacre Found. v. INS*, 78 F.3d 693, 696 (D.C. Cir. 1996).  Such is the case here.  FDA based its refusal to award Teva 180-day exclusivity on its consideration of all relevant factors, including uncontradicted evidence that the '952 patent was properly delisted from FDA's Orange Book *prior* to Teva's paragraph IV ANDA submission, and thus could not give rise to a period of generic marketing exclusivity.  The FFDCA and the Agency's own implementing regulations support – and indeed compel – this conclusion.  Furthermore, FDA more than adequately articulated the basis for its decision in the Agency's February 26, 2008 denial of Teva's citizen petition.  As such, FDA cannot be said to have acted in a manner that is arbitrary, capricious, or contrary to law under the APA.

Teva argues that it is entitled to 180-day exclusivity for risperidone tablets purportedly because, on the date it submitted its ANDA, the '952 patent was listed in the 2001 annual edition of the Orange Book in connection with Risperdal® Tablets and the then-current monthly supplement reflected no changes or deletions to the patent information for that NDA drug product.  Teva cannot prevail for several reasons.

As an initial matter, Teva is estopped from making this argument based on its own previous admission that the '952 patent had been "*officially delisted* from the . . . Orange Book."  (*See* FDA Mem. Ex. A) (emphasis added).  Teva made this statement at the same time that it corrected its improper paragraph IV certification to the '952 patent.  (*See id.*)  Having

previously represented without qualification that the '952 patent was "officially" delisted, Teva cannot now argue that the '952 patent remained listed FDA's "official" Orange Book at the time of Teva's submission.

Further, Teva cannot prevail because the '952 patent, without dispute, was *not* a listed patent on the date that Teva submitted its ANDA. Teva cannot ignore the patent information made publicly available through FDA's electronic Orange Book. Indeed, Teva never claims that it did not know about the electronic Orange Book in making its ANDA submission. Nor could it. The very Cumulative Supplement upon which Teva claims to have relied in submitting its paragraph IV certification, states:

> *There is an Electronic Orange Book Query (EOB)* at http://www.fda.gov/cer/ob. The Query provides searching of the approved drug list by active ingredient, proprietary name, applicant holder or applicant number. . . . There are links to patent and exclusivity information that may be applicable to each product.

(Teva Mem. Ex. 4, Aug. 2001 Cumulative Supp. at vi) (emphasis added).

Moreover, Teva does not contest the fact that, well prior to its ANDA submission, the electronic Orange Book plainly identified the '663 patent as the only listed patent for Risperdal® Tablets. Again, nor could it. FDA already has provided copies of the Agency's patent database as it appeared on June 29, 2001. This documentation confirms that the electronic Orange Book contained no reference whatsoever to the '952 patent by the time Teva submitted its ANDA. (*See* Teva Mem. Ex. 2, FDA C.P. Denial at 7, Ex. 2.) As FDA noted, "[t]his is the same patent information that would have been available to an applicant searching the electronic Orange Book any time after July 20, 2001." (*Id.* at 7.) Teva has provided no evidence to the contrary. Instead, Teva's own ANDA correspondence acknowledges that, before its ANDA had been accepted, the '952 patent "ha[d] been officially delisted from the . . . Orange Book." (FDA Mem. Ex. A.) Thus, all evidence establishes that the '952 patent had been removed from the

Orange Book at least one month prior to Teva's paragraph IV certification to that patent. Again, Teva has not, and cannot, come forward with any evidence to the contrary regarding the content of the electronic Orange Book. Indeed, Teva never claims to have consulted the electronic Orange Book and found information contrary to the facts set forth here and, as a sophisticated pharmaceutical company, Teva well knew by 2001 that it needed to consult the electronic Orange Book.[4]

With proof from FDA's electronic patent database reflecting that the '952 patent no longer appeared in the Orange Book at the time of Teva's original ANDA submission, Teva argues that this fact is "legally immaterial to the question of whether Teva was legally required to submit . . . a Paragraph IV certification to the '952 patent." (Teva Mem. at 20-21.) Teva, likewise, contends that the 2001 Annual Edition of the Orange Book and August 2001 Cumulative Supplement were "the only relevant sources of patent-listing information at the time Teva submitted its ANDA for generic risperidone tablets," and that Teva was "legally entitled" to rely solely on these two sources in submitting its ANDA. (Teva Mem. at 5, 21.) As discussed at length in FDA's opposition brief, however, nothing in the FFDCA or FDA's regulations allows generic applicants to rely solely on information available in the Agency's written paper publications, nor does the FFDCA or Agency regulations deem the paper Orange Book the sole source of patent listing information. (*See* FDA Mem. at 4-5, 17-19.)

Teva asserts that "FDA's own regulations . . . directed applicants to consult the Agency's printed monthly Cumulative Supplement to the Orange Book—not the electronic Orange Book or any other part of the Agency's website—in order to obtain the latest patent

---

[4] In the event the Court is considering awarding the relief Teva seeks, the Court should allow a brief period of discovery of Teva to ascertain whether, in fact, Teva knew (or as a sophisticated pharmaceutical company should have known) that the '952 patent had been delisted prior to Teva's ANDA submission based upon its review of the electronic Orange Book.

listing information . . . ."   (Teva Mem. at 4.)   Yet, the only regulation Teva cites for this proposition is 21 C.F.R. § 314.53 and that regulation says nothing of the kind.  The regulation merely states that "FDA will publish in the list the patent number and expiration date of each patent that is required to be, and is, submitted to FDA by an applicant," and that "FDA will publish such patent information upon approval of the application, or, if the patent information is submitted by the applicant after approval of an application . . . , as soon as possible after the submission to the agency . . . ."  21 C.F.R. § 314.53(e).  In other words, the regulation states that patent information submitted by the NDA-holder for listing will be published by FDA as soon as possible, and that new information will be published in a monthly supplement.

Teva makes much of the fact that the regulation also provides that "[p]atent information submitted by the last working day of a month will be published in that month's supplement to the [Orange Book] list."  (*See* 21 C.F.R. § 314.53(e), *quoted in* Teva Mem. at 10.)  But this regulatory provision provides no support for Teva's position.  This provision says nothing more than the Agency will publish *new* patent information in a monthly supplement— nowhere does the regulation state that the monthly supplement must contain information on the *removal* of patent listings.  Indeed, FDA has never interpreted the statute or its regulations as having that requirement.  As FDA pointed out in its denial of Teva's citizen petition, "the printed cumulative supplements to the Orange Book *do not include information on patent delistings*."  (*See* Teva Mem. Ex. 2, FDA C.P. Denial at 6 n.12.)  Rather, as FDA explained, the electronic Orange Book is to be used in conjunction with FDA's written publications.  (*See id*.)

Similarly, § 314.53(f) also provides no support for Teva's position.  Teva argues that it can rely on the information contained in the annual printed edition of the Orange Book because FDA's regulations supposedly require applicants to certify to "each listed patent"

"despite any disagreement as to the correctness of the patent information."  (*See* Teva Mem. at 11 (quoting 21 C.F.R. § 314.53(f)).  As an initial matter, this regulatory provision does not apply here because it specifically refers solely to "listed" patents, and the '952 patent was no longer "listed" as of the time of Teva's ANDA submission.  But the real significance of this provision is found in the language that Teva omitted from its brief:  § 314.53(f) provides that a certification is required *only* "[i]f the new drug application holder does not change the patent information submitted to FDA."  21 C.F.R. § 314.53(f).  Here, Janssen indisputably "change[d] the patent information submitted to FDA" by *twice* requesting that the Agency delist the '952 patent in connection with its Risperdal® Tablet NDA.  Thus, FDA's regulations did not (and could not) require Teva to certify to the '952 patent.

Finally, the printed paper version of the Orange Book itself does not allow Teva to ignore patent information readily available in the electronic Orange Book.  As Teva concedes, the Patent and Exclusivity Information Addendum to the 2001 annual edition of the Orange Book specifically states that "[s]ince all parts of this publication are subject to changes, additions, or deletions, the *Addendum* must be used in conjunction with the most current Cumulative Supplement."  (Teva Mem. Ex. 3, 2001 Orange Book at AD-2.)  And, as explained above, the Cumulative Supplement, in turn, specifically references the electronic Orange Book, which contains "links to patent and exclusivity information that may be applicable to each product."  (Teva Mem. Ex. 4, Aug. 2001 Cumulative Supp. at vi.)  Moreover, as FDA has explained, "the publishing history of the Orange Book, prominently displayed on the inside front cover of the printed [2001] annual edition of the Orange Book, also indicates, among other things, that the Orange Book is . . . 'Updated on the Internet.'"  (Teva Mem. Ex. 2, FDA C.P. Denial at 7.)  Thus, by 2001, each ANDA applicant knew that the electronic Orange Book

needed to be consulted for updated patent information prior to submitting any patent certifications.[5]

As FDA detailed in its 9-page denial of Teva's citizen petition, because the '952 patent was not listed in the Orange Book at the time of Teva's ANDA submission, Teva's ANDA could not lawfully contain a paragraph IV certification to that patent. (*See* Teva Mem. Ex. 2, FDA C.P. Denial at 3, 7-8.) The statute also makes clear that, without a proper paragraph IV certification, there can be no generic exclusivity. The generic exclusivity provision prevents FDA from approving an ANDA for a particular generic drug for 180 days *only* when there is a "previous application" on file that "contains a [paragraph IV] certification." *See* 21 U.S.C. § 355(j)(5)(B)(iv). Teva's ANDA did not "contain" such a certification. Consequently, Teva never had a valid claim to generic exclusivity. The *Ranbaxy* decision does not hold otherwise.

*Ranbaxy* is drastically different from this case—both factually and legally. There, the patents to which Ranbaxy and Ivax had certified were, without dispute, listed in FDA's Orange Book at the time that they submitted their simvastatin ANDAs. In fact, the NDA-holder

---

[5] The Cumulative Supplement states that the electronic Orange Book is "updated concurrently with the publication of the annual edition [of the Orange Book] or monthly cumulative supplements." (Teva Mem. Ex. 4, Aug. 2001 Cumulative Supp. at vi.) From this, Teva leaps to the unwarranted conclusion that "the only conceivable interpretation of that statement is that the electronic Orange Book would have contained the same information as the current Cumulative Supplement." (*See* Teva Mem. at 23.) As explained above, however, FDA's printed cumulative supplements to the Orange Book *had never included information on patent delistings* at the time of Teva's submission. (*See* Teva Mem. Ex. 2, FDA C.P. Denial at 6 n.12.) Indeed, the Introduction to the August 2001 Cumulative Supplement supports this fact. For instance, the Cumulative Supplement states that "*additions* to the Prescription Drug Product List[,] OTC Drug Product List . . . [and] Patent and Exclusivity Data are indicated by [a] symbol . . . ." (Teva Mem. Ex. 4, Aug. 2001 Cumulative Supp. at iv) (emphasis added). When discussing *deletions*, however, the Supplement solely mentions "[n]ew deletions to the Prescription Drug Product List and OTC Drug Product List"—it makes *no* reference whatsoever to any deletions of patent information included in the Patent and Exclusivity Data. (*See id.*) Thus, because patent delistings were *never* included in Cumulative Supplements, it was not only conceivable, but expected, that the information contained in the electronic Orange Book would not correspond exactly to the information contained in the Cumulative Supplement for the same month.

did not request that FDA delist its patents until almost *two years* after Ranbaxy submitted its ANDA, and almost *three years* after Ivax submitted its ANDA. *See Ranbaxy Labs., Ltd. v. Leavitt*, 459 F. Supp. 2d 1, 5 (D.D.C. 2006). In stark contrast, here, Janssen requested that FDA delist the '952 patent from the Orange Book in both April 2001 and June 2001—months *before* Teva submitted its risperidone ANDA. FDA's refusal to award Teva exclusivity based on a patent that Teva concedes had been "officially delisted" before its ANDA was accepted, therefore does not give rise to the same policy concerns that lead to the *Ranbaxy* decision.

The legal claims on which the two cases are based also differ significantly. In *Ranbaxy*, the applicants challenged the Agency's policy of conditioning 180-day exclusivity on whether the generic applicant had been sued for patent infringement. *See Ranbaxy*, 469 F.3d at 126. Here, Teva challenges the *procedure* of FDA's patent delisting practice and whether the Agency has properly administered the statute and its regulations by updating patent information through its electronic Orange Book. The *Ranbaxy* decision has nothing to offer this Court on this matter, other than to confirm that "21 U.S.C. § 355(j)(5) is silent with regard to the withdrawal of patent information previously submitted for listing in the Orange Book." *See id*. at 124.

In sum, the administrative decision which Teva challenges here is entirely consistent with (and required by) the statute and FDA's regulations, and does *not* contradict the *Ranbaxy* decision. Because Teva cannot show that it is likely to succeed on the merits of its case, the Court should deny injunctive relief on this basis alone. *See Apotex*, 449 F.3d at 1253-54.

**II.    The Balance of Harms Weighs Heavily In Favor Of Denying Injunctive Relief.**

Even if the Court considers the balance of hardships in this case, the Court should deny the injunctive relief Teva requests.  In assessing this factor, the Court must balance all hardships, *i.e.*, the harm that the movant will likely suffer absent an injunction against the likely harm the non-movant will suffer if the injunction issues.  Here, not only has Teva failed to establish facts to support a substantial likelihood of succeeding on the merits, but the balance of hardships also requires that this Court deny Teva's requested relief.[6]

Mylan unquestionably will suffer severe and irreparable harm if an injunction is awarded.  Mylan is entitled to, and expects to receive, final approval of its risperidone ANDA on June 29, 2008, once Janssen's pediatric exclusivity expires.  If Teva's motion is granted, however, Mylan's market entry will be delayed by at least six months, while Teva enjoys a 180-day monopoly over all generic sales in a $2.5 billion market.

As Teva concedes, the first generic entrant to the market establishes market dominance, which is very difficult for other subsequent entrants to overcome.  (*See* Rakoczy Decl. Ex. B, Harper Decl. ¶ 10; *see also* Teva Mem. at 27-28.)  Moreover, the first generic company to enter the market also usually maintains a significant portion of the generic market well beyond the 180-day exclusivity period.  (*See* Rakoczy Decl. Ex. B, Harper Decl. ¶ 11.)  This is because the first company to reach the marketplace in essence fills the pipeline and, in Teva's own words, gives the first entrant the opportunity to "enter into long-term sales agreements . . . and retain greater market share in the long-run."  (*See id.*; *see also* Teva Mem. at 28.)  It is thus

---

[6] FDA more than adequately addresses the irreparable harm point in its opposition brief.  (*See* FDA Mem. at 22-25.)  For its part, Mylan again points out that Teva's 6-year delay in raising this issue undermines its claim of irreparable injury.  *See Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *see also Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d. 30, 43 (D.D.C. 2000).

unclear how Teva can reasonably claim that no "private parties [will] suffer significant harm from the entry of an injunction," when the harm Mylan and every other risperidone applicant would face, both during and after an unwarranted period of marketing exclusivity, is the exact same type of harm that Teva claims entitles it to injunctive relief. (*See* Teva Mem. at 29.) It is even more perplexing given that Mylan, unlike Teva, faces the threat of being prevented from entering this lucrative market for half a year, if not more.

If an injunction were awarded and Mylan was prevented from entering the generic risperidone market by 180 days, Mylan projects that it will lose considerable market share. (*See* Rakoczy Decl. Ex. B, Harper Decl. ¶ 12.) In particular, Mylan estimates that it would achieve only about 5-10% of the market once Teva's period of exclusivity ends. (*Id.*) On the other hand, if Teva is not given a 180-day head-start, Mylan conservatively estimates that it could achieve up to 20% of the market if all approvable risperidone applicants were allowed to enter the market on June 29, 2008. (*Id.*) As Teva concedes, Mylan will never be able to "make up for" these lost sales. (*See id.*; *see also* Teva Mem. at 28 (stating that "it is impossible to 'make up' for a lost sale by filling a subsequent prescription").) Moreover, as Teva also concedes, if the Agency were required to award Teva an unlawful period of exclusivity, Mylan would not be able to recover any lost revenues from FDA. (*See* Rakoczy Decl. Ex. B, Harper Decl. ¶ 12; *see also* Teva Mem. at 28 (stating that "since [FDA is] immune from money damages, there is no way to recoup the substantial lost revenue opportunities").)

Furthermore, there is no guarantee that a preliminary injunction will not delay generic risperidone competition for much longer than 180 days. If Teva were awarded generic exclusivity, nothing in the statute requires Teva to launch its risperidone tablets immediately upon expiration of Janssen's pediatric exclusivity. In fact, it is possible that Teva's ANDA will

not even be approved at that time. Teva does not yet appear to have tentative approval, and FDA itself has indicated that final approval of Teva's ANDA come June 29, 2008 is not a certainty. (*See* Rakoczy Decl. Ex. C, Drugs@FDA Listing for Risperidone; *see also* FDA Mem. at 25.) And, of course, even if Teva had final approval, it might not immediately launch. With respect to its generic Zoloft® product, Teva did not launch as soon as it lawfully could. Instead, Teva delayed launching until it had manufactured what it deemed sufficient quantities of product. Consequently, a preliminary injunction could thus cause Mylan to suffer losses far in excess of its original projected estimate.

The balance of hardships thus tips decidedly in favor of denying Teva its requested relief.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Teva's motion for expedited preliminary injunctive relief.

Dated: March 26, 2008.                                    Respectfully submitted,

MYLAN PHARMACEUTICALS INC.

By:    */s/ William A. Rakoczy*
One of its attorneys

William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
Lara E. FitzSimmons
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Mylan Pharmaceuticals Inc.*

## CERTIFICATE OF SERVICE

I, William A. Rakoczy, HEREBY CERTIFY that on this 26th day of March 2008, a true and correct copy of **Mylan Pharmaceuticals Inc.'s Opposition to Teva's Motion for a Preliminary Injunction** was served via the Court's electronic filing system upon the following:

Jay P. Lefkowitz
Michael D. Shumsky
Gregory L. Skidmore
KIRKLAND & ELLIS LLP
655 15th Street N.W., Suite 1200
Washington, D.C. 20005
*Counsel for the Plaintiff Teva Pharmaceuticals USA, Inc.*

Drake Cutini
U.S. Department of Justice
Office of Consumer Litigation
Room 950 North
1331 Pennsylvania Ave., N.W.
Washington, D.C. 20004
*Counsel for the Federal Defendants*

_____*/s/ William A. Rakoczy*_____
William A. Rakoczy
*Counsel for Mylan Pharmaceuticals Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

TEVA PHARMACEUTICALS USA, INC.,

    Plaintiff,

  v.

MICHAEL O. LEAVITT, Secretary of
Health and Human Services,

ANDREW C. VON ESCHENBACH,
Commissioner of Food and Drugs, and

U.S. FOOD AND DRUG ADMINISTRATION,

    Defendants,

MYLAN PHARMACEUTICALS INC.,

    Intervenor-Defendant.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 08-cv-395 (RCL)

## <u>DECLARATION OF WILLIAM A. RAKOCZY</u>

I, WILLIAM A. RAKOCZY, declare as follows:

1.  I am William A. Rakoczy, a partner of Rakoczy Molino Mazzochi Siwik LLP,

counsel for Intervenor-Defendant Mylan Pharmaceuticals Inc.("Mylan") in this matter.

2.  I am a practicing attorney and am a member in good standing of the bars of the

District of Columbia (2004) and the State of Illinois (1995), as well as the following courts:

United States Supreme Court (2003); the United States Courts of Appeals for the Fourth Circuit

(2005), the Third Circuit (2003), the District of Columbia Circuit (1999), the Federal Circuit

(1999), and the Seventh Circuit (1995); and the United States District Courts for the District of

Columbia (2005), the Western District of Wisconsin (2001), and the Northern District of Illinois

(1995).

3.     I submit this Declaration in support of Mylan's Opposition to Teva's Motion for a Preliminary Injunction, and, in particular, to authenticate and provide to the Court certain exhibits cited and referenced therein.

4.     I have personal knowledge of the facts stated in this Declaration and am competent to testify to the same.

5.     Attached hereto as Exhibit A is a true and correct copy of Teva Pharmaceuticals USA's June 8, 2005 Response to Citizen Petition Nos. 2005P-0008 and 2005P-0046, excluding the exhibits attached thereto.

6.     Attached hereto as Exhibit B is a true and correct copy of the Declaration of Jason Harper, Executive Director of Product Portfolio Management for Mylan Pharmaceuticals Inc.

8.     Attached hereto as Exhibit C is a true and correct copy of the Drugs@FDA, FDA Approved Drug Products listing for generic risperidone tablets.

9.     The foregoing facts are true and correct as I verify and believe.

Dated: March 26, 2008.

I, William A. Rakoczy, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

_/s/ William A. Rakoczy_
William A. Rakoczy

# Exhibit A

to

Declaration of William A. Rakoczy

(Teva Pharmaceutical USA's June 8, 2005 Comments and
Response to Citizen Petition Nos. 2005P-0008 and 2005P-0046)



**Administrative Offices:**
TEVA PHARMACEUTICALS USA
1090 Horsham Road, PO Box 1090
North Wales, PA 19454-1090

1 5 2 0    5    JUN -9    A9 :16

**Deborah A. Jaskot, M.S., RAC**
Vice President, Regulatory Affairs

Direct Dial: (215) 591 3142
Direct FAX: (215) 591 8812
deborah.jaskot@tevausa.com

June 8, 2005

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane
Room 1061 (HFA-305)
Rockville, Maryland 20857

**Re:    Response to Citizen Petitions by Ivax Pharmaceuticals, Inc. and
Ranbaxy Laboratories Limited
Docket Nos. 2005P-0008; 2005P-0046**

These comments are respectfully submitted in response to the above-referenced Citizen Petitions, filed by Ivax Pharmaceuticals, Inc. ("Ivax") on January 5, 2005, and Ranbaxy Laboratories Limited ("Ranbaxy") on February 1, 2005. In their Petitions, Ivax and Ranbaxy request that the Food and Drug Administration ("FDA") reverse its decision to de-list from the Orange Book two patents for which Ivax and Ranbaxy had previously filed Paragraph IV Certifications in their respective Abbreviated New Drug Applications ("ANDAs") for generic versions of Merck & Co.'s Zocor® (simvastatin) tablets. Petitioners also request that FDA delay approval of any other simvastatin tablet ANDAs until 180 days after the first commercial marketing of their respective simvastatin products under their ANDAs.

Ivax's and Ranbaxy's Petitions are without merit and should be denied, because the patents at issue were improperly listed in the first instance as they do not claim the listed drug. Errors that occur with respect to the listing of patents should always be subject to correction, and should not be the basis for a 180-day exclusivity period. Petitioners are merely seeking to gain a specific benefit to which they were never lawfully entitled – i.e., a 180-day exclusivity period based on patents that do not qualify for listing in the Orange Book, and to force upon FDA and the generic industry a rule that makes no sense and which would lead to absurd results.

## I.    BACKGROUND

The FDCA requires that a sponsor of a New Drug Application ("NDA") must submit information to FDA with respect to "any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1). There does exist the possibility and, in fact, it sometimes occurs that improper patents (e.g., patents that do not claim the NDA drug, or an approved use of the drug) are submitted to FDA and listed in the Orange Book and it is appropriate that such errors be subject to correction.



1



When a generic drug applicant files an ANDA, it is required by law to submit one of four types of patent certifications "with respect to each patent which claims the listed drug…or which claims a use for such listed drug for which the applicant is seeking approval and for which information is required to be filed [by the NDA holder for the listed drug]." In practice, FDA only requires patent certifications to be filed or maintained by an ANDA applicant with respect to patents that are listed in the Orange Book. Thus, if an improper patent is initially listed, but is subsequently withdrawn from the Orange Book, an ANDA applicant's obligation to maintain any certification to that patent ceases. That is what happened with respect to simvastatin.

At the time Ivax submitted its ANDA in December 2000, there were three patents listed, at Merck's request, for Zocor in the Orange Book. These were U.S. Patent No. 4,444,784 ('the '784 patent), that claimed simvastatin and the use of simvastatin to treat high cholesterol; and two re-issued U.S. Patents: Nos. RE36,481 (the '481 patent) and RE26520 (the '520 patent). Ivax and Ranbaxy filed paragraph III certifications with respect to the '784 patent, and paragraph IV certifications with respect to the '481 and the '520 patents. Merck did not file a patent infringement lawsuit against any Paragraph IV ANDA applicant within the relevant statutorily mandated 45-day periods after receiving Ivax's and other applicants' Paragraph IV Notifications.

On or about November 3, 2003, FDA received a letter asserting that the '481 and '520 patents did not claim the reference listed drug Zocor, and requesting that FDA initiate its administrative procedure for determining whether those patents may remain listed in the Orange Book. Letter from Steven J. Lee, Esq. to FDA's Drug Information Services Branch (Nov. 3, 2003) (Exhibit A hereto). FDA's de-listing procedure involves FDA forwarding the listing challenge to the NDA holder (Merck) with a request to confirm whether the patent(s) should remain listed. *See* 21 C.F.R. § 314.53(f). Mr. Lee's de-listing request letter noted that the '481 and '520 patents do not claim simvastatin, but rather different compounds that are not present in the approved finished drug product Zocor, and requested that FDA forward the letter to Merck.

After receiving Mr. Lee's letter from FDA, Merck evidently realized its mistake in submitting these patents to FDA for listing in the Orange Book and thus requested that FDA de-list the patents. Following that request, FDA removed the two patents from the Orange Book in September 2004. As a result of these de-listings, all ANDA applicants are required to amend their paragraph IV certifications with respect to the two patents as required by FDA's regulations. 21 C.F.R. § 314.94(a)(12)(viii)(B). Ivax and Ranbaxy refuse to do so, however, and have instead submitted the above-referenced Petitions. As demonstrated herein, the Petitions are without merit and should be denied.

## II.    INCORRECTLY LISTED PATENTS CANNOT SUPPORT EXCLUSIVITY

The fundamental flaw of the Ivax/Ranbaxy Petitions is that they request FDA to expand the scope of the 180-day exclusivity period provisions of the FDCA in a way that is contrary to the plain language of the statute and FDA's governing regulations. Petitioners' position would require FDA to grant and enforce exclusivity based on Paragraph IV Certifications to patents that do not claim the listed drug. This would be legally improper and bad policy.

2

As FDA is well aware, in matters of implementing the FDCA (or any federal regulatory statute) the first, and often last, interpretive step is to determine whether the statute clearly addresses the issue. If the statute is clear, that is the end of the inquiry and the agency must effectuate the statutory mandate. [See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984).] Here, the clear statutory mandate precludes the interpretation proffered by the Petitioners by limiting 180-day exclusivity solely to ANDAs that contain the first Paragraph IV Certification to a patent that claims the reference listed drug. Specifically, the statutory exclusivity provision, 21 U.S.C. § 355(j)(5)(B)(iv), gives rise to exclusivity only where an ANDA contains a certification "described in" 21 U.S.C. § 355(j)(2)(A)(vii)(IV). That provision in turn only "describes" certifications to patents "which claim[] the listed drug…or…a use for such listed drug…and for which information is required to be filed under [21 U.S.C. § 355] subsection (b) or (c)." Subsections (b) and (c) likewise require the filing of information by an NDA sponsor, and the listing of such information in the Orange Book, only with respect to patents which claim the reference listed drug or a use of the drug. 21 U.S.C. §§ 355(b)(1), (c)(2). Where, as here, information on a patent is initially incorrectly submitted and listed, but the NDA sponsor, upon further investigation, determines that the patent does not cover the listed drug, the patent was never eligible for listing in the Orange Book, and no ANDA applicant was ever lawfully entitled to exclusivity as to that patent. In such an instance, it is appropriate that the NDA sponsor be permitted to de-list the patent(s).

## III.    FDA HAS NOT ACTED INCONSISTENTLY IN PRIOR DE-LISTING SITUATIONS

FDA's simvastatin decision is consistent with other de-listing decisions including one involving the drug nefazadone. In that case, the NDA holder requested, and FDA agreed to, the de-listing of a patent for which at least one ANDA applicant had filed a Paragraph IV Certification, but for which no patent litigation had been initiated against any applicant. As FDA explained,

> The agency considered and rejected whether, alternatively, it is required to maintain the '664 patent in the Orange Book because at least one ANDA was submitted containing a Paragraph IV Certification, in spite of the fact that no applicant was sued. Under FDA's current interpretation of section 505(j)(5)(B)(iv), the first ANDA applicant to submit a Paragraph IV Certification to a patent need not be sued as a result of that certification to be eligible for 180 days of exclusivity. However, the agency does not believe that because an ANDA applicant may be eligible for exclusivity merely by submitting a Paragraph IV patent challenge, the FDA must maintain the patent listing when no litigation results from that certification and the NDA holder requests that the patent be removed from the list. Moreover, even if FDA were to believe that it would be reasonable to leave a patent in the Orange Book, as a matter of equity based on the broad eligibility for exclusivity under the current regulations, the statutory language giving control over patent listings to the NDA holder, and the very limited exception in the regulations, mitigate against doing so.

Letter from Gary Buehler to Nefazadone HCl Tablet ANDA Applicants (July 31, 2003) (Exhibit B hereto).

In the instance of nefazadone, it was TEVA who was the first applicant to file a Paragraph IV certification to the subsequently de-listed metabolite patent.    Rather than petitioning FDA to maintain such an improper listing to preserve its exclusivity, TEVA acknowledged the Agency's decision as legally appropriate and well aligned with the intentions of the FDCA.[1]

In addition, metabolite patents have been removed for other products at the request of the NDA applicant as noted in Mr. Lee's letter to FDA.

## IV.    CONCLUSION

The Ivax and Ranbaxy Petitions are nothing more than an ill-conceived attempt to extract a benefit to which they are not entitled – namely, exclusivity under patents that are legally incapable of providing exclusivity.    The approach advocated by these companies is not only without support in the law, it would wreak havoc on FDA's implementation of the statutory and regulatory patent listing and 180-day exclusivity period provisions, and would provide no added public benefit.    Accordingly, the petitions should be denied.

Respectfully submitted,

_Deborah Gaskat_

---

[1] We do not address the merits of FDA's "de-listing" regulation (21 C.F.R. §314.94(a)(12)(viii)(B)), because the instant issue is whether improper patent listings can be corrected rather than whether litigation status should affect de-listing.

# EXHIBIT B

to

Declaration of William A. Rakoczy

(Declaration of Jason Harper)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-cv-395 (RCL) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| ANDREW C. VON ESCHENBACH, | ) | |
| Commissioner of Food and Drugs, and | ) | |
| | ) | |
| U.S. FOOD AND DRUG ADMINISTRATION, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| MYLAN PHARMACEUTICALS INC., | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

_____

## DECLARATION OF JASON HARPER

I, JASON HARPER, declare under penalty of perjury as follows:

1.      I am the Executive Director of Product Portfolio Management for Mylan Pharmaceuticals Inc. ("Mylan").  I have been employed by Mylan in various sales and marketing functions for over 12 years.  Mylan develops and manufactures quality generic drugs for sale in the United States.

2.      I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.  I respectfully submit this

declaration in support of Mylan's response in opposition to Plaintiff Teva's motion for a preliminary injunction.

3.      I have worked in the pharmaceutical industry for over 12 years, during which time I have developed experience and knowledge dealing with the marketing and promotion of generic pharmaceutical products.  Based on my experience, I am familiar with the benefits of so-called "180-day exclusivity."  I am also familiar with the harm that a company can suffer when its market entry is delayed.

**A.      Janssen's Brand Product:  Risperdal® (Risperidone) Tablets.**

4.      Janssen Pharma holds an approved NDA for Risperdal® (risperidone) Tablets, a popular antipsychotic medication.  It is my understanding that, in 2007, Janssen's sales for Risperdal® Tablets exceeded $2.5 billion dollars.

5.      FDA's patent database (commonly known as the "Orange Book") currently lists one patent in connection with Janssen's Risperdal® Tablets:  U.S. Patent No. 4,804,663 ("the '663 patent").  According to the Orange Book, the '663 patent expired on December 29, 2007, but the associated period of pediatric exclusivity does not expire until June 29, 2008.

6.      To date, FDA has not approved any abbreviated new drug applications ("ANDAs") for generic versions of Risperdal® Tablets.  It is my understanding, however, that once Janssen's pediatric exclusivity expires on June 29, 2008, all otherwise approvable ANDAs, including Mylan's, will be eligible for final approval on that date.

**B.      Mylan's Risperidone Tablet ANDA.**

7.      Mylan has submitted an ANDA for risperidone tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg, and 4mg.  As required by statute and regulation, prior to submitting its ANDA, Mylan searched FDA's patent database, including FDA's electronic Orange Book, to ascertain which

patents were listed for Janssen's Risperdal® Tablet NDA. This is standard practice in the industry. Mylan found that only the '663 patent was listed at that time, thus Mylan's original ANDA solely contained a patent certification to the '663 patent. Mylan's risperidone ANDA did not contain—and has never contained—a patent certification to any other patents.

8.      On March 31, 2004, FDA awarded Mylan tentative approval for its risperidone tablet ANDA, indicating that Mylan's risperidone products are safe and effective for use consistent with Mylan's proposed labeling, and that the only impediment to final Agency approval is Risperdal's remaining period of pediatric exclusivity. Mylan thus is entitled to, and expects to receive, final approval as soon as Janssen's pediatric exclusivity period expires on June 29, 2008. Mylan is prepared to market its generic risperidone products immediately at that time.

**C.    Irreparable Harm To Mylan.**

9.      If Mylan's final approval is delayed by virtue of an Order from this Court, and Teva is permitted to launch its risperidone products with 180-day exclusivity, Mylan will suffer irreparable harm.

10.     It is my experience that the first market entrant typically gets access to customers to which it might not otherwise have access by virtue of the fact that it offers a generic drug that temporarily is not available from any other supplier. Indeed, in my experience, the first generic market entrant establishes a market position that is difficult for subsequent entrants to overcome.

11.     The first generic company to enter the market also usually maintains a significant portion of the generic market well beyond the 180-day exclusivity period. This is because the first company to reach the marketplace in essence fills the pipeline and is able to enter into long-term contracts with many of the major customers. Consequently, subsequent entrants to the

market find it difficult to find prospective customers, much less recoup product investments and obtain significant market share of their own.

12.     I have analyzed Mylan's potential market share for generic risperidone tablets during the first 12 months of competition with Risperdal® and other generics.  Based on Risperdal's sales for 2007, if Teva is allowed to launch with 180 days of exclusivity, Mylan projects that it will lose considerable market share.  In particular, Mylan likely would achieve only about 5-10% of the market once Teva's period of exclusivity ends.  In the event Teva is not given a 180-day head-start, Mylan conservatively estimates that it could achieve up to 20% of the market if all approvable risperidone applicants were allowed to enter the market on June 29, 2008.  This loss of market share, and the corresponding loss in sales revenue, is unrecoverable. It is my understanding that Mylan has no remedy against FDA to recover its losses if Teva is allowed to commercially launch with exclusivity.

13.     The effects of an exclusive launch by Teva, however, would extend well beyond the unrecoverable loss of sales, market share, and profits.  If Teva is first to hit the market alone, it will be able to tie up valuable distribution channels so that, even after the six-month head-start, the loss of access to major customers would still make it difficult for Mylan to compete in the risperidone market.

14.     Apart from the lost opportunity for risperidone sales and decreased access to major customers, Mylan also risks losing sales of other generic products.  When companies like Teva have the opportunity to exclusively launch a drug such as a generic equivalent to Risperdal® Tablets, they have significant leverage to sell other products that they manufacture. The presence of an exclusive product is perhaps the single most effective way to increase sales

across other product lines.  Conversely, subsequent entrants to the market like Mylan have no such leverage.

## Conclusion

15.     In sum, if Teva's motion is granted and Teva is given a 180-day head-start in the generic risperidone market, Mylan will irreparably lose market share for this and possibly other products, as well as customer goodwill and access to major customers.

Dated: March 26, 2008

I, Jason Harper, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

Jason Harper

# Exhibit C

to

Declaration of William A. Rakoczy

(Drugs@FDA, FDA Approved Drug Products
listing for generic risperidone tablets)

 

## U.S. Food and Drug Administration

### CENTER FOR DRUG EVALUATION AND RESEARCH


**FDA Approved Drug Products**

FAQ | Instructions | Glossary | Contact Us | CDER Home

Start Over    Back to Search Results

# Overview

| | |
|---|---|
| **Drug Name** | **RISPERIDONE** |
| **Active Ingredient(s)** | • **RISPERIDONE** |
| **Form(s) and Strength(s) Available** | • **SOLUTION; ORAL: 1MG/ML**<br>• **TABLET; ORAL: 0.25MG; 0.5MG; 1MG; 2MG; 3MG; 4MG** |

Details about drugs are organized by FDA Application Number (NDA or ANDA or BLA).

## Click on a drug name or application number to view drug details:

Click on a column header to re-sort the table:

| Drug Name and FDA Application Number | Dosage Form/Route | Strength | Marketing Status | Company |
|---|---|---|---|---|
| RISPERIDONE (ANDA # 076288) | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | MYLAN |
| RISPERIDONE (ANDA # 076440) | SOLUTION; ORAL | 1MG/ML | None (Tentative Approval) | TEVA PHARMS |
| RISPERIDONE (ANDA # 076797) | SOLUTION; ORAL | 1MG/ML | None (Tentative Approval) | PAR PHARM |
| RISPERIDONE (ANDA # 076904) | SOLUTION; ORAL | 1MG/ML | None (Tentative Approval) | ROXANE |
| RISPERIDONE (ANDA # 077416) | SOLUTION; ORAL | 1MG/ML | None (Tentative Approval) | RANBAXY |
| RISPERIDONE (ANDA # 077769) | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | PLIVA |

Back to Top | Back to Previous Page | Back to Drugs@FDA Home

Disclaimer
CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research
Office of Training and Communications
Division of Information Services
Update Frequency: Daily



# U.S. Food and Drug Administration

Department of Health and Human Services

## CENTER FOR DRUG EVALUATION AND RESEARCH



**FDA Approved Drug Products**

**FAQ** | **Instructions** | **Glossary** | **Contact Us** | **CDER Home**

**Start Over**     **Back to Search Results**     **Back to Overview**

# Drug Details

| | |
|---|---|
| **Drug Name(s)** | **RISPERIDONE (Generic Drug)** |
| **FDA Application No.** | **(ANDA) 076288** |
| **Active Ingredient(s)** | **RISPERIDONE** |
| **Company** | **MYLAN** |
| **Original Approval or Tentative Approval Date** | **March 31, 2004** |

- **There are no Therapeutic Equivalents**
- **Approval History, Letters, Reviews, and Related Documents**

- **Labels are not available**

## Products on Application (ANDA) #076288

Click on a column header to re-sort the table:

| Drug Name | Active Ingredients | Strength | Dosage Form/Route | Marketing Status | RLD | TE Code |
|---|---|---|---|---|---|---|
| RISPERIDONE | RISPERIDONE | 0.25MG | TABLET; ORAL | None (Tentative Approval) | No | None |
| RISPERIDONE | RISPERIDONE | 0.5MG | TABLET; ORAL | None (Tentative Approval) | No | None |
| RISPERIDONE | RISPERIDONE | 1MG | TABLET; ORAL | None (Tentative Approval) | No | None |
| RISPERIDONE | RISPERIDONE | 2MG | TABLET; ORAL | None (Tentative Approval) | No | None |
| RISPERIDONE | RISPERIDONE | 3MG | TABLET; ORAL | None (Tentative Approval) | No | None |
| RISPERIDONE | RISPERIDONE | 4MG | TABLET; ORAL | None (Tentative Approval) | No | None |

**Back to Top** | **Back to Previous Page** | **Back to Drugs@FDA Home**

Disclaimer
CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research
Office of Training and Communications
Division of Information Services
Update Frequency: Daily