## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| TEVA PHARMACEUTICALS USA, Inc. | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| MICHAEL O. LEAVITT, in his official capacity | ) |
| as Secretary of Health and Human Services; | )          Case No. 08-395-RML |
|  | ) |
| ANDREW C. VON ESCHENBACH, M.D., in | ) |
| his official capacity as Commissioner of Food and Drugs; | ) |
|  | ) |
| UNITED STATES FOOD AND DRUG | ) |
| ADMINISTRATION, | ) |
|  | ) |
| Defendants, | ) |
|  | ) |
| MYLAN PHARMACEUTICALS INC. | ) |
|  | ) |
| Intervenor-Defendant. | ) |

_____)

## TEVA PHARMACEUTICALS USA, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR EXPEDITED INJUNCTIVE RELIEF

Jay P. Lefkowitz, P.C. (D.C. Bar No. 449280)*
Michael D. Shumsky (D.C. Bar No. 495078)
Gregory L. Skidmore (D.C. Bar No. 974024)
KIRKLAND & ELLIS LLP
655 15th Street N.W., Suite 1200
Washington, D.C.  20005
(202) 879-5000
(202) 879-5200  fax

*Counsel of Record

*Counsel for Teva Pharmaceuticals USA, Inc.*

April 1, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................1

ARGUMENT ...........................................................................................................................5

I.     Teva Is Likely To Succeed On The Merits. .........................................................................5

II.    The Equities Favor Teva. ...............................................................................................18

CONCLUSION.........................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Teva Pharms. USA, Inc.*,
  432 F. Supp. 2d 408 (D. Del. 2006) ................................................................................ 8

*American Bioscience, Inc. v. Thompson*,
  243 F.3d 579 (D.C. Cir. 2001) ...................................................................................... 10

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) ................................................................................... 9, 22

*ANR Pipeline Co. v. FERC*,
  71 F.3d 897 (D.C. Cir. 1995) ....................................................................................... 16

*Apotex, Inc. v. FDA*,
  No. 06-0627-JDB, 2006 WL 1030151 (D.D.C. 2006) ..................................... 4, 10, 19, 20

*Apotex, Inc. v. Thompson*,
  347 F.3d 1335 (Fed. Cir. 2003) ....................................................................................... 9

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*,
  No. 07-0668 (JDB), ___ F. Supp. 2d ___, 2008 WL 564942 (D.D.C. 2008) .................. 18

*Bracco Diagnostics, Inc. v. Shalala*,
  963 F. Supp. 20 (D.D.C. 1997) ..................................................................................... 19

*Collagenex Pharms., Inc. v. Thompson*,
  No. 03-1405-RMC, 2003 WL 21697344 (D.D.C. July 22, 2003) ................................... 19

*George Hyman Const. Co. v. Brooks*,
  963 F.2d 1532 (D.C. Cir. 1992) .................................................................................... 14

*In re Barr Labs., Inc.*,
  930 F.2d 72 (D.C. Cir. 1991) ....................................................................................... 22

*Mova Pharm. Corp. v. Shalala*,
  955 F. Supp. 128 (D.D.C. 1997),
  *aff'd* 140 F.3d 1060 (D.C. Cir. 1998) ........................................................................... 19

*Pfizer Inc. v. Shalala*,
  182 F.3d 975 (D.C. Cir. 1999) ...................................................................................... 14

*Pontchartrain Broad. Co. v. FCC*,
  15 F.3d 183 (D.C. Cir. 1994) ....................................................................................... 16

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
  438 F.3d 1123 (Fed. Cir. 2006)..................................................................................... 8

*Purepac Pharm. Co. v. Thompson*,
  354 F.3d 877 (D.C. Cir. 2004) ...................................................................................... 9

*Sandoz, Inc. v. FDA*,
  439 F. Supp. 2d 26 (D.D.C. 2006),
  *summarily aff'd* 2006 WL 2591087 (D.C. Cir. No. 06-5204, Aug. 30, 2006) ............ 4, 18

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)................................................................................... 14, 15, 17

*Teva Pharms., USA, Inc. v. FDA*,
  182 F.3d 1003 (D.C. Cir. 1999) ................................................................................. 16

**Statutes and Legislative Materials**

21 U.S.C. § 355(b)(1) ........................................................................................... 12

21 U.S.C. § 355(j)(7)(A)(i) ............................................................................. 2, 7, 8, 12

21 U.S.C. § 355(j)(7)(A)(ii) ........................................................................... 2, 7, 8, 12

21 U.S.C. § 355(j)(7)(A)(iii) .......................................................................... 2, 7, 8, 12

21 U.S.C. § 355(q)(1)(F)....................................................................................... 17

**Other Authorities**

21 C.F.R. § 10.45 .................................................................................................. 14

21 C.F.R. § 314.53 ........................................................................................... 2, 8, 13

*Approved Drug Products With Therapeutic Equivalence Evaluations* (21st ed. 2001) ............. 1, 9

*Approved Drug Products With Therapeutic Equivalence Evaluations* (25th ed. 2005)........... 2, 11

*Approved Drug Products With Therapeutic Equivalence Evaluations* (28th ed. 2008)........... 2, 16

D.C. Cir. R. 36(c).................................................................................................. 13

Fed. R. Civ. P. 65(a)(2).......................................................................................... 4, 18

**INTRODUCTION**

The government concedes that the '952 patent appeared in the 2001 Orange Book at the time Teva submitted its risperidone ANDA.  FDA Br. at 2.  It concedes that the then-current Cumulative Supplement to the Orange Book reflected no change to the official patent-listing information for Risperdal® tablets.  *Id*.  And it concedes that FDA itself expressly directed generic applicants to rely on "'the most current Cumulative Supplement' to the Orange Book," *id*. at 19, in order to determine whether there had been any "changes, additions, *or deletions*" to the official patent-listing information for a previously approved drug.  *See* 2001 Orange Book at AD-2 (emphasis added); August 2001 Cumulative Supplement at iii.  Yet it nonetheless asserts that "Teva's reliance on the printed Orange Book alone [wa]s not reasonable," FDA Br. at 21 n.11, and indeed that "Teva's approach [wa]s plainly unreasonable," *id*. at 20, because "neither the FDCA nor FDA regulations limit FDA's publication of patent information to a paper version or preclude FDA from listing that information on its web site."  *Id*. at 2-3; *see also* Mylan Br. at 10 (asserting that neither "the FFDCA or Agency regulations deem the paper Orange Book the sole source of patent listing information").

With respect, that argument completely misses the point.  No party to this case disputes that FDA is not limited to printing patent-listing information in annual Orange Books and monthly Cumulative Supplements, and nothing prevents FDA from putting those publications on the internet (or even maintaining some entirely different set of patent listings, like the electronic Orange Book Query feature).  Indeed, the Agency in 2005 notified the public that it would cease printing the annual Orange Book and monthly Cumulative Supplements altogether, and that it would instead make those publications available only on its website in Adobe PDF format.  At the same time, FDA began updating its website's electronic Orange Book Query feature on a daily basis, and, tellingly, it made a critical change to the annual Orange Book's longstanding

directive that applicants consult "the most current Cumulative Supplement" for updated patent information before submitting an ANDA. For the first time, the 2005 PDF edition of the annual Orange Book instructed applicants: "Since all parts of this publication are subject to changes, additions, or deletions, ***the Electronic Orange Book, updated daily***, should be consulted for the most recent patent and exclusivity information. The [PDF version of the annual Orange Book] and the monthly Cumulative Supplements to the annual edition will list patent and exclusivity information on a monthly basis." *Approved Drug Products With Therapeutic Equivalence Evaluations* (25th ed. 2005) ["2005 Orange Book"] at AD-2 (attached as Exhibit 1) (emphasis added); *see also Approved Drug Products With Therapeutic Equivalence Evaluations* (28th ed. 2008) ["2008 Orange Book"] at AD-2 (attached as Exhibit 2).

The issue in this case, then, is not whether FDA is precluded from publishing patent-listing information on the internet—it obviously is not—but which version of FDA's patent listings controlled at the time Teva submitted its risperidone ANDA in 2001, when FDA admittedly was disseminating inconsistent patent-listing information to the public. *See* FDA Br. at 19 ("[T]he '952 patent incorrectly remained in the paper Orange Book."). Needless to say, *some* version of the patent-listing information FDA disseminated in 2001 had to control, and there is no doubt that the controlling source in 2001 was the annual Orange Book, as updated by the most current Cumulative Supplement.

Neither the government nor Mylan identifies any credible ambiguity on that score, and there is none. The statute required FDA to "publish and make available to the public" official patent listings and update them every thirty days, 21 U.S.C. § 355(j)(7)(A)(i)-(iii), and FDA's Orange Book regulation thus obligated the Agency to publish both a comprehensive patent list and a "month's supplement" to that list. 21 C.F.R. § 314.53(e). In turn, both the annual Orange

Book and monthly Cumulative Supplements expressly stated that those publications were intended to fulfill the statutory and regulatory publication requirements. And perhaps most important, both sets of publications expressly directed applicants in 2001 to consult those publications (but *not* the electronic Orange Book Query feature) before submitting an ANDA. If Teva's interpretation of those unambiguous directives was so "plainly unreasonable," FDA Br. Br. at 20, and it so obvious that applicants instead were supposed to rely on "the electronic Orange Book for patent information *in 2001*," FDA Br. at 18 (emphasis added); *see also* Mylan Br. at 13 ("[B]y 2001, each ANDA applicant knew that the electronic Orange Book needed to be consulted."), then there would have been no need *in 2005* for FDA to amend the annual Orange Book to expressly direct applicants—for the first time—to consult "the Electronic Orange Book, updated daily," rather than "the most current Cumulative Supplement," before submitting an ANDA.

The bottom line here is that every conceivable source of law and guidance at the time Teva submitted its ANDA made clear that the Cumulative Supplements provided the legally operative patent listings, and despite its best efforts, FDA cannot credibly fault Teva for relying on the most current Cumulative Supplement when the Agency itself unambiguously directed generic applicants to do just that. Against that backdrop, FDA's letter decision offers no sound basis for the Agency's refusal to relist the '952 patent and restore Teva's exclusivity when, at the time Teva submitted its paragraph IV certification, both the annual Orange Book and FDA's then-current Cumulative Supplement reflected that the '952 patent remained listed.

This Court need not reach the equities: Apart from Teva's strong likelihood of success, the issues in this case are purely legal, and there is no reason why this Court should not consolidate Teva's preliminary injunction request with a trial on the merits under Fed. R. Civ. P.

65(a)(2). If this Court nonetheless reaches the equities, they clearly favor Teva. Neither the government nor Mylan even tries to explain how Teva could recover its statutory right to marketing exclusivity once other applicants enter the market, and they all but ignore the fact that courts have uniformly recognized that lost exclusivity is a quintessential irremediable harm. *See, e.g.*, *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006), *summarily aff'd* 2006 WL 2591087 (D.C. Cir. No. 06-5204, Aug. 30, 2006); *Apotex, Inc. v. FDA*, No. 06-0627-JDB, 2006 WL 1030151, at *17 (D.D.C. 2006). As to the balance of hardships, Mylan's claim that it would be harmed just as much as Teva is frivolous. Teva stands to lose its statutory right to be the exclusive marketer of generic risperidone beginning in June, while Mylan claims only the right to be one of many entrants into the market at that time. Finally, there is no question that the public's interest in greater market competition is best-served over the long-run by preserving the exclusivity incentive. Yet FDA's actions in this case undercut that reward by reducing the certainty that first-filers will receive their exclusivity—diminishing the incentive for them to challenge patents that appear in the Orange Book and, thus, the extent of market competition over the long-haul.

One last point is in order here. Both the government and Mylan ultimately fall back on the assertion that Teva somehow is not entitled to relief because Teva was forced to withdraw its paragraph IV certifications in 2001 and did not challenge FDA's delisting of the '952 patent until now. That assertion is meritless. This lawsuit challenges a February 2008 Letter Decision denying Teva's citizen petition, and was filed less than one week after FDA issued that decision. Neither the government nor Mylan denies that FDA's February 2008 decision is a final agency action subject to judicial review under the APA, and neither contests that Teva's lawsuit challenging that week-old decision was timely filed in this Court. Yet FDA's decision did not

4

reject Teva's petition because the petition itself was untimely, or because Teva acceded to FDA's demand that it withdraw its paragraph IV certification to the '952 patent in 2001. Instead, FDA's Letter Decision addressed Teva's petition **on the merits**—and there is thus no question that the merits of that decision are properly before this Court.

In any event, defendants' suggestion that Teva should have filed suit in 2001 gives new meaning to the term chutzpah. After all, at the very same time defendants are telling this Court that Teva waited **too long** to seek relief from the courts, they are asserting that this motion was filed **too soon**—because Teva's ANDA allegedly may not be approved on June 29, 2008, and Teva thus stands nothing to lose from further delay. *See, e.g.*, Mylan Br. at 16-17 (citing FDA Br. at 25). There is no sound basis for that assertion, but the key point for now is that the government and Mylan unquestionably would have made the same argument if Teva had sought relief seven years ago, when FDA had not even begun to review Teva's ANDA and legal action thus would have been woefully premature. With these defendants, it seems, there has never been an appropriate time to seek relief from the courts—not now, not then, not in between, and not (apparently) until Teva stands on the precipice of bankruptcy. Needless to say, that is not the law, and this Court should reject the defendants' duplicitous effort to avoid review of FDA's February 2008 Letter Decision.

At bottom, every aspect of this case favors the entry of an injunction requiring FDA to relist the '952 patent, honor Teva's paragraph IV certification, and restore Teva's legal right to 180-day marketing exclusivity for generic risperidone tablets.

## ARGUMENT

## I.    Teva Is Likely To Succeed On The Merits.

The government's principal argument in defense of FDA's letter decision is that "neither the statute nor the regulation relied upon by Teva limits the listing of patents to a paper version."

FDA Br. at 17; *see also id*. at 2 ("[N]either the FDCA nor FDA regulations limit FDA's publication of patent information to a paper version or preclude FDA from listing that information on its web site. In short, there is no statute or regulation that limits FDA's discretion in the manner urged by Teva."); *id*. at 4 ("Neither the statute nor the regulation limits publication to paper only."); *id*. ("The regulation … refers to publication of a 'list,' but does not limit this to a paper list."); *id*. ("The regulation refers to a monthly 'supplement to the list,' but does not state that it must be paper only."); *id*. at 17 ("The statute … simply requires FDA to 'publish' the information and does not specify that this must be paper only."); *id*. ("The regulation .. refers to publication of a 'list,' and again does not specify that this list must be only on paper."). Mylan, too, argues that nothing in "the FFDCA or Agency regulations deem[s] the paper Orange Book the sole source of patent listing information." Mylan Br. at 10.

Each of those statements is true. But none of them is relevant. Teva's argument is not that FDA is precluded from publishing patent-listing information in as many or as few forms as the Agency desires (though, to be sure, Congress probably did not anticipate internet publication when it passed Hatch-Waxman in 1984). Instead, Teva's position is that once FDA chose to publish patent-listing information in multiple formats—and once it introduced inconsistencies among those various sources—the legally controlling source in the event of such conflicts is the one that FDA expressly directed applicants to consult and which FDA itself unquestionably intended to fulfill its statutory and regulatory duties.

FDA's approach in this case is thus fundamentally unfair to applicants, who by all rights should be entitled to rely on an express FDA directive ordering them to consult the Orange Book's monthly Cumulative Supplements in order to obtain the most current patent-listing information. And FDA's approach would seriously undermine the statutory requirement that

FDA "publish and make available to the public" a list containing the patent information it receives from brand manufacturers, 21 U.S.C. § 355(j)(7)(a)(i), and "revise the list … [e]very thirty days," *id*. § 355(j)(7)(a)(ii)-(iii). As the government concedes, the whole point of those requirements is to ensure that FDA provides generic applicants with fair notice before they invest millions of dollars to engineer a proposed generic drug product and prepare to defend their efforts in court. *See* FDA Br. at 2 ("FDA is required to publish this information so that … generic drug manufacturers can decide whether their products might infringe [listed] patents."). It would defeat that purpose entirely if, as FDA and Mylan assert, applicants were not entitled to rely on the Agency's explicit directive that they consult the very sources it intended to fulfill the statutory and regulatory requirements, but instead were obligated (though FDA never told them) to consult some conflicting source of patent information that was not even referenced in the statute or regulations. That, in short, would epitomize arbitrary and capricious agency decisionmaking.

Neither the government in its brief, FDA in its letter decision, nor Mylan in this case seriously contests that point. Instead, they tacitly acknowledge its validity by contending that the Agency nonetheless provided adequate notice to the public because "the Orange Book and the Cumulative Supplement *refer to* the electronic Orange Book." FDA Br. at 19 (citing FDA Letter Decision at 6-7) (emphasis added); *see also* Mylan Br. at 9 ("The very Cumulative Supplement upon which Teva claims to have relied … states: '***There is an Electronic Orange Book Query (EOB)***.'") (emphasis in original); *id*. at 12. But the Cumulative Supplement's passing reference to the mere existence of an "electronic Orange Book Query" feature cannot reasonably be construed as a directive that the Query feature must be consulted. And to the extent the Cumulative Supplement said anything substantive about the electronic Orange Book's contents,

7

it told applicants that its contents were identical to the Cumulative Supplement, because its contents were updated "concurrently."

In any event, the Orange Book's passing references to an electronic Orange Book Query feature hardly cast doubt on the legal primacy of the printed Orange Book and its monthly Cumulative Supplements at the time Teva submitted its risperidone ANDA.  Indeed, for all of its carefully worded claims that neither the statute nor regulations "limit[ed]" patent listings to the printed annual Orange Book and Cumulative Supplements "only," the government never denies that FDA has always interpreted the statute and its regulations to require that the Agency publish—if nothing else—a comprehensive annual Orange Book and monthly Cumulative Supplements (but not that it maintain a searchable "Electronic Orange Book Query" feature on its website).

Nor could it.  The statute requires FDA both to "publish and make available to the public" a comprehensive patent list and update that list "[e]very thirty days," 21 U.S.C. § 355(j)(7)(a)(i)-(iii), and to that end, FDA's own regulations require the publication of a "month's supplement."  21 C.F.R. 314.53(e).  There is no doubt that when Teva submitted its ANDA in 2001, FDA intended the printed Orange Book and monthly Cumulative Supplements to fulfill those duties.  The Orange Book, after all, came to be called the Orange Book only because of the printed publication's bright orange cover.  *See, e.g.*, *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1127 n.4 (Fed. Cir. 2006); *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 414 (D. Del. 2006).  And both the Orange Book and its Cumulative Supplements expressly confirmed that those publications were designed to fulfill the statutory and regulatory requirements and directed applicants to rely on those publications in making their patent certifications:

[Hatch-Waxman] requires that patent information must now be filed with all newly submitted section 505 drug applications, and that no NDA may be approved after September 24, 1984, without the submission of pertinent patent information to the Agency.  The patent numbers and the expiration dates of appropriate patents claiming drug products that are the subject of approved applications will be published in this *Addendum* [to the annual Orange Book] or in the monthly Cumulative Supplement to this publication…. Since all parts of this publication are subject to changes, additions, or deletions, the *Addendum* [to the annual Orange Book] must be used in conjunction with the most current Cumulative Supplement.

2001 Orange Book at AD-2.

The Cumulative Supplement provides, among other things, information on newly approved drugs and, if necessary, revised therapeutic equivalence evaluations and updated patent and exclusivity data.  The Addendum [to the annual Orange Book] contains appropriate drug patent and exclusivity information required of the Agency by [Hatch-Waxman].  Because all parts of the publication are subject to changes, additions, or deletions, the [annual Orange Book] must be used in conjunction with the most current Cumulative Supplement.

August 2001 Cumulative Supplement at iii.

That, of course, is why the courts have never hesitated to recognize that these publications comprised FDA's official source of patent-listing information for purposes of the Hatch-Waxman Act.  *See, e.g.*, *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004) ("In order to determine what patents cover existing brand-name drugs and hence whether any paragraph IV certifications … are needed, applicants look in the 'Orange Book,' an FDA publication that includes all patent information that companies have submitted to the agency."); *Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003) ("The statute directs the FDA to list the disclosed patents, which the FDA does in a publication entitled 'Approved Drug Products With Therapeutic Equivalence Evaluations,' more commonly known as the 'Orange Book.'"); *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 802 (D.C. Cir. 2001) ("The FDA maintains a record of [patent] information in its publication entitled *Approved Drug Products with Therapeutic Equivalence*, commonly known as the Orange Book."); *American Bioscience,*

9

*Inc. v. Thompson*, 243 F.3d 579, 580 (D.C. Cir. 2001) ("The FDA keeps all [patent] information in a publication officially titled *Approved Drug Products with Therapeutic Equivalence*, commonly called the Orange Book."); *Apotex Inc. v. FDA*, 414 F. Supp. 2d 61, 64 (D.D.C. 2006) ("An ANDA-applicant seeking to market its drug before the NDA-drug's patent has expired must make a paragraph IV certification with respect to the 'listed patents' (*i.e.*, the patents that are listed in the Orange Book when the ANDA is filed), as well as those that are placed in the Orange Book subsequently (*i.e.*, 'later-listed patents').").

The government now tries to distinguish those cases on the ground that "[n]one … states that the Orange Book must only be in paper form, or makes any mention at all of what form the Orange Book must, or may, take." FDA Br. at 17. But again, Teva's argument is not that FDA is somehow precluded from maintaining patent-listing information in whatever form it wants (so long as it provides a comprehensive patent list and updates that list at least every thirty days). Teva's argument instead is that where the data published by FDA conflict, one source has to control—and the only reasonable solution to that dilemma recognizes that the controlling source must be the one that that FDA expressly directed applicants to consult in order to obtain the official patent-listing information that greases Hatch-Waxman's wheels—including information on patent "deletions." Put simply, generic applicants like Teva cannot be faulted for looking exactly where FDA directed them to look, rather than somewhere else.[1]

---

[1]    The government acknowledges that the Orange Book expressly directed applicants to look for information about delistings in the Cumulative Supplements, but now observes that the Cumulative Supplements apparently did not show delistings at all. *See* FDA Br. at 19; Mylan Br. at 11 (quoting FDA Decision at 6 n.12). To its credit, the government acknowledges that that is a serious problem: after all, it is hard to see why an applicant should be penalized when FDA unambiguously instructed applicants to look for certain information in a certain place, and then decided not to put the information there at all. Yet the government seeks to defend FDA's actions by asserting that: "Nonetheless, this does not make FDA's [actions] unreasonable." FDA Br. at 19. That defense is pure *ipse dixit*, and with all due respect, the fact that FDA unambiguously misdirected applicants epitomizes unreasonable agency action.

For this reason, Mylan's assertion that "the printed paper version of the Orange Book itself does not allow Teva to ignore patent information readily available in the electronic Orange Book," Mylan Br. at 12, is beside the point. That assertion presupposes that Teva was obligated to consult the electronic Orange Book in the first place. Teva was not. Neither the statute nor regulations in effect at the time Teva submitted its paragraph IV certification required FDA to maintain an "electronic Orange Book Query" feature, and neither the statute, regulations, Orange Book, or Cumulative Supplements directed applicants to consult the "electronic Orange Book Query" feature. Instead, the statute required FDA to update its patent listings "every thirty days," FDA's regulations required FDA to publish a "month's supplement," and FDA's monthly Cumulative Supplements both stated that they were intended to fulfill the Agency's legal duties and expressly directed applicants to consult those sources (but not the electronic Orange Book) in order to determine whether there had been any "changes, additions, or deletions" to the official patent-listing information for a previously approved drug.

In short, when Teva submitted its risperidone ANDA in August 2001, FDA was explicitly directing the public to rely upon the official patent listings contained in its printed annual Orange Book and monthly Cumulative Supplements (with their bright orange covers). And in 2005 (but no earlier), FDA decided that times had changed, and that applicants henceforth would be obligated to "consult … the Electronic Orange Book, updated daily," instead of the monthly-updated PDF versions of the annual Orange Book and Cumulative Supplements. *See* 2005 Orange Book at AD-2. Both approaches are perfectly legitimate. But FDA cannot turn back time and pretend that Teva was subject to its 2005 directive at the time Teva submitted its risperidone ANDA in 2001.

FDA's only other argument is that Teva's approach is unreasonable because it would preclude the Agency from using "the most current information available" when it reviews an applicant's patent certifications. FDA Br. at 16; *see also id*. at 17-18. But that approach threatens to write the publication requirements out of the statute entirely. After all, Congress did not merely require applicants to certify to patents that claim previously approved drugs. It established a carefully reticulated scheme that repeatedly requires FDA to provide public notice of any patent that a brand manufacturer has identified as claiming a previously approved drug. *See, e.g.*, 21 U.S.C. § 355(b)(1) (requiring brand-name drug applicants to submit to FDA "the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application" and providing that "the Secretary shall publish information submitted under th[at requirement]"); *id*. § 355(j)(7)(A)(i)-(iii) ("Within sixty days of September 24, 1984, the Secretary shall publish and make available to the public—a list in alphabetical order of the official and proprietary name of each drug which has been approved for safety and effectiveness [and] patent information submitted … respecting a drug included on the list"); *id*. § 355(j)(7)(A)(ii) ("Every thirty days after the publication of the first list under clause (i) the Secretary shall revise the list….").

Needless to say, Congress did not obligate FDA to "publish and make available to the public" continually updated patent-listing information for its own sake. It did so, as FDA concedes, to ensure that generic applicants and the public-at-large would remain fully informed of the official patent barriers to generic market entry, and to enable generic drug applicants to carry out their statutory certification obligations without having to guess what patents may or may not be relevant to their efforts. FDA Br. at 2. That, indeed, is why FDA's own regulations explicitly require generic applicants to submit "an appropriate certification for each ***listed***

*patent*," even if they disagree about "the correctness of the patent information … submitted to the agency under this section ***and published by FDA in the list***."   21 C.F.R. § 314.53(f) (emphasis added).  Under those circumstances, FDA's assertion that it is free to rely on patent data that does not appear in its official list would thoroughly undermine the statute and violate its own regulations—and not least of all because FDA repeatedly directed applicants to rely on its printed Orange Book and monthly Cumulative Supplements in order to obtain the most current patent-listing information before submitting an ANDA.[2]

Unable to defend FDA's letter decision on the merits, the government and Mylan ultimately claim that this Court should dodge the merits entirely, simply because Teva did not challenge FDA's putative delisting of the '952 patent in 2001.  *See, e.g.*, FDA Br. at 3 ("Teva has provided no credible justification for its years-long delay."); *id*. at 16 ("Teva removed its certification to the '952 patent and said nothing more about it until 2007."); *id*. at 22 ("Teva has failed to provide a valid explanation for why it waited more than six years to challenge FDA's delisting of the '952 patent, and now, incredibly, argues that its alleged harm is irreparable."); *cf*. Mylan Br. at 15 n.6 (arguing that "Teva's 6-year delay in raising this issue undermines its claim of irreparable injury").  That suggestion is frivolous.

This lawsuit challenges an FDA letter decision that denied Teva's citizen petition on February 26, 2008—less than one week before Teva filed its March 4 complaint in this case. While Teva's petition challenged FDA's 2001 attempt to effectuate the delisting of the '952 patent, neither Mylan nor the government disputes that the Agency's letter decision denying that

---

[2]   In that respect, FDA's analogy to court decisions is apt (though not for the reasons FDA suggests): judicial opinions (like patent listings or delistings) withheld from publication in the official reporter (like the Orange Book) generally lack precedential value and do not bind third parties.  *See, e.g.*, D.C. Cir. R. 36(c)(2).

petition constitutes final agency action that itself is subject to judicial review under the APA. *See* 21 C.F.R. § 10.45(d) ("[FDA's] final decision constitutes final agency action (reviewable in the courts under 5 U.S.C. 701 *et seq*. and, where appropriate, 28 U.S.C. 2201) on a [citizen] petition."). Nor does either defendant contend that Teva's challenge to FDA's recent letter decision is barred by the exhaustion doctrine, or that there is any other barrier to judicial review. *Cf. Pfizer Inc. v. Shalala*, 182 F.3d 975, 979-80 (D.C. Cir. 1999). As a result, there is no serious question that the APA entitles Teva to plenary review of FDA's letter decision, and—again— defendants never seriously claim otherwise.

The key point here, then, is that the government (and Mylan) can only defend FDA's letter decision on the same grounds that FDA itself relied upon to justify that decision in the first instance. *See, e.g.*, *George Hyman Const. Co. v. Brooks*, 963 F.2d 1532, 1538 (D.C. Cir. 1992) ("[T]he well-worn pages of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), teach that in the administrative context 'the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.' This is so because 'the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'") (internal citations omitted). Yet rather than claim (as the government and Mylan seem to here) that Teva's citizen petition was untimely, and its merits thus not properly presented to the Agency, FDA's letter decision unhesitatingly addressed, and rested solely on, the merits of Teva's citizen petition.[3] Sixty-five

---

[3]   *See, e.g.*, FDA Letter Decision at 6 ("You contend that Teva is entitled to 180 days of marketing exclusivity for its pending ANDA for risperidone tablets because the '952 patent appeared in the annual edition of the Orange Book (which you describe as the 'official' Orange Book) on the day submitted its ANDA containing a paragraph IV certification to the '952 patent. You also assert that FDA's delisting of the '952 patent does not affect Teva's 'entitlement' to 180-day exclusivity, because FDA 'failed to provide official notice of the 'delisting' for several months following the submission of Teva's ANDA'" (Petition at 2). We address these arguments below."); *id.* at 9 ("We have concluded that the '952 patent was delisted before Teva submitted to (Continued…)

years after *Chenery*, defendants cannot now claim credibly that the merits of FDA's letter decision are not properly before this Court, for reasons other than those on which that decision was based.[4]

But that's not all.  FDA did not merely ***choose*** to address Teva's petition on the merits; it was ***legally obligated*** to do so.  In at least three prior cases—involving the drugs olanzapine (Zyprexa®), fluoxetine hydrochloride (Sarafem®), and metoprolol succinate (Toprol XL®)— FDA retroactively relisted patents that it unlawfully had delisted from the Orange Book and it restored the first applicant's paragraph IV certifications—and it did so despite the fact that the generic applicants who sought relisting had acquiesced for years in FDA's delisting.

In the olanzapine case, for instance, Zenith Goldline ("Zenith") filed paragraph IV certifications to nine Orange Book patents that Eli Lilly had listed as claiming Zyprexa® in 2000 and 2001.  *See* Letter from P. Jaworski to G. Buehler, Jan. 26, 2007 (attached as Exh. 3).  In 2002, however, FDA purported to delist all nine of those patents and required Zenith to withdraw each of its nine paragraph IV certifications.  *Id*.  Zenith initially acquiesced to FDA's demands,

---

FDA ANDA 76-228 with a paragraph IV certification to the patent.  Accordingly, we deny your request that FDA relist the '952 patent.  Because the '952 patent was properly delisted and Teva's ANDA could not contain a paragraph IV certification for the patent, Teva is not eligible for 180-day exclusivity for ANDA 76-228.").

[4]    For that reason alone, Mylan's suggestion that Teva is somehow "estopped" from pursuing this action based on its past submissions to FDA is unavailing.  Mylan Br. at 2, 8.  Again, FDA did not remotely base its denial of Teva's petition on Teva's comments in the simvastatin matter (more on that in a moment), or on the fact that Teva parroted back to FDA the Agency's assertion that the patent had been "officially delisted" when it was forced to withdraw its paragraph IV certification.  Instead, FDA's Letter Decision rested solely on the merits of Teva's petition, and thus can be defended only on the merits.

In any event, Mylan's argument that Teva is estopped based on its prior comments in the simvastatin matter borders on the sanctionable.  As Mylan (and its counsel of record in this case) well know, those comments were withdrawn before FDA reached its decision in that matter; Teva was substituted as the real-party-in-interest in the *Ranbaxy* case; and the D.C. Circuit ruled for Teva in that case—flatly rejecting the (previously withdrawn) comments that Mylan now quotes in its brief, *see* Mylan Br. at 2.  Needless to say, even if Teva's comments never had been withdrawn, and Teva never had been made a party to the *Ranbaxy* case (much less the winning party in that case), Mylan's suggestion that Teva somehow could be estopped from relying on the D.C. Circuit's ***rejection*** of those comments in *Ranbaxy* would be fanciful.

15

but five years later—following the D.C. Circuit's decision in *Ranbaxy*—Zenith (which since had been acquired by IVAX Pharmaceuticals) requested that FDA relist the unlawfully delisted Zyprexa® patents and reinstate Zenith's exclusivity. *Id.* Notwithstanding Zenith's "years-long delay," *cf.* FDA Br. at 3, FDA relisted those patents without hesitation. *See* 2008 Orange Book at ADA 103-ADA 105 (attached as Exh. 4) (reflecting the relisting of all nine previously delisted Zyprexa® patents).

Fluoxetine and metoprolol are no different. In each case, the first-filer waited years to challenge FDA's unlawful delisting, yet the Agency nonetheless relisted the delisted patents and restored the first-filer's exclusivity without objection. *See* Letter from D. Jaskot to G. Buehler, Jan. 25, 2007 (attached as Exh. 5) (challenging the delisting of two Sarafem® patents) and 2008 Orange Book at ADA 59 (attached as Exh. 6) (reflecting the relisting of both previously delisted Sarafem® patents); *see also* Citizen Petition No. 2006P-0422 (attached as Exh. 7) (challenging the delisting of a Toprol XL® patent); Letter from J. Woodcock to C. Weiss, Dec. 12, 2007 (attached as Exh. 8) ("[T]he '714 patent has been relisted in the Orange Book, FDA has approved KV's ANDA No. 76-640, and FDA has recognized KV's eligibility for 180-day exclusivity … based on KV's Paragraph IV certification to the '714 patent."); 2008 Orange Book at ADA 94 (attached as Exh. 9) (reflecting the relisting of the previously delisted Toprol XL® patent).

It is, of course, axiomatic that agencies must treat like cases alike; when they fail to do so, their actions are by definition arbitrary and capricious. *See, e.g.*, *Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1010 (D.C. Cir. 1999) (citing *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995); *Pontchartrain Broad. Co. v. FCC*, 15 F.3d 183, 185 (D.C. Cir. 1994)). It thus is no mystery why FDA's letter decision does not even attempt to defend its denial of Teva's

16

petition on the ground that Teva acquiesced in the Agency's demand that it withdraw its paragraph IV certification and then waited too long to challenge FDA's putative delisting of the '952 patent. Given that FDA had just relisted the patents for olanzapine, fluoxetine, and metoprolol despite the fact that those delistings had gone unchallenged for years, any such claim would have flagrantly violated the APA. Wholly apart from *Chenery*, then, this Court should not countenance the defendants' remarkable suggestion that the Court decline to reach the merits of this case so that FDA may treat this case differently than it treated the relisting requests in olanzapine, fluoxetine, and metoprolol.

Finally—and regardless of the fact that defendants cannot immunize FDA's February letter decision by harping on Teva's failure to seek the restoration of its exclusivity in 2001—the suggestion that Teva should have challenged FDA's actions at that point is disingenuous at best. FDA consistently **refuses** to make exclusivity determinations until it is ready to approve a drug. *See, e.g.*, Letter from G. Buehler to M. Goshko (the "Granisetron Letter Decision"), Jan. 17, 2008, at 1 n.1 (attached as Exh. 10) ("It is FDA's practice to make decisions on eligibility for 180-day exclusivity **only** in the context of specific ANDAs **that are otherwise eligible for approval**. This approach is based on the multiple factors that may influence eligibility for exclusivity … up to the time an application is ready for approval … and could thus render a premature eligibility determination incorrect.") (emphasis added). In part as a result, FDA routinely ignores Congress's demand that the Agency resolve citizen petitions within 180 days. *See* 21 U.S.C. § 355(q)(1)(F) ("The Secretary shall take final agency action on a petition not later than 180 days after the date on which the petition is submitted."). Indeed, it ignored the statutory deadline in this very case.

That means that if Teva had petitioned FDA to restore its exclusivity in 2001, the Agency would have sat on Teva's request until now anyway—that is, until Teva's ANDA was "otherwise eligible for approval." *See* Granisetron Letter Decision at 1 n.1. And had Teva sued the Agency before FDA rendered its decision (and before Teva's approval otherwise was imminent), FDA assuredly would have claimed that Teva's lawsuit was premature, unripe, or otherwise barred by the exhaustion doctrine—not least of all because Teva could not plausibly have demonstrated any imminent harm from a patent delisting that transpired some six years before Teva's ANDA even was eligible for approval (and, indeed, before Teva had demonstrated that its generic risperidone tablets were bioequivalent to Janssen's Risperdal® tablets). *See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, No. 07-0668 (JDB), ___ F. Supp. 2d ___, 2008 WL 564942, *13-14 (D.D.C. 2008) (collecting examples of cases in which FDA has interposed similar objections); *see also* FDA Br. at 22-25 (making the same objections in this very case, despite the imminence of Teva's approval). Under these circumstances, the government's disingenuous assertion that Teva should have acted six years ago to protect its exclusivity should be rejected out-of-hand.

## II.    The Equities Favor Teva.

This Court need not reach the equities. The sole issue in this case is purely legal, and there is no reason not to consolidate Teva's motion for expedited preliminary injunctive relief with a trial on the merits. *See* Fed. R. Civ. P. 65(a)(2). But if this Court nonetheless reaches the equities, they clearly favor Teva.

First, it is beyond serious dispute that lost statutory exclusivity is an irreparable harm that warrants judicial protection. Both the government and Mylan all but ignore the great weight of authority holding that lost generic exclusivity entails far more than "mere" economic damages. As this Court recognized in the *Sandoz* case, cases like this one implicate the irretrievable loss of

18

a statutory right, and "'[o]nce the statutory entitlement has been lost, it cannot be recaptured.'" 439 F. Supp. 2d at 32 (quoting *Apotex,* 2006 WL 1030151 at *17); *see also* Mylan Br. at 7 (conceding that "this Court will never be able to turn back the clock" to "undo" its decision regarding Teva's right to exclusivity).

Despite the government's best efforts to reduce that right to a simple economic interest in lost (if admittedly irrecoverable) sales, lost exclusivity affects an array of intangible interests that likewise have been recognized as irreparable. Put simply, depriving an applicant of its 180-day head-start distorts the first-filer's customer relationships and business plans: again, Teva must make decisions about how to allocate its resources ***now***, and those decisions depend on how this Court resolves Teva's motion. *See* Marshall Decl. ¶ 14. Preliminary injunctions are designed precisely for circumstances like these, and it should come as no surprise that courts routinely grant preliminary injunctive relief in cases involving FDA decisions to divest a first applicant of its exclusivity. *See, e.g.*, *Collagenex Pharms., Inc. v. Thompson*, No. 03-1405-RMC, 2003 WL 21697344, at *10 (D.D.C. July 22, 2003); *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997), *aff'd* 140 F.3d 1060 (D.C. Cir. 1998); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997).

Second, the balance of hardships undoubtedly favors Teva. Mylan's argument that the harms it may suffer from a decision to grant injunctive relief are "the exact same type of harm that Teva claims" is simply incorrect. Mylan Br. at 16. Mylan asserts the right only to be one of many competitors to enter the risperidone market on June 29. Teva, by contrast, stands to lose its statutory right to be exclusive entrant into that market on June 29. As a result, the costs of denying injunctive relief will be borne singularly by Teva, while any costs to subsequent applicants (like Mylan) from the entry of an injunction will be shared across the industry. *See*

19

*Apotex*, 2006 WL 1030151, at *18.  All the other injuries Mylan asserts—reduced sales and diminished ability to enter into long-term supply contracts as a result of Teva's 180-day head-start, and delaying generic competition by 180 days, *see* Mylan Br. at 15-16—are simply products of the statutory exclusivity period Congress deemed necessary in order to encourage patent challenges.  But they are not harms that can justify the denial of injunctive relief that would protect that exclusivity.

Likewise, the government's suggestion that the balance of hardships is a wash—because Teva's loss would be offset by its competitors' gains—is demonstrably incorrect.  The very nature of marketing exclusivity means that a first applicant stands to gain more on its own than several generic companies would earn together if they entered a fully competitive market at the same time.  As a result, exclusivity increases the size of the pie (rather than merely dividing it among potential entrants), and the generic drug industry as a whole thus benefits from a judgment that preserves the full value of exclusivity for generic manufacturers who challenge Orange Book-listed patents.  Teva may be first today—but Mylan's turn will come, and it (like the rest of the generic industry) stands to benefit from a precedent that fully preserves the value of 180-day exclusivity.

Finally, the public interest is best served by the entry of an injunction in this case.  Although the government undoubtedly is correct that 180-day exclusivity temporarily delays the advent of full market competition, FDA Br. at 26—that, again, is the very nature of 180-day exclusivity—honoring Teva's claim to exclusivity fosters the public's interest in enhanced competition over the long run by preserving the exclusivity incentive.  As the *Ranbaxy* Court recognized, allowing FDA to divest first-filers of their statutory reward after they invest substantial resources in the development of a generic alternative and subject themselves to

potential liability by filing a paragraph IV certification unquestionably diminishes the incentive to undertake such challenges in the future. *See Ranbaxy*, 469 F.3d at 126 ("FDA's delisting policy diminishes the incentive for a manufacturer of generic drugs to challenge a patent listed in the Orange Book in the hope of bringing to market a generic competitor for an approved drug without waiting for the patent to expire.").

FDA tries to get around that fact here by asserting that Teva never really faced patent liability in this case because Janssen sought to delist the '952 patent and thus could not (or would not) have sued Teva for infringement. *See* FDA Br. at 21 ("Teva faced no risk whatsoever of patent litigation upon submitting its ANDA because the NDA holder had already withdrawn the '952 patent."); *id.* at 26 ("[T]here can be no public interest in giving Teva exclusivity as a reward for challenging a non-listed patent"). But that perspective is entirely backwards. With the benefit of 20/20 hindsight, it is easy to say that Teva never faced a risk of litigation from its paragraph IV certification in this case. But the relevant point for Hatch-Waxman purposes is that neither the Orange Book nor the then-current Cumulative Supplement put Teva on notice of that fact *before* Teva needed to choose whether to assume the always-uncertain risk that it would be sued.

Accepting FDA's argument that generic applicants cannot rely on FDA's official patent-listing publications—and, indeed, cannot even trust FDA's express directives that they consult those publications—thus would undercut the statute by reducing the likelihood that a first-filer eventually will receive exclusivity, ***as perceived by the applicant at the time it must decide whether to go through with filing a paragraph IV certification***. With the prospect of receiving exclusivity less certain, applicants will challenge fewer patents, decreasing the number of generic drugs, delaying the advent of market competition, and ensuring that drug prices remain high—in

direct contravention of the statute's core purpose, which is to "'get generic drugs into the hands of patients at reasonable prices—fast.'" *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 809 (D.C. Cir. 2001) (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)).

## CONCLUSION

For the foregoing reasons, Teva respectfully requests that this Court grant its motion for expedited injunctive relief.

Dated: April 1, 2008                              Respectfully submitted,

                                                  By:_/s Michael D. Shumsky_____
                                                  Jay P. Lefkowitz, P.C. (D.C. Bar No. 449280)*
                                                  Michael D. Shumsky (D.C. Bar No. 495078)
                                                  Gregory L. Skidmore (D.C. Bar No. 974024)
                                                  KIRKLAND & ELLIS LLP
                                                  655 15th Street N.W., Suite 1200
                                                  Washington, D.C. 20005
                                                  (202) 879-5000
                                                  (202) 879-5200 fax

                                                       *Counsel of Record

                                                  *Counsel for Teva Pharmaceuticals USA, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2008, I caused a copy of TEVA PHARMACEUTICALS

USA, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR EXPEDITED

PRELIMINARY INJUNCTIVE RELIEF to be served upon the following attorneys through the

Court's ECF filing system:

> Drake S. Cutini
> U.S. DEPARTMENT OF JUSTICE
> Office of Consumer Litigation
> P.O. 386
> Washington, DC 20044
> (202) 307-0044
> Fax: (202) 514-8742
> Email: drake.cutini@usdoj.gov
>
> *Counsel for the Federal Defendants*
>
> William A. Rakoczy
> RAKOCZY MOLINO MAZZOCHI SIWIK, LLP
> 6 West Hubbard Street, Suite 500
> Chicago, IL 60610
> (312) 222-6301
> Email: wrakoczy@rmmslegal.com
>
> *Counsel for Proposed Intervenor Mylan Pharms. Inc.*

> _____/s_____
> Michael D. Shumsky
> *Counsel for Teva Pharmaceuticals USA, Inc.*



# APPROVED DRUG PRODUCTS

WITH

## THERAPEUTIC EQUIVALENCE EVALUATIONS

### 25th EDITION

**THE PRODUCTS IN THIS LIST HAVE BEEN APPROVED UNDER SECTION 505 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.**

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH
OFFICE OF PHARMACEUTICAL SCIENCE
OFFICE OF GENERIC DRUGS

**2005**

# APPROVED DRUG PRODUCTS
## with
## THERAPEUTIC EQUIVALENCE EVALUATIONS

**The products in this list have been approved under section 505 of the Federal Food, Drug, and Cosmetic Act.  This volume is current through December 31, 2004.**

# 25th EDITION



## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION
### CENTER FOR DRUG EVALUATION AND RESEARCH
### OFFICE OF PHARMACEUTICAL SCIENCE
### OFFICE OF GENERIC DRUGS

**2005**

# PATENT AND EXCLUSIVITY INFORMATION ADDENDUM

This *Addendum* identifies drugs that qualify under the Drug Price Competition and Patent Term Restoration Act (1984 Amendments) for periods of exclusivity, during which abbreviated new drug applications (ANDAs) and applications described in Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (the Act) for those drug products may, in some instances, not be submitted or made effective as described below, and provides patent information concerning the listed drug products. Those drugs that have qualified for Orphan Drug Exclusivity pursuant to Section 527 of the Act and those drugs that have qualified for Pediatric Exclusivity pursuant to Section 505A are also included in this *Addendum*. This section is arranged in alphabetical order by active ingredient name followed the trade name. Active ingredient headings for multiple ingredient (combination) drug products are arranged alphabetically. For an explanation of the codes used in the *Addendum*, see the *Patent and Exclusivity Terms* Section. Exclusivity prevents the submission or effective approval of ANDAs or applications described in Section 505(b)(2) of the Act. It does not prevent the submission or approval of a second 505(b)(1) application except in the case of Orphan Drug exclusivity. Applications qualifying for periods of exclusivity are:

(1)  A new drug application approved after September 24, 1984, for a drug product all active ingredients (including any ester or salt of the active ingredient) of which had never been approved in any other new drug application under Section 505 (b) of the Act. No subsequent ANDA or application described in Section 505(b)(2) of the Act for the same drug may be *submitted* for a period of *five years* from the date of approval of the original application, except that such an application may be *submitted* after *four years* if it contains a certification that a patent claiming the drug is invalid or will not be infringed by the product for which approval is sought.

(2)  A new drug application approved after September 24, 1984, for a drug product containing an active ingredient (including any ester or salt of that active ingredient) that has been approved in an earlier new drug application and that includes reports of new clinical investigations (other than bioavailability studies). Such investigations must have been conducted or sponsored by the applicant and must have been essential to approval of the application. If these requirements are met, the approval of a subsequent ANDA or an application described in Section 505(b)(2) of the Act may not be *made effective* for the same drug or use, if for a new indication, before the expiration of *three years* from the date of approval of the original application. If an applicant has exclusivity for a new application or 505(b)(2) application for the drug product with indications or use, this does not preclude the approval of an ANDA or 505(b)(2) application not covered by the exclusivity.

(3) A supplement to a new drug application for a drug containing a previously approved active ingredient including any ester or salt of the active ingredient) approved after September 24, 1984, that contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the applicant. The approval of a subsequent ANDA or 505(b)(2) application for a change approved in the supplement may not be

*made effective* for *three years* from the date of approval of the original
supplement.

The Act requires that patent information be filed with all newly
submitted Section 505(b) drug applications.  No NDA may be approved after
September 24, 1984, without the submission of patent information to the
Agency.  Effective August 18, 2003, this information must be filed using FDA
Form 3524a "Patent Information Submitted with the Filing of an NDA, Amendment
or Supplement".

Upon approval, patent numbers and expiration dates, in addition to
certain other information on appropriate patents claiming drug products that
are the subject of approved applications, will be published on a daily basis
in the Electronic Orange Book, http://www.fda.gov/cder/ob/default.htm.  The
Addendum and the monthly Cumulative Supplements to the annual edition will
list patent information on a monthly basis.

Effective August 18, 2003 this, information must be submitted to the
agency upon approval on FDA Form 3542 "Patent Information Submitted Upon and
After Approval of an NDA or Supplement". Patent information on unapproved
applications or on patents beyond the scope of the Act (i.e., process or
manufacturing patents) will not be published.  FDA form 3542 will be the only
form used for the purposes of this publication.

The patents that FDA regards as covered by the statutory provisions for
submission of patent information are:  patents that claim the active
ingredient(s); drug product patents which include formulation/composition
patents; use patents for a particular approved indication or method of using
the product; and certain other patents as detailed on FDA Form 3542.  This
information, as provided by the sponsor on FDA form 3542, will be published
as described above.

Since all parts of this publication are subject to changes, additions, or
deletions, the Electronic Orange Book, updated daily, should be consulted for
the most recent patent and exclusivity information.  The Addendum and the
monthly Cumulative Supplements to the annual edition will list patent and
exclusivity information on a monthly basis.



# APPROVED DRUG PRODUCTS

WITH

## THERAPEUTIC EQUIVALENCE EVALUATIONS

### 28th EDITION

**THE PRODUCTS IN THIS LIST HAVE BEEN APPROVED UNDER SECTION 505 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.**

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH
OFFICE OF PHARMACEUTICAL SCIENCE
OFFICE OF GENERIC DRUGS

**2008**

# PATENT AND EXCLUSIVITY INFORMATION ADDENDUM

This *Addendum* identifies drugs that qualify under the Drug Price Competition and Patent Term Restoration Act (1984 Amendments) for periods of exclusivity, during which abbreviated new drug applications (ANDAs) and applications described in Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (the Act) for those drug products may, in some instances, not be submitted or made effective as described below, and provides patent information concerning the listed drug products. Those drugs that have qualified for Orphan Drug Exclusivity pursuant to Section 527 of the Act and those drugs that have qualified for Pediatric Exclusivity pursuant to Section 505A are also included in this *Addendum*. This section is arranged in alphabetical order by active ingredient name followed the trade name. Active ingredient headings for multiple ingredient (combination) drug products are arranged alphabetically. For an explanation of the codes used in the *Addendum*, see the *Patent and Exclusivity Terms* Section. Exclusivity prevents the submission or effective approval of ANDAs or applications described in Section 505(b)(2) of the Act. It does not prevent the submission or approval of a second 505(b)(1) application except in the case of Orphan Drug exclusivity. Applications qualifying for periods of exclusivity are:

(1) A new drug application approved after September 24, 1984, for a drug product all active ingredients (including any ester or salt of the active ingredient) of which had never been approved in any other new drug application under Section 505 (b) of the Act. No subsequent ANDA or application described in Section 505(b)(2) of the Act for the same drug may be *submitted* for a period of *five years* from the date of approval of the original application, except that such an application may be *submitted* after *four years* if it contains a certification that a patent claiming the drug is invalid or will not be infringed by the product for which approval is sought.

(2) A new drug application approved after September 24, 1984, for a drug product containing an active ingredient (including any ester or salt of that active ingredient) that has been approved in an earlier new drug application and that includes reports of new clinical investigations (other than bioavailability studies). Such investigations must have been conducted or sponsored by the applicant and must have been essential to approval of the application. If these requirements are met, the approval of a subsequent ANDA or an application described in Section 505(b)(2) of the Act may not be *made effective* for the same drug or use, if for a new indication, before the expiration of *three years* from the date of approval of the original application. If an applicant has exclusivity for a new application or 505(b)(2) application for the drug product with indications or use, this does not preclude the approval of an ANDA or 505(b)(2) application not covered by the exclusivity.

(3) A supplement to a new drug application for a drug containing a previously approved active ingredient including (any ester or salt of the active ingredient) approved after September 24, 1984, that contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the applicant. The approval of a subsequent ANDA or 505(b)(2) application for a change approved in the supplement may not be

*made effective* for *three years* from the date of approval of the original supplement.

The Act requires that patent information be filed with all newly submitted Section 505(b) drug applications. No NDA may be approved after September 24, 1984, without the submission of patent information to the Agency. Effective August 18, 2003, this information must be filed using FDA Form 3524a "Patent Information Submitted with the Filing of an NDA, Amendment or Supplement".

Effective August 18, 2003, this information must be submitted to the agency upon approval on FDA Form 3542 "Patent Information Submitted Upon and After Approval of an NDA or Supplement". Patent information on unapproved applications or on patents beyond the scope of the Act (i.e., process or manufacturing patents) will not be published. FDA form 3542 will be the only form used for the purposes of this publication.

The patents that FDA regards as covered by the statutory provisions for submission of patent information are: patents that claim the active ingredient(s); drug product patents which include formulation/composition patents; use patents for a particular approved indication or method of using the product; and certain other patents as detailed on FDA Form 3542. This information, as provided by the sponsor on FDA form 3542, will be published as described above.

Upon approval, patent numbers and expiration dates, in addition to certain other information on appropriate patents claiming drug products that are the subject of approved applications, will be published on a daily basis in the Electronic Orange Book, http://www.fda.gov/cder/ob/default.htm. The Addendum lists patent and exclusivity information up to January of the Edition year. The monthly Cumulative Supplements to the annual edition list patent and exclusivity information changes since the Annual Edition Addendum. Since all parts of this publication are subject to changes, additions, or deletions, the Electronic Orange Book, updated daily, should be consulted for the most recent patent and exclusivity information.



**IVAX Pharmaceuticals, Inc.**
Regulatory Affairs Department
Two University Plaza, Suite 220
Hackensack, New Jersey • 07601
Telephone: 215-293-6150
www.IVAXPharmaceuticals.com

January 26, 2007

Gary Buehler
Director, Office of Generic Drugs
Food and Drug Administration
Document Control Room, Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

**PATENT INFORMATION**

ANDA #76-000
OLANZAPINE TABLETS, 2.5 mg, 5 mg, 7.5 mg, 10 mg and 15 mg
REQUEST FOR RESTORATION OF PATENTS TO THE ORANGE BOOK

Dear Mr. Buehler:

This letter is in reference to ANDA No. 76-000. At the time the original ANDA was filed by Zenith Goldline (which since has been acquired by Teva Pharmaceuticals USA, Inc.), four patents were listed for the reference product Zyprexa® Tablets in the Orange Book: U.S. Patents 5,736,541 (the "'541 patent"), 5,919,485 (the "'485 patent"), 5,229,382 (the "'382 patent"), and 5,605,897 (the "'897 patent"). Pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), the original ANDA certified that none of Zenith's olanzapine drug products would infringe any of the listed patents and that the listed patents were otherwise invalid or unenforceable. In accordance with 21 U.S.C. § § 355(j)(2)(B) and 21 CFR 314.95(c), Zenith timely provided Notices of Certification ("paragraph IV notices") regarding those patents to their registered owners and/or assignees, Eli Lilly and Co. and Lilly Industries Ltd (together, "Lilly").

After Zenith filed its ANDA and provided the requisite paragraph IV notices, it discovered that Lilly had late-listed 4 additional patents in the Orange Book: U.S. Patents 5,817,655 (the "'655 patent"), 5,817,656 (the "'656 patent"), 5,817,657 (the "'657 patent"), and 5,627,178 (the "'178 patent"). Those patents were listed for the first time in the November 2000 supplement to the Orange Book, which became available in January, 2001. Zenith therefore submitted an Amendment to its ANDA, which included paragraph IV certifications to all 8 patents—the 4 to which Zenith initially certified, and the 4 late-listed patents from the January 2001 Orange Book supplement. Zenith timely notified Lilly of the amended certifications.

Lilly then late-listed another patent in the Orange Book—U.S. Patent 6,251,895 (the "'895 patent")—which first appeared in the Orange Book in June 2001. Zenith therefore submitted another Amendment to its ANDA, which included a paragraph IV certification to that patent. Zenith thereafter notified Lilly of its amended certification.

*ANDA #76-000*
*OLANZAPINE TABLETS, 2.5 mg, 5 mg, 7.5 mg, 10 mg and 15 mg*
*REQUEST FOR RESTORATION OF PATENTS TO THE ORANGE BOOK*
*Page 2 of 2*

After Zenith submitted its ANDA and provided its paragraph IV notices to Lilly, FDA delisted the '541, '485, '897, '655, '656, '657, '178, and '895 patents from the Orange Book, and required Zenith to update its patent certifications to reflect that only the '382 patent remained listed for the reference products. Those actions were impermissible. *See Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120, 125-26 (D.C. Cir. 2006) (holding that FDA may not delist a patent after an ANDA applicant submits a paragraph IV certification to that patent). Teva therefore requests that FDA immediately restore the unexpired '541, '485, '897, '655, '656, '657, '178, and '895 patents to the Orange Book. *See Sandoz Inc. v. F.D.A.*, 439 F. Supp. 2d 26, 30-31 (D.D.C. 2006), *summarily aff'd* 2006 WL 2591087 (D.C. Cir. 2006).

Should you have questions or require additional information regarding this matter, please contact me by telephone at (215) 591-3142 or by fax at (215) 591-8812.

Sincerely,

Patricia Jaworski
Director, Regulatory Affairs



# APPROVED DRUG PRODUCTS

WITH

## THERAPEUTIC EQUIVALENCE EVALUATIONS

28th EDITION

**THE PRODUCTS IN THIS LIST HAVE BEEN APPROVED UNDER SECTION 505 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.**

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH
OFFICE OF PHARMACEUTICAL SCIENCE
OFFICE OF GENERIC DRUGS

2008

## PRESCRIPTION AND OTC DRUG PRODUCT PATENT AND EXCLUSIVITY LIST

See report footnote for information regarding report content

| APPL/PROD NO | PATENT NO | PATENT EXPIRATON DATE | PATENT CODES | | EXCLUSIVITY CODE(S) | EXCLUSIVITY EXPIRATION DATE |
|---|---|---|---|---|---|---|
| OCTREOTIDE ACETATE; SANDOSTATIN LAR | | | | | | |
| 021008 002 | 5538739 | Jul 23, 2013 | | | M-55 | May 10, 2009 |
| | 5538739*PED | Jan 23, 2014 | | | PED | Nov 10, 2009 |
| | 5639480 | Jun 17, 2014 | DP | | | |
| | 5639480*PED | Dec 17, 2014 | | | | |
| | 5688530 | Nov 18, 2014 | | U-268 | | |
| | 5688530*PED | May 18, 2015 | | | | |
| | 5922338 | Jul 13, 2016 | DP | | | |
| | 5922338*PED | Jan 13, 2017 | | | | |
| | 5922682 | Jul 13, 2016 | DP | | | |
| | 5922682*PED | Jan 13, 2017 | | | | |
| OCTREOTIDE ACETATE; SANDOSTATIN LAR | | | | | | |
| 021008 003 | 5538739 | Jul 23, 2013 | | | M-55 | May 25, 2009 |
| | 5538739*PED | Jan 23, 2014 | | | PED | Nov 25, 2009 |
| | 5639480 | Jun 17, 2014 | DP | | | |
| | 5639480*PED | Dec 17, 2014 | | | | |
| | 5688530 | Nov 18, 2014 | | U-268 | | |
| | 5688530*PED | May 18, 2015 | | | | |
| | 5922338 | Jul 13, 2016 | DP | | | |
| | 5922338*PED | Jan 13, 2017 | | | | |
| | 5922682 | Jul 13, 2016 | DP | | | |
| | 5922682*PED | Jan 13, 2017 | | | | |
| OFLOXACIN; FLOXIN OTIC | | | | | | |
| 020799 001 | 5401741 | Mar 27, 2012 | | U-407 | | |
| OFLOXACIN; OFLOXACIN | | | | | | |
| 076527 001 | | | | | PC | Mar 16, 2008 |
| OLANZAPINE; ZYPREXA | | | | | | |
| 020592 001 | 5229382 | Apr 23, 2011 | DS  DP | U-547 | PED | Jul 14, 2007 |
| | 5229382 | Apr 23, 2011 | DS  DP | U-149 | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5605897 | Feb 25, 2014 | | U-176 | | |
| | 5605897*PED | Aug 25, 2014 | | | | |
| | 5627178 | Apr 23, 2011 | | U-364 | | |
| | 5627178*PED | Oct 23, 2011 | | | | |
| | 5736541 | Mar 24, 2015 | | U-307 | | |
| | 5736541*PED | Sep 24, 2015 | | | | |
| | 5817655 | Apr 23, 2011 | | U-364 | | |
| | 5817655*PED | Oct 23, 2011 | | | | |
| | 5817656 | Apr 23, 2011 | | U-360 | | |
| | 5817656*PED | Oct 23, 2011 | | | | |
| | 5817657 | Apr 23, 2011 | | U-363 | | |
| | 5817657*PED | Oct 23, 2011 | | | | |
| | 5919485 | Mar 24, 2015 | | U-308 | | |
| | 5919485*PED | Sep 24, 2015 | | | | |
| | 6251895 | Sep 23, 2017 | | | | |
| | 6251895*PED | Mar 23, 2018 | | | | |
| OLANZAPINE; ZYPREXA | | | | | | |
| 020592 002 | 5229382 | Apr 23, 2011 | DS  DP | U-149 | PED | Jul 14, 2007 |
| | 5229382 | Apr 23, 2011 | DS  DP | U-547 | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5605897 | Feb 25, 2014 | | U-176 | | |
| | 5605897*PED | Aug 25, 2014 | | | | |
| | 5627178 | Apr 23, 2011 | | U-364 | | |
| | 5627178*PED | Oct 23, 2011 | | | | |
| | 5736541 | Mar 24, 2015 | | U-307 | | |
| | 5736541*PED | Sep 24, 2015 | | | | |
| | 5817655 | Apr 23, 2011 | | U-364 | | |
| | 5817655*PED | Oct 23, 2011 | | | | |
| | 5817656 | Apr 23, 2011 | | U-360 | | |
| | 5817656*PED | Oct 23, 2011 | | | | |
| | 5817657 | Apr 23, 2011 | | U-363 | | |
| | 5817657*PED | Oct 23, 2011 | | | | |
| | 5919485 | Mar 24, 2015 | | U-308 | | |
| | 5919485*PED | Sep 24, 2015 | | | | |
| | 6251895 | Sep 23, 2017 | | | | |
| | 6251895*PED | Mar 23, 2018 | | | | |

# PRESCRIPTION AND OTC DRUG PRODUCT PATENT AND EXCLUSIVITY LIST

See report footnote for information regarding report content

| APPL/PROD NO | PATENT NO | PATENT EXPIRATON DATE | PATENT CODES | | EXCLUSIVITY CODE(S) | EXCLUSIVITY EXPIRATION DATE |
|---|---|---|---|---|---|---|
| **OLANZAPINE; ZYPREXA** | | | | | | |
| 020592 003 | 5229382 | Apr 23, 2011 | DS DP | U-149 | PED | Jul 14, 2007 |
| | 5229382 | Apr 23, 2011 | DS DP | U-547 | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5605897 | Feb 25, 2014 | | U-176 | | |
| | 5605897*PED | Aug 25, 2014 | | | | |
| | 5627178 | Apr 23, 2011 | | U-364 | | |
| | 5627178*PED | Oct 23, 2011 | | | | |
| | 5736541 | Mar 24, 2015 | | U-307 | | |
| | 5736541*PED | Sep 24, 2015 | | | | |
| | 5817655 | Apr 23, 2011 | | U-364 | | |
| | 5817655*PED | Oct 23, 2011 | | | | |
| | 5817656 | Apr 23, 2011 | | U-360 | | |
| | 5817656*PED | Oct 23, 2011 | | | | |
| | 5817657 | Apr 23, 2011 | | U-363 | | |
| | 5817657*PED | Oct 23, 2011 | | | | |
| | 5919485 | Mar 24, 2015 | | U-308 | | |
| | 5919485*PED | Sep 24, 2015 | | | | |
| | 6251895 | Sep 23, 2017 | | | | |
| | 6251895*PED | Mar 23, 2018 | | | | |
| **OLANZAPINE; ZYPREXA** | | | | | | |
| 020592 004 | 5229382 | Apr 23, 2011 | DS DP | U-149 | PED | Jul 14, 2007 |
| | 5229382 | Apr 23, 2011 | DS DP | U-547 | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5605897 | Feb 25, 2014 | | U-176 | | |
| | 5605897*PED | Aug 25, 2014 | | | | |
| | 5627178 | Apr 23, 2011 | | U-364 | | |
| | 5627178*PED | Oct 23, 2011 | | | | |
| | 5736541 | Mar 24, 2015 | | U-307 | | |
| | 5736541*PED | Sep 24, 2015 | | | | |
| | 5817655 | Apr 23, 2011 | | U-364 | | |
| | 5817655*PED | Oct 23, 2011 | | | | |
| | 5817656 | Apr 23, 2011 | | U-360 | | |
| | 5817656*PED | Oct 23, 2011 | | | | |
| | 5817657 | Apr 23, 2011 | | U-363 | | |
| | 5817657*PED | Oct 23, 2011 | | | | |
| | 5919485 | Mar 24, 2015 | | U-308 | | |
| | 5919485*PED | Sep 24, 2015 | | | | |
| | 6251895 | Sep 23, 2017 | | | | |
| | 6251895*PED | Mar 23, 2018 | | | | |
| **OLANZAPINE; ZYPREXA** | | | | | | |
| 020592 005 | 5229382 | Apr 23, 2011 | DS DP | U-547 | PED | Jul 14, 2007 |
| | 5229382 | Apr 23, 2011 | DS DP | U-149 | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5605897 | Feb 25, 2014 | | U-176 | | |
| | 5605897*PED | Aug 25, 2014 | | | | |
| | 5627178 | Apr 23, 2011 | | U-364 | | |
| | 5627178*PED | Oct 23, 2011 | | | | |
| | 5736541 | Mar 24, 2015 | | U-307 | | |
| | 5736541*PED | Sep 24, 2015 | | | | |
| | 5817655 | Apr 23, 2011 | | U-364 | | |
| | 5817655*PED | Oct 23, 2011 | | | | |
| | 5817656 | Apr 23, 2011 | | U-360 | | |
| | 5817656*PED | Oct 23, 2011 | | | | |
| | 5817657 | Apr 23, 2011 | | U-363 | | |
| | 5817657*PED | Oct 23, 2011 | | | | |
| | 5919485 | Mar 24, 2015 | | U-308 | | |
| | 5919485*PED | Sep 24, 2015 | | | | |
| | 6251895 | Sep 23, 2017 | | | | |
| | 6251895*PED | Mar 23, 2018 | | | | |

## PRESCRIPTION AND OTC DRUG PRODUCT PATENT AND EXCLUSIVITY LIST

See report footnote for information regarding report content

| APPL/PROD NO | PATENT NO | PATENT EXPIRATON DATE | PATENT CODES | | EXCLUSIVITY CODE(S) | EXCLUSIVITY EXPIRATION DATE |
|---|---|---|---|---|---|---|
| OLANZAPINE; ZYPREXA | | | | | | |
| 020592 006 | 5229382 | Apr 23, 2011 | DS | DP U-149 | PED | Jul 14, 2007 |
| | 5229382 | Apr 23, 2011 | DS | DP U-547 | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5605897 | Feb 25, 2014 | | U-176 | | |
| | 5605897*PED | Aug 25, 2014 | | | | |
| | 5627178 | Apr 23, 2011 | | U-364 | | |
| | 5627178*PED | Oct 23, 2011 | | | | |
| | 5736541 | Mar 24, 2015 | | U-307 | | |
| | 5736541*PED | Sep 24, 2015 | | | | |
| | 5817655 | Apr 23, 2011 | | U-364 | | |
| | 5817655*PED | Oct 23, 2011 | | | | |
| | 5817656 | Apr 23, 2011 | | U-360 | | |
| | 5817656*PED | Oct 23, 2011 | | | | |
| | 5817657 | Apr 23, 2011 | | U-363 | | |
| | 5817657*PED | Oct 23, 2011 | | | | |
| | 5919485 | Mar 24, 2015 | | U-308 | | |
| | 5919485*PED | Sep 24, 2015 | | | | |
| | 6251895 | Sep 23, 2017 | | | | |
| | 6251895*PED | Mar 23, 2018 | | | | |
| OLANZAPINE; ZYPREXA | | | | | | |
| 021253 001 | 5229382 | Apr 23, 2011 | DS | DP U-571 | PED | Sep 29, 2007 |
| | 5229382*PED | Oct 23, 2011 | | | PED | Sep 29, 2007 |
| OLANZAPINE; ZYPREXA ZYDIS | | | | | | |
| 021086 001 | 5229382 | Apr 23, 2011 | | U-324 | PED | Jul 14, 2007 |
| | 5229382*PED | Oct 23, 2011 | | | | |
| OLANZAPINE; ZYPREXA ZYDIS | | | | | | |
| 021086 002 | 5229382 | Apr 23, 2011 | | U-324 | PED | Jul 14, 2007 |
| | 5229382*PED | Oct 23, 2011 | | | | |
| OLANZAPINE; ZYPREXA ZYDIS | | | | | | |
| 021086 003 | 5229382 | Apr 23, 2011 | | U-324 | PED | Jul 14, 2007 |
| | 5229382*PED | Oct 23, 2011 | | | | |
| OLANZAPINE; ZYPREXA ZYDIS | | | | | | |
| 021086 004 | 5229382 | Apr 23, 2011 | | U-324 | PED | Jul 14, 2007 |
| | 5229382*PED | Oct 23, 2011 | | | | |
| OLMESARTAN MEDOXOMIL; BENICAR | | | | | | |
| 021286 001 | 5616599 | Apr 25, 2016 | DS | DP U-500 | | |
| | 6878703 | Nov 19, 2021 | | U-3 | | |
| OLMESARTAN MEDOXOMIL; BENICAR | | | | | | |
| 021286 003 | 5616599 | Apr 25, 2016 | DS | DP U-500 | | |
| | 6878703 | Nov 19, 2021 | | U-3 | | |
| OLMESARTAN MEDOXOMIL; BENICAR | | | | | | |
| 021286 004 | 5616599 | Apr 25, 2016 | DS | DP U-500 | | |
| | 6878703 | Nov 19, 2021 | | U-3 | | |
| OLOPATADINE HYDROCHLORIDE; PATADAY | | | | | | |
| 021545 001 | 5116863 | Dec 18, 2010 | DS | DP | NP | Dec 22, 2007 |
| | 5641805 | Jun 06, 2015 | | U-765 | | |
| | 6995186 | Nov 12, 2023 | | DP U-765 | | |
| OLOPATADINE HYDROCHLORIDE; PATANOL | | | | | | |
| 020688 001 | 5116863 | Dec 18, 2010 | | | | |
| | 5641805 | Jun 06, 2015 | | U-184 | | |
| OMEGA-3-ACID ETHYL ESTERS; LOVAZA | | | | | | |
| 021654 001 | 5502077 | Mar 26, 2013 | DS | U-822 | M-64 | Jun 12, 2010 |
| | 5656667 | Aug 27, 2018 | DS | DP U-822 | NCE | Nov 10, 2009 |
| | 5698594 | Aug 04, 2009 | DS | U-822 | | |



**Administrative Offices:**
TEVA PHARMACEUTICALS USA
1090 Horsham Road, PO Box 1090
North Wales, PA 19454-1090

**Deborah A. Jaskot, M.S., RAC**
Vice President, Regulatory Affairs

Direct Dial: (215) 591 3142
Direct FAX: (215) 591 8812
deborah.jaskot@tevausa.com

January 25, 2007

**PATENT INFORMATION**

Gary Buehler
Director, Office of Generic Drugs
Food and Drug Administration
Document Control Room, Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

ANDA #76-287
FLUOXETINE CAPSULES USP, 10 mg and 20 mg
REQUEST FOR RESTORATION OF 5,114,976 AND 5,744,501 TO THE ORANGE BOOK

Dear Mr. Buehler:

This letter is in reference to ANDA No. 76-287. At the time Teva submitted the ANDA to the Agency, three patents were listed in the Orange Book for the reference product Sarafem™ Capsules: U.S. Patents 4,971,998 (the "'998 patent"), 5,114,976 (the "'976 patent") and 5,744,501 (the "'501 patent"). Pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), the original ANDA certified that neither of Teva's fluoxetine hydrochloride drug products would infringe any of the listed patents and that the listed patents were otherwise invalid or unenforceable. In accordance with 21 U.S.C. § § 355(j)(2)(B) and 21 CFR 314.95(c), Teva timely provided Notices of Certification ("paragraph IV notices") regarding those patents to Eli Lilly and Co. (as the holder of NDA 18-936 for Sarafem™ Capsules) and to Massachusetts Institute of Technology (hereafter "MIT") as the assignee of the '998 patent.

After Teva submitted its ANDA and provided its paragraph IV notices, FDA delisted the '976 and '501 patents from the Orange Book and required Teva to update its patent certification to reflect that only the '998 patent remained listed for the reference products. Those actions were impermissible. *See Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120, 125-26 (D.C. Cir. 2006) (holding that FDA may not delist a patent after an ANDA applicant submits a paragraph IV certification to that patent). Teva therefore requests that FDA immediately restore the '976 and '501 patents to the Orange Book. *See Sandoz Inc. v. F.D.A.*, 439 F.Supp.2d 26, 30-31 (D.D.C. 2006), *summarily aff'd* 2006 WL 2591087 (D.C. Cir. 2006).

Should you have questions or require additional information regarding this matter, please contact me by telephone at (215) 591-3142 or by fax at (215) 591-8812.

Sincerely,

Deborah A. Jaskot
Vice President, Regulatory Affairs



# APPROVED DRUG PRODUCTS

WITH

## THERAPEUTIC EQUIVALENCE EVALUATIONS

28th EDITION

**THE PRODUCTS IN THIS LIST HAVE BEEN APPROVED UNDER SECTION 505 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.**

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH
OFFICE OF PHARMACEUTICAL SCIENCE
OFFICE OF GENERIC DRUGS

**2008**

## PRESCRIPTION AND OTC DRUG PRODUCT PATENT AND EXCLUSIVITY LIST

See report footnote for information regarding report content

| APPL/PROD NO | PATENT NO | PATENT EXPIRATON DATE | PATENT CODES | | EXCLUSIVITY CODE(S) | EXCLUSIVITY EXPIRATION DATE |
|---|---|---|---|---|---|---|
| FLUOCINONIDE; VANOS | | | | | | |
| 021758 001 | 6765001 | Dec 21, 2021 | | DP | I-487 | Mar 02, 2009 |
| | | | | | NP | Feb 11, 2008 |
| FLUOROURACIL; CARAC | | | | | | |
| 020985 001 | 6670335 | Jun 02, 2021 | | DP U-68 | | |
| FLUOXETINE HYDROCHLORIDE; PROZAC WEEKLY | | | | | | |
| 021235 001 | 5910319 | May 29, 2017 | | U-396 | | |
| | 5985322 | May 29, 2017 | | U-397 | | |
| | RE39030 | May 29, 2017 | | DP U-397 | | |
| | RE39030 | May 29, 2017 | | DP U-396 | | |
| FLUOXETINE HYDROCHLORIDE; SARAFEM | | | | | | |
| 018936 007 | 4971998 | Nov 20, 2007 | | U-338 | | |
| | 4971998*PED | May 20, 2008 | | U-338 | | |
| | 5114976 | May 19, 2009 | | U-341 | | |
| | 5114976*PED | Nov 19, 2009 | | U-341 | | |
| | 5744501 | May 19, 2009 | | U-342 | | |
| | 5744501*PED | Nov 19, 2009 | | U-342 | | |
| FLUOXETINE HYDROCHLORIDE; SARAFEM | | | | | | |
| 018936 008 | 4971998 | Nov 20, 2007 | | U-338 | | |
| | 4971998*PED | May 20, 2008 | | U-338 | | |
| | 5114976 | May 19, 2009 | | U-341 | | |
| | 5114976*PED | Nov 19, 2009 | | U-341 | | |
| | 5744501 | May 19, 2009 | | U-342 | | |
| | 5744501*PED | Nov 19, 2009 | | U-342 | | |
| FLUOXETINE HYDROCHLORIDE; OLANZAPINE; SYMBYAX | | | | | | |
| 021520 001 | 5229382 | Apr 23, 2011 | DS | DP | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| FLUOXETINE HYDROCHLORIDE; OLANZAPINE; SYMBYAX | | | | | | |
| 021520 002 | 5229382 | Apr 23, 2011 | DS | DP | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5945416 | Mar 24, 2017 | DS | DP | | |
| FLUOXETINE HYDROCHLORIDE; OLANZAPINE; SYMBYAX | | | | | | |
| 021520 003 | 5229382 | Apr 23, 2011 | DS | DP | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5945416 | Mar 24, 2017 | DS | DP | | |
| FLUOXETINE HYDROCHLORIDE; OLANZAPINE; SYMBYAX | | | | | | |
| 021520 004 | 5229382 | Apr 23, 2011 | DS | DP | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5945416 | Mar 24, 2017 | DS | DP | | |
| FLUOXETINE HYDROCHLORIDE; OLANZAPINE; SYMBYAX | | | | | | |
| 021520 005 | 5229382 | Apr 23, 2011 | DS | DP | | |
| | 5229382*PED | Oct 23, 2011 | | | | |
| | 5945416 | Mar 24, 2017 | DS | DP | | |
| FLUTICASONE FUROATE; VERAMYST | | | | | | |
| 022051 001 | 6858596 | Aug 03, 2021 | | DP U-808 | | |
| | 7101866 | Aug 03, 2021 | DS | DP U-808 | | |
| FLUTICASONE PROPIONATE; CUTIVATE | | | | | | |
| 021152 001 | 7300669 | Oct 20, 2019 | | DP U-835 | NDF | Mar 31, 2008 |
| | | | | | PED | Sep 30, 2008 |
| FLUTICASONE PROPIONATE; FLOVENT DISKUS 100 | | | | | | |
| 020833 002 | 6536427 | Mar 01, 2011 | | DP | | |
| | 6536427*PED | Sep 01, 2011 | | DP | | |
| FLUTICASONE PROPIONATE; FLOVENT DISKUS 250 | | | | | | |
| 020833 003 | 6536427 | Mar 01, 2011 | | DP | | |
| | 6536427*PED | Sep 01, 2011 | | DP | | |
| FLUTICASONE PROPIONATE; FLOVENT DISKUS 50 | | | | | | |
| 020833 001 | 6536427 | Mar 01, 2011 | | DP | | |
| | 6536427*PED | Sep 01, 2011 | | DP | | |



**Charles A. Weiss**
Direct 212.908.6287
cweiss@kenyon.com

One Broadway
New York, NY 10004-1007
212.425.7200
Fax 212.425.5288

October 18, 2006

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane, Room 1061
Rockville, MD 20852

## CITIZEN PETITION

### ACTION REQUESTED

      KV Pharmaceutical Company ("KV") respectfully submits this Citizen Petition under Section 505 of the Food, Drug and Cosmetic Act (generally codified at 21 U.S.C. § 355) and Section 10.30 of the Food and Drug Administration's implementing regulations (21 C.F.R. § 10.30). This petition requests that FDA: (1) relist U.S. Patent 5,246,714 (the '714 patent) in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") for 100 mg and 200 mg Toprol-XL (metoprolol succinate extended release) tablets, both approved drug products of AstraZeneca LP; (2) refrain from approval of any Abbreviated New Drug Application ("ANDA") for metoprolol succinate extended release100 mg and 200 mg tablets filed subsequent to KV's ANDA No. 76-640 for metoprolol succinate extended release 100 mg and 200 mg tablets until KV's 180-day exclusivity based on the '714 patent has expired; and (3) confirm that KV's right to 180-day exclusivity with regard to ANDA No. 76-640 has not been affected by FDA's earlier erroneous delisting of the '714 patent from the Orange Book.

      The plain language of 21 U.S.C. § 355(j)(5)(B)(iv)(2002) establishes that KV is entitled to 180 days of marketing exclusivity for its generic drug product based on KV's paragraph IV certification of the '714 patent. KV's exclusivity should not be extinguished by FDA's erroneous delisting of the patent from the Orange Book. FDA's delisting was in error because the patent was delisted after KV filed its paragraph IV certification, after AstraZeneca did not file a corresponding infringement action, and after KV qualified for exclusivity. FDA's delisting was also in error because the '714 patent was delisted after it had been subject to a

*CP1*

*2006P-0422*



lawsuit. *See* 21 C.F.R. § 314.94(a)(12)(viii)(B). The plain language of the statute and court precedent compel FDA to preserve KV's exclusivity by relisting the '714 patent.

In view of the plain language of section 355(j)(5)(B)(iv), court precedent compelling FDA to preserve KV's exclusivity by relisting the '714 patent, and regulations prohibiting removal of the '714 patent from the Orange Book, KV petitions FDA to relist the '714 patent for Toprol-XL, maintain KV's exclusivity against subsequently filed ANDA applications, and confirm KV's right to its forthcoming exclusivity period.

## STATEMENT OF GROUNDS

### I.    Background

In January 2003, KV submitted an Abbreviated New Drug Application (ANDA No. 76-640) for 200 mg metoprolol succinate tablets. KV's metoprolol succinate is a generic version of Toprol-XL, an approved drug of AstraZeneca LP. In July 2003, KV amended its ANDA No. 76-640 to also include 100 mg metoprolol succinate tablets.

As part of its ANDA, KV submitted paragraph IV certifications on all five patents listed by FDA as covering 100 mg and 200 mg Toprol-XL tablets in the then-current Orange Book. KV's paragraph IV certifications asserted that KV's proposed product did not infringe any of the listed patents and/or that the listed patents were invalid. The listed patents at that time included the '714 patent as well as U.S. Patent 4,927,640 (the '640 patent); U.S. Patent 4,957,745 (the '745 patent); U.S. Patent 5,001,161 (the '161 patent); and U.S. Patent 5,081,154 (the '154 patent). In fulfillment of its statutory requirement, KV notified the NDA holder (AstraZeneca LP) and patent owner (Aktiebolaget Hassle) of KV's paragraph IV certifications. KV believes it was the first applicant to file a substantially complete ANDA application on 100 mg and 200 mg metoprolol succinate tablets and was the first to submit paragraph IV certifications on each of the five listed patents.

AstraZeneca brought infringement actions against KV based on KV's certification of the '154 patent, the '161 patent and the '745 patent for 100 mg and 200 mg metoprolol



succinate.[1]  AstraZeneca did not bring infringement actions based on KV's certification of the '714 patent or the '640 patent—presumably, having been satisfied that KV successfully designed around the remaining listed patents and that no infringement action legitimately could be brought on them.

Nevertheless, to establish KV's freedom to operate under the '714 patent and the '640 patent, KV filed declaratory judgment counterclaims on both remaining listed patents.  KV filed its declaratory judgment counterclaims on 200 mg tablets on May 27, 2003.  On August 11, 2003, the district court entered a consent order dismissing with prejudice KV's counterclaims on 200 mg tablets in view of AstraZeneca's covenant-not-to-sue on the '714 and '640 patents.  KV filed declaratory judgment counterclaims on 100 mg tablets on September 11, 2003.  On October 27, 2003, the district court likewise entered a consent order dismissing with prejudice KV's counterclaims on 100 mg tablets in view of AstraZeneca's covenant-not-to-sue on the '714 and '640 patents.  AstraZeneca's covenants-not-to-sue again demonstrate that KV's extensive efforts to design around the '714 patent and the '640 patent were apparently successful.

It is KV's understanding that well after KV notified AstraZeneca of its respective paragraph IV certifications on the '714 patent and subsequent to KV's filing of respective declaratory judgment counterclaims on the '714 patent, FDA removed ("delisted") the '714 patent from the Orange Book—presumably at the request of AstraZeneca.[2]  KV respectfully submits FDA's delisting was erroneous in view of 21 U.S.C. § 355(j)(5)(B)(iv) and 21 C.F.R. § 314.94(a)(12)(viii)(B) because the delisting occurred after KV's paragraph IV certifications and after the filing of KV's declaratory judgment actions.

KV is aware of no reason why the '714 patent should rightfully have been delisted by FDA in the circumstances of this matter, or that AstraZeneca initially listed the '714 patent,

---

[1]     On May 6, 2003, AstraZeneca brought Civil Action No. 03-0592 in the District Court for the Eastern District of Missouri based on KV's ANDA with paragraph IV certifications on 200 mg metoprolol succinate.  On August 22, 2003, AstraZeneca brought Civil Action No. 03-1169 in the same court based on KV's then-amended ANDA with paragraph IV certifications on 100 mg metoprolol succinate.  On October 6, 2003 the actions were consolidated under Civil Action No. 03-0592.

[2]     The '640 patent was not removed from the Orange Book.

Division of Dockets Management
October 18, 2006
Page 4



which at least facially could apply to Toprol-XL, in error. *See* 21 C.F.R. § 314.53(b) and (f).

AstraZeneca identified the '714 patent as covering Toprol-XL. KV subsequently devoted

considerable resources to designing a generic drug product that does not infringe a valid claim of

any patent then listed in the Orange Book for Toprol-XL. Subsequent to KV's paragraph IV

certification, AstraZeneca chose not to bring an infringement action against KV on the '714

patent. Further, KV's ensuing declaratory judgment counterclaim to establish noninfringement

was dismissed by stipulation. These facts demonstrate that KV's extensive efforts to design

around the '714 patent were successful. KV's success in designing around the patent resulted in

KV's statutory and regulatory eligibility for 180 days of marketing exclusivity for 100 mg and

200 mg metoprolol succinate tablets. *See* 21 U.S.C. § 355(j)(5)(B)(iv); 21 C.F.R.

§§ 314.94(a)(12)(viii)(B) and 314.107(c).

## II.    The plain language of 21 U.S.C. § 355(j)(5)(B)(iv) provides KV with 180 Days of marketing exclusivity

Under the plain language of 21 U.S.C. § 355(j)(5)(B)(iv)(2002),[3] KV is entitled to

180 days of marketing exclusivity for 100 mg and 200 mg metoprolol succinate tablets based on

the '714 patent because KV is apparently the first ANDA applicant on those drug products to file

a paragraph IV certification on the '714 patent. That period has not been triggered because KV

has not commercially marketed its product (and could not, since the ANDA has not yet been

approved) and there has not been a court decision holding the '714 patent invalid or not

infringed.[4] *See Ranbaxy Labs. Ltd. v. Leavitt*, No. 05-1838, 2006 U.S. Dist. LEXIS 24612, *28-

---

[3]      Because a paragraph IV certification was filed on metoprolol succinate 100 mg and
200 mg tablets before December 8, 2003, amendments to 21 U.S.C. § 355(j) found in the
Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), Pub. L. No.
108-173 Sta. 2066 (Dec. 8, 2003), do not apply to the exclusivity determinations discussed
herein. *See* MMA § 1102(b)(1).

[4]      21 U.S.C. § 355(j)(5)(B)(iv)(2002) reads:
If the application contains a certification described in subclause (IV) of paragraph
(2)(A)(vii) and is for a drug for which a previous application has been submitted
under this subsection [containing] such a certification, the application shall be
made effective not earlier than one hundred and eighty days after--
(I) the date the Secretary receives notice from the applicant under the previous
application of the first commercial marketing of the drug under the previous
application, or

Division of Dockets Management
October 18, 2006
Page 5



29 (D.D.C. May 1, 2006) *appeal pending* , *No. 06-5154 (D.C. Cir.)* (Attachment A).  Absent a triggering court decision, a first-to-file applicant may enjoy its exclusivity so long as the patent is listed for an approved drug or approved method of using the drug and the patent does not expire. *See, e.g., Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 886-88 (D.C. Cir. 2003) (affirming FDA delisting of patent listed for method of treating epilepsy on drug not actually approved to treat epilepsy because successful ANDA applicant could never have exclusivity on a method that had never been approved); *Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 354 (D.N.J. 2003) (certification on patent that expired does not provide exclusivity).  The statute bars approval of later-filed applications until the first-to-file applicant enjoys its period of exclusive marketing.  *Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *26 (finding statutory bar of approval "generally undisputed").

A.    **The NDA holder must list patents that cover the approved drug and ANDA applicants must rely on that listing**

Applicants seeking approval from FDA to market a new drug product must file a New Drug Application (NDA).  Applicants seeking approval to market a generic version of an already approved drug product must file an Abbreviated New Drug Application (ANDA).  NDA holders approved to market a new drug product must submit information on patents that claim the drug or use of the drug for which the NDA was approved.  21 U.S.C. § 355(b)(1) and (c)(2); 21 C.F.R. § 314.53.  This information is published by FDA in the Orange Book.  21 U.S.C. § 355(j)(7)(A)(iii).

Applicants for ANDAs are required to make certifications as to each patent listed in the Orange Book for a relevant drug product, or to state that a listed patent does not cover a use for which the ANDA applicant is seeking approval.  21 U.S.C. § 355(j)(2)(A)(vii-viii). Certifications must be made despite disagreement about the accuracy or relevance of the listed patent information.  21 C.F.R. §§ 314.53(f) and 314.94(a)(12)(vii).  As such, ANDA applicants must rely on the NDA holder's good faith listing of patents when ANDA applicants set out to design a drug product that does not infringe a valid claim of any of the NDA holder's listed

---

(II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed[.]

patents.

### B. First-to-file paragraph IV applicants that are not sued are eligible for exclusivity

An ANDA applicant that is first to file a paragraph IV certification asserting that a particular listed patent is invalid or not infringed by the applicant's ANDA is eligible for 180 days of marketing exclusivity for a generic version of that drug. Exclusivity begins on the day the applicant first commercially markets the drug or on the day a court finds the listed patent invalid or not infringed. *See* 21 U.S.C. § 355(j)(5)(B)(iv).[5]

### C. KV is eligible for exclusivity because it was first to file and no court decision has been rendered

AstraZeneca listed the '714 patent in the Orange Book for Toprol-XL. KV filed an ANDA application seeking to market a generic version of Toprol-XL (100 mg and 200 mg) and was apparently the first-filer on these drug products. Along with its ANDA, KV filed a paragraph IV certification on the '714 patent. AstraZeneca subsequently did not bring an infringement action on the '714 patent. Therefore, to establish its freedom to operate, KV brought declaratory judgment actions on the '714 patent. The declaratory judgment actions were later dismissed based on AstraZeneca's covenants-not-to-sue.

The apparent result of AstraZeneca's decision not to sue KV and the parties' joint decision to stipulate to dismissal of KV's declaratory judgment counterclaims is that no court decision finding the '714 patent invalid or not infringed will trigger KV's exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv). *See Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249, 1251, 1253 (D.C. Cir. 2006) (affirming FDA determination that a "stipulation and order" is insufficient to trigger 180-day exclusivity and refusing to enjoin FDA from providing exclusivity to first-to-file generic applicant). The plain language of 21 U.S.C. § 355(j)(5)(B)(iv), therefore, provides KV

---

[5]    A "court decision" for purposes of beginning an applicant's 180 days of marketing exclusivity does not include a stipulated dismissal of a declaratory judgment action for lack of subject matter jurisdiction such as the dismissal of KV's declaratory judgment counterclaim discussed herein. *See Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249, 1251, 1253 (D.C. Cir. 2006) (affirming a district court denial of a preliminary injunction against an FDA determination that a stipulated dismissal of a declaratory judgment action based on a promise not to sue did not trigger exclusivity).

Division of Dockets Management
October 18, 2006
Page 7



with 180 days of marketing exclusivity beginning at KV's notification of the first commercial marketing of its drug products.

## III.    The '714 patent could not be delisted after AstraZeneca chose not to sue KV on the '714 patent

Despite KV's statutory eligibility for exclusivity based on the '714 patent, FDA apparently delisted the '714 patent in 2003 and may have concluded erroneously that KV is not entitled to 180 days of marketing exclusivity under the '714 patent.  Despite FDA's erroneous delisting of the '714 patent, KV continues to be entitled to 180 days of marketing exclusivity in view of the District Court for the District of Columbia's recent decision in *Ranbaxy Labs. Ltd. v. Leavitt*.  There, the district court established that FDA may <u>not</u> delist a patent after an ANDA applicant has already submitted a paragraph IV certification and become eligible for 180-day exclusivity based on the NDA holder's decision not to sue the ANDA applicant.  *See* 2006 U.S. Dist. LEXIS 24612 at *28; *See* June 22, 2006 FDA Letter at 1-2, Docket Nos. 2005P-0008/CP1, 2005P-0046/CP1, and 2006P-0258/CP1 (June 22 FDA Letter) (Attachment B) (acknowledging court determination that it was impermissible for "FDA to remove [listed patents] at the request of [the NDA holder] when [ANDA] applicants had already submitted certification to those patents . . . and thus had become eligible for 180-day exclusivity . . . .").  The holding of that case directly controls the current matter and mandates that this Petition be granted.

In *Ranbaxy*, the district court enjoined FDA's erroneous delisting of patents for which ANDA applicants were first to file paragraph IV certifications but had not been sued by the NDA holder.  The district court held that FDA could not treat first-to-file applicants that had <u>not</u> been sued by the NDA holder differently from first-to-file applicants that had been sued by the NDA holder because both types of applicants had been equally provided exclusivity under the statutory scheme.  *See Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *28 ("If [the NDA holder] had sued plaintiffs because of their paragraph IV certifications, plaintiffs would have been in danger of losing their right to the 180-day exclusivity period upon final FDA approval only if the patents were found to be enforceable or infringed.  In this case, however the FDA delisted the patents from the Orange Book, disregarding the plaintiffs' <u>success in avoiding suit</u>.  That disparate treatment here contravened the plain and undisputed intent of Congress.")

Division of Dockets Management
October 18, 2006
Page 8



(emphasis added).

### A.  Delisting is improper subsequent to a Paragraph IV certification to which exclusivity attaches

The court in *Ranbaxy* considered whether two ANDA applicants first to file paragraph IV certifications on particular dosages of simvastatin were entitled to exclusivity despite FDA's delisting of the paragraph-IV-certified patents. *See id.* at *13-16. The applicants had both filed paragraph IV certifications on two listed patents and paragraph III certifications on one listed patent that was soon to expire.[6] The NDA holder did not bring an infringement action against the applicants based on their paragraph IV certifications. *Id.* at *15. As such, the ANDA applicants were at that time entitled to exclusivity on their respective dosage forms of simvastatin. *See* 21 U.S.C. § 355(j)(5)(B)(iv); 21 C.F.R. § 314.107(c). Their respective applications, however, would not be given final approval until the paragraph-III-certified patent expired. *See Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *14.

Prior to expiration of the paragraph-III-certified patent, the NDA holder requested FDA delist the ANDA applicants' paragraph-IV-certified patents. *Id.* at *15-16. Under FDA's understanding of its regulations at that time, delisting of the patents would effectively eliminate the ANDA applicants' respective exclusivities.[7]

Nevertheless, at the request of the NDA holder, FDA delisted the paragraph-IV-certified patents and, in the mind of FDA, eliminated any exclusivity available on those patents. *See id.* at *16. The ANDA applicants filed respective citizen petitions to relist the patents— which FDA subsequently denied. *See id.* at *17. The ANDA applicants then brought actions to enjoin FDA to relist the patents and provide the exclusivity to which the applicants were entitled.

---

[6]     Paragraph III certifications seek approval only after expiration of the certified patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(III).

[7]     While the FDCA statute provides no express mechanism for removing a patent formerly listed in the Orange Book, FDA has interpreted the statute to afford the agency a ministerial role in listing and delisting patents. *See Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *10. If a listed patent is removed from the Orange Book, FDA has interpreted its regulations to require paragraph IV certifications to be amended to accurately reflect that the patent is no longer listed for the relevant drug product. *See* 21 C.F.R. § 314.94(a)(12)(viii). Applications that do not contain a paragraph IV listing are not subject to a delay in approval under 21 U.S.C. § 355(j)(5)(B)(iv) and, therefore, extinguish the first-to-file applicant's exclusivity. *See id.*



*Id.* at \*20. The district court agreed with the applicants that FDA's delisting of the patents was erroneous and remanded to FDA to relist the patents and provide the applicants with their rightful exclusivity. *See id.* at \*28-30.

### B. Improper to distinguish between paragraph IV certifications resulting in suit and paragraph IV certifications not resulting in suit

The court held that FDA could not delist paragraph-IV-certified patents upon which applicants had <u>not</u> been sued (thereby depriving applicants of exclusivity) while refusing to delist paragraph-IV-certified patents upon which applicants had been sued (thereby preserving exclusivity). *See Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at \*28. The statute clearly provides equal mechanisms providing exclusivity to those that are sued and those that are not sued. *See id.* at \*26 ("[I]t is undisputed that Congress did not restrict this reward to only those ANDA holders who have been sued for infringement, or successfully defended such a suit, just as Congress did not restrict the reward to those ANDA holders who avoided suit by persuasion or effectively designing around the patent or otherwise."). As such, it was improper for FDA to favor "one of two equal statutory provisions over the other." *Id.* at \*28.

The court found FDA's interpretation of its regulations allowing delisting of patents in one circumstance and not the other contravened "the plain and undisputed intent of Congress" because FDA's disparate delisting practice "effectively eliminates Congress's 'first commercial marketing' trigger, in violation of the clear command of Congress." *Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at \*28; *see also* 21 U.S.C. § 355(j)(5)(B)(iv) ("[T]he application shall be made effective not earlier than one hundred and eighty days after . . . the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application . . . .").

FDA should have provided exclusivity to the first-to-file applicants (whether sued or not) because Congress intended to reward both generic manufacturers that incur substantial risk and expense in defending infringement suits as well as generic manufacturers that incur substantial risk and expense in designing around patents. *Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at \*25-26. The citizen petitions to relist the patents should have been granted. *See id.* at \*30.



**C.    FDA relisted the patents and confirmed exclusivities**

In response to the district court's decision, FDA relisted the patents. June 22 FDA Letter at 2. In notifying interested parties of the patent relistings, FDA explained that the issue before the court was "whether it was permissible for FDA to remove [listed patents from the Orange Book], at the request of [the NDA holder] when [ANDA] applicants had already submitted certification to those patents . . . and thus had become eligible for 180-day exclusivity under section 505(j)(5)(B)(iv)." *Id.* at 1. FDA acknowledged that the court's order required "the patents be relisted, and that eligibility for 180-day exclusivity be determined based on the paragraph IV certification made to the patents." *Id.* at 2. As a result, absent an appellate court ruling to the contrary, the patents will remain listed until the ANDA applicants' respective periods of exclusivity have been triggered and have run. *Id.*

**D.    The '714 patent should likewise be relisted
        and KV's exclusivity confirmed**

The '714 patent should likewise be relisted by FDA and FDA should confirm KV's entitlement to exclusivity based on the '714 patent. KV filed its ANDA application with paragraph IV certifications on the '714 patent well before the '714 patent was delisted. When KV filed its paragraph IV certifications and AstraZeneca did not subsequently file an infringement action, KV was entitled to 180 days of marketing exclusivity triggered either by a court decision or KV's first commercial marketing. KV's marketing exclusivity should not be eliminated or compromised simply because AstraZeneca did not sue KV on the '714 patent. Such an action would contravene "the plain and undisputed intent of Congress" and "effectively eliminate[] Congress's 'first commercial marketing' trigger, in violation of the clear command of Congress." *Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *28. Instead, the '714 patent should be relisted and KV should be provided the exclusivity to which it is entitled. *See id.* at *30.

**IV.    The '714 patent was erroneously delisted after KV filed
         its declaratory judgment counterclaim**

As discussed above, prior to the district court's decision in *Ranbaxy Laboratories, Ltd.*, FDA's erroneous delisting of the '714 patent would have undermined KV's exclusivity. *See* 2006 U.S. Dist. LEXIS 24612 at *18-19. Nevertheless, even in the absence of the district court's



holding, FDA's own regulations expressly prohibited the delisting of the '714 patent and FDA should relist the patent until KV's exclusivity period has expired. *See Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *30 (finding FDA denial of citizen petitions requesting relisting of erroneously delisted patents contrary to the clear intent of Congress). FDA regulations expressly prohibited the delisting of the '714 patent because the patent was delisted after it was subject to a declaratory judgment action in an ANDA litigation. *See* 21 C.F.R. §§ 314.94(a)(12)(viii)(B) and 314.107(c).

### A.   Patents that are subject to declaratory judgment actions may not be delisted

Section 314.94(a)(12)(viii)(B) of FDA's regulations establishes that "[a] patent that is subject of a lawsuit under § 314.107(c) <u>shall not be removed</u> from the [Orange Book] until FDA determines . . . that no delay in effective dates of approval is required under that section as a result of the lawsuit . . . ." *Id.* (emphasis added). FDA has at least once asserted that the lawsuit referenced in § 314.107(c) may include either an infringement action <u>or</u> a declaratory judgment action (such as the declaratory judgment action brought by KV on the '714 patent). *See* Brief For Appellants (FDA) at 32, *Ranbaxy Labs. Ltd. v. Leavitt*, No. 06-5154 (D.C. Cir. June 21, 2006) (relevant portions at Attachment C) ("Accordingly, when an NDA holder . . . delists a patent <u>in the absence of</u> patent infringement or <u>declaratory judgment litigation</u> (litigation referred to in 21 C.F.R. § 314.107(c)), ANDAs with paragraph IV certifications must be amended . . .") (emphasis added).[8]  While FDA later reconsidered its own clear and unambiguous reading of these regulations, a review of the plain language of § 314.94(a)(12)(viii)(B) and § 314.107(c) makes apparent that FDA's position in the above-cited brief is the proper reading of the intersection between these two regulations.

---

[8]      FDA later withdrew this position in the *Ranbaxy* appeal. *See* Reply Brief For The Appellants (FDA) at 35, *Ranbaxy Labs. Ltd. v. Leavitt*, No. 06-5154 (D.C. Cir. July 27, 2006) (relevant portions at Attachment D) ("Our reference to declaratory judgment actions on page 32 of our opening brief was inadvertent."). Nevertheless, a plain reading of the regulation (and its related statute) supports FDA's position in the original brief and FDA should embrace its original (and proper) appeal position.



### 1.    A "court decision" under § 314.107(c) may arise from a declaratory judgment action

Section 314.94(a)(12)(viii)(B) expressly states a patent will not be delisted from the Orange Book if the patent is subject to a "lawsuit" under § 314.107(c) (unless no exclusivity is presently attached to the patent). The only reference in § 314.107(c) to any kind of "lawsuit" is a reference to a "decision of the court" that triggers exclusivity. *See* § 314.107(c)(ii) ("The date of a <u>decision of the court</u> holding the relevant patent invalid, unenforceable, or not infringed.") (emphasis added).[9]

FDA interprets exclusivity under § 314.107(c) to be triggered by a "decision of the court" in either an infringement action <u>or</u> a declaratory judgment action (in ANDA litigations) so long as the action results in an actual decision of invalidity, noninfringement or unenforceability that is clear on the face of the court's decision.[10]  *See Apotex, Inc.*, 449 F.3d at 1251. The Court of Appeals for the D.C. Circuit has affirmed FDA's interpretation. *See id.* at 1253. A consistent interpretation of the "lawsuit" language found in § 314.107(c), therefore, would require that the "decision of a court" in § 314.107(c) be interpreted to encompass both infringement actions and declaratory judgment actions—since both are capable of producing a triggering "court decision." Likewise, a consistent interpretation of section 314.94(a)(12)(viii) prohibits the delisting of the '714 patent after it is subject to an infringement action <u>or</u> a declaratory judgment action.

Nevertheless, FDA has at times interpreted the "lawsuit under § 314.107(c)" to be solely a lawsuit initiated by an NDA holder or patent owner within forty-five days of notice of a paragraph IV certification rather than any ANDA litigation that may result in a "decision of a court." *See, e.g., Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *12 n.5 ("The FDA has interpreted the reference in 21 C.F.R. § 314.94(a)(12)(viii)(B) to a 'lawsuit under § 314.107(c)'

---

[9]    21 C.F.R. § 314.107(c) interprets the exclusivity triggering language of 21 U.S.C. § 355(j)(5)(B)(iv).

[10]    FDA has asserted that a "decision of the court" under § 314.107(c)(ii) is a decision with an "actual holding evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court." *Apotex, Inc.*, 449 F.3d at 1251 *citing* FDA Letter from Gary Buehler, Dir., Office of Generic Drugs, to Tammy McIntire, Apotex Corp. at 2 (Apr. 11, 2006) (Attachment E).



to refer to a lawsuit brought against an ANDA applicant within the first 45 days after the patent owner and the NDA holder received notice.") A plain reading of FDA's definition of "a court decision," however, renders FDA's interpretation erroneous because the only reference to litigation in § 314.107(c) encompasses any ANDA litigation (whether an infringement action or a declaratory judgment action) where a court may render a decision of invalidity, noninfringement or unenforceability. *See Apotex, Inc.*, 449 F.3d at 1251; 21 C.F.R. § 314.107(c). Further, the regulation in its present form makes no mention of a lawsuit that is initiated by an NDA holder or a patent owner within forty-five days. *See* 21 C.F.R. § 314.107(c)(2006); *Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *12 n.5 ("This definition of litigation appeared in the version of § 314.107(c) before it was amended to remove the 'successful defense' requirement."). It would be improper for FDA to restrict "a lawsuit under § 314.107(c)" to a specific kind of lawsuit not even mentioned in the regulation.

### 2. An interpretation of "lawsuit" based on the 1994 version of § 314.107(c) would be erroneous.

FDA has argued, however, that its interpretation of § 314.107(c) is based on the regulation as it existed prior to amendments in 1998—and based on language that was expressly repealed in 1998. *See* 63 FR 59710, Nov. 5, 1998; 21 C.F.R. § 314.107(c) (2000); *Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *12 n.5. An interpretation based on language that has been expressly repealed from a regulation is simply not supportable and should be rejected by FDA as an improper and unreasonable interpretation.

The repeal of the relevant language in 1998 was necessitated by a court decision finding the regulation contrary to statute. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998). The regulation was contrary to statute because it required an ANDA applicant to successfully defend a patent infringement action brought by an NDA holder or patent owner within forty-five days of notification of a paragraph IV certification before the applicant could be eligible for exclusivity. *Mova Pharm. Corp.*, 140 F.3d at 1076 ("We find that the FDA exceeded its statutory authority in imposing the successful-defense requirement as a prerequisite to the invocation of the 180-day exclusivity . . . ."). The statute, on the other hand, provides "first applicants the 180-day exclusivity period even if they have <u>not</u> been sued."



*Purepac Pharm. Co. v. Freidman*, 162 F.3d 1201, 1205 (D.C. Cir. 1998) (emphasis added); *Mova Pharm. Corp.*, 140 F.3d at 1076. After the court decision in *Mova Pharmaceuticals Corp.*, FDA amended the regulation to remove the "successful defense" requirement along with any mention of litigation brought within forty-five days of paragraph IV notification. *See* 63 FR 59710, Nov. 5, 1998.

The current version of § 314.107(c), therefore, has no reference to litigation initiated within forty-five days. *See* 21 C.F.R. § 314.107(c) (2006). In fact, as discussed above, the current version's only reference to litigation is to a "court decision." FDA's interpretation of a "court decision" in § 314.107(c) as set forth in *Apotex, Inc*, (encompassing both infringement actions and declaratory judgment actions) cannot be reconciled with FDA's assertion that patents may be delisted under § 314.94(a)(12)(viii) only when litigation is initiated within forty-five days of notification of a paragraph IV certification. Instead, FDA's opposite assertion that patents may only be delisted "in the absence of patent infringement or declaratory judgment litigation" is the proper and reasonable interpretation of the regulations and should be applied to the '714 patent. *See* Brief For Appellants (FDA) at 32, *Ranbaxy Labs. Ltd. v. Leavitt*, No. 06-5154 (D.C. Cir. June 21, 2006).

### 3. The statute does not differentiate between infringement actions and declaratory judgment actions

FDA's position can likewise not be reconciled with statute. In describing lawsuits brought following a paragraph IV certification, Congress expressly contemplated that an applicant might file a declaratory judgment action if the NDA holder or patent owner did not bring an infringement action within forty-five days. *See* 21 U.S.C. § 355(j)(5)(B)(iii) ("Any action brought under [the declaratory judgment statute] shall be brought in the judicial district where the defendant has its principal place of business . . . ."). Attempts by FDA to distinguish between types of lawsuits that are both clearly authorized by Congress and both clearly trigger exclusivity through a "court decision" demonstrate a failure of the interpretation to find statutory authority. Because the plain language of the regulations demonstrates that the "court decision" of § 314.107(c) encompasses declaratory judgment actions and because the statute makes no distinction (as to exclusivity) between declaratory judgment actions and infringement actions, a

Division of Dockets Management
October 18, 2006
Page 15



proper interpretation of § 314.94(a)(12)(viii) requires that patents upon which a declaratory judgment action has been initiated (by an ANDA applicant) not be removed from the Orange Book until the applicant's exclusivity has expires. *See* 21 C.F.R. § 314.94(a)(12)(viii).

**B.    KV is entitled to exclusivity because § 314.94(a)(12)(viii) prohibits delisting of the '714 patent**

KV brought its counterclaim for a declaratory judgment of noninfringement by its 200 mg tablets on May 27, 2003. KV brought its counterclaim for a declaratory judgment of noninfringement by its 100 mg tablets on September 11, 2003. Because FDA apparently delisted the '714 patent after KV brought its respective declaratory judgment actions, the delisting of the '714 patent was in error. It is FDA's practice, upon learning of an erroneously delisted patent, to relist the patent and to determine eligibility for exclusivity based on paragraph IV certifications made to that patent. *See* June 22 FDA Letter at 2 ("The court found that FDA's delisting . . . was inconsistent with congressional intent regarding eligibility for exclusivity. The Agency believes that the order effectively requires that the patents be relisted, and that eligibility for 180-day exclusivity be determined based on the paragraph IV certifications made to the patents."). As such, the erroneously delisted '714 patent should be relisted and KV's exclusivity should be maintained. *See Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *30; *see also Purepac Pharm. Co.*, 162 F.3d at 1205 (affirming FDA's action withholding final approval of an ANDA application pending first-to-file ANDA applicants first commercial marketing of the generic drug product).

**V.    Conclusion**

KV has invested considerable time and resources developing a formulation for its metoprolol succinate 100 mg and 200 mg tablets. In doing so, it designed around the '714 patent. In view of KV's successful design of a noninfringing product, AstraZeneca chose not to sue KV directly and additionally stipulated to dismissal of KV's declaratory judgment counterclaims. Subsequent to KV's successful paragraph IV certifications and declaratory judgment actions, however, AstraZeneca presumably requested FDA delist the patent. FDA apparently agreed and erroneously delisted the patent.



A patent upon which a paragraph IV certification has been filed and by which an ANDA applicant has become eligible for 180 days of exclusivity may <u>not</u> be delisted. *See Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *28; June 22 FDA Letter at 1-2. Likewise, a patent upon which a declaratory judgment action has been initiated may <u>not</u> be delisted. *See* 21 C.F.R. § 314.94(a)(12)(viii)(B). Had AstraZeneca sued KV, FDA would not have delisted the '714 patent at AstraZeneca's request. The fact that AstraZeneca did not sue KV on the '714 patent should not influence KV's entitlement to exclusivity. *See Ranbaxy Labs. Ltd.*, 2006 U.S. Dist. LEXIS 24612 at *28.

By filing a paragraph IV certification, KV has exposed itself to costly patent litigation and has availed itself of the 180-day marketing exclusivity provided in 21 U.S.C. § 355(j)(5)(B)(iv). FDA should not deprive KV of the 180-day exclusivity to which it is entitled under the plain language of the statute by delisting the patent in a manner that extinguishes KV's exclusivity before that exclusivity has run. FDA's erroneous delisting of the '714 patent does not impair the agency's ability to relist the patent for the period necessary to recognize KV's exclusivity. As such, KV petitions FDA to (1) relist the '714 patent, (2) refrain from approval of all ANDAs for metoprolol succinate 100 mg and 200 mg tablets filed subsequent to KV's ANDA, and (3) confirm KV's continuing eligibility for exclusivity.

Division of Dockets Management
October 18, 2006
Page 17



## ENVIRONMENTAL IMPACT

The relief requested by this petition would result in the recognition of a 180-day period of exclusivity for an ANDA application.  Because the grant of the petition would not have an effect on the environment, no environmental assessment is required.  21 C.F.R. § 25.31(a) (2004).

## ECONOMIC IMPACT

Information on the economic impact of the action requested by this petition will be submitted if requested by the Commissioner.

## CERTIFICATION

The undersigned certifies that, to the best of his knowledge and belief, this petition includes all information and views on which the petition relies, and includes representative data and information known to him that are unfavorable to the petition.

Respectfully submitted,

KENYON & KENYON LLP
1 Broadway
New York, NY 10004-1007
212-425-7200

Attorneys for Petitioner
KV Pharmaceutical Company

By: _____
CHARLES A. WEISS

NY01 1251592 v1

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

Food and Drug Administration
Rockville MD 20857

0 1 2 9   7   DEC 17   DEC 12 2007
                              A9 :30

Charles A. Weiss
Kenyon & Kenyon LLP
One Broadway
New York, NY  10004-1007

Re:  Docket No. 2006P-0422/CP 1

Dear Mr. Weiss:

This letter responds to your citizen petition received on October 18, 2006, and submitted on behalf of KV Pharmaceutical Company (KV) (the Petition).  In the Petition, you request that the Food and Drug Administration (FDA) (1) relist U.S. Patent 5,246,714 (the '714 patent) in FDA's publication, *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book) for Toprol-XL (metoprolol succinate extended release) 100-milligram (mg) and 200-mg tablets, (2) refrain from approving any abbreviated new drug application (ANDA) for metoprolol succinate extended release 100- and 200-mg tablets until KV's 180-day exclusivity based on the '714 patent has expired, and (3) confirm that KV's right to 180-day exclusivity with regard to its ANDA No. 76-640 has not been affected by FDA's delisting of the '714 patent from the Orange Book.

The Petition is moot because the '714 patent has been relisted in the Orange Book, FDA has approved KV's ANDA No. 76-640, and FDA has recognized KV's eligibility for 180-day exclusivity for metoprolol succinate extended-release 100- and 200-mg tablets in its May 18, 2007, letter approving the ANDA.  This 180-day exclusivity was based on KV's Paragraph IV certification to the '714 patent as well as other listed patents.  Therefore your petition is denied as moot.

Sincerely,

*Dc Thnfp no fr O. Woodcock*

Janet Woodcock, M.D.
Acting Director
Center for Drug Evaluation and Research

2006 P-0422                                        PDN 1



# APPROVED DRUG PRODUCTS

WITH

## THERAPEUTIC EQUIVALENCE EVALUATIONS

### 28th EDITION

**THE PRODUCTS IN THIS LIST HAVE BEEN APPROVED UNDER SECTION 505 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.**

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH
OFFICE OF PHARMACEUTICAL SCIENCE
OFFICE OF GENERIC DRUGS

2008

# PRESCRIPTION AND OTC DRUG PRODUCT PATENT AND EXCLUSIVITY LIST
### See report footnote for information regarding report content

| APPL/PROD NO | PATENT NO | PATENT EXPIRATON DATE | PATENT CODES | | EXCLUSIVITY CODE(S) | EXCLUSIVITY EXPIRATION DATE |
|---|---|---|---|---|---|---|
| **METHYLPHENIDATE HYDROCHLORIDE; RITALIN LA** | | | | | | |
| 021284 001 | 5837284 | Dec  04, 2015 | DP | | | |
| | 6228398 | Nov  01, 2019 | DP | U-472 | | |
| | 6635284 | Dec  04, 2015 | DP | U-591 | | |
| **METHYLPHENIDATE HYDROCHLORIDE; RITALIN LA** | | | | | | |
| 021284 002 | 5837284 | Dec  04, 2015 | DP | | | |
| | 6228398 | Nov  01, 2019 | DP | U-472 | | |
| | 6635284 | Dec  04, 2015 | DP | U-591 | | |
| **METHYLPHENIDATE HYDROCHLORIDE; RITALIN LA** | | | | | | |
| 021284 003 | 5837284 | Dec  04, 2015 | DP | | | |
| | 6228398 | Nov  01, 2019 | DP | U-472 | | |
| | 6635284 | Dec  04, 2015 | DP | U-591 | | |
| **METHYLPHENIDATE HYDROCHLORIDE; RITALIN LA** | | | | | | |
| 021284 004 | 5837284 | Dec  04, 2015 | DP | | | |
| | 6228398 | Nov  01, 2019 | DP | | | |
| | 6635284 | Dec  04, 2015 | DP | U-591 | | |
| **METOCLOPRAMIDE HYDROCHLORIDE; REGLAN ODT** | | | | | | |
| 021793 001 | 6024981 | Apr  09, 2018 | DP | | | |
| | 6221392 | Apr  09, 2018 | DP | | | |
| **METOCLOPRAMIDE HYDROCHLORIDE; REGLAN ODT** | | | | | | |
| 021793 002 | 6024981 | Apr  09, 2018 | DP | | | |
| | 6221392 | Apr  09, 2018 | DP | | | |
| **METOPROLOL SUCCINATE; METOPROLOL SUCCINATE** | | | | | | |
| 076640 001 | | | | | PC | Jan  22, 2008 |
| **METOPROLOL SUCCINATE; METOPROLOL SUCCINATE** | | | | | | |
| 076640 002 | | | | | PC | Jan  22, 2008 |
| **METOPROLOL SUCCINATE; TOPROL-XL** | | | | | | |
| 019962 001 | 4927640*PED | Nov  22, 2007 | | | D-95 | Feb  15, 2008 |
| | 4957745 | Sep  18, 2007 | DP | U-107 | M-61 | Jul  18, 2010 |
| | 4957745*PED | Mar  18, 2008 | | | PED | Jan  18, 2011 |
| | 5001161 | Sep  18, 2007 | DP | | PED | Aug  15, 2008 |
| | 5001161*PED | Mar  18, 2008 | | | | |
| | 5081154 | Sep  18, 2007 | DS | | | |
| | 5081154*PED | Mar  18, 2008 | | | | |
| **METOPROLOL SUCCINATE; TOPROL-XL** | | | | | | |
| 019962 002 | 4927640*PED | Nov  22, 2007 | | | D-95 | Feb  15, 2008 |
| | 4957745 | Sep  18, 2007 | DP | U-107 | M-61 | Jul  18, 2010 |
| | 4957745*PED | Mar  18, 2008 | | | PED | Jan  18, 2011 |
| | 5001161 | Sep  18, 2007 | DP | | PED | Aug  15, 2008 |
| | 5001161*PED | Mar  18, 2008 | | | | |
| | 5081154 | Sep  18, 2007 | DS | | | |
| | 5081154*PED | Mar  18, 2008 | | | | |
| | 5246714 | Sep  21, 2010 | | | | |
| | 5246714*PED | Mar  21, 2011 | | | | |
| **METOPROLOL SUCCINATE; TOPROL-XL** | | | | | | |
| 019962 003 | 4927640*PED | Nov  22, 2007 | | | D-95 | Feb  15, 2008 |
| | 4957745 | Sep  18, 2007 | DP | U-107 | M-61 | Jul  18, 2010 |
| | 4957745*PED | Mar  18, 2008 | | | PED | Jan  18, 2011 |
| | 5001161 | Sep  18, 2007 | DP | | PED | Aug  15, 2008 |
| | 5001161*PED | Mar  18, 2008 | | | | |
| | 5081154 | Sep  18, 2007 | DS | | | |
| | 5081154*PED | Mar  18, 2008 | | | | |
| | 5246714 | Sep  21, 2010 | | | | |
| | 5246714*PED | Mar  21, 2011 | | | | |
| **METOPROLOL SUCCINATE; TOPROL-XL** | | | | | | |
| 019962 004 | 4927640*PED | Nov  22, 2007 | | | D-95 | Feb  15, 2008 |
| | 4957745 | Sep  18, 2007 | DP | U-107 | M-61 | Jul  18, 2010 |
| | 4957745*PED | Mar  18, 2008 | | | PED | Jan  18, 2011 |
| | 5001161 | Sep  18, 2007 | DP | U-107 | PED | Aug  15, 2008 |
| | 5001161*PED | Mar  18, 2008 | | | | |
| | 5081154 | Sep  18, 2007 | DS | U-107 | | |
| | 5081154*PED | Mar  18, 2008 | | | | |
| **METRONIDAZOLE; METROGEL** | | | | | | |
| 021789 001 | 6881726 | Feb  21, 2022 | DP | U-743 | NP | Jun  30, 2008 |



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

Marc A. Goshko
Executive Director, Teva North America
Teva Parenteral Medicines
19 Hughes
Irvine, CA 92618-1902

RE:    Docket No. 2007N-0389
ANDA 77-165: Granisetron Hydrochloride Injection, 1 mg/mL

Dear Mr. Goshko:

This is in response to your letter dated September 28, 2007 (Teva Letter), in which you assert that abbreviated new drug application (ANDA) 77-165 is entitled to 180-day generic drug exclusivity. This ANDA is for Granisetron Hydrochloride Injection in 1 milligram/1 milliLiter single dose vials. It was submitted by SICOR Pharmaceuticals, Inc., now Teva Parenteral Medicines, Inc. (Teva), and was received for filing on June 1, 2004. The reference listed drug for this ANDA is Kytril Injection (Kytril), the new drug application (NDA) for which is held by Hoffman-LaRoche, Inc. As explained in this letter, it is the Agency's position that Teva is entitled to 180-day exclusivity with respect to ANDA 77-165. The Teva ANDA was approved on December 31, 2007, and Teva was granted 180-day exclusivity at that time.

Teva's ANDA 77-165 was the first ANDA for this drug product containing a paragraph IV certification to a listed patent for Kytril. Because this ANDA was submitted after December 8, 2003, the 180-day exclusivity for ANDAs referencing Kytril is governed by section 505(j)(5)(D) of the Federal Food, Drug, and Cosmetic Act (FFDCA or Act), as amended by the provisions of Title XI of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the MMA), Pub. L. 108-173, 117 Stat. 2066 (Dec. 8, 2003). *See* section 1102(b) of the MMA. FDA has not promulgated regulations implementing these new statutory provisions; until it does so, it will regulate directly from the statute in determining whether ANDA applicants are entitled to exclusivity.[1]

---

[1] It is FDA's practice to make decisions on eligibility for 180-day exclusivity only in the context of specific ANDAs that are otherwise eligible for approval. This approach is based on the multiple factors that may influence eligibility for exclusivity or forfeiture up to the time an application is ready for approval (e.g., patent expiration, patent delisting, failure to obtain a tentative approval within 30 months, withdrawal of ANDA) and could thus render a premature eligibility determination incorrect. When the agency must make an approval decision for an ANDA, it will inform the applicant that it is either 1) a first applicant and entitled to exclusivity, 2) a first applicant that has forfeited its exclusivity, or 3) eligible only for a tentative approval because one or more first applicants are eligible for 180-day exclusivity. It is possible that an ANDA applicant could be informed upon approval that it is a "first applicant" eligible for 180-day exclusivity pursuant to section 505(j)(5)(B)(iv), but later forfeit that exclusivity under section 505(j)(5)(D). FDA will consider whether there has been a forfeiture of 180-day exclusivity when approval of a subsequent ANDA may be blocked by a first applicant's exclusivity.

The MMA established a new set of forfeiture events under which an applicant previously eligible for 180-day exclusivity could lose that eligibility. These provisions are quite complex and, because of the value of 180-day exclusivity, are of substantial interest to regulated industry. In recognition of this interest, and to obtain the benefit of comment from interested parties on the interpretation and application of the new provisions in specific factual settings, we are establishing public dockets to receive comments on certain complex MMA issues. The Teva Letter raised issues regarding forfeiture of 180-day exclusivity that, while product specific, also could have a significant effect on exclusivity for other products. We established a docket on October 11, 2007, to permit public comment on the issues raised by the Teva Letter. We received comments from four interested parties. Three of these (Sun Pharmaceuticals, Ltd., Ranbaxy, Inc., and Baxter Healthcare Corporation (Baxter)[2]) agreed that Teva was eligible for 180-day exclusivity; one (Olsson Frank Weeda (OFW)) believed that Teva has forfeited its exclusivity.

In considering the applicability of the MMA forfeiture and exclusivity provisions to the granisetron ANDAs, we have considered the views of Teva and the other parties submitting comments.

## I.      STATUTORY AND REGULATORY BACKGROUND

Under the 1984 Hatch-Waxman Amendments (Hatch-Waxman Amendments) to the Act, an NDA applicant must submit information for each patent that claims the drug or method of using the drug that is the subject of the NDA and for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the patent owner engaged in the manufacture, use, or sale of the drug." Sections 505(b)(1) and (c)(2). FDA publishes this patent information in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book).

An applicant must include in its ANDA one of the following certifications with respect to each listed patent for the listed drug it references:

>     (I)  that such patent information has not been filed (a paragraph I certification),
>     (II)  that such patent has expired (a paragraph II certification),
>     (III)  of the date on which such patent will expire (a paragraph III certification), or
>     (IV)  that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted (a paragraph IV certification).

Section 505(j)(2)(A)(vii).[3] See also 21 CFR 314.94(a)(12)(i)(A). An applicant submitting a paragraph IV certification to a listed patent must provide the NDA holder and the patent owner notice of its patent certification, including a description of the legal and factual basis for its

---

[2] Baxter acknowledges that it shares Teva's interest in this matter because it is the first filer with respect to a different granisetron injection product, and has the identical risk of forfeiture as described in the Teva Letter. The other parties who submitted comments did not identify what, if any, interest they have in the outcome.

[3] The Act provides only one circumstance in which an ANDA applicant need not certify to a listed patent: "if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection," the applicant can submit "a statement that the method of use patent does not claim such a use" (a section viii statement). Section 505(j)(2)(A)(viii); see also 21 CFR 314.94(a)(12)(iv).

assertion that the patent is invalid or not infringed.  Section 505(j)(2)(B).  Should the NDA holder or patent owner initiate a patent infringement action against the ANDA applicant within 45 days of receiving the required notice, approval of the ANDA will be stayed for 30 months from the date of the notice or such shorter or longer time as the court might order.  Section 505(j)(5)(B)(iii).

The MMA exclusivity provisions, like those in the Hatch-Waxman Amendments, provide the first applicant(s) to submit a paragraph IV certification challenging a patent - and thus undertake the risk of litigation - an incentive in the form of the opportunity to be the only generic drug manufacturer to compete with the innovator for a 180-day period.  The requirements for obtaining and retaining this 180-day exclusivity period are described at sections 505(j)(5)(B)(iv) and 505(j)(5)(D) of the Act.

Section 505(j)(5)(D) describes a significant new feature of 180-day exclusivity under the MMA in the form of a set of conditions under which an ANDA applicant loses - or forfeits - eligibility for 180-day exclusivity.  Only one of these possible forfeiture events is at issue in this matter, i.e., the "failure to market" event, which appears in the Act as follows:

(I)  FAILURE TO MARKET .--The first applicant fails to market the drug by the later of--
   (aa)    the earlier of the date that is--
      (AA)    75 days after the date on which the approval of the application of the first applicant is made effective under subparagraph (B)(iii); or
      (BB)    30 months after the date of submission of the application of the first applicant; or
   (bb)    with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:
      (AA)    In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.
      (BB)    In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.
      (CC)    The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

Section 505(j)(5)(D)(i)(I).

## II.    FACTUAL BACKGROUND

Teva is eligible for 180-day exclusivity for granisetron hydrochloride injection 1 mg/mL, because it was a "first applicant," as described in section 505(j)(5)(D)(iv)(II)(bb).  Teva's ANDA was received for filing on June 1, 2004.  At that time it contained a paragraph III certification to U.S. Patent No. 4,886,808 ('808 patent); a section viii statement to a method-of-use patent, U.S. Patent No. 5,953,340 ('340 patent); and a paragraph IV certification to U.S. Patent No. 6,294,548 patent ('548 patent).  Teva provided notice of the certification to the NDA holder and patent owner as required.  The paragraph IV certification to the '548 patent qualified Teva as the sole first applicant eligible for 180-day exclusivity.

There are two features of Teva's patent certifications that, operating together, raise the question of Teva's possible forfeiture of its 180-day exclusivity.  The first is that ANDA 77-165 was received for filing on June 1, 2004, which is almost 43 months before the December 29, 2007 expiration date of the '808 patent.  The paragraph III certification to the '808 patent meant that FDA could not approve the ANDA before the date the '808 patent was due to expire, regardless of Teva's success in its paragraph IV certification challenge to the '548 patent.  The second factor is that neither Teva nor any subsequent applicant was sued as a result of its paragraph IV certification to the '548 patent, or has yet brought a declaratory judgment action regarding that patent, and the '548 patent remains listed in the Orange Book.

## III.    DISCUSSION

Application of the "failure to market" forfeiture provisions in section 505(j)(5)(D)(i)(I) requires a series of earlier-of/later-of analyses.  The statute directs that a forfeiture event occurs when the first applicant fails to market the drug by the later of two dates.  One of these dates is calculated under subpart (aa) by determining the earlier of a date that is either, under subitem (AA), 75 days after the first applicant's ANDA is approved or, under subitem (BB), 30 months after the date of submission of the first applicant's ANDA.[4]  Teva's ANDA was approved on December 31, 2007, so the 75-day period under (AA) would expire on March 15, 2008.  The relevant date under subitem (BB) is 30 months after the date of submission of Teva's ANDA, or December 1, 2006.  Because the date under (BB) is earlier than the March 15, 2008 date under (AA), the "30 month from submission date" of December 1, 2006, is the applicable date under the subpart (aa) analysis.

The statute then directs that FDA look to the "later of" the December 1, 2006 date or a date under subpart (bb) of section 505(j)(5)(D)(i)(I).  Subpart (bb) identifies three events that, if occurring as to a first applicant or any other applicant, could start a 75-day period leading to forfeiture. These events include, very generally, when (a) a court enters a final decision that the patent is

---

[4] Section 505(j)(5)(D)(i)(I)(aa)(BB) states that the 30 month period should be calculated from the date of "the submission of the application of the first applicant."  In applying the MMA 180-day exclusivity provisions, FDA will consider the date an ANDA containing a paragraph IV certification is submitted to be the date the agency considers the ANDA to have been "received" pursuant to 21 CFR 314.101(b).  Both this regulation and the definition of "first applicant" at section 505(j)(5)(B)(iv)(II)(bb) of the Act require that the ANDA containing the paragraph IV certification be substantially complete, meaning it is sufficiently complete to permit a substantive review.  When an ANDA containing a paragraph IV certification is determined, upon review, to have been substantially complete as of the day it was submitted to FDA, it will be considered to be received as of the date it was submitted  (i.e., date-stamped by the appropriate FDA mail-room).

invalid or not infringed, (b) a court signs a settlement order or consent decree entering final judgment that includes a finding that the patent is invalid or not infringed, or (c) the patent information for the listed drug is withdrawn by the NDA holder. To date, no action for infringement of the '548 patent has been brought against Teva or any subsequent applicant, nor has any granisetron ANDA applicant brought a declaratory judgment action regarding infringement of the '548 patent in an attempt to gain patent certainty and initiate the 75-day period leading to forfeiture. Therefore, no court has entered a final judgment of invalidity or non-infringement, and no court has signed a settlement order or consent decree entering final judgment of invalidity or non-infringement. The holder of the reference listed drug also has not requested that the patent be withdrawn from the Orange Book. Thus, none of the events contemplated in the statute's "later of" construct has occurred. Moreover, there is no pending litigation that could lead to a final judgment or decision that would start the 75-day forfeiture period.

The question posed by this set of circumstances is whether, when no "later" event as identified under subpart (bb) has occurred at the time the agency makes its exclusivity determination, forfeiture of 180-day exclusivity occurs when the applicant fails to market the drug by the applicable date under subpart (aa).[5]

We find that under the plain language of the statute, 180-day exclusivity is not forfeited for failure to market when an event under subpart (aa) has occurred, but - as in this case - none of the events in subpart (bb) has occurred. The "failure to market" provision results in forfeiture when there are two dates on the basis of which FDA may identify the "later" event as described in section 505(j)(5)(D)(i)(I). The provision does not effect a forfeiture when an event under subpart (aa) has occurred, but no event under subpart (bb) has yet occurred.

This is not a situation in which it would be impossible for a later event to occur. Although at the time FDA made its exclusivity decision, there was no litigation regarding the '548 patent pending that could result in a forfeiture event under subitem (AA) or (BB) of subpart (bb), there was nevertheless the possibility that either an additional ANDA applicant would be sued as a result of a paragraph IV certification to the patent or one of the applicants would bring a declaratory judgment action against the NDA holder or patent owner. Either of these actions could result in a forfeiture event. In addition, the patent could be withdrawn by the NDA holder, resulting in a forfeiture event under subitem (CC). Because at least one of the events described in subpart (bb) could still have occurred and, if it did, would necessarily occur "later" than December 1, 2006, Teva did not forfeit its exclusivity.[6]

---

[5] We note that in this matter, there is no allegation that Teva has "parked" its exclusivity (where it would serve as an effective barrier against approval of any subsequent ANDAs referencing the same listed drug) as a result of settlement of patent litigation with the NDA holder and/or patent owner. Teva's failure to obtain final approval and trigger its exclusivity with commercial marketing before December 31, 2007, as anticipated under section 505(j)(5)(B)(iv)(I), appears to have been a function solely of its paragraph III certification to a patent that expired December 29, 2007, more than three years after the ANDA was submitted.

[6] Inherent in the structure of the "failure to market" forfeiture provisions is the possibility that a first applicant would be able to enter into a settlement agreement with the NDA holder or patent owner in which a court does not enter a final judgment of invalidity or non-infringement (i.e., without a forfeiture event under subpart (bb) occurring), and that subsequent applicants would be unable to initiate a forfeiture with a declaratory judgment action. This inability to force a forfeiture of 180-day exclusivity could result in delays in the approval of otherwise approvable ANDAs owned by applicants that would market their generic drugs if they could but obtain approval. This potential scenario is not one for which the statute currently provides a remedy.

The comment submitted by OFW disagrees with this interpretation of the "failure to market" forfeiture provision.  It asserts that FDA should base its forfeiture decision on the state of events as of a specific date, without regard to the possibility that certain relevant events may occur in the future.  OFW argues that, if on the date when a subsequent ANDA would be eligible for final approval but for the first applicant's 180-day exclusivity, "there is no ***actually*** pending patent litigation, no final court decision that the patent is invalid or not infringed, and the patent remains in the Orange Book," then subpart (bb) should be "disregarded completely" and only the events in subpart (aa) should be considered.  OFW Letter, at 3.

The comments from OFW apparently concede that, if there is patent litigation pending, it would be premature for FDA to make a forfeiture decision solely on the grounds that a subsequent ANDA would be eligible for final approval but for 180-day exclusivity.  When patent litigation is pending, OFW notes, the Agency cannot make a forfeiture determination until the litigation is resolved and the agency can ascertain whether a forfeiture event in subpart (bb) has occurred.

Whatever appeal OFW's proposal might have for a hypothetical exclusivity forfeiture program, it is not consistent with the statutory language in section 505(j)(5)(D)(i)(I).  The MMA could have employed the approach suggested by OFW, in which the agency determines - at the time a subsequent ANDA is ready for approval - whether any of certain events have occurred.  It did not.  Instead, the scheme Congress adopted expressly directs that, even if an earlier event has occurred, the Agency await the occurrence of one of certain "later" events before finding a forfeiture of exclusivity.  Section 505(j)(5)(D)(i)(I).  By including the declaratory judgment mechanism as a means for initiating a forfeiture, Congress may have intended to provide subsequent applicants with an effective tool for clearing the path to final ANDA approval.  As OFW notes, whether declaratory judgments will prove to be an effective means for establishing patent certainty - and forcing forfeiture of exclusivity - remains to be seen.  Nevertheless, the Agency may not read out of the statute the forfeiture provisions that rely on an ANDA applicant's success in patent litigation.[7]

Although the structure of the 180-day exclusivity and forfeiture provisions may give rise to concerns about parking of exclusivity, and the premature review of ANDAs, neither of these is a factor in the current granisetron matter.  Teva has not parked its exclusivity (indeed, it actively pursued final approval and initiated commercial marketing promptly upon approval), and it submitted its ANDA only three and a half years before the expiration of the patent to which it filed a paragraph III certification.  This timing is entirely reasonable.

---

[7] The OFW comment raises a point that has been a source of some concern to the Agency irrespective of the forfeiture provisions, and that is that the "race" to earn 180-day exclusivity by submitting the first ANDA to challenge a patent may result in the submission of ANDAs that may also contain one or more paragraph III certifications to patents that do not expire until well into the future and that will preclude approval of the application for many years.  We have received ANDAs for which, based on the patent expiration dates and corresponding certifications, the sponsor has no intention to obtain approval and market the generic drug for 12 years or more.  OFW is correct when it notes that this practice may result in agency resources being committed to unnecessary reviews.  There is the very real possibility that events will occur in the years between initial review and patent expiration such that the sponsor ultimately will decide not to obtain approval of and market the generic drug product.  See OFW Letter, at 7-8.  Furthermore, should the sponsor seek final approval after the lapse of many years from initial review and tentative approval, the ANDA would almost certainly have to be reviewed a second time before a final approval could issue.

## IV.    CONCLUSION

For the reasons discussed above, the Agency has determined that Teva is entitled to 180-day exclusivity with respect to ANDA 77-165.

If you have any questions regarding this correspondence, please contact Cecelia M. Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely yours,


Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

cc:    Docket No. 2007N-0389
        Winston & Strawn LLP, Counsel for Sun Pharmaceuticals, Ltd.
        David Adams, Counsel for Ranbaxy, Inc.
        Baxter Healthcare Corporation
        Olsson Frank Weeda

**-------------------------------------------------------------------------------------------------------------**
**This is a representation of an electronic record that was signed electronically and
this page is the manifestation of the electronic signature.**
**-------------------------------------------------------------------------------------------------------------**

```
 /s/
--------------------
Gary Buehler
1/17/2008 07:57:06 AM
```