**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TEVA PHARMACEUTICALS USA, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0395 (RCL) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary, | ) | |
| U.S. Department of Health and Human | ) | |
| Services, *et al*., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MYLAN PHARMACEUTICALS INC., | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |
| | ) | |

**NOTICE OF FILING ADMINISTRATIVE RECORD**

Pursuant to this Court's instructions of April 4, 2008, the government defendants hereby file the administrative record for the administrative decision challenged in the above-captioned case.

Of Counsel:

JAMES C. STANSEL
Acting General Counsel

GERALD F. MASOUDI
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

SHOSHANA HUTCHINSON
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane, GCF-1
Rockville, MD 20857
301-827-8579

April 9, 2008

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

EUGENE M. THIROLF
Director


_____/s/_____
DRAKE CUTINI
Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
202-307-0044
Fax: 202-514-8742
drake.cutini@usdoj.gov

CERTIFICATE

In witness whereof, I have, pursuant to the provision of Title 42, United States Code,

Section 3505, and Staff Manual Guide 1410.23(1)(A)(6)(b) (April 27, 2007), hereto set

my hand and caused the seal of the Department of Health and Human Services to be

affixed this ___7___ day of April, 2008.

Carolyn Kachovec, Director
Division of Dockets Management
Office of Management Programs
Office of Management
Food and Drug Administration

By direction of the Secretary of
        Health and Human Services



## ADMINISTRATIVE RECORD
### DOCKET NO. 2007P-0316

| Bates Range | Date | Description |
|---|---|---|
| 000001-000017 | 8/03/07 | Citizen petition (with exhibits attached) from Teva Pharmaceuticals requesting that FDA relist U.S. Patent No. 5,158,952; declare the Teva's exclusivity was not affected by the delisting; and refrain from approving other risperidone ANDAs for 180 days |
| 000018-000019 | 1/04/08 | Revised certification, pursuant to 21 U.S.C. § 355(q)(1)(H), from Teva to its citizen petition |
| 000020-000046 | 2/26/08 | Letter (with exhibits attached) from FDA to Teva, denying Teva's citizen petition |
| 000047-000048 | 1984 | U.S.C.C.A.N. 2647 at 2647-2648 |
| 000049-000054 | | 21 C.F.R. § 314.53 |
| 000055-000063 | | 21 C.F.R. §§ 314.94, 314.95 |
| 000064-000066 | | 21 C.F.R. § 314.101 |
| 000067-000089 | 10/13/06 | Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc., 456 F. Supp. 2d 644 (D. N.J. 2006) |
| 000090 | 5/11/07 | Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc., 223 Fed. Appx. 999 (Fed. Cir. 2007) |
| 000091-000093 | 1/01 | Orange Book Cumulative Supplement 1, January 2001, at v-vi |
| 000094-000100 | 4/30/06 | Ranbaxy Labs. v. Leavitt, 459 F. Supp. 2d 1 (D.D.C. 2006) |
| 000101-000105 | 11/14/06 | Ranbaxy Labs. v. Leavitt, 469 F.3d 120 (D.C. Cir. 2006) |
| 000106-000107 | 10/3/1994 | 59 Fed. Reg. 50338, 50346 |



**Administrative Offices:**
TEVA PHARMACEUTICALS USA
1090 Horsham Road, PO Box 1090
North Wales, PA 19454-1090

2550    7    AUG -6  A8:35

**Deborah A. Jaskot, M.S., RAC**
Vice President, Regulatory Affairs

Direct Dial: (215) 591 3142
Direct FAX: (215) 591 8812
deborah.jaskot@tevausa.com

August 3, 2007

Division of Dockets Management
Food and Drug Management
5630 Fishers Lane
Room 1061 (HFA-305)
Rockville, MD 28057

## CITIZEN PETITION

### ACTION REQUESTED

Teva Pharmaceuticals USA, Inc. ("Teva") respectfully submits this Citizen Petition pursuant to section 505 of the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 355, and section 10.30 of the Agency's implementing regulations, 21 C.F.R. § 10.30. This petition requests that the Agency:

(1)    Relist U.S. Patent No. 5,158,952 ("the '952 patent") in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") for 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg, and 4 mg Risperdal® (risperidone) tablets, all approved products of Janssen Pharmaceutica Inc. as the holder of NDA No. 20-272;

(2)    Confirm that Teva's right to 180-day exclusivity with regard to ANDA No. 76-228 has not been affected by FDA's erroneous delisting of the '952 patent from the Orange Book; and

(3)    Refrain from approving any Abbreviated New Drug Application ("ANDA") for 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg, and 4 mg risperidone tablets until Teva's 180-day exclusivity period expires.

### STATEMENT OF GROUNDS

### INTRODUCTION

The plain text, structure, and history of 21 U.S.C. § 355(j)(5)(B)(iv) establish that Teva is entitled to 180 days of marketing exclusivity for its generic risperidone tablets as a result of Teva's August 28, 2001 paragraph IV certification to the '952 patent. That is so because the '952 patent appeared in the official Orange Book on the day Teva submitted its paragraph IV certification; because Teva thus was required to submit a certification to that patent at the time it

2007P-0316

CP 1

submitted its ANDA for generic risperidone drug products; and because Teva then became the first company to submit a paragraph IV certification to any of the listed patents claiming Risperdal®. FDA's purported "delisting" of the '952 patent in no way undermines Teva's entitlement to 180-day exclusivity, because the Agency failed to provide official notice of the "delisting" for several months following the submission of Teva's ANDA. As the D.C. Circuit recently recognized in the *Ranbaxy* (simvastatin) case, the adoption of a rule that would divest the first generic applicant of its exclusivity after that applicant has assumed the very risks 180-day exclusivity is designed to reward—the expense of formulating a non-infringing product and preparing a legal defense to a potential action for patent infringement, and then the submission of an infringing paragraph IV certification to the Agency—would fundamentally "change the incentive structure adopted by Congress," in clear violation of the plain text and structure of the Hatch-Waxman Act. *Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120, 125-26 (D.C. Cir. 2006).

At bottom, given that the '952 patent remained listed in the official Orange Book on the date Teva submitted its paragraph IV certification to the Agency, and in view of the plain language of section 355(j)(5)(B)(iv), court precedent compelling FDA to preserve Teva's exclusivity by relisting the '952 patent, and the Agency's own practice regarding patent relisting, Teva thus petitions FDA to relist the '952 patent for Risperdal®, maintain Teva's exclusivity against subsequently filed ANDAs, and confirm Teva's right to its 180-day exclusivity period.

## BACKGROUND

Risperidone is an atypical antipsychotic medication sold by Janssen Pharmaceutica ("Janssen") under the trade-name Risperdal®. Janssen holds NDA No. 20-272, for risperidone tablets. As of August 2001, FDA's official *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book") listed two patents as claiming Risperdal® tablets: U.S. Patent No. 4,804,663 ("the '663 patent"), which is set to expire on December 29, 2007, and U.S. Patent No. 5,158,952 ("the '952 patent"), which will expire on October 27, 2009. *See* Orange Book (2001 ed.), at ADA 57 (Exhibit 1).

On August 28, 2001, Teva submitted an original Abbreviated New Drug Application ("ANDA"), No. 76-228, seeking approval to market generic risperidone tablets in 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg, and 4 mg strengths. *See* Patent Certification for Risperdal® ANDA ("Original Patent Certification") (Exhibit 2). In accordance with 21 U.S.C. § 355(j)(2)(A)(vii), Teva's ANDA contained a certification with respect to each patent listed as claiming Risperdal® tablets. *Id.* Because the official Orange Book listed both the '663 and '952 patents for Risperdal® tablets, Teva was required to certify as to both patents, and it did so. *See* 21 C.F.R. 314.53(f). Teva filed a certification under § 355(j)(2)(A)(vii)(III) ("Paragraph III certification") as to the '663 patent, which is set to expire on December 29, 2007, and a certification under § 355(j)(2)(A)(vii)(IV) ("Paragraph IV certification") as to the '952 patent, asserting that the patent was invalid or would not be infringed by Teva's generic risperidone tablets. *See* Original Patent Certification.

2

000002

On October 12, 2001, FDA notified Teva that it had "delisted" the '952 patent from the Orange Book (even though it continued to appear in the official Orange Book at that time). *See* Letter from Deborah Jaskot to Gary Buehler (Oct. 22, 2001) ("Jaskot Letter") (Exhibit 3). It also informed Teva that it would not accept Teva's ANDA for filing unless Teva modified its patent certification to reflect that the '952 patent was no longer listed as claiming the reference drug product. *Id.* Thus, even though FDA had not informed Teva of the putative delisting prior to the submission of Teva's paragraph IV certification; even though the official Orange Book continued to list the '952 patent as claiming Risperdal® tablets; and even though Teva had assumed the very risks 180-day exclusivity is designed to reward, Teva was forced to follow the agency's directive and amend its ANDA.

In January 2002, FDA released a revised Orange Book, which for the first time noted the official delisting of the '952 patent, and listed only the '663 patent as claiming Risperdal® tablets. *See* Orange Book (2002 ed.), at ADA 65 (Exhibit 4).

In November 2006, the D.C. Circuit ruled that the plain text of the FDCA prevented FDA from effectuating the delisting of a patent following the submission of a paragraph IV certification as to that patent. *Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120, 125-26 (D.C. Cir. 2006). The court struck down FDA's practice because it "change[d] the incentive structure adopted by Congress," by "depriv[ing] the generic applicant of a period of marketing exclusivity" after the generic manufacturer had expended significant resources in developing a non-infringing generic substitute and undertaken the risk of infringing the patent by filing a paragraph IV certification. *Id.* at 126. The D.C. Circuit thus held that FDA's approach to delisting contravened the plain meaning of the FDCA, and invalidated FDA's practice under *Chevron* step one. *Id.*

Following the D.C. Circuit's decision, Teva began reviewing its portfolio of pending ANDAs to determine whether FDA's unlawful delisting practices had deprived Teva of its entitlement to 180-day exclusivity for any other generic product. As with respect to Ivax's ANDA for olanzapine drug products, this case presents such a situation.

## ARGUMENT

The plain language of the FDCA entitles Teva to a 180-day period of first-filer exclusivity for generic Risperdal® tablets. Teva was the first generic manufacturer to file an ANDA for generic risperidone tablets containing a paragraph IV certification as to the '952 patent. Under 21 U.S.C. § 355(j)(5)(B)(iv) (2002), the earliest any subsequently-filed paragraph IV ANDA can be approved is "one hundred and eighty days after" Teva first commercially markets its generic risperidone tablets or the date of a court decision holding the '952 patent to be invalid or not infringed. *Id.*[1] To date, neither of these events has occurred—there has been no

---

[1]    Because Teva filed its ANDA in August 2001, its claims are governed by the version of the FDCA that existed prior to the amendments made in the Medicare Modernization Act of 2003 ("MMA"). *See* MMA, Pub. L. No. 108-173, 117 Stat. 2006, § 1102(b)(1) (Dec. 8, 2003). All citations in this petition are to the pre-MMA version of the statute.

000003

litigation concerning the '952 patent, and Teva will not begin commercial marketing of its generic risperidone products until the patent term of (and any subsequent period of pediatric exclusivity with respect to) the '663 patent expires. At that time Teva will be entitled to 180 days of sole marketing exclusivity under the plain terms of § 355(j)(5)(B)(iv).[2]

Teva's entitlement to generic exclusivity may not be denied on the basis of FDA's putative "delisting" of the '952 patent prior to the submission of Teva's paragraph IV certification to the Agency. At the time Teva submitted its original ANDA for generic risperidone products (which contained a paragraph IV certification to the '952 patent), it had no choice but to certify as to the '952 patent. After all, the official Orange Book continued to list the '952 patent as claiming Risperdal® tablets. Both FDA regulations and longstanding case law make clear that the agency does not adjudicate questions of patent law; instead, it plays only a ministerial role in maintaining the Orange Book. *See, e.g., Apotex, Inc. v. Thompson,* 347 F.3d 1335, 1349-50 (Fed. Cir. 2003); *Alphapharm Pty Ltd. v. Thompson,* 330 F. Supp. 2d 1, 7 (D.D.C. 2004); *see also* 21 C.F.R. § 314.53(f). As a result, where a patent remains listed for a particular drug in the official Orange Book, a generic applicant has no choice but to believe that the NDA holder is continuing to assert that patent as claiming the listed drug. In that situation, both the statute and agency regulations require the generic applicant to submit a certification with respect to the disputed patent. *Apotex,* 347 F.3d at 1350 ("The statutory language shows a clear congressional intention to require certification whenever an ANDA applicant seeks approval of a drug that is claimed by a patent *that is listed in the Orange Book.*") (emphasis added); *Sandoz, Inc. v. FDA,* 439 F. Supp. 2d 26, 31 (D.D.C. 2006) (same); 21 C.F.R. § 314.53(f).

Thus, at the time of its ANDA submission in August 2001, Teva was required to submit a certification to the '952 patent. FDA's putative delisting of the '952 patent did not become effective until January 2002, when the official Orange Book reflected the delisting of that patent. Absent any change in the Orange Book listings that reasonably would have put Teva on notice of the '952 delisting, it had no choice but to certify to the '952 patent on the date that it submitted its paragraph IV certification to the Agency. *See Apotex,* 347 F.3d at 1350 (noting that certification is "require[d]" for any patent listed in the Orange Book as claiming a drug). Teva thus did precisely what it was obligated to do under the plain text of the governing statute and Agency regulations, and it therefore earned its exclusivity as the first applicant to file a paragraph IV certification to a patent listed as claiming the reference listed drug.

Divesting Teva of its 180-day exclusivity under these circumstances would fundamentally undermine the incentive scheme established by the Hatch-Waxman Act, and expose the exclusivity reward to manipulation by brand manufacturers. Courts, including the D.C. Circuit in its recent *Ranbaxy* decision, routinely reject such an approach to the statutory

---

[2]   Because the Federal Circuit recently held that the '663 patent is valid and enforceable, *see Janssen Pharmaceutica v. Mylan Pharms.,* No. 07-1021 (Fed. Cir. May 11, 2007), no manufacturer is entitled to exclusivity based on its first-to-file status with respect to that patent. Thus, under FDA's pre-MMA, patent-by-patent approach to exclusivity, Teva's exclusivity based on its first-filer status with respect to the '952 patent will not be shared with the first applicant that filed a paragraph IV certification with respect to the '663 patent. Teva alone is entitled to exclusivity for these drug products.

4

scheme. Thus, a brand manufacturer may not delist a patent in order to eliminate generic exclusivity after an ANDA applicant wins its paragraph IV litigation on a patent. *See, e.g.*, 21 CFR § 314.94(a)(12)(viii)(B); *Torpharm v. Thompson*, 260 F. Supp. 69, 83 n.15 (D.D.C. 2003). By the same token, as the *Ranbaxy* Court recognized, FDA may not effectuate the delisting of a patent for a referenced drug after a generic manufacturer submits a paragraph IV certification. 469 F.3d at 125-26.

The reasoning behind these decisions is straightforward. The primary purpose of the Hatch-Waxman Act is to promote generic competition in the pharmaceutical market and prevent brand manufacturers from using inapplicable patents to block generic applicants from entering the market. A policy that permits a brand manufacturer to effectuate the delisting of a patent after the submission of a paragraph IV certification and without notice to the pharmaceutical community allows brand manufacturers to manipulate the generic approval process by forcing generic manufacturers to invest significant resources and assume the risk of patent litigation without any guarantee of the 180-day exclusivity reward. By thereby decreasing the incentives for generic manufacturers to develop competing products for listed drugs, such an approach is fundamentally inconsistent with the Hatch-Waxman Act. *Id.*

That is precisely the case here. On the date Teva filed its ANDA for generic risperidone drug products, Teva was obligated to rely on the official Orange Book's indication that its generic risperidone product would have to be designed so as not to infringe the '952 patent, or that Teva otherwise would have to invest significant sums in preparing a legal challenge to the validity or enforceability of the '952 patent. As a result, Teva invested substantial resources to engineer a non-infringing drug product and prepare a legal challenge to the '952 patent. Most important, Teva then assumed the very risk 180-day exclusivity is designed to reward, by deliberately exposing itself to patent litigation with the submission of a paragraph IV certification to the '952 patent in its original ANDA. *See* 35 U.S.C. § 271(e)(2); *see also Purepac Pharmaceutical Co. v. Thompson*, 354 F.3d 877, 889 (D.C. Cir. 2004); Brief of the Federal Defendants, *Purepac Pharmaceutical Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004) ("An original ANDA which includes a paragraph IV certification is considered effectively submitted on the date it is received by FDA, provided that FDA finds, after conducting a threshold review, that the application is substantially complete.").

Thus, even though Teva did precisely what the statute is designed to reward, FDA's putative "delisting" of the patent—despite the fact that the '952 continued to appear in the official Orange Book—has deprived Teva of the reward Congress guaranteed in the Hatch-Waxman Act.

At bottom, FDA's decision to effectuate the delisting of the '952 patent without prior notice rendered Teva's substantial investment in generic risperidone a nullity. Just as in *Ranbaxy*, the adoption of such a policy clearly "diminishes the incentive for a manufacturer of generic drugs to challenge a patent listed in the Orange Book." *Ranbaxy*, 469 F.3d at 126. Ultimately, such a rule will act as an overall disincentive for companies to even attempt to produce generic drug alternatives, lest their significant investment in the design of a non-infringing product and preparation of a legal defense to an infringement action turn out to have been wasted. Such a policy directly contradicts the policies behind the Hatch-Waxman Act, and cannot be sustained. *See Ranbaxy*, 469 F.3d at 125-26.

000005

Indeed, FDA itself has acknowledged as much. On May 15, 2007, the Agency relisted eight patents for Zyprexa® (olanzapine) that had been delisted several years earlier at the request of the brand manufacturer. That decision only underscores FDA's understanding that *Ranbaxy* requires not only a prospective change in agency practice, but also remedial action to restore to generic manufacturers any statutory rights wrongly denied by previous delistings. Patents that have been wrongly removed from the Orange Book must be relisted, and any exclusivity owed generic companies on those patents must be restored--even if several years have passed since the original delisting. As it did with the olanzapine patents, FDA must relist the '952 patent to protect the policies behind the Hatch-Waxman Act.

The fact that FDA never accepted Teva's paragraph IV ANDA for filing thus has no bearing on the fact that FDA must relist the '952 patent. FDA's refusal to file Teva's paragraph IV certification as to the '952 patent was based on its since-overturned delisting policy. At that time, the Agency gave Teva no choice but to amend its patent certification for its risperidone ANDA. And as in the olanzapine case, FDA now has no choice but to relist the '952 patent and restore Teva's exclusivity.

### CONCLUSION

This case rises and falls on one fact: on the date Teva submitted its original ANDA containing a paragraph IV certification in August 2001, the '952 patent continued to appear in the official Orange Book. Teva thus did everything it was required to do under the plain text of the statutes and governing regulations in order to secure the statutory reward of 180-day exclusivity: it had engineered a non-infringing pathway around the '952 patent, it had prepared a legal challenge to that patent, and most critically, it filed the very first paragraph IV certification to the '952 patent. As the first filer, Teva thus earned its 180-day period of exclusivity under the Hatch-Waxman Act, and FDA may not lawfully deprive Teva of this right.

Teva thus respectfully requests that FDA relist the '952 patent, confirm Teva's status as the first generic applicant to file a paragraph IV certification as to that patent, and acknowledge Teva's entitlement to a 180-day period of exclusivity on generic risperidone tablets.

### ENVIRONMENTAL IMPACT

The relief requested by this petition would result in the recognition of a 180-day period of exclusivity for an ANDA applicant. Because the grant of the petition would not have an effect on the environment, no environmental assessment is required. *See* 21 C.F.R. § 25.31(a).

### ECONOMIC IMPACT

Information on the economic impact of the action will be submitted if requested by the Commissioner.

000006

## **CERTIFICATION**

The undersigned certifies that, to the best of his knowledge and belief, this petition includes all information and views on which the petition relies, and includes representative data and information known to him that are unfavorable to the petition.

Sincerely,

Deborah Jaslot

DAJ

7

**Exhibit 1**



# APPROVED DRUG PRODUCTS

## WITH

## THERAPEUTIC EQUIVALENCE EVALUATIONS

### 21ST EDITION

THE PRODUCTS IN THIS LIST HAVE BEEN APPROVED UNDER SECTION 505 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH
OFFICE OF INFORMATION TECHNOLOGY
DIVISION OF DATA MANAGEMENT AND SERVICES

2001

026126  APPROVED DRUG PRODUCTS WITH THERAPEUTIC
EQUIVALENCE EVALUATIONS
2001 VOLUME 21
SISAC

1048-5996(2001)21;1-N

76240053

MANAGEMENT, Y LIVNEH, TO : Y LIVNEH,
FOR: LIVNEH, MANAGEMENT

PRESCRIPTION AND OTC DRUG PRODUCT
PATENT AND EXCLUSIVITY DATA

ADA57



| APPL/PROD NUMBER | INGREDIENT NAME; TRADE NAME | PATENT NUMBER | PATENT EXPIRES | USE CODE | EXCLUS CODE | EXCLUS EXPIRES |
|---|---|---|---|---|---|---|
| 020741 003 | REPAGLINIDE,PRANDIN | 5216167 | OCT 10, 2006 | U-214 | NCE | DEC 22, 2002 |
| | | 5312924 | OCT 10, 2006 | | | |
| | | 4873080 | OCT 10, 2016 | | | |
| | | 5767097 | JAN 23, 2015 | | | |
| | | 6051258 | DEC 22, 2017 | | | |
| 020903 001 | RIBAVIRIN,REBETOL | | | D-235 | I-249 NP | DEC 09, 2001 |
| | | | | | | JUN 03, 2001 |
| 021024 001 | RIFAPENTINE,PRIFTIN | | | D-100 | NCE ODE | JUN 22, 2003 |
| 020599 001 | RILUZOLE,RILUTEK | 4886214 | JUL 22, 2008 | D-222 | | JUN 22, 2002 |
| 020474 001 | RIMEXOLONE,VEXOL | 5583122 | DEC 10, 2013 | | | DEC 12, 2002 |
| 020835 001 | RISEDRONATE SODIUM,ACTONEL | 6165513 | JUN 10, 2018 | | | |
| 020835 002 | RISEDRONATE SODIUM,ACTONEL | 5583122 | DEC 10, 2013 | D-222 | I-292 NCE I-291 I-293 I-290 | MAR 10, 2013 MAR 27, 2013 APR 14, 2003 APR 14, 2003 MAR 14, 2003 APR 14, 2003 APR 14, 2003 APR 14, 2003 |
| | | 6165513 | MAR 10, 2017 | | | |
| 020272 001 | RISPERIDONE,RISPERDAL | 4804663 | DEC 29, 2007 | D-90 | | |
| 020272 002 | RISPERIDONE,RISPERDAL | 4804663 | OCT 27, 2009 | D-90 | | |
| | | 5158952 | DEC 29, 2009 | | | |
| 020272 003 | RISPERIDONE,RISPERDAL | 4804663 | OCT 27, 2009 | D-90 | | |
| | | 5158952 | DEC 29, 2009 | | | |
| 020272 004 | RISPERIDONE,RISPERDAL | 4804663 | OCT 27, 2009 | D-90 | | |
| | | 5158952 | DEC 29, 2009 | | | |
| 020272 005 | RISPERIDONE,RISPERDAL | 4804663 | DEC 29, 2007 | D-90 | | |
| 020272 007 | RISPERIDONE,RISPERDAL | 4804663 | OCT 27, 2009 | D-90 | | |
| | | 5158952 | DEC 29, 2009 | | | |
| 020272 008 | RISPERIDONE,RISPERDAL | 4804663 | OCT 27, 2009 | D-90 | | |
| | | 5158952 | DEC 29, 2009 | | | |
| 020588 001 | RISPERIDONE,RISPERDAL | 5453425 | JUN 17, 2014 | D-90 | | |
| 020659 001 | RITONAVIR,NORVIR | 5541206 | JUL 01, 2014 | D-190 | NCE | MAR 01, 2001 |
| | | 5484801 | JAN 28, 2014 | | | |
| | | 5635523 | JUN 29, 2014 | | | |
| | | 5846987 | JUN 29, 2016 | | | |
| | | 5674882 | OCT 09, 2014 | D-140 | | |
| 020680 001 | RITONAVIR,NORVIR | 5541206 | JUL 01, 2014 | D-190 | NCE | MAR 01, 2001 |
| | | 5648497 | JUL 30, 2013 | D-140 | | |
| | | 5846987 | JUN 29, 2016 | D-190 | | |
| | | 5948436 | SEP 13, 2013 | | | |

000010

**Exhibit 2**

000011



**Corporate Headquarters:**
TEVA PHARMACEUTICALS USA
1090 Horsham Road, PO Box 1090
North Wales, PA 19454-1090

Phone: (215) 591 3000
FAX: (215) 591 8600

# PATENT CERTIFICATION

### Risperidone Tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg and 4 mg

The undersigned certifies that to the best of our knowledge and in TEVA Pharmaceuticals USA's opinion there are 2 listed patents which claim the reference drug Risperdal® Tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg and 4 mg.

| Patent No. | Expiration Date |
|---|---|
| U.S. Patent #4804663 | 12/29/2007 |
| U.S. Patent #5158952 | 10/27/2009 |

### Paragraph IV Certification

The undersigned hereby certifies, pursuant to Section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act, as amended, that U.S. Patent #5158952 which has been filed for Risperdal® Tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg and 4 mg is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the drug product for which this application is submitted. TEVA Pharmaceuticals USA, the applicant, will give notice as required by 505(j)(2)(B)(i) and (ii) to Janssen Pharmaceutica Inc. as the holder of NDA #20272 for Risperdal® Tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg and 4 mg and owner of the patent. This notice will include a detailed statement of the factual and legal basis of the applicant's opinion that the patent is invalid, unenforceable, or will not be infringed.

### Paragraph III Certification

The undersigned further certifies that pursuant to Section 505(j)(2)(A)(vii)(III) of the Act, as amended, U.S. Patent #4804663 will expire on 12/29/2007. TEVA Pharmaceuticals USA will not engage in the commercial distribution of Risperidone Tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg and 4 mg prior to the expiration of this patent.

Deborah A. Jaskot
Executive Director, Regulatory Affairs

8/28/01
Date

12

000012

**Exhibit 3**



**Administrative Offices:**
TEVA PHARMACEUTICALS USA
1090 Horsham Road, PO Box 1090
North Wales, PA 19454-1090

**Philip Erickson, R.Ph.**
Director, Regulatory Affairs
Solid Oral Dosage Forms

Phone: (215) 591 3000
FAX: (215) 591 8600

October 22, 2001

Gary Buehler, Director
Office of Generic Drugs
Food and Drug Administration
Document Control Room
Metro Park North II
7500 Standish Place, Room 150
Rockville, Maryland 20855-2773

**NEW CORRESPONDENCE**

ANDA # 76-228
RISPERIDONE TABLETS, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg and 4 mg
NEW CORRESPONDENCE

Dear Mr. Buehler:

We submit herewith a new correspondence to the above-referenced original abbreviated new drug application in response to an October 12, 2001 telephone conversation between Ms. Emily Thomas (Project Manager FDA) and Philip Erickson of TEVA Pharmaceuticals USA. Specifically, Ms. Thomas has requested the following additional information:

1)      Reference listed drug labels for Risperidone Tablets, 0.25 mg, 0.5 mg, 2 mg and 3 mg. Please find enclosed copies of the labeling for Risperdal® Tablets, 0.25 mg, 0.5 mg, 2 mg and 3 mg. *(Attachment 1)*

2)      Revised patent certification. U.S. Patent 5,158,952 with an expiration of October 27, 2009 has been officially delisted from the Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), therefore only U.S. Patent 4,804,663 with an expiration of December 29, 2007 remains. Please find enclosed a patent certification revised accordingly. *(Attachment 2)*

The information presented herein represents, in our opinion, a complete response to the questions presented in the October 12, 2001 telephone conversation. This information is submitted for your continued review and acceptance of ANDA # 76-228. If there are any further questions, please do not hesitate to contact me at (215) 591-3141 or facsimile at (215) 591-8812.

Sincerely,

*Deborah Pashat*
/for PE

PE/cw·
Enclosures

000014

**Exhibit 4**

# APPROVED DRUG PRODUCTS

WITH

THERAPEUTIC EQUIVALENCE EVALUATIONS

22nd EDITION

THE PRODUCTS IN THIS LIST HAVE BEEN APPROVED UNDER
SECTION 505 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH
OFFICE OF INFORMATION TECHNOLOGY
DIVISION OF DATA MANAGEMENT AND SERVICES

2002



PRESCRIPTION AND OTC DRUG PRODUCT
PATENT AND EXCLUSIVITY DATA

ADA65

| APPL/PROD NUMBER | INGREDIENT NAME; TRADE NAME | PATENT NUMBER | PATENT EXPIRES | USE CODE | EXCLUS CODE | EXCLUS EXPIRES |
|---|---|---|---|---|---|---|
| 020272 005 | RISPERIDONE;RISPERDAL | 4804663 | DEC 29 2007 | U-90 | | |
| 020272 008 | RISPERIDONE;RISPERDAL | 4804663 | DEC 29 2007 | U-90 | | |
| 020272 009 | RISPERIDONE;RISPERDAL | 4804663 | DEC 29 2007 | U-90 | | |
| 020588 001 | RISPERIDONE;RISPERDAL | 4804663 | DEC 29 2007 | U-90 | | |
| 020659 001 | RITONAVIR;NORVIR | 5453425 | JUL 11 2014 | | | |
| | | 5215516 | JUL 01 2014 | U-190 | | |
| | | 5484801 | JAN 28 2014 | U-140 | | |
| | | 5541206 | JUL 10 2014 | U-190 | | |
| 020680 001 | RITONAVIR;NORVIR | 5846987 | DEC 15 2014 | U-190 | | |
| | | 5674682 | JUN 26 2012 | U-140 | | |
| | | 5886036 | OCT 06 2014 | U-190 | | |
| 020945 001 | RITONAVIR;NORVIR | 5612206 | DEC 29 2012 | U-347 | | |
| | | 5635523 | JUL 30 2013 | U-348 | | |
| | | 5612206 | DEC 29 2011 | U-347 | | |
| | | 5648497 | SEP 29 2014 | | | |
| | | 5846987 | | | | |
| | | 5886036 | | | | |
| | | 5846987 | | | | |
| | | 5615522 | | | | |
| | | 6232233 | | | | |
| 020823 003 | RIVASTIGMINE TARTRATE;EXELON | 5602176 | AUG 14 2007 | U-322 | NCE | APR 21, 2005 |
| 020823 004 | RIVASTIGMINE TARTRATE;EXELON | 4948807 | FEB 11 2007 | U-322 | NCE | APR 21, 2005 |
| 020823 005 | RIVASTIGMINE TARTRATE;EXELON | 5602176 | AUG 14 2007 | U-322 | NCE | APR 21, 2005 |
| 020823 006 | RIVASTIGMINE TARTRATE;EXELON | 4948807 | AUG 14 2007 | U-322 | NCE | APR 21, 2005 |
| | | 4948807 | FEB 11 2007 | U-322 | NCE | APR 21, 2005 |
| 021025 001 | RIVASTIGMINE TARTRATE;EXELON | 5602176 | AUG 14 2007 | U-322 | NCE | APR 21, 2005 |
| | | 4948807 | FEB 11 2007 | U-322 | | |
| 020864 001 | RIZATRIPTAN BENZOATE;MAXALT | 5296520 | FEB 21 2014 | U-240 | NCE | JUN 29, 2003 |
| 020864 002 | RIZATRIPTAN BENZOATE;MAXALT | 5296520 | FEB 11 2014 | U-240 | NCE | JUN 29, 2003 |
| 020865 001 | RIZATRIPTAN BENZOATE;MAXALT-MLT | 5296520 | JAN 28 2014 | U-240 | NCE | JUN 29, 2003 |
| | | 5602162 | JAN 28 2014 | U-240 | NCE | JUN 29, 2003 |
| 020865 002 | RIZATRIPTAN BENZOATE;MAXALT-MLT | 5296520 | FEB 11 2012 | U-240 | NCE | JUN 29, 2003 |
| | | 5602162 | OCT 11 2012 | U-240 | | |
| 020214 002 | ROCURONIUM BROMIDE;ZEMURON | 5296520 | FEB 28 2012 | | | |
| 020214 001 | ROCURONIUM BROMIDE;ZEMURON | 5602162 | FEB 11 2014 | | | |
| 021042 001 | ROFECOXIB;VIOXX (P/P) | 4894369 | OCT 11 2014 | U-266 | NCE | MAY 20, 2004 |
| | | 4894369 | APR 13 2008 | U-266 | | |
| | | 5719178 | APR 11 2008 | | | |
| | | 5739136 | APR 24 2013 | | | |
| | | 6063011 | NOV 25 2017 | | | |
| | | 6239173 | MAY 16 2013 | | | |
| | | | JUN 24 2013 | | | |

01/28/08   MON 13:39 FAX 3018276870          DMP/DDM                                    ☒002

# TEVA

| | | |
|---|---|---|
| **Administrative Offices:**<br>TEVA PHARMACEUTICALS USA<br>1090 Horsham Road, PO Box 1090<br>North Wales, PA 19454-1090 | 0803  B  JAN −7  A8:34 | **Deborah A. Jaskot, M.S., RAC**<br>Vice President, Regulatory Affairs |

Direct Dial: (215) 591 3142
Direct FAX: (215) 591 8812
deborah.jaskot@tevausa.com

January 4, 2008

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane
Room 1061 (HFA-305)
Rockville, MD 20857

**RE:    PETITION No. 2007P-0316: RISPERDAL (RISPERIDONE) TABLETS**

Pursuant to 21 C.F.R. § 10.30(g) and 21 U.S.C. §§ 355(q)(1)(H) and (q)(1)(I), Petitioner Teva Pharmaceuticals USA, Inc. ("Teva") hereby supplies the following supplemental information relating to the above-captioned petition:

1. Revised certification pursuant to 21 U.S.C. § 355(q)(1)(H).

I certify that, to my best knowledge and belief: (a) this petition includes all information and views upon which the petition relies; (b) this petition includes representative data and/or information known to the petitioner which are unfavorable to the petition; and (c) I have taken reasonable steps to ensure that any representative data and/or information which are unfavorable to the petition were disclosed to me. I further certify that the information upon which I have based the action requested herein first became known to the party on whose behalf this petition is submitted on or about the following date: May 15, 2007. If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: Teva Pharmaceuticals USA. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.

By law, FDA's response to the above-captioned petition is due no later than February 4, 2008. *See* 21 U.S.C. § 355(q)(1)(F) ("The Secretary shall take final agency action on a petition not later than 180 days after the date on which the petition is submitted."). The filing of this supplemental information does not extend the statutory deadline for FDA to respond. *See id.* § 355(q)(1)(F)(2) ("The Secretary shall not extend such period for any reason, including ... the submission of ... supplemental information supplied by the petitioner."). We look forward to receiving a timely response from the Agency.

Respectfully submitted,

Deborah A. Jaskot

2007P − 0316

C_R1

000018

01/28/08  MON 13:40 FAX 3018276870          DMP/DDM                                    ☒003

## VERIFICATION

I certify that, to my best knowledge and belief: (a) I have not intentionally delayed submission of this document or its contents; and (b) the information upon which I have based the action requested herein first became known to me on or about December 31, 2007. If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: Teva Pharmaceuticals USA. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.

By:   _Deborah Jaskot_

Deborah A. Jaskot
Vice President, Regulatory Affairs
Teva Pharmaceuticals USA, Inc.

2

000019



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Rockville MD 20857

FEB 2 6 2008

Deborah A. Jaskot, M.S., R.A.C.
Vice President, Regulatory Affairs
Teva Pharmaceuticals USA
1090 Horsham Road, P.O. Box 1090
North Wales, PA 19454-1090

Re:    Docket No. 2007P-0316/CP1 and CR1

Dear Ms. Jaskot:

This responds to your citizen petition dated August 3, 2007 (Petition), and the revised certification to your Petition dated January 4, 2008 (Correction).[1]  Your Petition requests that the Food and Drug Administration (FDA or the Agency) relist U. S. Patent Number 5,158,952 (the '952 patent) for the 0.25-milligram (mg), 0.5-mg, 1-mg, 2-mg, 3-mg, and 4-mg strengths of Risperdal (risperidone) tablets (new drug application (NDA) 20-272) in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book).  You also request that FDA confirm that Teva Pharmaceutical USA's (Teva) eligibility for 180-day exclusivity in connection with its abbreviated new drug application (ANDA) 76-228 for risperidone tablets in these strengths has not been affected by FDA's delisting of the '952 patent from the Orange Book.  Your request is based on the contention that the '952 patent appeared in the printed annual edition of the Orange Book on the day that Teva submitted ANDA 76-228, which contained a certification pursuant to section 505(j)(2)(A)(vii)(IV) of the Act (paragraph IV certification) to the '952 patent, and a certification pursuant to section 505(j)(2)(A)(vii)(III) of the Act (paragraph III certification) to U. S. Patent Number 4,804,663 (the '663 patent).

We have carefully reviewed your Petition and have concluded that the '952 patent was delisted before Teva submitted ANDA 76-228 to FDA.  For the reasons described in further detail in this Response, we deny your request that FDA relist the '952 patent.  As Teva's ANDA did not contain a paragraph IV certification for a listed patent, and Teva did not provide the required

---

[1] See Docket No. 2007P-0316/CP1 and CR1.  On January 4, 2008, you submitted a "revised certification pursuant to 21 U.S.C. 355(q)(1)(H)" relating to your pending citizen petition.  Section 505(q) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 355(q)) was added by the Food and Drug Administration Amendments Act of 2007 (Public Law 110-85) (FDAAA) on September 27, 2007.  You have alleged that your Petition, received by FDA on August 6, 2007, is subject to section 505(q)(1)(F) of the Act.  It is FDA's view that the requirements, prohibitions, and benefits described in section 505(q) of the Act do not apply to requests submitted to FDA before September 27, 2007.  Were it otherwise, FDA would be barred from considering your Petition, as it did not contain the required certification described in section 505(q)(1)(H) without which the Secretary "shall not consider a petition for review."  A certification submitted after the petition does not make the original petition "contain" the certification.  Moreover, we note that section 505(q) of the Act does not apply to a petition that relates solely to the timing of the approval of an application pursuant to current section 505(j)(5)(B)(iv) of the Act, which describes the 180-day exclusivity period accorded to certain applications (505(q)(4)(A) of the Act).  As described further in this Response, although framed as a patent delisting matter, your Petition relates solely to Teva's eligibility for exclusivity and thus to the timing of the approval of ANDAs for risperidone tablets pursuant to section 505(j)(5)(B)(iv) of the Act.  Because FDAAA does not apply to your Petition, we are responding to your Petition in accordance with our regulations on citizen petitions at 21 CFR 10.30.

1

000020

notice of such certification to the holder of the NDA for the reference listed drug and each owner of the listed patent, Teva would not be eligible for 180-day exclusivity pursuant to section 505(j)(5)(B)(iv) of the Act for its pending ANDA 76-228.

I.    BACKGROUND

A.    ANDAs and Eligibility for 180-day Exclusivity

The Drug Price Competition and Patent Term Restoration Act of 1984 (Public Law 98-417) (the Hatch-Waxman Amendments) created section 505(j) of the Act (21 U.S.C. 355(j)). The Hatch-Waxman Amendments reflect Congress's efforts to balance the need to "make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962" with new incentives for drug development in the form of marketing exclusivity and patent term extensions.[2] Section 505(j) of the Act established an abbreviated approval pathway for a drug product that is the same as a previously approved drug (the reference listed drug) with respect to active ingredient, dosage form, route of administration, strength, labeling, and conditions of use, among other characteristics. An ANDA applicant also must demonstrate that its proposed product is bioequivalent to the reference listed drug. An applicant that can meet the requirements under section 505(j) for approval may rely upon the Agency's finding of safety and effectiveness for the reference listed drug, and need not repeat the extensive nonclinical and clinical investigations required for approval of a full NDA submitted under section 505(b)(1) of the Act. The timing of approval for an ANDA is subject to the patent and marketing exclusivity protections accorded the reference listed drug.

Section 505(b)(1) of the Act requires the sponsor of an NDA to "file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture[,] use, or sale of the drug." Upon approval of an application under section 505(c) of the Act, FDA publishes the patent information provided by the drug product's sponsor in the Orange Book, which is made available to the public in several formats. FDA's role in patent listing is ministerial. As discussed in the preamble to the June 2003 final rule, FDA "will not evaluate a patent to assess whether the declaration is accurate or whether the patent has been appropriately submitted for listing. We will, however, review the declaration for completeness and to determine that the information given by the NDA applicant or holder or patent owner indicates that the patent is eligible for listing."[3]

---

[2] See House Report No. 98-857, part 1, at 14 (1984), reprinted in 1984 U.S.C.C.A.N. 2647 at 2647-2648.

[3] "Applications for FDA Approval to Market a New Drug: Patent Submission and Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying That a Patent Claiming a Drug Is Invalid or Will Not Be Infringed; Final Rule" (68 FR 36676 at 36687; June 18, 2003). It should be noted that certain sections of this final rule regarding the application of 30-month stays on approval of certain ANDAs and applications submitted under section 505(b)(2) of the Act were superseded by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Public Law 108-173) and revoked by technical amendment (69 FR 11309; March 10, 2004).

000021

The Orange Book is published annually and updated monthly in print. During the time period relevant to this petition, the information in the Orange Book was updated approximately on a monthly basis on the Orange Book Web page (the electronic Orange Book), which is linked from the FDA Web site. Beginning in 1998, current patent listings for approved drug products could be obtained from the electronic Orange Book in a search by *active ingredient*, *proprietary name*, *application holder*, or *application number*.

An ANDA applicant must include a patent certification described in section 505(j)(2)(A)(vii) of the Act for each patent that claims the reference listed drug or a method of using the drug for which the applicant is seeking approval and for which information is required to be filed under subsection 505(b) or 505(c) of the Act. For each patent listed in the Orange Book, the ANDA applicant must submit either a paragraph III certification (delaying approval until the date on which such patent will expire), a paragraph IV certification (certifying that such patent is invalid or will not be infringed by the manufacture, use, or sale of the drug product for which the ANDA is submitted), or, with respect to a method of use patent, a statement that the patent does not claim a use for which the ANDA applicant is seeking approval (section 505(j)(2)(A)(viii) of the Act). Submission of an ANDA for a drug product or the use of a drug product claimed in a patent is an act of patent infringement if the ANDA product is intended to be marketed before patent expiration (see 35 U.S.C. 271(e)(2)).

An applicant submitting a paragraph IV certification is required to give notice of the patent challenge to the holder of the NDA for the reference listed drug and each owner of the patent that is the subject of the certification. For an original ANDA, notice must be provided after receipt of an acknowledgment letter from the Office of Generic Drugs (OGD) advising that the application is sufficiently complete to permit a substantive review and has been received by OGD (21 CFR 314.95(b)).[4] Notice of a paragraph IV certification includes, among other things, "a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed" (section 505(j)(2)(B)(iii) of the Act) and it subjects the ANDA applicant to the risk that it will be sued for patent infringement. In addition, if the NDA holder or patent owner initiates a patent infringement action within 45 days after receiving notice of the paragraph IV certification, there will be a statutory 30-month stay of approval of the ANDA while the patent infringement litigation is pending (section 505(j)(5)(B)(ii) of the Act).

The 180-day exclusivity period described in section 505(j)(5)(B)(iv) of the Act provides an incentive for ANDA applicants to challenge listed patents that may be invalid, unenforceable, or not infringed by the drug product described in the ANDA. This patent challenge involves the filing of a paragraph IV certification to a listed patent, notification to the NDA holder and patent owner, and the opportunity for the NDA holder and patent owner to sue the ANDA applicant for patent infringement. The first applicant to submit a substantially complete ANDA containing a paragraph IV certification may be eligible for a 180-day period of marketing exclusivity during which approval of subsequent ANDAs for the same drug product that also contain a paragraph IV certification to the patent will not be granted. Any exclusivity period would run for 180 days from either the first commercial marketing of the first applicant's drug product or from a court

---

[4] With respect to ANDAs, FDA uses the terms *received* or *received for substantive review* to refer to the action described in the Act as filing, and these terms are used in this Response (see 21 CFR 314.101(b)).

3

000022

decision finding that the patent that is the subject of the paragraph IV certification is invalid or not infringed, whichever is earlier (see section 505(j)(5)(B)(iv) of the Act), during the unexpired term of the patent.[5]

B.    Patents Listed in the Orange Book for Risperdal (risperidone) Tablets

The reference listed drug for Teva's ANDA is Janssen Pharmaceutica's (Janssen) Risperdal (risperidone) tablets (NDA 20-272). The 1-mg, 2-mg, 3-mg, 4-mg, and 5-mg Risperdal tablets were approved in 1993.[6] The 0.25-mg and 0.5-mg strengths were approved in 1999. After approval, the sponsor submitted information to FDA on the '663 patent and the '952 patent for listing in the Orange Book entry for Risperdal tablets. The '663 patent expired on December 29, 2007, and pediatric exclusivity attached to that patent will expire on June 29, 2008.[7] The '952 patent will expire on October 27, 2009.

On April 4, 2001, Janssen's parent company, Johnson & Johnson, sent correspondence to the Division of Neuropharmacological Drug Products in FDA's Center for Drug Evaluation and Research (CDER) requesting removal of the '952 patent from the Orange Book listing for 1-mg, 2-mg, 3-mg, and 4-mg Risperdal tablets. On June 11, 2001, Johnson & Johnson sent correspondence via facsimile to the Division of Database Management stating that its April 4, 2001, correspondence also should have requested delisting of the '952 patent for 0.25-mg, 0.5-mg, and 5-mg Risperdal tablets, and requesting removal of the '952 patent from the Orange Book listing for these strengths. In accordance with these instructions, FDA modified its patent listing database on June 11, 2001, to remove the '952 patent from the entries for Risperdal tablets in the above-referenced strengths in response to Johnson & Johnson's requests on April 4, 2001, and June 11, 2001. The delisting of the '952 patent was reflected in the publicly available, electronic Orange Book shortly after June 29, 2001, and no later than July 20, 2001, the date of the next database update.[8] An applicant searching the publicly available, electronic Orange

---

[5] The version of section 505(j)(5)(B)(iv) of the Act in effect at the time of Teva's ANDA submission predates enactment of the MMA, which amended this and other provisions of the Act. Unless otherwise noted (as in footnote 1), all statutory references reflect the pre-MMA version of the Act.

[6] The 5-mg strength of Risperdal (risperidone) tablets (NDA 20-272) has been discontinued from marketing.

[7] The New Jersey federal district court's finding that the '663 patent was valid and enforceable was affirmed by the Federal Circuit on May 11, 2007 (see *Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*, 2006 U.S. Dist LEXIS 74582 (D.N.J. 2006), *aff'd*, 2007 U.S. App. LEXIS 11686 (Fed. Cir. 2007)). The Federal Circuit's mandate issued on June 26, 2007, following denial of a petition for panel rehearing and rehearing en banc (see 2007 U.S. App. LEXIS 16041 (Fed. Cir. 2007)). Accordingly, Teva's ANDA for risperidone tablets, which contains a paragraph III certifications to the '663 patent, will not be eligible for approval prior to June 29, 2008.

[8] The Division of Database Management was responsible for updating the Orange Book. In 2001, the Division of Database Management maintained the patent information submitted by NDA holders pursuant to section 505(b) and (c) of the Act in CDER's Oracle database from which it created patent.txt files on a regular basis. Each patent database .txt file contained the public patent information available at the time of creation of the file, and was released through the electronic Orange Book shortly after it was created. The patent database .txt file created June 4, 2001, showed that the '952 patent and the '663 patent were listed for Risperdal tablets. The patent database .txt file created June 29, 2001, showed that only the '663 patent was listed for Risperdal tablets, reflecting the removal of the' 952 patent on June 11, 2001, at Johnson & Johnson's request. Although we are unable to provide the exact date on which the patent information in the June 29, 2001, .txt file became publicly available in the electronic Orange Book, FDA has determined that it was available by the time the next patent .txt file was created on July 20, 2001.

4

Book after July 20, 2001, would have found that only the '663 patent was listed for Risperdal tablets (see section II.A of this Response for further discussion of the availability of patent information in printed and electronic versions of the Orange Book).

C.    Teva's ANDA 76-228 for Risperidone Tablets

On August 28, 2001, Teva submitted an ANDA for risperidone tablets. The Teva ANDA contained a paragraph III certification to the '663 patent and a paragraph IV certification to the '952 patent. During a filing review of the ANDA to determine whether it was sufficiently complete to permit a substantive review, OGD evaluated the ANDA in accordance with its usual practice to determine whether the ANDA contained an appropriate patent certification for each patent listed for the reference listed drug identified in the ANDA. When reviewing Teva's ANDA, the OGD project manager relied on the publicly available, electronic Orange Book for the most current patent listing information (see September 25, 2001, printout for risperidone from the electronic Orange Book, attached as Exhibit 1). In light of the absence of the '952 patent from the electronic Orange Book, an OGD project manager also contacted the Orange Book staff to clarify the discrepancy between the patent certifications provided in Teva's ANDA and the patent currently listed for Risperdal tablets. The Orange Book staff confirmed that the '952 patent had been delisted for Risperdal tablets.

OGD concluded that Teva had submitted a patent certification for a patent (the '952 patent) that was no longer listed for the reference listed drug, Risperdal tablets. On October 12, 2001, an OGD project manager contacted Philip Erickson, R.Ph., Director of Regulatory Affairs, Solid Oral Dosage Forms, for Teva Pharmaceuticals USA, and requested, among other things, that Teva submit a revised patent certification because the '952 patent had been delisted from the Orange Book. On October 22, 2001, Teva submitted a letter via facsimile withdrawing its patent certification to the '952 patent. Teva's letter stated, with reference to the revised patent certification: "U.S. Patent 5,158,952 with an expiration of October 27, 2009 *has been officially delisted* from the Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), therefore only U.S. Patent 4,804,663 with an expiration of December 29, 2007 remains. Please find enclosed a patent certification revised accordingly" (emphasis added).[9]  The revised patent certification, signed by D. Jaskot, Executive Director of Regulatory Affairs, Teva Pharmaceuticals USA stated: "Paragraph III Certification: The undersigned hereby certifies that to the best of our knowledge and in TEVA Pharmaceuticals USA's opinion there is one listed patent which claims the reference drug Risperdal® Tablets, 0.25 mg, 0.5 mg, 1 mg, 2 mg, 3 mg and 4 mg. U.S. Patent No. 4804663  Expiration December 29, 2007..."[10]

On October 24, 2001, OGD issued a standard acknowledgement letter[11] to Teva indicating that Teva's ANDA for risperidone tablets had been received for substantive review.  The Teva

---

[9] See Exhibit 3 to Petition: Correspondence dated October 22, 2001, from D. Jaskot (Teva) to G. Buehler (OGD) regarding ANDA 76-228 (Teva's October 22, 2001, Correspondence). A paper copy of Teva's October 22, 2001, Correspondence was received by OGD on October 23, 2001.

[10] See Attachment 2 to Teva's October 22, 2001, Correspondence.

[11] When an ANDA containing a paragraph IV certification is received for substantive review by OGD, OGD will issue a paragraph IV acknowledgment letter which describes, among other things, an ANDA applicant's obligations

5

000024

ANDA, as received by OGD, did not contain a paragraph IV certification to any listed patent for Risperdal tablets, and thus there was no paragraph IV certification for which Teva would have been required to provide notice to the NDA holder for Risperdal and the owner of the '952 patent.

## II.    ANALYSIS

You contend that Teva is entitled to 180 days of marketing exclusivity for its pending ANDA for risperidone tablets because the '952 patent appeared in the annual edition of the Orange Book (which you describe as the "official" Orange Book) on the day that Teva submitted its ANDA containing a paragraph IV certification to the '952 patent. You also assert that FDA's delisting of the '952 patent does not affect Teva's "entitlement" to 180-day exclusivity, because FDA "failed to provide official notice of the 'delisting' for several months following the submission of Teva's ANDA" (Petition at 2). We address these arguments below.

### A.    Public Availability of Information Regarding Delisting of '952 Patent

As described in section I.A. of this Response, FDA makes patent information for listed drugs available to the public in several formats. In 2001, we published a printed annual edition of the Orange Book with cumulative monthly supplements, and maintained a public docket (1995S-0117) for patent term extensions and new patents listed for human drugs. We also provided an electronic Orange Book updated approximately on a monthly basis. The '952 patent was listed for Risperdal tablets in the Patent and Exclusivity Information Addendum (the Addendum) to the printed 21st annual edition of the Orange Book, which is described on the title page as current through December 31, 2000. The Addendum states that "[s]ince all parts of this publication are subject to changes, additions, or deletions, the *Addendum* must be used in conjunction with the most current Cumulative Supplement" (Orange Book, 21st ed., at AD-2). In turn, Section 1.3 of each Cumulative Supplement to the 21st annual edition of the Orange Book describes the availability of the electronic Orange Book. The Cumulative Supplements state, among other things, that

> [t]here is an Electronic Orange Book Query (EOB) at http://www.fda.gov/cder/ob. The Query provides searching of the approved drug list by active ingredient, proprietary name, applicant holder, or applicant number. Product search categories are: prescription, over-the-counter, discontinued drugs. There are links to patent and exclusivity information that may be applicable to each product. The data is updated concurrently with the publication of the annual edition or monthly cumulative supplements.[12]

---

to provide the required notice to the NDA holder and each patent owner of its paragraph IV certification to a patent listed for the reference listed drug. OGD did not issue a paragraph IV acknowledgement letter to Teva because its ANDA did not contain a paragraph IV certification to a listed patent when received for substantive review by OGD,

[12] See, e.g., Orange Book Cumulative Supplement 1, January 2001, at v. Although the printed cumulative supplements to the Orange Book do not include information on patent delistings, the caveat regarding possible "changes, additions, or deletions" encourages the public to seek the most currently available information. The electronic Orange Book contained the most current information regarding patents listed for Risperdal tablets.

6

000025

Moreover, the publishing history of the Orange Book, prominently displayed on the inside front cover of the printed 21st annual edition of the Orange Book, also indicates, among other things, that the Orange Book is "Updated by monthly cumulative supplements. Updated on the Internet. Address: http://www.fda.gov/cder/drug.htm."

An applicant searching the electronic Orange Book shortly after June 29, 2001, and no later than July 20, 2001, would have found that only the '663 patent was listed for Risperdal tablets. To illustrate this fact, we have loaded the June 29, 2001, patent database .txt file described in footnote 8 and the database *scripts* (the set of computer instructions to ask the database for certain data) for the electronic Orange Book that were in use in 2001.[13] The electronic Orange Book Query by active ingredient for risperidone, and the information available from each link from the search results page are attached to this Response as Exhibit 2. An applicant searching the electronic Orange Book for risperidone would have found that there was only one listed patent for NDA 20-272 for Risperdal tablets: the '663 patent. Indeed, we note that we have a printout supplied by a different ANDA applicant and dated October 30, 2001, of the electronic Orange Book entry for Risperdal tablets (NDA 20-272), which shows that the only patent listed was the '663 patent (Exhibit 3). This is the same patent information that would have been available to an applicant searching the electronic Orange Book any time after July 20, 2001. As with Teva's ANDA, OGD received for substantive review the November 2001 ANDA referencing Risperdal tablets with a patent certification only to the '663 patent.

In summary, at the time Teva submitted its ANDA, the electronic Orange Book contained the most current information regarding patents listed for Risperdal tablets. Your assertion that the delisting of the '952 patent did not become effective until publication of the 2002 annual edition of the Orange Book is without merit.

    B.       Patent Certification Obligations for Receipt of ANDAs

You contend that Teva was required to provide a certification to the '952 patent in its submission of an ANDA for risperidone tablets on August 28, 2001, because "where a patent remains listed for a particular drug in the official Orange Book, a generic applicant has no choice but to believe that the NDA holder is continuing to assert that patent as claiming the listed drug" (Petition at 1 to 2, and 4). However, by July 20, 2001, it was publicly known from the electronic Orange Book that the NDA holder was not continuing to assert the '952 patent as claiming Risperdal tablets. As the '952 patent was no longer listed for the reference listed drug when Teva's ANDA 76-228 was submitted, a certification to the '952 patent was neither necessary nor permitted.

The Agency's regulations at 21 CFR 314.94(a)(12)(i), implementing section 505(j)(2)(A)(vii) of the Act, require that an ANDA contain a certification with respect to each patent that "claims the reference listed drug or that claims a use of such listed drug for which the applicant is seeking approval under section 505(j) of the act and for which information is required to be filed under section 505(b) and (c) of the act and [21 CFR] 314.53." Patent information for approved drug products changes with some frequency as a result of requests by NDA holders to list newly issued patents or delist patents for their products in accordance with their statutory obligations

---

[13] FDA's database protocols and scripts have changed over time.

7

under section 505(b) and (c) of the Act. As a result, OGD's filing review of ANDAs routinely includes a determination of whether the patent certifications contained in the ANDA correspond to the patents actually listed for the reference listed drug, as assessed by the most current patent information the Agency has received. OGD does not rely solely on the applicant's representation that the ANDA contains the required patent certifications; OGD conducts an independent review of the patent information for the reference listed drug that FDA has received from the NDA holder.[14]  The '952 patent was delisted for Risperdal tablets before any applicant, including Teva, submitted an ANDA referencing that drug. Accordingly, Teva was required to remove its certification to the '952 patent before its ANDA would be formally received by the Agency.

     C.     Hatch-Waxman Incentives for Developing Generic Drugs

With reference to the decision by the Circuit Court of Appeals for the District of Columbia in *Ranbaxy Laboratories Ltd. v. Leavitt*,[15] you assert that "adoption of a rule that would divest the first generic applicant of its exclusivity after that applicant has assumed the very risks 180-day exclusivity is designed to reward – the expense of formulating a non-infringing product and preparing a legal defense to a potential action for patent infringement, and then the submission of an infringing paragraph IV certification to the Agency – would fundamentally 'change the incentive structure adopted by Congress,' in clear violation of the plain text and structure of the Hatch-Waxman Act" (Petition at 2, citing 469 F.3d at 125-26). We recognize that, based on the *Ranbaxy* decision, once an ANDA applicant has submitted a paragraph IV certification to a listed patent, FDA may not remove the patent from the Orange Book until that applicant's 180-day exclusivity has expired (or the patent has expired). However, the factual predicate upon which the *Ranbaxy* decision was based is absent from Teva's risperidone ANDA. In *Ranbaxy*, the patents had been listed for Zocor (simvastatin) at the time Ranbaxy and Ivax Pharmaceuticals, Inc. (Ivax) (subsequently acquired by Teva) submitted their paragraph IV certifications and, after OGD had received their ANDAs, Ranbaxy and Ivax each provided the required notice of their paragraph IV certifications to Merck & Co., Inc., the NDA holder and patent owner, thereby subjecting themselves to the risk of patent infringement litigation. The NDA holder's request to delist the patents for simvastatin came almost 2 years *after* the Ranbaxy ANDA was submitted and almost 3 years *after* the Ivax ANDA was submitted.[16]  In contrast, Johnson & Johnson requested that the '952 patent for Risperdal be delisted 2 to 4 months *before* Teva's ANDA for risperidone was submitted. Moreover, the fact of patent delisting was available in the electronic Orange Book at least 1 month before Teva submitted its application.

---

[14] Section 505(j)(2)(c)(vii) requires that an ANDA contain a certification with respect to each patent claiming the drug or use of the listed drug for which the applicant seeks approval "and for which information is required to be filed under [505(b) or (c)]." Therefore, to determine what certifications an ANDA must contain, FDA will refer to the most recent patent information submitted by the NDA holder. For example, if a new patent has been timely submitted to FDA for the reference listed drug and an ANDA does not contain a certification to the patent, OGD will contact the ANDA applicant and require that the applicant submit an appropriate patent certification. It is FDA's long-standing practice to require a certification to a patent recently submitted to FDA (if submitted within the time frame established by section 505(c) of the Act) even if the patent has not yet appeared in the Orange Book in any format.

[15] 469 F.3d 120 (D.C. Cir. 2006).

[16] See *Ranbaxy Laboratories Ltd. v. Leavitt*, 459 F.Supp.2d 1 (D.D.C. 2006).

8

Given that an NDA holder's request to delist a patent is implicitly an acknowledgment that the standard for patent listing set forth in section 505(b) and (c) of the Act – that a "claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture[,] use, or sale of the drug" – could no longer be met, Teva's purported paragraph IV certification to a delisted patent assumed none of the risks that 180-day exclusivity is designed to reward. By the time Teva submitted its ANDA, Johnson & Johnson had effectively informed FDA (and, with publication in the electronic Orange Book, the generic drug industry) that a claim of infringement of the '952 patent could not reasonably be brought against an ANDA applicant referencing Risperdal tablets. Because Teva withdrew its paragraph IV certification and never notified the NDA holder and patent owner that it believed the '952 patent to be invalid, unenforceable, or not infringed, Teva has not been subject to any risk of patent infringement litigation.[17]

The "reward Congress guaranteed in the Hatch-Waxman Act" (Petition at 5) is the opportunity for an ANDA applicant to compete with other ANDA applicants for the first substantially complete ANDA containing a paragraph IV certification to a listed patent for the reference listed drug. The uncertainties associated with this "guarantee" are encountered by all ANDA applicants – i.e., another applicant may be the "first applicant," thereby blocking a competitor from marketing for 180 days following its approval; the patent may be held to be valid and enforceable (as was the '663 patent listed for Risperdal); the patent that is the subject of a paragraph IV certification may expire before the applicant can obtain approval of its ANDA; or a patent may be delisted before submission of an ANDA (as was the '952 patent).

III.    CONCLUSION

We have concluded that the '952 patent was delisted before Teva submitted to FDA ANDA 76-228 with a paragraph IV certification to the patent. Accordingly, we deny your request that FDA relist the '952 patent. Because the '952 patent was properly delisted and Teva's ANDA could not contain a paragraph IV certification for that patent, Teva is not eligible for 180-day exclusivity for ANDA 76-228.

Sincerely,

Janet Woodcock, M.D.
Acting Director
Center for Drug Evaluation and Research

---

[17] To the extent that Teva complains that it has gone to the expense of formulating a non-infringing product, this expense is borne by any ANDA applicant that seeks to market its proposed generic product before expiration of a valid and enforceable patent, irrespective of whether the patent is listed in the Orange Book. Indeed, in the preamble to our 1994 final rule on patent and exclusivity provisions, we noted: "FDA, however, believes it would be prudent for [ANDA] applicants to conduct patent searches if possible. A patent search could reveal the existence of an unlisted, but valid, patent and thus prevent an unnecessary expenditure of resources by applicants and FDA on a product that might not be marketable" (see "Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions, Part II; Final Rule" (59 FR 50338 at 50346; October 3, 1994).

9

000028

**1**

Patent and Exclusivity Search Results                                Page 1 of 1

**Patent and Exclusivity Search Results from query on 020272 001.**

## Patent Data

Appl Prod Patent    Patent      Use
No    No    No     Expiration Code
**020272 001    4804663 DEC 29,2007 U-90**

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

Thank you for searching the Electronic Orange Book

Patent and Exclusivity Terms

Return to Electronic Orange Book Home Page

000030

**2**

# Electronic Orange Book Query

**Query by Active Ingredient:**

| risperidone | (Type in part or all of name)

Select the list you would like to search:

◉ Rx (Prescription Drug Products)
○ OTC (Over-the-Counter Drug Products)
○ Disc (Discontinued Drug Products)



Return to the Electronic Orange Book Home Page

Active Ingredient Search

**Active Ingredient Search Results from "Rx" table for query on "risperidone."**

| Appl No | TE Code | RLD | Active Ingredient | Dosage Form; Route | Strength | Proprietary Name | Applicant |
|---------|---------|-----|-------------------|--------------------|----------|------------------|-----------|
| 020588 | | Yes | RISPERIDONE | Solution; Oral | 1MG/ML | RISPERDAL | JANSSEN |
| 020272 | | No | RISPERIDONE | Tablet; Oral | 0.25MG | RISPERDAL | JANSSEN |
| 020272 | | No | RISPERIDONE | Tablet; Oral | 0.5MG | RISPERDAL | JANSSEN |
| 020272 | | Yes | RISPERIDONE | Tablet; Oral | 1MG | RISPERDAL | JANSSEN |
| 020272 | | No | RISPERIDONE | Tablet; Oral | 2MG | RISPERDAL | JANSSEN |
| 020272 | | No | RISPERIDONE | Tablet; Oral | 3MG | RISPERDAL | JANSSEN |
| 020272 | | No | RISPERIDONE | Tablet; Oral | 4MG | RISPERDAL | JANSSEN |

**Thank you for searching the** Electronic Orange Book

**Return to Electronic Orange Book Home Page**

Orange Book: Active Ingredient Detail Record Search

**Search results from the "Rx" table for query on "020272."**

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 1MG |
| Application Number: | 020272 |
| Product Number: | 001 |
| Approval Date: | Dec 29, 1993 |
| Reference Listed Drug | Yes |
| RX/OTC/DISCN: | RX |
| TE Code: | |

Patent and Exclusivity Info for this product: Click Here

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 2MG |
| Application Number: | 020272 |
| Product Number: | 002 |
| Approval Date: | Dec 29, 1993 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |

Patent and Exclusivity Info for this product: Click Here

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 3MG |
| Application Number: | 020272 |
| Product Number: | 003 |
| Approval Date: | Dec 29, 1993 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |

Patent and Exclusivity Info for this product: Click Here

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |

Orange Book: Active Ingredient Detail Record Search

| | |
|---|---|
| Strength: | 4MG |
| Application Number: | 020272 |
| Product Number: | 004 |
| Approval Date: | Dec 29, 1993 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |

Patent and Exclusivity Info for this product: Click Here

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 0.5MG |
| Application Number: | 020272 |
| Product Number: | 007 |
| Approval Date: | Jan 27, 1999 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |

Patent and Exclusivity Info for this product: Click Here

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 0.25MG |
| Application Number: | 020272 |
| Product Number: | 008 |
| Approval Date: | May 10, 1999 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |

Patent and Exclusivity Info for this product: Click Here

## Thank you for searching the Electronic Orange Book!

Return to Electronic Orange Book Home Page

Patent and Exclusivity Search Results

**Patent and Exclusivity Search Results from query on 020272 001.**

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Use Code |
|---------|---------|-----------|-------------------|----------|
| 020272 001 | | 4804663 | DEC 29,2007 | U-90 |

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

**Thank you for searching the** Electronic Orange Book

<u>Patent and Exclusivity</u> Terms

<u>Return to Electronic Orange Book Home Page</u>

Patent and Exclusivity Search Results

**Patent and Exclusivity Search Results from query on 020272 002.**

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Use Code |
|---------|---------|-----------|-------------------|----------|
| 020272 | 002 | 4804663 | DEC 29,2007 | U-90 |

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

**Thank you for searching the** Electronic Orange Book

Patent and Exclusivity Terms

Return to Electronic Orange Book Home Page

000037

Patent and Exclusivity Search Results

**Patent and Exclusivity Search Results from query on 020272 003.**

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Use Code |
|---------|---------|-----------|-------------------|----------|
| 020272 | 003 | 4804663 | DEC 29,2007 | U-90 |

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

**Thank you for searching the** Electronic Orange Book

**Patent and Exclusivity Terms**

**Return to Electronic Orange Book Home Page**

**Patent and Exclusivity Search Results from query on 020272 004.**

## Patent Data

| Appl<br>No | Prod<br>No | Patent<br>No | Patent<br>Expiration | Use<br>Code |
|---|---|---|---|---|
| 020272 004 | | 4804663 | DEC 29,2007 | U-90 |

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

Thank you for searching the Electronic Orange Book

Patent and Exclusivity Terms

Return to Electronic Orange Book Home Page

000039

Patent and Exclusivity Search Results                                    Page 1 of 1

**Patent and Exclusivity Search Results from query on 020272 007.**

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Use Code |
|---------|---------|-----------|-------------------|----------|
| 020272 007 | | 4804663 | DEC 29,2007 | U-90 |

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

**Thank you for searching the** Electronic Orange Book

Patent and Exclusivity Terms

Return to Electronic Orange Book Home Page

**000040**

Patent and Exclusivity Search Results

**Patent and Exclusivity Search Results from query on 020272 008.**

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Use Code |
|---------|---------|-----------|-------------------|----------|
| 020272 | 008 | 4804663 | DEC 29,2007 | U-90 |

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

**Thank you for searching the** Electronic Orange Book

<u>Patent and Exclusivity Terms</u>

<u>Return to Electronic Orange Book Home Page</u>

**3**

# Electronic Orange Book

## Approved Drug Products

### with
### Therapeutic Equivalence Evaluations

#### Current through July 2001

#### Preface

#### FAQ

**Search by Active Ingredient     Search by Applicant Holder**

**Search by Proprietary Name     Search by Application Number**

**The products in this list have been approved under section 505 of the Federal Food, Drug, and Cosmetic Act.**

Drug questions email: DRUGINFO@CDER.FDA.GOV

U.S Department of Health and Human Services
Public Health Service
Food and Drug Administration
Center for Drug Evaluation and Research
Office of Information Technology
Division of Data Management and Services

Updated: October 19, 2001

000043

Active Ingredient Detail Record Search

**Search results from the "Rx" table for query on "020272."**

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 1MG |
| Application Number: | 020272 |
| Product Number: | 001 |
| Approval Date: | DEC 29, 1993 |
| Reference Listed Drug | Yes |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: | Click Here |

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 2MG |
| Application Number: | 020272 |
| Product Number: | 002 |
| Approval Date: | DEC 29, 1993 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: | Click Here |

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 3MG |
| Application Number: | 020272 |
| Product Number: | 003 |
| Approval Date: | DEC 29, 1993 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: | Click Here |

http://www.accessdata.fda.gov/scripts/cder/ob/docs/tempaidet.cfm?Appl_No=020272&TAB...  10/30/01

Active Ingredient Detail Record Search

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 4MG |
| Application Number: | 020272 |
| Product Number: | 004 |
| Approval Date: | DEC 29, 1993 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: Click Here | |

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 0.5MG |
| Application Number: | 020272 |
| Product Number: | 007 |
| Approval Date: | JAN 27, 1999 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: Click Here | |

| | |
|---|---|
| Active Ingredient: | RISPERIDONE |
| Dosage Form;Route: | Tablet; Oral |
| Proprietary Name: | RISPERDAL |
| Applicant: | JANSSEN |
| Strength: | 0.25MG |
| Application Number: | 020272 |
| Product Number: | 008 |
| Approval Date: | MAY 10, 1999 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: Click Here | |

http://www.accessdata.fda.gov/scripts/cder/ob/docs/tempaidet.cfm?Appl_No=020272&TAB... 10/30/01

Patent and Exclusivity Search Results                    Page 1 of 1

Patent and Exclusivity Search Results from query on 020272 001.

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Use Code |
|---------|---------|-----------|-------------------|----------|
| 020272 001 | | 4804663 | DEC | U-90 |

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

Thank you for searching the Electronic Orange Book

**Patent and Exclusivity Terms**

**Return to Electronic Orange Book Home Page**

000046

## LEGISLATIVE HISTORY
### P.L. 98-417

in carrying out its functions. It is the Committee's intent that the commission be funded through these public contributions. However, if these contributions were insufficient to pay the commission's expenses, the Secretary would be authorized to use up to $1 million in Commodity Credit Corporation funds for these purposes. H.J. Res. 600 also authorizes the commission's executive agencies and the General Accounting Office to assist the commission by furnishing it with personnel and support services. It is expected that costs of such personnel and services would not be substantial. Thus, the cost of this joint resolution could be as much as $1 million, or, within sufficient public contributions, the federal cost could be negligible.

Enactment of this joint resolution would not affect the budget of state or local governments.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,
RUDOLPH G. PENNER, *Director.*

### INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of Rule XI of the Rules of the House of Representatives, the Committee estimates that enactment of H.J. Res. 600 will have no inflationary impact on the national economy.

### OVERSIGHT STATEMENT

No summary of oversight findings and recommendations made by the Committee on Government Operations under clause 2(b)(2) of Rule X of the Rules of the House of Representatives was available to the Committee with reference to the subject matter specifically addressed by H.J. Res. 600.

No specific oversight activities other than the hearings detailed in this report were conducted by the Committee within the definition of clause 2(b)(1) of Rule X of the Rules of the House of Representatives.

2646

## DRUG PRICE COMPETITION AND PATENT TERM RESTORATION ACT[1]
### P.L. 98-417

*P.L. 98-417, see page 98 Stat. 1585*

Senate Report (Judiciary Committee) No. 98-547,
June 28, 1984 [To accompany S. 1538]

House Report (Energy and Commerce Committee) No. 98-857(I),
June 21, 1984 [To accompany H.R. 3605]

House Report (Judiciary Committee) No. 98-857(II),
Aug. 1, 1984 [To accompany H.R. 3605]

Cong. Record Vol. 130 (1984)

#### DATES OF CONSIDERATION AND PASSAGE

Senate June 28, August 10, September 12, 1984

House September 6, 1984

S. 1538 was passed in lieu of the House bill after amending its language to contain the text of the House bill. The House Report (Part I, this page, and Part II, page 2686) and a Related Report (page 2721) are set out.

### HOUSE REPORT NO. 98-857, Part I
[page 1]

The Committee on Energy and Commerce, to whom was referred the bill (H.R. 3605) to amend the Federal Food, Drug, and Cosmetic Act to authorize an abbreviated new drug application under section 505 of that Act for generic new drugs equivalent to approved new drugs, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

[page 14]
### PURPOSE AND SUMMARY

#### TITLE I

The purpose of Title I of the bill is to make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962. Under current law, there is a generic drug approval procedure for pioneer drugs approved before 1962, but not for pioneer drugs approved after 1962.

Title I of the bill generally extends the procedures used to approve generic copies of pre-62 drugs to post-62 drugs. Generic copies

2647

000047

## LEGISLATIVE HISTORY
P.L. 98-417
[page 15]

of any drug may be approved if the generic is the same as the original drug or so similar that FDA has determined the differences do not affect safety and effectiveness.

Title I also requires patent owners to submit information to FDA regarding produce and use patents that cover approved drugs. Generic copies of these drugs may be approved when the patents expire unless the company certifies that the patent is invalid or will not be infringed. In such cases, the generic company must notify the patent owner about its certification and approval of the generic drug may not be made effective until the court decides the patent infringement or a period of 18 months, whichever occurs first. Notification must be given when the generic has submitted an ANDA with bioequivalence data.

In addition, Title I affords four years of exclusive market life to drugs which may not be patented and which are submitted for the first time after the enactment of the bill. Further, drugs which were approved for the first time between 1982 and the date of enactment received ten years of exclusive market life.

### TITLE II

The purpose of Title II of the bill is to create a new incentive for increased expenditure for research and development of certain products which are subject to premarket approval. The incentive is the restoration of a part of the patent life while the product is awaiting pre-market approval. Under current law, a patent continues to run while the maker of the product is testing and awaiting approval to market it.

Title II of H.R. 3605 provides for one extension of the earliest patent on certain products subject to pre-market approval. The extension would be for a period equal to: (1) half of the time required to test the product for safety (and effectiveness in some cases); and (2) all of the time required for agency to approve marketing of the product. These products include: human drugs, animal drugs, medical devices, and food and color additives.

Title II places several limits on the period of patent extension. First, the period of extension may not exceed two years for products either currently being tested or awaiting approval. For all other products, the period of patent extension may not exceed five years. Second, the period of patent extension, when added to the time left after the product's approval, may not exceed fourteen years. Third, any time that the product's manufacturer did not act with due diligence during the regulatory review period would be subtracted.

Finally, Title II provides that it is not an act of patent infringement for a generic drug maker to import or to test a patented drug in preparation for seeking FDA approval if marketing of the drug would occur after expiration of the patent.

### HEARINGS

The Committee's Subcommittee on Health and the Environment held one day of hearings on H.R. 3605, the Drug Price Competition Act, on July 15, 1983. Testimony was received from 15 witnesses,

2648

## DRUG PRICE AND PATENT TERM ACT
P.L. 98-417
[page 16]

representing nine organizations, with additional material submitted by two individuals and organizations.

### COMMITTEE CONSIDERATION

On August 1, 1983, the Committee's Subcommittee on Health met. The Subcommittee met in open session and ordered favorably reported H.R. 3605 without amendment by voice vote. On June 12, 1984, the Committee met in open session on H.R. 3605, amended the bill, and ordered it favorably reported by a voice vote. The title of the bill was amended to the Drug Price Competition and Patent Term Restoration Act of 1984.

### BACKGROUND AND NEED FOR THE LEGISLATION

#### TITLE I—ABBREVIATED NEW DRUG APPLICATIONS

Prior to 1962, the Federal Food, Drug and Cosmetic Act (FFDCA) required that all drugs be approved as safe before they could be marketed. The 1962 amendments required that all new drugs be safe and effective before they could be approved as safe and effective prior to marketing.

As a result of the 1962 amendments, FDA did two things regarding the pre-1962 drugs. First, the agency created the Drug Efficacy Study (DESI) to determine if all pre-1962 drugs were effective. Second, FDA established a policy permitting the approval of a generic equivalent to a pre-1962 drug without the approval of a pioneer drug (NDA).

As a result of the 1962 amendments, the manufacturer of a pioneer drug must conduct tests on humans that show the product to be safe and effective and submit the results in a new drug application (NDA). A manufacturer of a generic drug must conduct tests that show the generic drug is the same as the pioneer drug and that it will be properly manufactured and labeled. This information is submitted in an abbreviated new drug application (ANDA).

The only difference between a NDA and ANDA is that the generic manufacturer is not required to conduct human clinical trials. FDA considers such resting to be unnecessary and wasteful because the drug has already been determined to be safe and effective. Moreover, such retesting is unethical because it requires that some sick patients take placebos and be denied treatment known to be effective.

Prior to 1962, FDA allow this ANDA procedure only for pioneer drugs approved before 1962. There is no ANDA procedure for approving generic equivalents of pioneer drugs approved after 1962. While the FDA has been considering since 1978 an extension of the pre-1962 ANDA policy to post-1962 drugs, it has not extended the application. Because of the agency's failure to act, Title I of H.R. 3605 is necessary to establish a post-1962 ANDA policy.

Some have suggested that "Paper NDAs" be used to approve generic equivalents of pioneer drugs approved after 1962. Under the "Paper NDA" procedure, the generic manufacturer may submit scientific reports, instead of clinical trials, to support findings of safety and efficacy. This procedure is inadequate, however, because FDA estimates that satisfactory reports are not available for 85

2649

000048

**Food and Drug Administration, HHS**                              **§ 314.53**

appears in the
the printed volume

**ification of inva-
gement of a pat-**

tion. For each
e drug or drugs
that are relied
for approval of
conducted or
r such drug or
plicant certifies
) that a patent
e, or will not be
t shall send no-
n by registered
rn receipt re-
following per-

patent that is
ification or the
ed by the owner
e name and ad-
ner or its rep-
ained from the
nd Trademark

approved appli-
5(b) of the act
hich is claimed
se of which is
and for which
approval, or, if
does not reside
usiness within
e application
, or other au-
me and address
r or its attor-
ed official may
vision of Drug
(HFD–80), Cen-
and Research,
istration, 5600
MD 20857.
s not apply to
s no uses for
seeking ap-

The applicant
quired by para-
n when it re-
knowledgment
application has
me, the appli-
lication to in-
ying that the
to each person

identified under paragraph (a) of this
section and that the notice met the
content requirement under paragraph
(c) of this section.

(c) *Content of a notice.* In the notice,
the applicant shall cite section
505(b)(3)(B) of the act and shall include,
but not be limited to, the following in-
formation:

(1) A statement that a 505(b)(2) appli-
cation submitted by the applicant has
been filed by FDA.

(2) The application number.

(3) The established name, if any, as
defined in section 502(e)(3) of the act, of
the proposed drug product.

(4) The active ingredient, strength,
and dosage form of the proposed drug
product.

(5) The patent number and expiration
date, as submitted to the agency or as
known to the applicant, of each patent
alleged to be invalid, unenforceable, or
not infringed.

(6) A detailed statement of the fac-
tual and legal basis of the applicant's
opinion that the patent is not valid,
unenforceable, or will not be infringed.
The applicant shall include in the de-
tailed statement:

(i) For each claim of a patent alleged
not to be infringed, a full and detailed
explanation of why the claim is not in-
fringed.

(ii) For each claim of a patent al-
leged to be invalid or unenforceable, a
full and detailed explanation of the
grounds supporting the allegation.

(7) If the applicant does not reside or
have a place of business in the United
States, the name and address of an
agent in the United States authorized
to accept service of process for the ap-
plicant.

(d) *Amendment to an application.* If an
application is amended to include the
certification described in §314.50(i), the
applicant shall send the notice required
by paragraph (a) of this section at the
same time that the amendment to the
application is submitted to FDA.

(e) *Documentation of receipt of notice.*
The applicant shall amend its applica-
tion to document receipt of the notice
required under paragraph (a) of this
section by each person provided the no-
tice. The applicant shall include a copy
of the return receipt or other similar
evidence of the date the notification

was received. FDA will accept as ade-
quate documentation of the date of re-
ceipt a return receipt or a letter ac-
knowledging receipt by the person pro-
vided the notice. An applicant may
rely on another form of documentation
only if FDA has agreed to such docu-
mentation in advance. A copy of the
notice itself need not be submitted to
the agency.

(f) *Approval.* If the requirements of
this section are met, the agency will
presume the notice to be complete and
sufficient, and it will count the day fol-
lowing the date of receipt of the notice
by the patent owner or its representa-
tive and by the approved application
holder as the first day of the 45-day pe-
riod provided for in section 505(c)(3)(C)
of the act. FDA may, if the applicant
amends its application with a written
statement that a later date should be
used, count from such later date.

[59 FR 50362, Oct. 3, 1994, as amended at 68 FR
36703, June 18, 2003; 69 FR 11310, Mar. 10, 2004]

**§ 314.53  Submission of patent informa-
tion.**

(a) *Who must submit patent informa-
tion.* This section applies to any appli-
cant who submits to FDA a new drug
application or an amendment to it
under section 505(b) of the act and
§ 314.50 or a supplement to an approved
application under §314.70, except as
provided in paragraph (d)(2) of this sec-
tion.

(b) *Patents for which information must
be submitted and patents for which infor-
mation must not be submitted—(1) General
requirements.* An applicant described in
paragraph (a) of this section shall sub-
mit the required information on the
declaration form set forth in paragraph
(c) of this section for each patent that
claims the drug or a method of using
the drug that is the subject of the new
drug application or amendment or sup-
plement to it and with respect to which
a claim of patent infringement could
reasonably be asserted if a person not
licensed by the owner of the patent en-
gaged in the manufacture, use, or sale
of the drug product. For purposes of
this part, such patents consist of drug
substance (active ingredient) patents,
drug product (formulation and com-
position) patents, and method-of-use
patents. For patents that claim the

103

drug substance, the applicant shall submit information only on those patents that claim the drug substance that is the subject of the pending or approved application or that claim a drug substance that is the same as the active ingredient that is the subject of the approved or pending application. For patents that claim a polymorph that is the same as the active ingredient described in the approved or pending application, the applicant shall certify in the declaration forms that the applicant has test data, as set forth in paragraph (b)(2) of this section, demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the new drug application. For patents that claim a drug product, the applicant shall submit information only on those patents that claim a drug product, as is defined in § 314.3, that is described in the pending or approved application. For patents that claim a method of use, the applicant shall submit information only on those patents that claim indications or other conditions of use that are described in the pending or approved application. The applicant shall separately identify each pending or approved method of use and related patent claim. For approved applications, the applicant submitting the method-of-use patent shall identify with specificity the section of the approved labeling that corresponds to the method of use claimed by the patent submitted. Process patents, patents claiming packaging, patents claiming metabolites, and patents claiming intermediates are not covered by this section, and information on these patents must not be submitted to FDA.

(2) *Test Data for Submission of Patent Information for Patents That Claim a Polymorph.* The test data, referenced in paragraph (b)(1) of this section, must include the following:

(i) A full description of the polymorphic form of the drug substance, including its physical and chemical characteristics and stability; the method of synthesis (or isolation) and purification of the drug substance; the process controls used during manufacture and packaging; and such specifications and analytical methods as are nec-

essary to assure the identity, strength, quality, and purity of the polymorphic form of the drug substance;

(ii) The executed batch record for a drug product containing the polymorphic form of the drug substance and documentation that the batch was manufactured under current good manufacturing practice requirements;

(iii) Demonstration of bioequivalence between the executed batch of the drug product that contains the polymorphic form of the drug substance and the drug product as described in the NDA;

(iv) A list of all components used in the manufacture of the drug product containing the polymorphic form and a statement of the composition of the drug product; a statement of the specifications and analytical methods for each component; a description of the manufacturing and packaging procedures and in-process controls for the drug product; such specifications and analytical methods as are necessary to assure the identity, strength, quality, purity, and bioavailability of the drug product, including release and stability data complying with the approved product specifications to demonstrate pharmaceutical equivalence and comparable product stability; and

(v) Comparative in vitro dissolution testing on 12 dosage units each of the executed test batch and the new drug application product.

(c) *Reporting requirements*—(1) *General requirements.* An applicant described in paragraph (a) of this section shall submit the required patent information described in paragraph (c)(2) of this section for each patent that meets the requirements described in paragraph (b) of this section. We will not accept the patent information unless it is complete and submitted on the appropriate forms, FDA Forms 3542 or 3542a. These forms may be obtained on the Internet at *http://www.fda.gov* by searching for "forms".

(2) *Drug substance (active ingredient), drug product (formulation or composition), and method-of-use patents*—(i) *Original Declaration.* For each patent that claims a drug substance (active ingredient), drug product (formulation and composition), or method of use, the applicant shall submit FDA Form

3542a. The following in verification is required:
(A) New drug applicatio
(B) Name of new dr sponsor;
(C) Trade name (or name) of new drug;
(D) Active ingredient
(E) Strength(s) of new
(F) Dosage form of ne
(G) United States issue date, and expirat ent submitted;
(H) The patent owner dress, phone number a fax number and e-mail a
(I) The name, full number and, if availa and e-mail address of resentative who reside place of business with States authorized to patent certification 505(b)(3) and 505(j)(2)(B §§ 314.52 and 314.95 (if new drug application a er does not reside or business within the Uni
(J) Information on ent has been submitte the new drug applicati
(K) Information on ration date is a new e the patent had been viously for listing;
(L) Information on ent is a product-by- which the product clai
(M) Information on stance (active ingre cluding the following
(1) Whether the p drug substance that is dient in the drug pro the new drug appli ment;
(2) Whether the pat morph that is the dient that is describ application or supplem
(3) Whether the data, described in this section, demons product containing perform the same a described in the ne or supplement, and polymorphic form(s patent for which suc

104

**Food and Drug Administration, HHS** §314.53

dentity, strength,
the polymorphic
ance;

atch record for a
ning the poly-
drug substance
at the batch was
urrent good man-
quirements;

of bioequivalence
batch of the drug
the polymorphic
bstance and the
bed in the NDA;
mponents used in
he drug product
rphic form and a
mposition of the
ent of the speci-
al methods for
scription of the
ackaging proce-
controls for the
cifications and
are necessary to
rength, quality,
lity of the drug
se and stability
the approved
to demonstrate
ience and com-
; and
tro dissolution
its each of the
the new drug

nts—(1) *General*
nt described in
ction shall sub-
it information
(c)(2) of this
hat meets the
in paragraph
ill not accept
unless it is
on the appro-
3542 or 3542a.
ained on the
.fda.gov by

e ingredient),
or composi-
*patents*—(1)
each patent
ance (active
(formulation
od of use, the
FDA Form

3542a. The following information and
verification is required:

(A) New drug application number;

(B) Name of new drug application
sponsor;

(C) Trade name (or proposed trade
name) of new drug;

(D) Active ingredient(s) of new drug;

(E) Strength(s) of new drug;

(F) Dosage form of new drug;

(G) United States patent number,
issue date, and expiration date of pat-
ent submitted;

(H) The patent owner's name, full ad-
dress, phone number and, if available,
fax number and e-mail address;

(I) The name, full address, phone
number and, if available, fax number
and e-mail address of an agent or rep-
resentative who resides or maintains a
place of business within the United
States authorized to receive notice of
patent certification under sections
505(b)(3) and 505(j)(2)(B) of the act and
§§314.52 and 314.95 (if patent owner or
new drug application applicant or hold-
er does not reside or have a place of
business within the United States);

(J) Information on whether the pat-
ent has been submitted previously for
the new drug application;

(K) Information on whether the expi-
ration date is a new expiration date if
the patent had been submitted pre-
viously for listing;

(L) Information on whether the pat-
ent is a drug-by-process patent in
which the product claimed is novel;

(M) Information on the drug sub-
stance (active ingredient) patent in-
cluding the following:

(*1*) Whether the patent claims the
drug substance that is the active ingre-
dient in the drug product described in
the new drug application or supple-
ment;

(*2*) Whether the patent claims a poly-
morph that is the same active ingre-
dient that is described in the pending
application or supplement;

(*3*) Whether the applicant has test
data, described in paragraph (b)(2) of
this section, demonstrating that a drug
product containing the polymorph will
perform the same as the drug product
described in the new drug application
or supplement, and a description of the
polymorphic form(s) claimed by the
patent for which such test data exist;

(*4*) Whether the patent claims only a
metabolite of the active ingredient;
and

(*5*) Whether the patent claims only
an intermediate;

(N) Information on the drug product
(composition/formulation) patent in-
cluding the following:

(*1*) Whether the patent claims the
drug product for which approval is
being sought, as defined in §314.3; and

(*2*) Whether the patent claims only
an intermediate;

(O) Information on each method-of-
use patent including the following:

(*1*) Whether the patent claims one or
more methods of using the drug prod-
uct for which use approval is being
sought and a description of each pend-
ing method of use or related indication
and related patent claim of the patent
being submitted; and

(*2*) Identification of the specific sec-
tion of the proposed labeling for the
drug product that corresponds to the
method of use claimed by the patent
submitted;

(P) Whether there are no relevant
patents that claim the drug substance
(active ingredient), drug product (for-
mulation or composition) or method(s)
of use, for which the applicant is seek-
ing approval and with respect to which
a claim of patent infringement could
reasonably be asserted if a person not
licensed by the owner of the patent en-
gaged in the manufacture, use, or sale
of the drug product;

(Q) A signed verification which
states:

"The undersigned declares that this is an
accurate and complete submission of patent
information for the NDA, amendment or sup-
plement pending under section 505 of the
Federal Food, Drug, and Cosmetic Act. This
time-sensitive patent information is sub-
mitted pursuant to 21 CFR 314.53. I attest
that I am familiar with 21 CFR 314.53 and
this submission complies with the require-
ments of the regulation. I verify under pen-
alty of perjury that the foregoing is true and
correct."; and

(R) Information on whether the ap-
plicant, patent owner or attorney,
agent, representative or other author-
ized official signed the form; the name
of the person; and the full address,
phone number and, if available, the fax
number and e-mail address.

105

(ii) *Submission of patent information upon and after approval.* Within 30 days after the date of approval of its application or supplement, the applicant shall submit FDA Form 3542 for each patent that claims the drug substance (active ingredient), drug product (formulation and composition), or approved method of use. FDA will rely only on the information submitted on this form and will not list or publish patent information if the patent declaration is incomplete or indicates the patent is not eligible for listing. Patent information must also be submitted for patents issued after the date of approval of the new drug application as required in paragraph (c)(2)(ii) of this section. As described in paragraph (d)(4) of this section, patent information must be submitted to FDA within 30 days of the date of issuance of the patent. If the applicant submits the required patent information within the 30 days, but we notify an applicant that a declaration form is incomplete or shows that the patent is not eligible for listing, the applicant must submit an acceptable declaration form within 15 days of FDA notification to be considered timely filed. The following information and verification statement is required:

(A) New drug application number;

(B) Name of new drug application sponsor;

(C) Trade name of new drug;

(D) Active ingredient(s) of new drug;

(E) Strength(s) of new drug;

(F) Dosage form of new drug;

(G) Approval date of new drug application or supplement;

(H) United States patent number, issue date, and expiration date of patent submitted;

(I) The patent owner's name, full address, phone number and, if available, fax number and e-mail address;

(J) The name, full address, phone number and, if available, fax number and e-mail address of an agent or representative who resides or maintains a place of business within the United States authorized to receive notice of patent certification under sections 505(b)(3) and 505(j)(2)(B) of the act and §§ 314.52 and 314.95 (if patent owner or new drug application applicant or hold-

er does not reside or have a place of business within the United States);

(K) Information on whether the patent has been submitted previously for the new drug application;

(L) Information on whether the expiration date is a new expiration date if the patent had been submitted previously for listing;

(M) Information on whether the patent is a product-by-process patent in which the product claimed is novel;

(N) Information on the drug substance (active ingredient) patent including the following:

(*1*) Whether the patent claims the drug substance that is the active ingredient in the drug product described in the approved application;

(*2*) Whether the patent claims a polymorph that is the same as the active ingredient that is described in the approved application;

(*3*) Whether the applicant has test data, described in paragraph (b)(2) of this section, demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the approved application and a description of the polymorphic form(s) claimed by the patent for which such test data exist;

(*4*) Whether the patent claims only a metabolite of the active ingredient; and

(*5*) Whether the patent claims only an intermediate;

(O) Information on the drug product (composition/formulation) patent including the following:

(*1*) Whether the patent claims the approved drug product as defined in § 314.3; and

(*2*) Whether the patent claims only an intermediate;

(P) Information on each method-of-use patent including the following:

(*1*) Whether the patent claims one or more approved methods of using the approved drug product and a description of each approved method of use or indication and related patent claim of the patent being submitted;

(*2*) Identification of the specific section of the approved labeling for the drug product that corresponds to the method of use claimed by the patent submitted; and

(3) The description of method of use as requi tion;

(Q) Whether there a patents that claim the substance (active ingre proved drug product ( composition) or approv use and with respect to of patent infringement ably be asserted if a censed by the owner of gaged in the manufactu of the drug product;

(R) A signed veri states: "The undersign this is an accurate an mission of patent info NDA, amendment or proved under section 50 Food, Drug, and Cosr time-sensitive patent submitted pursuant to attest that I am famil 314.53 and this subm with the requirements tion. I verify under pe that the foregoing is rect."; and

(S) Information on w cant, patent owner or representative or other cial signed the form; person; and the full number and, if availab ber and e-mail address.

(3) *No relevant paten* cant believes that ther patents that claim th (active ingredient), dr mulation or compositi od(s) of use for which received approval, and which a claim of pat could reasonably be as not licensed by the ow engaged in the manu sale of the drug produ will verify this inforn propriate forms, FD/ 3542a.

(4) *Authorized signat* tions required by this signed by the appl owner, or the appli owner's attorney, ag tive), or other authori

(d) *When and where information—(1) Origin

000052

ave a place of
ed States);
hether the pat-
previously for

ether the expi-
iration date if
submitted pre-

hether the pat-
cess patent in
ed is novel;
the drug sub-
nt) patent in-

nt claims the
he active ingre-
ct described in
;
claims a poly-
e as the active
bed in the ap-

icant has test
graph (b)(2) of
ing that a drug
polymorph will
e drug product
ved application
he polymorphic
he patent for
st;
claims only a
ive ingredient;

nt claims only

e drug product
n) patent in-

claims the ap-
as defined in

nt claims only

ch method-of-
ollowing:
claims one or
of using the
and a descrip-
thod of use or
atent claim of
ed;
e specific sec-
beling for the
sponds to the
by the patent

(J) The description of the patented
method of use as required for publica-
tion;

(Q) Whether there are no relevant
patents that claim the approved drug
substance (active ingredient), the ap-
proved drug product (formulation or
composition) or approved method(s) of
use and with respect to which a claim
of patent infringement could reason-
ably be asserted if a person not li-
censed by the owner of the patent en-
gaged in the manufacture, use, or sale
of the drug product;

(R) A signed verification which
states: "The undersigned declares that
this is an accurate and complete sub-
mission of patent information for the
NDA, amendment or supplement ap-
proved under section 505 of the Federal
Food, Drug, and Cosmetic Act. This
time-sensitive patent information is
submitted pursuant to 21 CFR 314.53. I
attest that I am familiar with 21 CFR
314.53 and this submission complies
with the requirements of the regula-
tion. I verify under penalty of perjury
that the foregoing is true and cor-
rect."; and

(S) Information on whether the appli-
cant, patent owner or attorney, agent,
representative or other authorized offi-
cial signed the form; the name of the
person; and the full address, phone
number and, if available, the fax num-
ber and e-mail address.

(3) No relevant patents. If the appli-
cant believes that there are no relevant
patents that claim the drug substance
(active ingredient), drug product (for-
mulation or composition), or the meth-
od(s) of use for which the applicant has
received approval, and with respect to
which a claim of patent infringement
could reasonably be asserted if a person
not licensed by the owner of the patent
engaged in the manufacture, use, or
sale of the drug product, the applicant
will verify this information in the ap-
propriate forms, FDA Forms 3542 or
3542a.

(4) Authorized signature. The declara-
tions required by this section shall be
signed by the applicant or patent
owner, or the applicant's or patent
owner's attorney, agent (representa-
tive), or other authorized official.

(d) When and where to submit patent
information—(1) Original application. An

§ 314.53

applicant shall submit with its original
application submitted under this part,
including an application described in
section 505(b)(2) of the act, the infor-
mation described in paragraph (c) of
this section on each drug (ingredient),
drug product (formulation and com-
position), and method of use patent
issued before the application is filed
with FDA and for which patent infor-
mation is required to be submitted
under this section. If a patent is issued
after the application is filed with FDA
but before the application is approved,
the applicant shall, within 30 days of
the date of issuance of the patent, sub-
mit the required patent information in
an amendment to the application under
§ 314.60.

(2) Supplements. (i) An applicant shall
submit patent information required
under paragraph (c) of this section for
a patent that claims the drug, drug
product, or method of use for which ap-
proval is sought in any of the following
supplements:

(A) To change the formulation;

(B) To add a new indication or other
condition of use, including a change in
route of administration;

(C) To change the strength;

(D) To make any other patented
change regarding the drug, drug prod-
uct, or any method of use.

(ii) If the applicant submits a supple-
ment for one of the changes listed
under paragraph (d)(2)(i) of this section
and existing patents for which informa-
tion has already been submitted to
FDA claim the changed product, the
applicant shall submit a certification
with the supplement identifying the
patents that claim the changed prod-
uct.

(iii) If the applicant submits a sup-
plement for one of the changes listed
under paragraph (d)(2)(i) of this section
and no patents, including previously
submitted patents, claim the changed
product, it shall so certify.

(iv) The applicant shall comply with
the requirements for amendment of
formulation or composition and meth-
od of use patent information under
paragraphs (c)(2)(ii) and (d)(3) of this
section.

107

(3) *Patent information deadline.* If a patent is issued for a drug, drug product, or method of use after an application is approved, the applicant shall submit to FDA the required patent information within 30 days of the date of issuance of the patent.

(4) *Copies.* The applicant shall submit two copies of each submission of patent information, an archival copy and a copy for the chemistry, manufacturing, and controls section of the review copy, to the Central Document Room, Center for Drug Evaluation and Research, Food and Drug Administration, 5901–B Ammendale Rd., Beltsville, MD 20705–1266. The applicant shall submit the patent information by letter separate from, but at the same time as, submission of the supplement.

(5) *Submission date.* Patent information shall be considered to be submitted to FDA as of the date the information is received by the Central Document Room.

(6) *Identification.* Each submission of patent information, except information submitted with an original application, and its mailing cover shall bear prominent identification as to its contents, i.e., "Patent Information," or, if submitted after approval of an application, "Time Sensitive Patent Information."

(e) *Public disclosure of patent information.* FDA will publish in the list the patent number and expiration date of each patent that is required to be, and is, submitted to FDA by an applicant, and for each use patent, the approved indications or other conditions of use covered by a patent. FDA will publish such patent information upon approval of the application, or, if the patent information is submitted after approval of an application as provided under paragraph (d)(2) of this section, as soon as possible after the submission to the agency of the patent information. Patent information submitted by the last working day of a month will be published in that month's supplement to the list. Patent information received by the agency between monthly publication of supplements to the list will be placed on public display in FDA's Freedom of Information Staff. A request for copies of the file shall be sent in writing to the Freedom of Information Staff (HFI–35), Food and Drug Administration, rm. 12A–16, 5600 Fishers Lane, Rockville, MD 20857.

(f) *Correction of patent information errors.* If any person disputes the accuracy or relevance of patent information submitted to the agency under this section and published by FDA in the list, or believes that an applicant has failed to submit required patent information, that person must first notify the agency in writing stating the grounds for disagreement. Such notification should be directed to the Drug Information Services Branch (HFD–84), Center for Drug Evaluation and Research, Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857. The agency will then request of the applicable new drug application holder that the correctness of the patent information or omission of patent information be confirmed. Unless the application holder withdraws or amends its patent information in response to FDA's request, the agency will not change the patent information in the list. If the new drug application holder does not change the patent information submitted to FDA, a 505(b)(2) application or an abbreviated new drug application under section 505(j) for a drug that is claimed by a patent for which information has been submitted must, despite any disagreement as to the correctness of the patent information, contain an appropriate certification for each listed patent.

[59 FR 50363, Oct. 3, 1994, as amended at 68 FR 36703, June 18, 2003; 69 FR 13473, Mar. 23, 2004]

§ 314.54 **Procedure for submission of an application requiring investigations for approval of a new indication for, or other change from, a listed drug.**

(a) The act does not permit approval of an abbreviated new drug application for a new indication, nor does it permit approval of other changes in a listed drug if investigations, other than bioavailability or bioequivalence studies, are essential to the approval of the change. Any person seeking approval of a drug product that represents a modification of a listed drug (e.g., a new indication or new dosage form) and for which investigations, availability or bioequi are essential to the changes that, except paragraph (b) of this 505(b)(2) application. T need contain only th needed to support the of the listed drug.

(1) The applicant shal plete archival copy of that contains the follow

(i) The information §314.50(a), (b), (c), (d)(1 (g), except that §314.50 contain the proposed production record, inc tion of the equipment the manufacture of a c the drug product.

(ii) The information §314.50 (d)(2), (d)(4) (if a drug), (d)(5), (d)(6), and support the safety and the drug product.

(iii) Identification of for which FDA has ma safety and effectiveness finding the applicant r approval of its propose by established name, etary name, dosage f route of administration drug's application hol drug's approved applica

(iv) If the applicant proval only for a new not for the indications listed drug on which lies, a certification so s

(v) Any patent inform under section 505(b)(1) respect to any patent w drug for which approval method of using such which a claim of paten could reasonably be ass not licensed by the ow engaged in the manu sale of the drug product

(vi) Any patent certi ment required under se the act with respect to patents that claim the that claim any other investigations relied o cant for approval of were conducted, or tha the listed or other drug

000054

e Superintendent of
overnment Printing
n, DC 20402, 202–783–

1992, as amended at 64

request a change
ug.

nges from a listed
agency will accept a
section are those
in paragraph (b) of
ns to submit abbre-
plications for other
ed drug will not be

wants to submit an
application for a
is not identical to
ute of administra-
and strength, or in
ingredient is sub-
the active ingredi-
ination drug, must
ion from FDA to
breviated applica-

ission to submit an
application for a
paragraph (b) of
must submit and
petition request-
rson seeking per-
ch a change from
g shall submit a
e with §10.20 of
format specified
ter. The petition
rmation specified
er and any addi-
uired by this sec-
of §10.20 or §10.30
sistent with any
on, the provisions

hall identify a
a copy of the
he drug product
the petition and
labeling for the
ner may, under
identify more
example, when
duct is a com-
differs from the
listed drug with
redient, and the
nt is an active

ingredient of a listed drug. The peti-
tioner shall also include information to
show that:

(1) The active ingredients of the pro-
posed drug product are of the same
pharmacological or therapeutic class
as those of the reference listed drug.

(2) The drug product can be expected
to have the same therapeutic effect as
the reference listed drug when adminis-
tered to patients for each condition of
use in the reference listed drug's label-
ing for which the applicant seeks ap-
proval.

(3) If the proposed drug product is a
combination product with one different
active ingredient, including a different
ester or salt, from the reference listed
drug, that the different active ingre-
dient has previously been approved in a
listed drug or is a drug that does not
meet the definition of "new drug" in
section 201(b) of the act.

(e) No later than 90 days after the
date a petition that is permitted under
paragraph (a) of this section is sub-
mitted, FDA will approve or disapprove
the petition.

(1) FDA will approve a petition prop-
erly submitted under this section unless
it finds that:

(i) Investigations must be conducted
to show the safety and effectiveness of
the drug product or of any of its active
ingredients, its route of administra-
tion, dosage form, or strength which
differs from the reference listed drug;
or

(ii) For a petition that seeks to
change an active ingredient, the drug
product that is the subject of the peti-
tion is not a combination drug; or

(iii) For a combination drug product
that is the subject of the petition and
has an active ingredient different from
the reference listed drug:

(A) The drug product may not be ade-
quately evaluated for approval as safe
and effective on the basis of the infor-
mation required to be submitted under
§314.94; or

(B) The petition does not contain in-
formation to show that the different
active ingredient of the drug product is
of the same pharmacological or thera-
peutic class as the ingredient of the
reference listed drug that is to be
changed and that the drug product can
be expected to have the same thera-

peutic effect as the reference listed
drug when administered to patients for
each condition of use in the listed
drug's labeling for which the applicant
seeks approval; or

(C) The different active ingredient is
not an active ingredient in a listed
drug or a drug that meets the require-
ments of section 201(p) of the act; or

(D) The remaining active ingredients
are not identical to those of the listed
combination drug; or

(iv) Any of the proposed changes
from the listed drug would jeopardize
the safe or effective use of the product
so as to necessitate significant labeling
changes to address the newly intro-
duced safety or effectiveness problem;
or

(v) FDA has determined that the ref-
erence listed drug has been withdrawn
from sale for safety or effectiveness
reasons under §314.161, or the reference
listed drug has been voluntarily with-
drawn from sale and the agency has
not determined whether the with-
drawal is for safety or effectiveness
reasons.

(2) For purposes of this paragraph,
"investigations must be conducted"
means that information derived from
animal or clinical studies is necessary
to show that the drug product is safe or
effective. Such information may be
contained in published or unpublished
reports.

(3) If FDA approves a petition sub-
mitted under this section, the agency's
response may describe what additional
information, if any, will be required to
support an abbreviated new drug appli-
cation for the drug product. FDA may,
at any time during the course of its re-
view of an abbreviated new drug appli-
cation, request additional information
required to evaluate the change ap-
proved under the petition.

(f) FDA may withdraw approval of a
petition if the agency receives any in-
formation demonstrating that the peti-
tion no longer satisfies the conditions
under paragraph (e) of this section.

§ 314.94  Content and format of an ab-
breviated application.

Abbreviated applications are re-
quired to be submitted in the form and
contain the information required under

125

000055

this section. Three copies of the application are required, an archival copy, a review copy, and a field copy. FDA will maintain guidance documents on the format and content of applications to assist applicants in their preparation.

(a) *Abbreviated new drug applications.* Except as provided in paragraph (b) of this section, the applicant shall submit a complete archival copy of the abbreviated new drug application that includes the following:

(1) *Application form.* The applicant shall submit a completed and signed application form that contains the information described under §314.50(a)(1), (a)(3), (a)(4), and (a)(5). The applicant shall state whether the submission is an abbreviated application under this section or a supplement to an abbreviated application under §314.97.

(2) *Table of contents.* The archival copy of the abbreviated new drug application is required to contain a table of contents that shows the volume number and page number of the contents of the submission.

(3) *Basis for abbreviated new drug application submission.* An abbreviated new drug application must refer to a listed drug. Ordinarily, that listed drug will be the drug product selected by the agency as the reference standard for conducting bioequivalence testing. The application shall contain:

(i) The name of the reference listed drug, including its dosage form and strength. For an abbreviated new drug application based on an approved petition under §10.30 of this chapter or §314.93, the reference listed drug must be the same as the listed drug approved in the petition.

(ii) A statement as to whether, according to the information published in the list, the reference listed drug is entitled to a period of marketing exclusivity under section 505(j)(4)(D) of the act.

(iii) For an abbreviated new drug application based on an approved petition under §10.30 of this chapter or §314.93, a reference to FDA-assigned docket number for the petition and a copy of FDA's correspondence approving the petition.

(4) *Conditions of use.* (i) A statement that the conditions of use prescribed, recommended, or suggested in the la-

beling proposed for the drug product have been previously approved for the reference listed drug.

(ii) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(5) *Active ingredients.* (i) For a single-active-ingredient drug product, information to show that the active ingredient is the same as that of the reference single-active-ingredient drug, as follows:

(A) A statement that the active ingredient of the proposed drug product is the same as that of the reference listed drug.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(ii) For a combination drug product, information to show that the active ingredients are the same as those of the reference listed drug except for any different active ingredient that has been the subject of an approved petition, as follows:

(A) A statement that the active ingredients of the proposed drug product are the same as those of the reference listed drug, or if one of the active ingredients of the reference listed drug and the abbreviated application is submitted under the approval of a petition under §314.93 to vary such active ingredient, information to show that the other active ingredients of the drug product are the same as the other active ingredients of the reference listed drug, information to show that the different active ingredient is an active ingredient of another listed drug or of a drug that does not meet the definition of "new drug" in section 201(p) of the act, and such other information about the different active ingredient that FDA may require.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(6) *Route of administration, dosage form, and strength.* (i) Information to show that the route of administration,

dosage form, and ... product are the sa... reference listed dru... ferences that have ... an approved petitio...

(A) A statement ... ministration, do... strength of the p... are the same as th... listed drug.

(B) A reference t... notated proposed ... currently approve... erence listed drug ... graph (a)(8) of this ...

(ii) If the route ... dosage form, or s... product differs fro... ed drug and the ... tion is submitted... petition under §3... tion about the d... ministration, dosa... that FDA may req...

(7) *Bioequivalen...* that shows the ... bioequivalent to ... drug upon which ... or

(ii) If the abbrev... cation is submitt... approved under ... any bioavailab... testing require... other informa... agency to show... ents of the prop... of the same phar... peutic class as ... listed drug and ... product can b... same therape... erence listed dru... product contains... gredient than the... FDA will conside... product to have... effect as the refer... applicant provide... onstrating that: ...

(A) There is a... basis for determi... of the specific pr... ferent active ingr... the member of ... cological or ther... reference listed... sulting drug prod...

e drug product
approved for the

applicant's an-
ling and to the
ling for the ref-
ded under para-
on.
(i) For a single-
product, infor-
e active ingre-
hat of the ref-
gredient listed

the active in-
ed drug product
of the reference

applicant's an-
ling and to the
ling for the ref-
ded under para-
on.
h drug product,
t the active in-
as those of the
cept for any dif-
that has been
ed petition, as

the active in-
ed drug product
of the reference
the active in-
e of the active
ce listed drug
ication is sub-
ed of a petition
h active ingre-
how that the
of the drug
the other ac-
ference listed
that the dif-
s an active in-
d drug or of a
the definition
201(p) of the
mation about
redient that

pplicant's an-
g and to the
ng for the ref-
d under para-

ation, dosage
formation to
ministration,

dosage form, and strength of the drug product are the same as those of the reference listed drug except for any differences that have been the subject of an approved petition, as follows:

(A) A statement that the route of administration, dosage form, and strength of the proposed drug product are the same as those of the reference listed drug.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(ii) If the route of administration, dosage form, or strength of the drug product differs from the reference listed drug and the abbreviated application is submitted under an approved petition under §314.93, such information about the different route of administration, dosage form, or strength that FDA may require.

(7) *Bioequivalence.* (i) Information that shows that the drug product is bioequivalent to the reference listed drug upon which the applicant relies; or

(ii) If the abbreviated new drug application is submitted under a petition approved under §314.93, the results of any bioavailability or bioequivalence testing required by the agency, or any other information required by the agency to show that the active ingredients of the proposed drug product are of the same pharmacological or therapeutic class as those in the reference listed drug and that the proposed drug product can be expected to have the same therapeutic effect as the reference listed drug. If the proposed drug product contains a different active ingredient than the reference listed drug, FDA will consider the proposed drug product to have the same therapeutic effect as the reference listed drug if the applicant provides information demonstrating that:

(A) There is an adequate scientific basis for determining that substitution of the specific proposed dose of the different active ingredient for the dose of the member of the same pharmacological or therapeutic class in the reference listed drug will yield a resulting drug product whose safety and

effectiveness have not been adversely affected.

(B) The unchanged active ingredients in the proposed drug product are bioequivalent to those in the reference listed drug.

(C) The different active ingredient in the proposed drug product is bioequivalent to an approved dosage form containing that ingredient and approved for the same indication as the proposed drug product or is bioequivalent to a drug product offered for that indication which does not meet the definition of "new drug" under section 201(p) of the act.

(iii) For each in vivo bioequivalence study contained in the abbreviated new drug application, a description of the analytical and statistical methods used in each study and a statement with respect to each study that it either was conducted in compliance with the institutional review board regulations in part 56 of this chapter, or was not subject to the regulations under §56.104 or §56.105 of this chapter and that each study was conducted in compliance with the informed consent regulations in part 50 of this chapter.

(8) *Labeling*—(i) *Listed drug labeling.* A copy of the currently approved labeling (including, if applicable, any Medication Guide required under part 208 of this chapter) for the listed drug referred to in the abbreviated new drug application, if the abbreviated new drug application relies on a reference listed drug.

(ii) *Copies of proposed labeling.* Copies of the label and all labeling for the drug product including, if applicable, any Medication Guide required under part 208 of this chapter (4 copies of draft labeling or 12 copies of final printed labeling).

(iii) *Statement on proposed labeling.* A statement that the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter is the same as the labeling of the reference listed drug except for differences annotated and explained under paragraph (a)(8)(iv) of this section.

(iv) *Comparison of approved and proposed labeling.* A side-by-side comparison of the applicant's proposed labeling

127

including, if applicable, any Medication Guide required under part 208 of this chapter with the approved labeling for the reference listed drug with all differences annotated and explained. Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers. Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusively under section 505(j)(4)(D) of the act.

(9) *Chemistry, manufacturing, and controls.* (i) The information required under § 314.50(d)(1), except that § 314.50(d)(1)(ii)(c) shall contain the proposed or actual master production record, including a description of the equipment, to be used for the manufacture of a commercial lot of the drug product.

(ii) *Inactive ingredients.* Unless otherwise stated in paragraphs (a)(9)(iii) through (a)(9)(v) of this section, an applicant shall identify and characterize the inactive ingredients in the proposed drug product and provide information demonstrating that such inactive ingredients do not affect the safety or efficacy of the proposed drug product.

(iii) *Inactive ingredient changes permitted in drug products intended for parenteral use.* Generally, a drug product intended for parenteral use shall contain the same inactive ingredients and in the same concentration as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an applicant may seek approval of a drug product that differs from the reference listed drug in preservative, buffer, or antioxidant

provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product.

(iv) *Inactive ingredient changes permitted in drug products intended for ophthalmic or otic use.* Generally, a drug product intended for ophthalmic or otic use shall contain the same inactive ingredients and in the same concentration as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an applicant may seek approval of a drug product that differs from the reference listed drug in preservative, buffer, substance to adjust tonicity, or thickening agent provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product, except that, in a product intended for ophthalmic use, an applicant may not change a buffer or substance to adjust tonicity for the purpose of claiming a therapeutic advantage over or difference from the listed drug, e.g., by using a balanced salt solution as a diluent as opposed to an isotonic saline solution, or by making a significant change in the pH or other change that may raise questions of irritability.

(v) *Inactive ingredient changes permitted in drug products intended for topical use.* Generally, a drug product intended for topical use, solutions for aerosolization or nebulization, and nasal solutions shall contain the same inactive ingredients as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an abbreviated application may include different inactive ingredients provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product.

(10) *Samples.* The information required under § 314.50(e)(1) and (e)(2)(i). Samples need not be submitted until requested by FDA.

(11) *Other.* The information required under § 314.50(g).

(12) *Patent certifi claiming drug, drug p use.* (A) Except as graph (a)(12)(iv) of t tification with resp issued by the United Trademark Office th of the applicant and knowledge, claims t drug or that claims : drug for which the a approval under secti and for which infor to be filed under sec of the act and § 314 patent, the applican patent number and ion and to the best one of the following

(1) That the pate not been submitted cant shall entitle s "Paragraph I Certifi

(2) That the pate applicant shall ent cation "Paragraph I

(3) The date on wh expire. The applican a certification "Pa cation"; or

(4) That the pate forceable, or will n the manufacture, u drug product for wh application is subm shall entitle suc "Paragraph IV Cert tification shall be s lowing form:

I, *(name of applican* No. _____ *(is in will not be infringed by sale of) (name of pro* which this application

The certification sl by a statement tha comply with the § 314.95(a) with res notice to each own their representativ of the approved app ed drug, and with under § 314.95(c) w content of the noti

(B) If the abbrevi cation refers to a itself a licensed g patented drug first tion 505(b) of the

(12) *Patent certification—*(i) *Patents claiming drug, drug product, or method of use.* (A) Except as provided in paragraph (a)(12)(iv) of this section, a certification with respect to each patent issued by the United States Patent and Trademark Office that, in the opinion of the applicant and to the best of its knowledge, claims the reference listed drug or that claims a use of such listed drug for which the applicant is seeking approval under section 505(j) of the act and for which information is required to be filed under section 505(b) and (c) of the act and § 314.53. For each such patent, the applicant shall provide the patent number and certify, in its opinion and to the best of its knowledge, one of the following circumstances:

(*1*) That the patent information has not been submitted to FDA. The applicant shall entitle such a certification "Paragraph I Certification";

(*2*) That the patent has expired. The applicant shall entitle such a certification "Paragraph II Certification";

(*3*) The date on which the patent will expire. The applicant shall entitle such a certification "Paragraph III Certification"; or

(*4*) That the patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the drug product for which the abbreviated application is submitted. The applicant shall entitle such a certification "Paragraph IV Certification". This certification shall be submitted in the following form:

I, (*name of applicant*), certify that Patent No. _____ (*is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of*) (*name of proposed drug product*) for which this application is submitted.

The certification shall be accompanied by a statement that the applicant will comply with the requirements under § 314.95(a) with respect to providing a notice to each owner of the patent or their representatives and to the holder of the approved application for the listed drug, and with the requirements under § 314.95(c) with respect to the content of the notice.

(B) If the abbreviated new drug application refers to a listed drug that is itself a licensed generic product of a patented drug first approved under section 505(b) of the act, the appropriate patent certification under paragraph (a)(12)(i) of this section with respect to each patent that claims the first-approved patented drug or that claims a use for such drug.

(ii) *No relevant patents.* If, in the opinion of the applicant and to the best of its knowledge, there are no patents described in paragraph (a)(12)(i) of this section, a certification in the following form:

In the opinion and to the best knowledge of (*name of applicant*), there are no patents that claim the listed drug referred to in this application or that claim a use of the listed drug.

(iii) *Method of use patent.* (A) If patent information is submitted under section 505(b) or (c) of the act and § 314.53 for a patent claiming a method of using the listed drug, and the labeling for the drug product for which the applicant is seeking approval does not include any indications that are covered by the use patent, a statement explaining that the method of use patent does not claim any of the proposed indications.

(B) If the labeling of the drug product for which the applicant is seeking approval includes an indication that, according to the patent information submitted under section 505(b) or (c) of the act and § 314.53 or in the opinion of the applicant, is claimed by a use patent, an applicable certification under paragraph (a)(12)(i) of this section.

(iv) *Method of manufacturing patent.* An applicant is not required to make a certification with respect to any patent that claims only a method of manufacturing the listed drug.

(v) *Licensing agreements.* If the abbreviated new drug application is for a drug or method of using a drug claimed by a patent and the applicant has a licensing agreement with the patent owner, a certification under paragraph (a)(12)(i)(A)(*4*) of this section ("Paragraph IV Certification") as to that patent and a statement that it has been granted a patent license.

(vi) *Late submission of patent information.* If a patent on the listed drug is issued and the holder of the approved application for the listed drug does not submit the required information on the patent within 30 days of issuance of the patent, an applicant who submitted an

129

abbreviated new drug application for that drug that contained an appropriate patent certification before the submission of the patent information is not required to submit an amended certification. An applicant whose abbreviated new drug application is submitted after a late submission of patent information, or whose pending abbreviated application was previously submitted but did not contain an appropriate patent certification at the time of the patent submission, shall submit a certification under paragraph (a)(12)(i) of this section or a statement under paragraph (a)(12)(iii) of this section as to that patent.

(vii) *Disputed patent information.* If an applicant disputes the accuracy or relevance of patent information submitted to FDA, the applicant may seek a confirmation of the correctness of the patent information in accordance with the procedures under § 314.53(f). Unless the patent information is withdrawn or changed, the applicant shall submit an appropriate certification for each relevant patent.

(viii) *Amended certifications.* A certification submitted under paragraphs (a)(12)(i) through (a)(12)(iii) of this section may be amended at any time before the effective date of the approval of the application. However, an applicant who has submitted a paragraph IV patent certification may not change it to a paragraph III certification if a patent infringement suit has been filed against another paragraph IV applicant unless the agency has determined that no applicant is entitled to 180-day exclusivity or the patent expires before the lawsuit is resolved or expires after the suit is resolved but before the end of the 180-day exclusivity period. If an applicant with a pending application voluntarily makes a patent certification for an untimely filed patent, the applicant may withdraw the patent certification for the untimely filed patent. An applicant shall submit an amended certification by letter or as an amendment to a pending application or by letter to an approved application. Once an amendment or letter is submitted, the application will no longer be considered to contain the prior certification.

(A) *After finding of infringement.* An applicant who has submitted a certification under paragraph (a)(12)(i)(A)(*4*) of this section and is sued for patent infringement within 45 days of the receipt of notice sent under § 314.95 shall amend the certification if a final judgment in the action against the applicant is entered finding the patent to be infringed. In the amended certification, the applicant shall certify under paragraph (a)(12)(i)(A)(*3*) of this section that the patent will expire on a specific date. Once an amendment or letter for the change has been submitted, the application will no longer be considered to be one containing a certification under paragraph (a)(12)(i)(A)(*4*) of this section. If a final judgment finds the patent to be invalid and infringed, an amended certification is not required.

(B) *After removal of a patent from the list.* If a patent is removed from the list, any applicant with a pending application (including a tentatively approved application with a delayed effective date) who has made a certification with respect to such patent shall amend its certification. The applicant shall certify under paragraph (a)(12)(ii) of this section that no patents described in paragraph (a)(12)(i) of this section claim the drug or, if other relevant patents claim the drug, shall amend the certification to refer only to those relevant patents. In the amendment, the applicant shall state the reason for the change in certification (that the patent is or has been removed from the list). A patent that is the subject of a lawsuit under § 314.107(c) shall not be removed from the list until FDA determines either that no delay in effective dates of approval is required under that section as a result of the lawsuit, that the patent has expired, or that any such period of delay in effective dates of approval is ended. An applicant shall submit an amended certification. Once an amendment or letter for the change has been submitted, the application will no longer be considered to be one containing a certification under paragraph (a)(12)(i)(A)(*4*) of this section.

(C) *Other amendments.* (*1*) Except as provided in paragraphs (a)(12)(vi) and

(a)(12)(viii)(C)(2) of [this section, an ap]plicant shall amend[...] tification if, at any [...] fective date of the a[...] plication, the applic[...] submitted certificati[...] curate.

(2) An applicant [...] amend a submitted [...] information on a pa[...] drug is submitted [...] ate of approval of [...] plication.

(13) *Financial certifi[...]* *statement.* An abbr[...] shall contain a fina[...] or disclosure stateme[...] part 54 of this chapt[...]

(b) *Drug products* [...] *Efficacy Study Imple[...]* *view.* If the abbrevi[...] cation is for a dupli[...] uct that is subject [...] view (a review of th[...] proved as safe betwe[...] other DESI-like re[...] product evaluated [...] listed drug, the app[...] with the provisions [...] this section.

(c) [Reserved]

(d) *Format of an [...]* *tion.* (1) The applic[...] complete archival co[...] viated application c[...] paragraphs (a) and [...] FDA will maintain[...] during the review o[...] permit individual re[...] information that is [...] their particular tec[...] the application, to [...] personnel access to [...] official business, [...] one place a complet[...] cation.

(i) *Format of subm[...]* may submit portio[...] copy of the abbrevi[...] any form that the [...] agree is acceptable [...] in paragraph (d)(1)(i[...]

(ii) *Labeling.* The [...] required under § [...] chapter (commonly [...] package insert or [...] ing), including all [...] ures, must be subm[...] in electronic form[...]

*f infringement.* An
ubmitted a certifi-
aph (a)(12)(i)(A)(*4*)
is sued for patent
45 days of the re-
under §314.95 shall
ion if a final judg-
against the appli-
g the patent to be
nded certification,
ertify under para-
of this section
xpire on a specific
ment or letter for
submitted, the ap-
ger be considered
g a certification
2)(i)(A)(*4*) of this
gment finds the
and infringed, an
is not required.

*a patent from the*
removed from the
ith a pending ap-
tentatively ap-
ith a delayed ef-
s made a certifi-
to such patent
ication. The ap-
under paragraph
on that no pat-
raph (a)(12)(i) of
drug or, if other
the drug, shall
to refer only to
In the amend-
ll state the rea-
in certification
as been removed
that is the sub-
§314.107(c) shall
e list until FDA
no delay in ef-
al is required
a result of the
has expired, or
delay in effec-
s ended. An ap-
amended cer-
ndment or let-
een submitted,
onger be con-
ning a certifi-
(a)(12)(i)(A)(4)

*(I)* Except as
(a)(12)(vi) and

(a)(12)(viii)(C)(*2*) of this section, an ap-
plicant shall amend a submitted cer-
tification if, at any time before the ef-
fective date of the approval of the ap-
plication, the applicant learns that the
submitted certification is no longer ac-
curate.

(*2*) An applicant is not required to
amend a submitted certification when
information on a patent on the listed
drug is submitted after the effective
date of approval of the abbreviated ap-
plication.

(13) *Financial certification or disclosure
statement.* An abbreviated application
shall contain a financial certification
or disclosure statement as required by
part 54 of this chapter.

(b) *Drug products subject to the Drug
Efficacy Study Implementation (DESI) re-
view.* If the abbreviated new drug appli-
cation is for a duplicate of a drug prod-
uct that is subject to FDA's DESI
review (a review of drug products ap-
proved as safe between 1938 and 1962) or
other DESI-like review and the drug
product evaluated in the review is a
listed drug, the applicant shall comply
with the provisions of paragraph (a) of
this section.

(c) [Reserved]

(d) *Format of an abbreviated applica-
tion.* (1) The applicant must submit a
complete archival copy of the abbre-
viated application as required under
paragraphs (a) and (c) of this section.
FDA will maintain the archival copy
during the review of the application to
permit individual reviewers to refer to
information that is not contained in
their particular technical sections of
the application, to give other agency
personnel access to the application for
official business, and to maintain in
one place a complete copy of the appli-
cation.

(i) *Format of submission.* An applicant
may submit portions of the archival
copy of the abbreviated application in
any form that the applicant and FDA
agree is acceptable, except as provided
in paragraph (d)(1)(ii) of this section.

(ii) *Labeling.* The content of labeling
required under §201.100(d)(3) of this
chapter (commonly referred to as the
package insert or professional label-
ing), including all text, tables, and fig-
ures, must be submitted to the agency
in electronic format as described in

paragraph (d)(1)(iii) of this section.
This requirement applies to the con-
tent of labeling for the proposed drug
product only and is in addition to the
requirements of paragraph (a)(8)(ii) of
this section that copies of the for-
matted label and all proposed labeling
be submitted. Submissions under this
paragraph must be made in accordance
with part 11 of this chapter, except for
the requirements of §11.10(a), (c)
through (h), and (k), and the cor-
responding requirements of §11.30.

(iii) *Electronic format submissions.*
Electronic format submissions must be
in a form that FDA can process, re-
view, and archive. FDA will periodi-
cally issue guidance on how to provide
the electronic submission (e.g., method
of transmission, media, file formats,
preparation and organization of files).

(2) For abbreviated new drug applica-
tions, the applicant shall submit a re-
view copy of the abbreviated applica-
tion that contains two separate sec-
tions. One section shall contain the in-
formation described under paragraphs
(a)(2) through (a)(6), (a)(8), and (a)(9) of
this section 505(j)(2)(A)(vii) of the act
and one copy of the analytical proce-
dures and descriptive information
needed by FDA's laboratories to per-
form tests on samples of the proposed
drug product and to validate the appli-
cant's analytical procedures. The other
section shall contain the information
described under paragraphs (a)(3),
(a)(7), and (a)(8) of this section. Each of
the sections in the review copy is re-
quired to contain a copy of the applica-
tion form described under §314.50(a).

(3) [Reserved]

(4) The applicant may obtain from
FDA sufficient folders to bind the ar-
chival, the review, and the field copies
of the abbreviated application.

(5) The applicant shall submit a field
copy of the abbreviated application
that contains the technical section de-
scribed in paragraph (a)(9) of this sec-
tion, a copy of the application form re-
quired under paragraph (a)(1) of this
section, and a certification that the
field copy is a true copy of the tech-
nical section described in paragraph
(a)(9) of this section contained in the

131

archival and review copies of the abbreviated application.

[57 FR 17983, Apr. 28, 1992; 57 FR 29353, July 1, 1992, as amended at 58 FR 47552, Sept. 8, 1993; 59 FR 50364, Oct. 3, 1994; 63 FR 5252, Feb. 2, 1998; 63 FR 66399, Dec. 1, 1998; 64 FR 401, Jan. 5, 1999; 65 FR 56479, Sept. 19, 2000; 67 FR 77672, Dec. 19, 2002; 68 FR 69019, Dec. 11, 2003; 69 FR 18766, Apr. 8, 2004]

### § 314.95　Notice of certification of invalidity or noninfringement of a patent.

(a) *Notice of certification.* For each patent that claims the listed drug or that claims a use for such listed drug for which the applicant is seeking approval and that the applicant certifies under § 314.94(a)(12) is invalid, unenforceable, or will not be infringed, the applicant shall send notice of such certification by registered or certified mail, return receipt requested to each of the following persons:

(1) Each owner of the patent which is the subject of the certification or the representative designated by the owner to receive the notice. The name and address of the patent owner or its representative may be obtained from the United States Patent and Trademark Office; and

(2) The holder of the approved application under section 505(b) of the act for the listed drug that is claimed by the patent and for which the applicant is seeking approval, or, if the application holder does not reside or maintain a place of business within the United States, the application holder's attorney, agent, or other authorized official. The name and address of the application holder or its attorney, agent, or authorized official may be obtained from the Division of Drug Information Resources (HFD-80), Center for Drug Evaluation and Research, Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857.

(3) This paragraph does not apply to a use patent that claims no uses for which the applicant is seeking approval.

(b) *Sending the notice.* The applicant shall send the notice required by paragraph (a) of this section when it receives from FDA an acknowledgment letter stating that its abbreviated new drug application is sufficiently complete to permit a substantive review.

At the same time, the applicant shall amend its abbreviated new drug application to include a statement certifying that the notice has been provided to each person identified under paragraph (a) of this section and that the notice met the content requirements under paragraph (c) of this section.

(c) *Contents of a notice.* In the notice, the applicant shall cite section 505(j)(2)(B)(ii) of the act and shall include, but not be limited to, the following information:

(1) A statement that FDA has received an abbreviated new drug application submitted by the applicant containing any required bioavailability or bioequivalence data or information.

(2) The abbreviated application number.

(3) The established name, if any, as defined in section 502(e)(3) of the act, of the proposed drug product.

(4) The active ingredient, strength, and dosage form of the proposed drug product.

(5) The patent number and expiration date, as submitted to the agency or as known to the applicant, of each patent alleged to be invalid, unenforceable, or not infringed.

(6) A detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid, unenforceable, or will not be infringed. The applicant shall include in the detailed statement:

(i) For each claim of a patent alleged not to be infringed, a full and detailed explanation of why the claim is not infringed.

(ii) For each claim of a patent alleged to be invalid or unenforceable, a full and detailed explanation of the grounds supporting the allegation.

(7) If the applicant does not reside or have a place of business in the United States, the name and address of an agent in the United States authorized to accept service of process for the applicant.

(d) *Amendment to an abbreviated application.* If an abbreviated application is amended to include the certification described in § 314.94(a)(12)(i)(A)(4), the applicant shall send the notice required by paragraph (a) of this section at the same time that the amendment to the

abbreviated applicatio FDA.

(e) *Documentation of* The applicant shall a viated application to of the notice required (a) of this section by vided the notice. The include a copy of the other similar evidence notification was receiv cept as adequate docu date of receipt a return son provided the noti may rely on another mentation only if FD such documentation in of the notice itself n mitted to the agency.

(f) *Approval.* If the this section are met, F the notice to be com cient, and it will cor lowing the date of rece by the patent owner c tive and by the appr holder as the first day riod　provided　for 505(j)(4)(B)(iii) of the a the applicant provides ment to FDA that a l be used, count from suc

[59 FR 50366, Oct. 3, 1994, as 36705, June 18, 2003; 69 FR ]

### § 314.96　Amendments proved abbreviated

(a) *Abbreviated new c* (1) An applicant may a viated new drug appl submitted under § 314.! approved, to revise ex tion or provide additio

(2) Submission of an a taining significant data constitutes an agreeme and the applicant to ex period only for the tin review the significant d tion and for no more tha

(3) Submission of an a taining significant data to resolve deficiencies tion as set forth in a letter issued under § 31 an agreement between t plicant under section 5 act to extend the date

000062

Food and Drug Administration, HHS

applicant shall
new drug appli-
atement certi-
been provided
ed under para-
and that the
requirements
is section.
In the notice,
cite section
and shall in-
ed to, the fol-

FDA has re-
ew drug appli-
applicant con-
availability or
formation.
plication num-

me, if any, as
) of the act, of

ent, strength,
proposed drug

and expiration
agency or as
f each patent
enforceable, or

nt of the fac-
he applicant's
is not valid,
be infringed.
de in the de-

patent alleged
and detailed
aim is not in-

a patent al-
enforceable, a
ation of the
egation.

not reside or
n the United
dress of an
s authorized
s for the ap-

eviated appli-
pplication is
certification
l)(A)(4), the
tice required
ction at the
ment to the

abbreviated application is submitted to
FDA.

(e) *Documentation of receipt of notice.*
The applicant shall amend its abbre-
viated application to document receipt
of the notice required under paragraph
(a) of this section by each person pro-
vided the notice. The applicant shall
include a copy of the return receipt or
other similar evidence of the date the
notification was received. FDA will ac-
cept as adequate documentation of the
date of receipt a return receipt or a let-
ter acknowledging receipt by the per-
son provided the notice. An applicant
may rely on another form of docu-
mentation only if FDA has agreed to
such documentation in advance. A copy
of the notice itself need not be sub-
mitted to the agency.

(f) *Approval.* If the requirements of
this section are met, FDA will presume
the notice to be complete and suffi-
cient, and it will count the day fol-
lowing the date of receipt of the notice
by the patent owner or its representa-
tive and by the approved application
holder as the first day of the 45-day pe-
riod provided for in section
505(j)(4)(B)(iii) of the act. FDA may, if
the applicant provides a written state-
ment to FDA that a later date should
be used, count from such later date.

[57 FR 50366, Oct. 3, 1994, as amended at 68 FR
36705, June 18, 2003; 69 FR 11310, Mar. 10, 2004]

### § 314.96 Amendments to an unap-proved abbreviated application.

(a) *Abbreviated new drug application.*
(1) An applicant may amend an abbre-
viated new drug application that is
submitted under § 314.94, but not yet
approved, to revise existing informa-
tion or provide additional information.

(2) Submission of an amendment con-
taining significant data or information
constitutes an agreement between FDA
and the applicant to extend the review
period only for the time necessary to
review the significant data or informa-
tion and for no more than 180 days.

(3) Submission of an amendment con-
taining significant data or information
to resolve deficiencies in the applica-
tion as set forth in a not approvable
letter issued under § 314.120 constitutes
an agreement between FDA and the ap-
plicant under section 505(j)(4)(A) of the
act to extend the date by which the

agency is required to reach a decision
on the abbreviated new drug applica-
tion only for the time necessary to re-
view the significant data or informa-
tion and for no more than 180 days.

(b) The applicant shall submit a field
copy of each amendment to
§ 314.94(a)(9). The applicant, other than
a foreign applicant, shall include in its
submission of each such amendment to
FDA a statement certifying that a field
copy of the amendment has been sent
to the applicant's home FDA district
office.

[57 FR 17983, Apr. 28, 1992, as amended at 58
FR 47352, Sept. 8, 1993; 64 FR 401, Jan. 5, 1999]

### § 314.97 Supplements and other changes to an approved abbre-viated application.

The applicant shall comply with the
requirements of §§ 314.70 and 314.71 re-
garding the submission of supple-
mental applications and other changes
to an approved abbreviated applica-
tion.

### § 314.98 Postmarketing reports.

(a) Except as provided in paragraph
(b) of this section, each applicant hav-
ing an approved abbreviated new drug
application under § 314.94 that is effec-
tive shall comply with the require-
ments of § 314.80 regarding the report-
ing and recordkeeping of adverse drug
experiences.

(b) Each applicant shall submit one
copy of each report required under
§ 314.80 to the Division of Epidemiology
and Surveillance (HFD–730), Center for
Drug Evaluation and Research, Food
and Drug Administration, 5600 Fishers
Lane, Rockville, MD 20857.

(c) Each applicant shall make the re-
ports required under § 314.81 and section
505(k) of the act for each of its ap-
proved abbreviated applications.

[57 FR 17983, Apr. 28, 1992, as amended at 64
FR 401, Jan. 5, 1999]

### § 314.99 Other responsibilities of an applicant of an abbreviated applica-tion.

(a) An applicant shall comply with
the requirements of § 314.65 regarding
withdrawal by the applicant of an un-
approved abbreviated application and
§ 314.72 regarding a change in ownership
of an abbreviated application.

000063

(b) An applicant may ask FDA to waive under this section any requirement that applies to the applicant under §§ 314.92 through 314.99. The applicant shall comply with the requirements for a waiver under § 314.90.

## Subpart D—FDA Action on Applications and Abbreviated Applications

Source: 50 FR 7493, Feb. 22, 1985, unless otherwise noted. Redesignated at 57 FR 17983, Apr. 28, 1992.

### § 314.100  Timeframes for reviewing applications and abbreviated applications.

(a) Within 180 days of receipt of an application for a new drug under section 505(b) of the act, or of an abbreviated application for a new drug under section 505(j) of the act, FDA will review it and send the applicant either an approval letter under § 314.105, or an approvable letter under § 314.110, or a not approvable letter under § 314.120. This 180-day period is called the "review clock."

(b) During the review period, an applicant may withdraw an application under § 314.65 or an abbreviated application under § 314.99 and later resubmit it. FDA will treat the resubmission as a new application or abbreviated application.

(c) The review clock may be extended by mutual agreement between FDA and an applicant or as provided in §§ 314.60 and 314.96, as the result of a major amendment.

[57 FR 17987, Apr. 28, 1992, as amended at 64 FR 402, Jan. 5, 1999]

### § 314.101  Filing an application and receiving an abbreviated new drug application.

(a)(1) Within 60 days after FDA receives an application, the agency will determine whether the application may be filed. The filing of an application means that FDA has made a threshold determination that the application is sufficiently complete to permit a substantive review.

(2) If FDA finds that none of the reasons in paragraphs (d) and (e) of this section for refusing to file the application apply, the agency will file the application and notify the applicant in writing. The date of filing will be the date 60 days after the date FDA received the application. The date of filing begins the 180-day period described in section 505(c) of the act. This 180-day period is called the "filing clock."

(3) If FDA refuses to file the application, the agency will notify the applicant in writing and state the reason under paragraph (d) or (e) of this section for the refusal. If FDA refuses to file the application under paragraph (d) of this section, the applicant may request in writing within 30 days of the date of the agency's notification an informal conference with the agency about whether the agency should file the application. If, following the informal conference, the applicant requests that FDA file the application (with or without amendments to correct the deficiencies), the agency will file the application over protest under paragraph (a)(2) of this section, notify the applicant in writing, and review it as filed. If the application is filed over protest, the date of filing will be the date 60 days after the date the applicant requested the informal conference. The applicant need not resubmit a copy of an application that is filed over protest. If FDA refuses to file the application under paragraph (e) of this section, the applicant may amend the application and resubmit it, and the agency will make a determination under this section whether it may be filed.

(b)(1) An abbreviated new drug application will be reviewed after it is submitted to determine whether the abbreviated application may be received. Receipt of an abbreviated new drug application means that FDA has made a threshold determination that the abbreviated application is sufficiently complete to permit a substantive review.

(2) If FDA finds that none of the reasons in paragraphs (d) and (e) of this section for considering the abbreviated new drug application not to have been received applies, the agency will receive the abbreviated new drug application and notify the applicant in writing.

(3) If FDA considers the abbreviated new drug application not to have been

received under this section, FE cant, ordinarily plicant may the
(i) Withdraw drug applicatio
(ii) Amend th application to c or
(iii) Take no FDA will refuse viated new drug
(c) [Reserved]
(d) FDA may r tion or may n viated new drug ceived if any of
(1) The applica completed appli
(2) The applic in the form rec § 314.94.
(3) The applica plication is inco not on its face c quired under s 505(j), or sectio § 314.50 or § 314.94
(4) The applic complete envir which addresses ified in the ap § 25.40 of this cha sufficient inform the requested ac egorical exclusio of this chapter.
(5) The applica plication does n and complete F each part of the in English.
(6) The applica statement for ea tory study that compliance with forth in part 58 each study not ance with part brief statement noncompliance.
(7) The applica statement for ea it was conducte the institutiona tions in part 56 not subject to t that it was cor with the inform

**[left column — partially obscured at binding]**

h. I (4-1-07 Edition)

...r the applicant in ...g filing will be the ...the date FDA re-...n. The date of fil-...y period described ...e act. This 180-day ...filing clock.''

...o file the applica-...notify the appli-...state the reason ...or (e) of this sec-...If FDA refuses to ...der paragraph (d) ...pplicant may re-...in 30 days of the ...otification an in-...ith the agency ...ency should file ...lowing the infor-...pplicant requests ...lication (with or ...o correct the de-...will file the ap-...under paragraph ...notify the appli-...view it as filed. ...led over protest, ...be the date 60 ...e applicant re-...conference. The ...ubmit a copy of ...filed over pro-...file the applica-...(e) of this sec-...amend it, and the ...it it, and the ...determination ...ther it may be

...new drug appli-...after it is sub-...hether the ab-...ay be received. ...ed new drug ap-...DA has made a ...n that the ab-...s sufficiently ...ubstantive re-

...one of the rea-...and (e) of this ...he abbreviated ...o have been ...ency will re-...drug applica-...icant in writ-

...e abbreviated ...to have been

received under paragraph (d) or (e) of this section, FDA will notify the applicant, ordinarily by telephone. The applicant may then:

(i) Withdraw the abbreviated new drug application under § 314.99; or

(ii) Amend the abbreviated new drug application to correct the deficiencies; or

(iii) Take no action, in which case FDA will refuse to receive the abbreviated new drug application.

(c) [Reserved]

(d) FDA may refuse to file an application or may not consider an abbreviated new drug application to be received if any of the following applies:

(1) The application does not contain a completed application form.

(2) The application is not submitted in the form required under § 314.50 or § 314.94.

(3) The application or abbreviated application is incomplete because it does not on its face contain information required under section 505(b), section 505(j), or section 507 of the act and § 314.50 or § 314.94.

(4) The applicant fails to submit a complete environmental assessment, which addresses each of the items specified in the applicable format under § 25.40 of this chapter or fails to provide sufficient information to establish that the requested action is subject to categorical exclusion under § 25.30 or § 25.31 of this chapter.

(5) The application or abbreviated application does not contain an accurate and complete English translation of each part of the application that is not in English.

(6) The application does not contain a statement for each nonclinical laboratory study that it was conducted in compliance with the requirements set forth in part 58 of this chapter, or, for each study not conducted in compliance with part 58 of this chapter, a brief statement of the reason for the noncompliance.

(7) The application does not contain a statement for each clinical study that it was conducted in compliance with the institutional review board regulations in part 56 of this chapter, or was not subject to those regulations, and that it was conducted in compliance with the informed consent regulations

in part 50 of this chapter, or, if the study was subject to but was not conducted in compliance with those regulations, the application does not contain a brief statement of the reason for the noncompliance.

(8) The drug product that is the subject of the submission is already covered by an approved application or abbreviated application and the applicant of the submission:

(i) Has an approved application or abbreviated application for the same drug product; or

(ii) Is merely a distributor and/or repackager of the already approved drug product.

(9) The application is submitted as a 505(b)(2) application for a drug that is a duplicate of a listed drug and is eligible for approval under section 505(j) of the act.

(e) The agency will refuse to file an application or will consider an abbreviated new drug application not to have been received if any of the following applies:

(1) The drug product is subject to licensing by FDA under the Public Health Service Act (42 U.S.C. 201 *et seq.*) and subchapter F of this chapter.

(2) In the case of a 505(b)(2) application or an abbreviated new drug application, the drug product contains the same active moiety as a drug that:

(i) Was approved after September 24, 1984, in an application under section 505(b) of the act, and

(ii) Is entitled to a 5-year period of exclusivity under section 505(c)(3)(D)(ii) and (j)(4)(D)(ii) of the act and § 314.108(b)(2), unless the 5-year exclusivity period has elapsed or unless 4 years of the 5-year period have elapsed and the application or abbreviated application contains a certification of patent invalidity or noninfringement described in § 314.50(i)(1)(i)(A)(*4*) or § 314.94(a)(12)(i)(A)(*4*).

(f)(1) Within 180 days after the date of filing, plus the period of time the review period was extended (if any), FDA will either:

(i) Approve the application; or

(ii) Issue a notice of opportunity for hearing if the applicant asked FDA to provide it an opportunity for a hearing

135

on an application in response to an approvable letter or a not approvable letter.

(2) Within 180 days after the date of receipt, plus the period of time the review clock was extended (if any), FDA will either approve or disapprove the abbreviated new drug application. If FDA disapproves the abbreviated new drug application, FDA will issue a notice of opportunity for hearing if the applicant asked FDA to provide it an opportunity for a hearing on an abbreviated new drug application in response to a not approvable letter.

(3) This paragraph does not apply to applications or abbreviated applications that have been withdrawn from FDA review by the applicant.

[57 FR 17987, Apr. 28, 1992; 57 FR 29353, July 1, 1992, as amended at 59 FR 50366, Oct. 3, 1994; 62 FR 40599, July 29, 1997; 64 FR 402, Jan. 5, 1999]

### § 314.102  Communications between FDA and applicants.

(a) *General principles.* During the course of reviewing an application or an abbreviated application, FDA shall communicate with applicants about scientific, medical, and procedural issues that arise during the review process. Such communication may take the form of telephone conversations, letters, or meetings, whichever is most appropriate to discuss the particular issue at hand. Communications shall be appropriately documented in the application in accordance with § 10.65 of this chapter. Further details on the procedures for communication between FDA and applicants are contained in a staff manual guide that is publicly available.

(b) *Notification of easily correctable deficiencies.* FDA reviewers shall make every reasonable effort to communicate promptly to applicants easily correctable deficiencies found in an application or an abbreviated application when those deficiencies are discovered, particularly deficiencies concerning chemistry, manufacturing, and controls issues. The agency will also inform applicants promptly of its need for more data or information or for technical changes in the application or the abbreviated application needed to facilitate the agency's review. This

early communication is intended to permit applicants to correct such readily identified deficiencies relatively early in the review process and to submit an amendment before the review period has elapsed. Such early communication would not ordinarily apply to major scientific issues, which require consideration of the entire pending application or abbreviated application by agency managers as well as reviewing staff. Instead, major scientific issues will ordinarily be addressed in an action letter.

(c) *Ninety-day conference.* Approximately 90 days after the agency receives the application, FDA will provide applicants with an opportunity to meet with agency reviewing officials. The purpose of the meeting will be to inform applicants of the general progress and status of their applications, and to advise applicants of deficiencies that have been identified by that time and that have not already been communicated. This meeting will be available on applications for all new chemical entities and major new indications of marketed drugs. Such meetings will be held at the applicant's option, and may be held by telephone if mutually agreed upon. Such meetings would not ordinarily be held on abbreviated applications because they are not submitted for new chemical entities or new indications.

(d) *End of review conference.* At the conclusion of FDA's review of an application or an abbreviated application as designated by the issuance of an approvable or not approvable letter, FDA will provide applicants with an opportunity to meet with agency reviewing officials. The purpose of the meeting will be to discuss what further steps need to be taken by the applicant before the application or abbreviated application can be approved. This meeting will be available on all applications or abbreviated applications, with priority given to applications for new chemical entities and major new indications for marketed drugs and for the first duplicates for such drugs. Requests for such meetings shall be directed to the director of the division responsible for reviewing the application or abbreviated application.

(e) *Other meetings.* O tween FDA and applic with advance notice entific, medical, and arise during the rev quests for meetings sh the director of the di for reviewing the app viated application. every attempt to gr meetings that involve and that can be sched convenient times. Ho visits (i.e., an unan scheduled visit by resentative) are disco urgent matters, such important new safety

[57 FR 17988, Apr. 28, 19 1, 1992]

### § 314.103  Dispute res

(a) *General.* FDA is solving differences be and FDA reviewing o spect to technical req plications or abbrevi as quickly and amic through the coopera information and views

(b) *Administrative issues.* When adminis dural disputes arise should first attempt matter with the div for reviewing the app viated application, be consumer safety offic application or abbrev If resolution is not ac cant may raise the person designated whose function shall what has happened a timely and equitable i priate issues to raise man include resolvin scheduling meetings, replies to inquiries timely completion of Further details on th contained in a staff m is publicly available lic information regula

(c) *Scientific and me* Because major scient dinarily communicat in an approvable or n ter pursuant to § 314.1

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

LEXSEE 2006 U.S. DIST. LEXIS 74582


Positive
As of: Apr 04, 2008

**JANSSEN PHARMACEUTICA N.V., and JANSSEN PHARMACEUTICA
PRODUCTS, L.P., Plaintiffs, v. MYLAN PHARMACEUTICALS., INC.,
Defendants. JANSSEN PHARMACEUTICA N.V., and JANSSEN
PHARMACEUTICA PRODUCTS, L.P., Plaintiffs, v. DR. REDDY'S
LABORATORIES, LTD., and DR. REDDY'S LABORATORIES, INC., Defendants.**

**CIVIL ACTION NO. 03-6220 (JCL), CIVIL ACTION NO. 03-6185 (JCL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*456 F. Supp. 2d 644; 2006 U.S. Dist. LEXIS 74582*

**October 13, 2006, Decided**

**SUBSEQUENT HISTORY:** Claim dismissed by
*Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.,*
*2006 U.S. Dist. LEXIS 81622 (D.N.J., Nov. 8, 2006)*

**PRIOR HISTORY:** *Janssen Pharmaceutica N.V. v.
Mylan Pharms., Inc., 2006 U.S. Dist. LEXIS 5443
(D.N.J., Feb. 10, 2006)*

**COUNSEL:** [**1] For JANSSEN PHARMACEUTICA
N.V., JANSSEN PHARMACEUTICA PRODUCTS,
L.P., Plaintiffs: DOUGLAS SCOTT EAKELEY, JOHN
R. MIDDLETON, KAYLYNN SUN-LEE YOON,
LOWENSTEIN SANDLER, PC, ROSELAND, NJ.;
MATTHEW JONATHAN ATLAS, LOWENSTEIN
SANDLER, ROSELAND, NJ, US.; RITA MARIE
JENNINGS, LOWENSTEIN SANDLER, ROSELAND,
NJ.

For JANSSEN PHARMACEUTICA, INC., Consol
Plaintiff: DOUGLAS SCOTT EAKELEY, JOHN R.
MIDDLETON, KAYLYNN SUN-LEE YOON,
LOWENSTEIN SANDLER, PC, ROSELAND, NJ.

For DR. REDDY'S LABORATORIES, LTD., DR.
REDDY'S LABORATORIES, INC., Defendants: ALAN
HENRY POLLACK, BUDD LARNER, SHORT HILLS,
NJ.

For JANSSEN PHARMACEUTICA N.V., JANSSEN
PHARMACEUTICA PRODUCTS, L.P., Counter
Defendants: JOHN R. MIDDLETON, KAYLYNN SUN-
LEE YOON, LOWENSTEIN SANDLER, PC,
ROSELAND, NJ.; MATTHEW JONATHAN ATLAS,

LOWENSTEIN SANDLER, ROSELAND, NJ, US.;
RITA MARIE JENNINGS, LOWENSTEIN SANDLER,
ROSELAND, NJ.

For JANSSEN PHARMACEUTICA N.V., JANSSEN
PHARMACEUTICA PRODUCTS, L.P., Plaintiffs:
DOUGLAS SCOTT EAKELEY, JOHN R.
MIDDLETON, KAYLYNN SUN-LEE YOON,
LOWENSTEIN SANDLER, PC, ROSELAND, NJ.;
MATTHEW JONATHAN ATLAS, LOWENSTEIN
SANDLER, ROSELAND, NJ, US.; RITA MARIE
JENNINGS, LOWENSTEIN SANDLER, ROSELAND,
NJ.

For [**2] MYLAN PHARMACEUTICALS INC.,
Defendant: ARNOLD B. CALMANN, SAIBER,
SCHLESINGER, SATZ & GOLDSTEIN, LLC,
NEWARK, NJ.; JEFFREY SOOS, SAIBER
SCHLESINGER SATZ & GOLDSTEIN, NEWARK,
NJ.

For JANSSEN PHARMACEUTICA N.V., Counter
Defendant: JOHN R. MIDDLETON, KAYLYNN SUN-
LEE YOON, LOWENSTEIN SANDLER, PC,
ROSELAND, NJ.; RITA MARIE JENNINGS,
LOWENSTEIN SANDLER, ROSELAND, NJ.

For JANSSEN PHARMACEUTICA PRODUCTS, L.P.,
Counter Defendant: JOHN R. MIDDLETON,
KAYLYNN SUN-LEE YOON, LOWENSTEIN
SANDLER, PC, ROSELAND, NJ.; MATTHEW
JONATHAN ATLAS, LOWENSTEIN SANDLER,
ROSELAND, NJ, US.; RITA MARIE JENNINGS,

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 70 of 109

Page 2

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

LOWENSTEIN SANDLER, ROSELAND, NJ.

For JANSSEN PHARMACEUTICA N.V., Counter Defendant: JOHN R. MIDDLETON, KAYLYNN SUN-LEE YOON, LOWENSTEIN SANDLER, PC, ROSELAND, NJ.; MATTHEW JONATHAN ATLAS, LOWENSTEIN SANDLER, ROSELAND, NJ, US.; RITA MARIE JENNINGS, LOWENSTEIN SANDLER, ROSELAND, NJ.

For JANSSEN PHARMACEUTICA PRODUCTS, L.P., Counter Defendant: JOHN R. MIDDLETON, KAYLYNN SUN-LEE YOON, LOWENSTEIN SANDLER, PC, ROSELAND, NJ.; RITA MARIE JENNINGS, LOWENSTEIN SANDLER, ROSELAND, NJ.

For JANSSEN PHARMACEUTICA N.V., Counter Defendant: MATTHEW JONATHAN ATLAS, LOWENSTEIN SANDLER, ROSELAND, NJ, [**3] US.

**JUDGES:** John C. Lifland, U.S.D.J.

**OPINION BY:** John C. Lifland

**OPINION**

[*647] LIFLAND, District Judge

I. Introduction

Plaintiffs, Janssen Pharmaceutica, N.V., a Belgian corporation, and its New Jersey-based subsidiary, Janssen Pharmaceutica, L.P. (collectively "Janssen"), are the inventors and producers of r isperidone, the active ingredient in Janssen's successful drug for the treatment of schizophrenia, Risperdal. It is perhaps an understatement to describe Risperdal as merely "successful." The drug has been described by the American Chemical Society as "a standard in the treatment of psychosis, revolutionizing anti-psychotic treatments." Pl.'s Ex. ("PX") 309. In 2005 alone, Risperdal accounted for over $ 3 billion in worldwide sales for Janssen's parent company, Johnson & Johnson. Vergis Tr. 78:9-16.

Defendants, Mylan Pharmaceuticals, Inc. ("Mylan"), a West Virginia corporation, Dr. Reddy's Laboratories, Ltd., an Indian corporation, and its New Jersey-based subsidiary, Dr. Reddy's Laboratories, Inc. (collectively, "DRL"), are drug manufacturers seeking to market a generic version of risperidone. Janssen filed this suit claiming infringement of its *U.S. Patent No. 4,804,663* ("the [**4] *'663 patent*"), which claims risperidone, among other chemical compounds. Mylan and DRL concede they have infringed the *'663 patent*; they counter, however, that the *'663 patent* is invalid due to

obviousness, and alternatively, Mylan argues that the *'663 patent* is unenforceable due to Janssen's alleged inequitable conduct.

The parties tried the case before the Court from June 28, 2006 through June 30, 2006 and on July 5, 2006. Thereafter, they submitted proposed findings of fact and conclusions of law. The parties submissions and the record evidence have been carefully considered. For the reasons set forth below, [1] the Court finds that Mylan and DRL have failed to prove by clear and convincing evidence that the *'663 patent* is obvious under *35 U.S.C. § 103(a)*, and that Mylan has failed to prove by clear and convincing evidence that Janssen engaged in inequitable conduct. Thus, the *'663 patent* [*648] is neither invalid nor unenforceable, and as a result, Mylan and DRL have infringed that patent under *35 U.S.C. § 271(e)(2)*.

> 1    This opinion shall constitute the Court's findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52(a)*.

[**5] II. Background

A. The *'663 Patent*

On February 14, 1989, the United States Patent and Trademark Office ("PTO") issued the *'663 patent* to its inventors Ludo E.J. Kennis and Jan Vandenberk and assignee, Janssen. PX 1. The *'663 patent* originated from a patent application filed with the PTO on March 27, 1985. Stipulations of Fact ("SF") 14-15; PX 1.

The *'663 patent*'s 18 claims encompass compounds "having useful antipsychotic properties and being useful in the treatment of a variety of complaints in which serotonin release is of predominant importance." PX 1. Among these compounds are risperidone and compound 11, which are included in each of the patent's 18 claims. [2] SF-17. There is no claim in the *'663 patent* in which risperidone is the only compound. PX 1; Wolff Tr. 546:1-10.

> 2    In the *'663 patent*, the chemical name for Risperidone is 3-[2-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl]-6,7,8,9-tetrahydro-2-methyl-4H-pyrido[1,2-a]pyrimidin-4-one; the chemical name for Compound 11 is 3-[2-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl]-2-methyl-4H-pyrido[1, 2-a]pyrimidin-4-one. Defs' Ex. ("DX") 1.

[**6] The compounds claimed in the *'663 patent* were the result of Janssen's efforts to invent an effective antipsychotic drug, with few side effects, for the treatment of Schizophrenia. Tamminga Tr. 53:4-22.

B. Schizophrenia

Schizophrenia is a debilitating disease of the brain

000068

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 71 of 109

Page 3

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

characterized by hallucinations, delusions and other symptoms that impair a person's capacity for thought, attention, memory, emotion and social functioning. Tamminga Tr. 46:19-47:1. Despite much research, the cause, mechanism, and etiology of the disease remain unknown. Tamminga Tr. 47:2-3.

People who suffer from schizophrenia exhibit a wide array of symptoms that can be classified into three major categories: positive symptoms, negative symptoms, and cognitive symptoms. Tamminga Tr. 47:4-7.

Positive symptoms include extreme hallucinations and paranoid delusions. Hallucinations are auditory, visual or both. Schizophrenics do not just have voices in their mind, "they believe that there are people actually talking to them." Tamminga Tr. 47:8-16. In addition, schizophrenics believe in the false realities created by their delusions, sometimes causing the delusions to take over their lives. Id. at 47:17-18.

[**7] Negative symptoms include the complete loss of all emotion and lack of spontaneous thought, both of which "result in a loss of social skills and really an entire loss of social functioning." Tamminga Tr. 47:19-24.

Cognitive symptoms include the impairment of memory and attention. These cognitive deficits cause schizophrenics to become unable to use information and to have great difficulty making decisions. Tamminga Tr. 47:25-48:4.

These symptoms can entirely take over the lives of persons with schizophrenia, preventing them from working or developing social networks. Less than 20 percent of schizophrenics have jobs, less than 15 percent ever marry, and approximately 10 percent eventually commit suicide. Tamminga Tr. 48:5-15.

[*649] C. Early Treatments

Schizophrenia is a disease as old as mankind. For most of that time, there were no effective medical treatments. The only option was compassionate care, placing schizophrenics into protected environments such as government hospitals that quickly became overcrowded. But compassionate care did nothing to treat the symptoms and the patients did not get better. Tamminga Tr. 48:18-49:2.

Beginning in the 1930s, doctors attempted medical [**8] treatments. These treatments included induced fever, electroconvulsive shock therapy and frontal lobotomy. None of these attempts to treat the disease was effective. To the contrary, these treatments could even worsen the symptoms of schizophrenia. Tamminga Tr. 49:3-12.

D. First Generation, "Typical" Antipsychotic Drugs

The lack of effective treatment options continued

into the 1950s. Then, for the first time, doctors developed an antipsychotic drug to treat schizophrenia, called chlorpromazine. Tamminga Tr. 49:13-18. The discovery that chlorpromazine could treat some symptoms of schizophrenia was accidental. Physicians were testing chlorpromazine as a sedative when they noticed that chlorpromazine significantly reduced the hallucinations and delusions of their schizophrenic patients. Tamminga Tr. 49:19-25.

As the first pharmaceutical treatment for schizophrenia, chlorpromazine was rapidly adopted for use throughout the medical community. Pharmaceutical companies quickly began searching for similar drugs. This led to the development of new antipsychotics such as Janssen's haloperidol, marketed under the trade name, Haldol. Chlorpromazine, haloperidol, and other similar drugs [**9] became known as first generation, or typical, antipsychotics. Tamminga Tr. 50:12-16, 21-25.

While chlorpromazine and the other typical antipsychotics were an improvement over compassionate care and the early ineffective treatments, they were not perfect. A typical antipsychotic improved the positive symptoms of schizophrenia, but it had no effect on the negative or cognitive symptoms that severely impaired the emotions, thoughts, and social functioning of schizophrenics. In fact, in some cases a typical antipsychotic could even worsen these symptoms. Tamminga Tr. 50:1-3.

More significantly, even when typical antipsychotics were successful at treating the positive symptoms of schizophrenia, they had many unwanted and serious side effects, including sedation, cardiac side effects, and motor side effects. The motor-related side effects were the largest drawback. Tamminga Tr. 51:1-5.

For example, typical antipsychotics caused extrapyramidal symptoms ("EPS") that caused patients to experience rigidity and tremors similar to those of Parkinson's disease. The rigidity and tremors brought on by EPS were always uncomfortable and often painful. EPS symptoms tended to cease when a patient [**10] stopped taking the medication. Tamminga Tr. 51:6-52:2.

Even worse, EPS symptoms could also gradually develop into a more serious motor syndrome called "tardive dyskinesia" ("TD"), characterized by motor difficulties such as, repetitive, involuntary, and purposeless movements. Unlike EPS, tardive dyskinesia was frequently irreversible even after the medication was discontinued. Tamminga Tr. 51:13-23.

These side effects had significant repercussions in the treatment of schizophrenia. Not surprisingly, patients disliked these motor side effects so much that they sometimes [*650] stopped taking their medication altogether. Tamminga Tr. 52:3-5.

000069

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

E. Second Generation, "Atypical" Antipsychotic Drugs

In the 1960s, scientists' search for an improved antipsychotic resulted in the development of the first second generation or "atypical" antipsychotic, clozapine. Clozapine was introduced in the 1960s in Europe. Unlike the typical antipsychotics, clozapine had reduced motor side effects. Tamminga Tr. 52:6-9, 52:25-53:1.

Soon after clozapine was introduced, however, researchers discovered that while it had reduced motor side effects, it had a significant toxicity issue. It was found that clozapine [**11] could cause agranulocytosis, a sometimes deadly blood disorder. Due to its toxicity, the Food and Drug Administration ("FDA") did not approve clozapine in the United States until 1990. And even then, it was not approved for general use; its approval was limited to use only with treatment-resistant patients. Tamminga Tr. 52:10-24.

Despite this drawback, the discovery of clozapine demonstrated that it was possible to treat the positive symptoms of schizophrenia without serious motor side effects. It gave the medical community renewed hope for developing improved antipsychotic drugs. Tamminga Tr. 53:2-8. For that reason, clozapine became the focus of researchers looking for new drugs that would incorporate clozapine's improvements without its toxicity. Strupczewski Dep. (11/16/2004) Tr. 82:4-9. For example, both Eli Lilly and Sandoz spent years on research programs to modify clozapine to create a drug that would retain clozapine's benefits and eliminate its toxic effect. Meltzer Tr. 250:3-17; Tamminga Tr. 53:2-8.

F. Risperidone

Janssen was one of the companies attempting to develop a safe atypical antipsychotic. Following years of research and the testing of many potential compounds, [**12] two Janssen scientists, Kennis and Vandenberk, discovered risperidone. When approved by the FDA, risperidone became the first atypical antipsychotic available for general use that effectively treated symptoms with reduced side effects. Risperidone, sold by Janssen under the trademark Risperdal, was approved by the FDA in late 1993 and was first sold in the United States in 1994. Tamminga Tr. 53:9-13; Vergis Tr. 76:6-7, 13-15, 76:24-77:5.

Risperidone was a major advance over the typical antipsychotic drugs. Tamminga Tr. 55:19-56:5. Like the typical antipsychotics, risperidone has a potent effect in treating the positive symptoms of schizophrenia. However, unlike the typical antipsychotics, risperidone also improves the negative and cognitive symptoms of schizophrenia. Moreover, risperidone also has an extremely low side effect profile, with reduced EPS and almost no TD. Tamminga Tr. 53:14-22, 55:19-56:5.

Risperdal had a revolutionary impact on the treatment of schizophrenia. Once risperidone entered the market, the medical community "set aside" the typical antipsychotics. Tamminga Tr. 55:19-25.

G. Mylan & DRL's Abbreviated New Drug Applications

Following Janssen's success with [**13] Risperdal, generic manufacturers began filing Abbreviated New Drug Applications ("ANDA") with the FDA under the Hatch-Waxman Act, 28 U.S.C. § 355(j)(1), seeking approval to sell generic risperidone products. Most of those companies chose not to challenge Janssen's '663 patent and [*651] included a "paragraph III" certification under 28 U.S.C. § 355(j)(2)(A)(vii)(III), indicating that the FDA should not approve their applications until after the expiration of the '663 patent. Vergis Tr. 82:9-13; PX 75, PX 76, PX 77, PX 78, PX 85; PX 396.

On November 29, 2001, Mylan submitted an ANDA (No. 76-288) to the FDA seeking approval to market a generic risperidone tablet in various doses. Initially, Mylan also chose not to challenge the '663 patent by including a paragraph III certification with its ANDA. SF 21.

On October 24, 2003, DRL submitted an ANDA (No. 76-879) to the FDA also seeking to sell a generic version of risperidone. SF-27. DRL's ANDA, however, contained a "paragraph IV" certification pursuant to 28 U.S.C. § 355(j)(2)(A)(vii)(IV), challenging the validity of the '663 patent. [3] SF 29. On November 19, 2003, Mylan followed [**14] DRL's lead and amended its ANDA (No. 76-288) to include a paragraph IV certification. SF-23. Both Defendants informed Janssen of its paragraph IV certifications shortly thereafter. SF 24, 29.

> 3    DRL twice amended its ANDA to include different doses and variations of a generic risperidone.

H. The Current Litigation

On December 30, 2003, Janssen filed separate patent infringement actions against Mylan (Civil No. 03-6220) and DRL (Civil No. 03-6185) under 35 U.S.C. § 271(e)(2). [4] On March 8, 2004, the two actions were consolidated for discovery and pre-trial purposes. Two additional actions filed by Janssen against DRL (Civil Nos. 05-0884, 5326) based on the filing of additional paragraph IV certifications for different forms of risperidone were consolidated with No. 03-6185 on March 9, 2006.

> 4    Upon receiving notice of an applicant's paragraph IV certification, 35 U.S.C. § 271(e)(2) permits the patent holder to immediately bring an action in a U.S. District Court for a determination that the application infringes the patent. See, e.g.,

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

*SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1314 (Fed. Cir. 2006).*

[**15] In February 2004, Mylan and DRL filed separate answers. Both Defendants asserted an affirmative defense claiming that the *'663 patent* is invalid for obviousness under *35 U.S.C. § 103(a)*. Both Defendants also asserted a counterclaim seeking a declaration of invalidity.

On June 7, 2006, Mylan amended its answer to include the additional affirmative defense that the *'663 patent* is unenforceable due to Janssen's alleged inequitable conduct. Mylan also seeks a declaratory judgment to that effect. DRL did not join Mylan in asserting this defense and counterclaim.

### I. Jurisdiction, Venue and Applicable Law

This Court has subject matter jurisdiction over Janssen's patent infringement claims and Mylan and DRL's counterclaims pursuant to *28 U.S.C. §§ 1331* and *1338(a)*. Defendants have waived any objections to this Court's exercise of personal jurisdiction, SF 11, and venue is proper under *28 U.S.C. §§ 1391(b)(1)* and *(c)*, and *1400(b)*.

Because this action arises under the patent laws of the United States, this Court must apply the precedents of the United States Court of Appeals for the Federal Circuit, [**16] which has jurisdiction over any appeal of this judgment. See *28 U.S.C. § 1295(a)*.

### III. Analysis

#### A. Patent Infringement

One is liable for patent infringement if he or she, "without authority makes, uses, [*652] offers to sell, or sells any patented invention . . . during the term of the patent therefor . . . ." *35 U.S.C. § 271(a)*. Additionally, the filing of an application with the FDA under *21 U.S.C. § 355(j)* "for a drug claimed in a patent" is an act of infringement "if the purpose of such submission"--as demonstrated in the applicant's paragraph IV certification--"is to obtain approval . . . to engage in the commercial manufacture, use, or sale of [that] drug . . . before the expiration of such patent." *35 U.S.C. § 271(e)(2)(A)*.

Defendants concede infringing the claims of the *'663 patent* with their proposed ANDA products. SF 47. Thus, the only issues before the Court are those raised in Defendants' affirmative defenses to infringement: (1) whether the *'663 patent* is invalid due to obviousness, as asserted by Mylan and DRL, and (2) whether the *'663 patent* is unenforceable due [**17] to inequitable conduct, as asserted only by Mylan.

"A patent shall be presumed valid." *35 U.S.C. § 282*.

The validity of each claim within a patent must be evaluated independently; the invalidity of one claim does not disturb the presumption of validity of another. Id. The party challenging the patent bears the burden of proving by clear and convincing evidence the invalidity or unenforceability of the claims of a patent. Id. "The 'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence'" and "has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] 'highly probable.'" *Buildex, Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1463 (Fed. Cir. 1988)* (internal quotation omitted).

#### B. Obviousness

"[A] claimed invention is unpatentable if the differences between it and the prior art are 'such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. [**18] '" *Alza Corp. v. Mylan Labs., Inc., F.3d , No. 06-1019, 464 F.3d 1286, 2006 U.S. App. LEXIS 22616, at *4 (Fed. Cir. Sept. 6, 2006)* (quoting *35 U.S.C. § 103(a)*). Obviousness is a question of law. *2006 U.S. App. LEXIS 22616 at *4-5*. Its resolution depends on four underlying factual inquiries, the so-called Graham [5] factors: "'(1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness.'" *2006 U.S. App. LEXIS 22616 at *5* (quoting *In re Dembiczak, 175 F.3d 994, 998 (Fed. Cir. 1999))*.

> 5   *Graham v. John Deere Co., 383 U.S. 1, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966)*.

#### 1. The Scope and Content of the Prior Art

The scope and content of the prior art is limited to art that is analogous to the claimed invention. See *In re Bigio, 381 F.3d 1320, 1325 (Fed. Cir. 2004)*. Analogous art is that which is from the same field of endeavor or, if not within the [**19] field of endeavor, is still reasonably pertinent to the particular problem with which the inventor is involved. Id.

The prior art includes (1) analogous patents or printed publications of a person besides the inventor in this or a foreign country before March 27, 1985, (2) analogous patents and printed publications of the inventor in this or a foreign country before March 27, 1984, and (3) analogous U.S. Patents (not invented by Kennis and Vandenberk) that issued after March 27, [*653] 1985 but were filed before --or were entitled to rely on a U.S. filing date before -- March 27, 1985. *35*

000071

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

U.S.C. § 102(a), (b), and (e).

Defendants argue that the '663 patent is obvious in light of the drug pirenperone, which is covered by U.S. Patent No. 4,342,870 ("the '870 patent"). Pirenperone was also invented in part by Kennis. The '870 patent was assigned to Janssen, and issued more than one year prior to the filing date of the '663 patent. Thus, it is statutory prior art under 35 U.S.C. § 102(b).

Other patents and publications fall within the scope and content of the prior art, and will be discussed in more detail as necessary below.

2. The Level **[**20]** of Ordinary Skill in the Prior Art

The second Graham factor is the level of ordinary skill in the prior art. The obviousness analysis is conducted from the perspective of a person at that skill level. 35 U.S.C. § 103(a). This hypothetical person of ordinary skill is an objective legal construct who is presumed to be aware of all the relevant prior art. Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 962 (Fed. Cir. 1986).

While the person having ordinary skill knows all of the prior art, he or she is neither a genius nor an innovator. "A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which." Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 454 (Fed. Cir. 1985); see also Life Techs., Inc. v. Clontech Lab., Inc., 224 F.3d 1320, 1326 (Fed. Cir. 2000).

The parties in this case dispute the appropriate educational background of the person having ordinary **[**21]** skill in the art. Janssen argues such a person would have a master's de gree in chemistry, medicinal chemistry, or pharmacy, or a bachelor's degree in one of those fields "with at least t wo years of experience in research in antipsychotic drugs." Pl.'s FF&CL, at p.24. Mylan and DRL claim that the person of ordinary skill would have a "Ph.D with at least two years of experience and a record of research success, which is attested to by a small group of publications." Defs.' FF&CL, at p. 49. The dispute appears to b e somewhat academic (so to speak). [6] Neither party contends that the educational background of the person of ordinary skill is determinative of whether the '663 patent is obvious or nonobvious. See, e.g., Meltzer Tr. 266:2-9, 19-24 (testifying that a person of ordinary skill with either educational background would find the '663 patent nonobvious); Wolff Tr. 530:19-25 (testifying that the person of ordinary skill would have possessed a doctorate, without stating that this educational level was essential to viewing the '663 patent as obvious).

Additionally, neither party provided evidence on how specific items of prior art in the record would have been viewed differently **[**22]** depending upon the educational background of the person of ordinary skill.

6    The Court assures the reader that this is the only pun to be found in this lengthy opinion.

Furthermore, it appears that few courts conducting an obviousness analysis ever specify the exact level of ordinary skill in the art. In the opinion of one authority, this is because, "[i]n practice, the concept of 'a person of ordinary skill in the art' seems more designed to remind judges to put themselves in the shoes of a skilled artisan, rather than to compel a specific factual finding." Roger Schechter **[*654]** & John Thomas, Principles of Patent Law, § 5.3.2.2 (2d ed. 2004). This view of the third Graham factor has some support in Federal Circuit case law. In Environmental Designs, Ltd. v. Union Oil Co., 713 F.2d 693, 697 (Fed. Cir. 1983), the Court of Appeals explained that when evaluating the level of ordinary skill in the prior art,

> [t]he important consideration lies in the need to adhere to the statute, **[**23]** i.e., to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of 'ordinary skill in the art' -- not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand.

With that said, the Federal Circuit has specified several factors to look at in defining the level of ordinary skill in the art. These factors that show that educational background is only part of the story. See Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc., 707 F.2d 1376, 1382 (Fed Cir. 1983). They include: "(1) the educational level of the inventor; (2) types of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5)sophistication of the technology; and (6) educational level of active workers in the field." Environmental Designs, 713 F.2d at 696 (citing Orthopedic, 707 F.2d at 1382).

Here, the '663 patent's inventor, Kennis, has a degree in industrial engineering from a foreign university that he testified was not capable of comparison to a Bachelor of Science or a Bachelor of Arts. Kennis Dep. **[**24]** (10/20/2004) Tr. 11:19-13:8. In any event, Kennis stated that he is not a doctor. Id. at 11:17-18. Additionally, Dr. Meltzer testified that the actual workers involved in the development of antipsychotic compounds have bachelor's or master's degrees, not doctorate degrees. Meltzer Tr. 266:15-18; see also Strupczewski

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 75 of 109

Page 7

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

Dep. (11/16/2004) Tr. 13:15-23. The Court finds this testimony persuasive, and finds that the person of ordinary skill in the art in 1985 searching for an antipsychotic compound with reduced EPS would have had a master's degree in chemistry, medicinal chemistry, or pharmacy, or a bachelor's degree in one of those fields with at least two years of experience in research in antipsychotic drugs.[7]

> 7    The Court stresses however, that its ultimate ruling--that the *'663 patent* is nonobvious and therefore not invalid--is not contingent upon this finding. Indeed, the Court would find the *'663 patent* nonobvious even were it to hold that the person of ordinary skill in the art possessed a doctorate degree. As stated above, the parties have not presented any evidence that particular pieces of prior art would have been viewed any differently if the person evaluating it had a bachelor's, master's or doctorate.

[**25] To the extent the parties presented evidence bearing on the remaining factors articulated in *Environmental Designs, 713 F.2d at 696*, they are considered in the analysis below in determining whether the person of ordinary skill in 1985 would have found the *'663 patent* obvious.

3. The Differences Between the Claimed Invention and the Prior Art

"For a chemical compound, a prima facie case of obviousness requires 'structural similarity between claimed and prior art subject matter . . . *where the prior art gives reason or motivation to make the claimed compositions*.'" *Yamanouchi Pharm. Co. v. Merck & Co., 231 F.3d 1339, 1343 (Fed. Cir. 2000)* (emphasis added) (quoting *In re Dillon, 919 F.2d 688, 692 (Fed. Cir. 1990)* (en banc)).

Because *35 U.S.C. § 103(a)* orders a Court to determine whether the subject matter was obvious "at the time the invention was made," the obviousness inquiry [*655]   cannot be performed using hindsight. Accordingly, this Court must apply the "motivation-suggestion-teaching" test, which asks "whether a person of ordinary skill in the art, possessed with the understandings and knowledge reflected [**26] in the prior art, and motivated by the general problem facing the inventor, would have been led to make the combination recited in the claims." *In re Kahn, 441 F.3d 977, 988 (Fed. Cir. 2006)* (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1321-24 (Fed Cir. 2005))*.

It is not enough for a party seeking to defeat a patent on obviousness grounds to merely identify each element of the invention in the prior art. *Id. at 986*. This can be done for nearly all inventions. Id. Instead, a prima facie

case of obviousness requires the party to "explain the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious." *Id.* (internal quotations omitted).

Evidence of a "motivation to combine" need not be found explicitly in the prior art--it "may be implicit from the prior art as a whole." *In re Kotzab, 217 F.3d 1365, 1370 (Fed. Cir. 2000)*. If such evidence is lacking, however, the use of hindsight will be inferred. *Kahn, 441 F.3d at 986*.

a. Defendants' Obviousness Argument

Mylan and DRL do [**27]   not argue that risperidone would have been obvious; instead they claim that *compound 11* would have been obvious in 1985 in light of the prior art. As mentioned earlier, risperidone and compound 11 are embodiments of all 18 claims in the *'663 patent*. SF 17. The claims are written in the Markush format. "A Markush group is a listing of specified alternatives of a group in a patent claim." *Abbott Labs. v. Baxter Pharm. Prods., 334 F.3d 1274, 1280 (Fed. Cir. 2003)*. "[M]embers of the Markush group are . . . alternatively usable for the purposes of the invention." Id. (internal quotations omitted). Because the *'663 patent*'s claims are written this way, Janssen "has made a representation that for the purposes of the claimed invention, the [embodiments] of the group[s] are equivalents." *In re Skoll, 523 F.2d 1392, 1397 (CCPA 1975)*. As a result, if one embodiment of a group is obvious, e.g., compound 11, Janssen is precluded from arguing that any other embodiment of the claim, e.g., risperidone, is not obvious. Id.; see also *Ecolochem Inc. v. So. Cal. Edison Co., No. 95-1320, 1996 U.S. App. LEXIS 13330, at *6 (Fed. Cir. June 5, 1996)* [**28] (not published) ("By claiming a Markush group, [the patentee] has indicated that for the purpose of claim validity, the members of the claimed group are functionally equivalent. Thus if utilizing one element of the group is anticipated or obvious, the patentee is precluded from arguing that the claim is valid.").

Pirenperone, of the *'870 patent*, is structurally identical to compound 11 with one exception: pirenperone has a ketone group, where compound 11 has a benzisoxazole group. Wolff Tr. 547:8-548:24. Mylan and DRL argue that a person of ordinary skill in the art in 1985 would have been motivated from the prior art to start with pirenperone, and take the following series of allegedly obvious steps in order to arrive at compound 11.

First, Defendants claim that pirenperone would have been chosen as a lead compound by one looking for an antipsychotic with minimal side effects, including EPS, because it possessed indicators of those properties. Second, Defendants claim that once pirenperone was

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

chosen, it would have been obvious to the person of ordinary skill in 1985 that its only problem was that it had a short half-life, and thus had to be administered to patients three **[\*656]** times **[\*\*29]** per day, which was a problem for schizophrenics. Third, given the prior art, Mylan and DRL believe it then would have been obvious that pirenperone's ketone group was responsible for this durational problem. Fourth, it then would have been obvious, Defendants assert, to the person of ordinary skill that the solution to this problem was to convert the ketone group to a benzisoxazole, and that this change would permit the compound to retain its desired antipsychotic activity with low side effects.

The Court concludes that Mylan and DRL have failed to prove by clear and convincing evidence that all of these steps would have been obvious to the person of ordinary skill in the art in 1985. Indeed, they have failed to prove that *any* would have been obvious.

b. The Person of Ordinary Skill Would Not Have Chosen Pirenperone as a Lead Compound

Defendants argue that the person of ordinary skill in the art in 1985 would have started with pirenperone in attempting to create an antipsychotic with reduced EPS, because pirenperone possessed properties that the prior art taught would be needed for such a drug, namely, dopamine antagonism and serotonin antagonism.[8]

> 8    A short biochemistry lesson, provided by the parties, is in order. Dopamine and serotonin are hormones that, when found in the brain, act as neurotransmitters. A neurotransmitter is a chemical that permits the billions of nerve endings in the brain to communicate with each other. In turn, this communication enables a human being to function.
>
> Each nerve ending in the brain contains dozens of different "receptors." Neurotransmitters attach to the receptors and cause a chemical reaction. However, in the same way that only certain keys will open certain locks, only certain neurotransmitters will attach to certain receptors. For example, there are receptors that will only allow dopamine (and similar chemicals) to attach, and receptors that will only allow serotonin to attach. Receptors are categorized by what neurotransmitter can attach to it, and within these categories, there are further subcategories. For example, there are five types of dopamine receptors.
>
> Pharmaceutical companies can create drugs that mimic the actions of neurotransmitters. These drugs attach to receptors and behave like a particular neurotransmitter. Such drugs are called "agonists." For example, a drug that mimics the

functioning of dopamine is called a "dopamine agonist."

> Conversely, drugs can be created that block the actions of neurotransmitters. These drugs attach to particular receptors and prevent neurotransmitters from attaching. Such drugs are called "antagonists." For example, a drug that blocks the functioning of dopamine is called a "dopamine antagonist." Meltzer Tr. 227:20-232:24; Pl.'s FF&CL, at app. A.

**[\*\*30]**    As stated earlier, when applying the "motivation-suggestion-teaching" test, the Court must ask whether the person of ordinary skill in the art in 1985, "motivated by the general problem facing the inventor would have been led to make the combination recited in the claims." *Kahn, 441 F.3d at 988* (internal quotations omitted). The general problem in 1985 was how to develop a safe and effective antipsychotic with reduced EPS. McMillen Tr. 483:11-484:18; Wolff Tr. 618:5-8. Therefore, Mylan and DRL must demonstrate why the hypothetical person would have been motivated to choose pirenperone as a lead compound in attacking this general problem. [9] See *Yamanouchi, 231 F.3d at 1344*. First, Defendants argue that tests in the prior **[\*657]** art demonstrate that pirenperone was a dopamine antagonist, and therefore the prior art teaches that pirenperone would be an effective antipsychotic. Second, Defendants claim that pirenperone would have been thought to have a low incidence, of EPS due to its serotonin antagonism.

> 9    Mylan and DRL dispute that Yamanouchi "'mandates' the identification of a lead compound as a predicate to an obviousness analysis," and suggest that they need not demonstrate why one of ordinary skill in the art in 1985 would start with pirenperone. Defs.' Findings of Fact and Conclusions of Law ("FF&CL") 61-62. The Court disagrees. The Federal Circuit's statement in Yamanouchi that "[a]t the outset, [the Defendant] did not show the required motivation for selecting example 44 as a lead compound," *231 F.3d at 1345*, was not the creation of a new legal requirement, but merely a factually-specific application of the "motivation-suggestion-teaching" test. As explained earlier, in cases involving chemical compounds, the party alleging the obviousness of the patent must demonstrate that "'the prior art gives reason or motivation to make the claimed compositions.'" *Id. at 1343* (quoting *In re Dillon, 919 F.2d at 692*). The Yamanouchi Court faulted the Defendant there for failing to show motivation for selecting example 44 as a lead compound because *it was the Defendant's own allegation* that "one of skill in the art would have considered it obvious to

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

select the example 44 compound from [a prior art patent] and [a compound from another prior art patent] to use as leads for making [a compound in the disputed patent]." *Id. at 1343-44.* Similarly here, it is *Mylan and DRL* which allege that one of ordinary skill in the art in 1985 would have started with pirenperone, see, e.g., Defs.' FF&CL, p. 34; Defs. Post-Trial Br. 6-7, and that is precisely why this Court is requiring Defendants to prove that the prior art teaches the motivation to do so. See *In re Dillon, 919 F.2d at 692.*

[**31] The Court concludes that Defendants are incorrect on both points. First, the prior art teaches that in 1985 pirenperone was an antianxiety drug, not an antipsychotic. Second, one following the conventional wisdom in 1985 for choosing a drug with reduced EPS would not have selected pirenperone because that wisdom did not emphasize serotonin antagonism. The prior art provided other more likely starting points for the development of an improved atypical antipsychotic drug.

(1) Pirenperone Was Not Considered an Antipsychotic

Pirenperone's failure of standard tests for antipsychotics indicates that it would not have been considered an antipsychotic and thus, would have made an unlikely choice as a starting point. Meltzer Tr. 274:3-275:5; PX 94; PX 388; PX 389.

As both of Defendants' experts admitted, no prior art described pirenperone as an antipsychotic. No prior art said that pirenperone was being considered or should be considered as an antipsychotic drug. No prior art tested pirenperone as an antipsychotic in humans. Wolff Tr. 638:23-639:5, 641:6-8, 641:18-20; McMillen Tr. 511:8-10. Instead, pirenperone was recognized in the literature to be a pure serotonin antagonist that [**32] might be clinically useful to treat anxiety. Meltzer Tr. 269:5-8; PX 22; PX 94; PX 96; PX 202; PX 388; PX 389.

Janssen--the company that invented pirenperone and knew it best--did not view pirenperone as a potential antipsychotic drug. Meltzer Tr. 271:18-22. Indeed, the pirenperone patent does not even mention that pirenperone might be an antipsychotic. PX 80; Wolff Tr. 641:3-5; Meltzer Tr. 269:15-20. Instead, that patent describes the pirenperone family of compounds as "very potent serotonin[] antagonists" to "be used in the treatment of a variety of diseases in which serotonin release is of predominant importance." PX 80, col. 11, ll. 11-14; Wolff Tr. 639:15-22. The patent focused on pirenperone's serotonin antagonist qualities with no indication of antipsychotic potential. Meltzer Tr. 269:12-25; Wolff Tr. 639:6-14; PX 80 (abstract). On the basis of this evidence, the Court concludes that Janssen did not view pirenperone as a potential antipsychotic.

In addition, the published literature consistently describes pirenperone as a pure serotonin antagonist that could be useful [*658] to treat anxiety disorder. Janssen conducted extensive research on pirenperone. In both its published and [**33] unpublished research, Janssen studied and described pirenperone only as a treatment for anxiety. Wolff Tr. 638:1-10, 641:9-17; Meltzer Tr. 270:1-8; McMillen Tr. 508:21-509:4. Janssen's studies make this clear. See PX 21, 22, 93, 96, 202.

As Defendants' expert witness Dr. Brian McMillen testified, antianxiety drugs can sometimes be used for antipsychotic purposes, "depend[ing] on the dose and activity" of the drug. McMillen Tr. 470:25-471:5. It is apparent, however, that the two classes of drugs are not interchangeable. The testimony of Dr. Herbert Meltzer, and the prior art, demonstrated that an antianxiety drug will not always successfully function as an antipsychotic. Meltzer Tr. 272:1-19; PX 94, PX 388, PX 389.

Indeed, prior art was explicit that pirenperone failed to function as an antipsychotic. In three published studies on pirenperone and another of its compounds, setoperone, Janssen told the world that setoperone was an antipsychotic, while pirenperone was not. PX 94, PX 388; PX 389; McMillen Tr. 509:16-510:11; Meltzer Tr. 272:1-272:19, 273:12-275:5.

Mylan and DRL rely solely on the fact that pirenperone, in addition to its serotonin antagonism, is a dopamine antagonist [**34] to support their claim that pirenperone is an antipsychotic. See, e.g., Defs.' FF&CL, p. 35; McMillen Tr. 479:15-20; Meltzer Tr. 275:6-11. Not all dopamine antagonists are effective antipsychotics, however. Meltzer Tr. 275:25-276:17. Therefore, companies such as Janssen developed, used, and published tests, in addition to those for dopamine antagonism, to determine whether a compound would be an antipsychotic. Meltzer Tr. 271:18-272:19. While setoperone passed these additional tests, pirenperone failed them. Meltzer Tr. 271:18-272:19, 273:12-275:5; McMillen Tr. 509:16-510:11; PX 94; PX 388; PX 389.

For example, Dr. Janssen tested both setoperone and pirenperone twice using food reinforcement, cocaine discrimination and fentanyl discrimination. Passing the food reinforcement tests as evidenced by suppression of response control is an effect that is characteristic of antipsychotic activity. The published results demonstrated that setoperone passed both tests. By contrast, pirenperone failed the same standard tests for antipsychotic activity. Wolff Tr. 643:9-15; Meltzer Tr. 273:12-274:12; PX 94; PX 388; PX 389. Thus, setoperone was unique in combining LSD antagonism (i.e., serotonin [**35] antagonism, an effect shared with pirenperone) with typical antipsychotic activity. Wolff Tr. 642:22-25; PX 94. As a result of these studies, Janssen studied setoperone, not pirenperone, in humans to treat schizophrenia. PX 391; PX 392; Wolff Tr. 634:12-635:7. It is clear from these test results that a

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 78 of 109

Page 10

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

person of ordinary skill would have not considered pirenperone an antipsychotic.

The same studies also tested pirenperone for antianxiety activity. In those tests, unlike the antipsychotic tests, pirenperone performed better than setoperone. Dr. Janssen reported that pirenperone was effective in the antianxiety tests and had the potential to be another Librium or Valium--known antianxiety drugs. PX 94; Meltzer Tr. 274:13-23. As a result, Janssen studied pirenperone only as a treatment for anxiety in humans.

Dr. Janssen's three publications told one of ordinary skill in the art that pirenperone is an anxiety drug and that it is not an antipsychotic. A person of ordinary skill in the art in 1985, trying to develop an antipsychotic drug, would not turn to pirenperone **[*659]** in light of that prior art. Meltzer Tr. 275:2-5.

Even Dr. Manfred Wolff, Mylan and DRL's expert witness on obviousness, **[**36]** agreed that one of ordinary skill in the art would hesitate go against Dr. Janssen's recommendation on pirenperone:

> Q. Now, we are talking about the person of ordinary skill and about a compound. Pirenperone is patented as a pure serotonin antagonist, is being studied only in anxiety and Dr. Janssen who you think the ordinary scientist would give so much deference is telling the world pirenperone is not an antipsychotic, *you think a person of ordinary skill would go against Dr. Janssen's recommendation?*
>
> A. *Perhaps not.*

Wolff Tr. 643:20-644:2 (emphasis added).

Dr. Wolff's "perhaps not" makes it clear that Mylan and DRL have failed to prove by clear and convincing evidence that it would have been obvious for one of ordinary skill in the art in 1985 to select pirenperone as a starting point to develop an antipsychotic drug.

(2) The Conventional Wisdom in 1985 for Predicting Whether a Drug Would Have Reduced EPS Teaches Away From Selecting Pirenperone as a Lead Compound

There is a second flaw in Mylan and DRL's argument that pirenperone would have been chosen as a lead compound. They assert that it was well known in 1985 that all that was needed to create **[**37]** an antipsychotic drug with reduced EPS was to find a compound, like pirenperone, with combined serotonin and dopamine antagonism. See, e.g., Defs.' FF&CL, pp. 35-37. This, however, was not the conventional wisdom in 1985.

To the contrary, nearly all the prior art typical antipsychotic drugs-drugs that caused debilitating EPS-were also combined serotonin-dopamine antagonists. Meltzer Tr. 247:2-14, 260:23-261:2; PX 98, p. 170 at Table 2. It was only first demonstrated by Dr. Meltzer much later, in 1989, that a particular ratio of serotonin and dopamine antagonism is critical to creating an atypical antipsychotic. PX 14; Meltzer Tr. 247:20-24. As it happens, the compounds of the *'663 patent*, risperidone and compound 11, both have the desirable dopamine-serotonin ratio, and that is part of the reason for their effectiveness. PX 1. But simply being a serotonin-dopamine antagonist, like pirenperone, is not enough and knowledge of the desirable ratio comes from pure hindsight; it is not recited anywhere in the prior art.

In the early 1980s, numerous theories were put forward regarding the role of the brain's receptors in schizophrenia and how to reduce EPS. Meltzer Tr. 237:15-238:11, **[**38]** 242:13-243:1; McMillen Tr. 503:23-504:9.

The prior art demonstrated that the dominant theory in March 1985 was the anticholinergic theory, which focused not on serotonin, but on acetylcholine--another of the brain's many neurotransmitters. It was believed that the combination of antidopamine and anticholinergic [10] (acetylcholine-blocking) activities would lead to an atypical antipsychotic with reduced EPS. Meltzer Tr. 262:8-10; 248:3-11.

> 10    The term anticholinergic is sometimes also referred to as antimuscarinic, Meltzer Tr. 240:20-21, because a subclass of acetylcholine receptors are also sensitive to the neurotransmitter muscarine. Pl.'s FF&CL, at app. A.

This theory was developed by comparing the anticholinergic activity of known drugs. Researchers such as Dr. Solomon Snyder found that clozapine, which had the lowest level of EPS, was the strongest anticholinergic. **[*660]** Meltzer Tr. 238:2-14, 240:11-241:14; Wolff Tr. 627:23-628:1; PX 265. By contrast, haloperidol, a typical antipsychotic that produced the most **[**39]** EPS, was the weakest anticholinergic. Meltzer Tr. 241:19-21; Wolff Tr. 628:2-6.

As Dr. Snyder put it:

> There was an inverse correlation between EPS incidence and anticholinergic potency, with clozapine being the most potent anticholinergic and butyrophenone haloperidol the weakest, findings obtained independently by Miller and Hiley (Table 2).

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 79 of 109

Page 11

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

PX 36 at 988. [11] See also Wolff Tr. 628:7-17.

11  Indeed, the prior art in evidence is replete with teachings that the anticholinergic theory was the conventional wisdom in the 1970s, 1980s and beyond: Snyder wrote in 1974 that "[t]he *most potent anticholinergics* should evoke the fewest extrapyramidal effects; conversely, drugs with the highest incidence of these side effects should be the weakest anticholinergics." PX 265 at 1248 (emphasis added).

Miller and Hiley concluded in 1974 that "[t]he results obtained here support the hypothesis that the *antimuscarinic activity* of these drugs is related to the frequency of extrapyramidal side effects." PX 725 at 596 (emphasis added).

Creese said in 1976: "The *anticholinergic properties* of these drugs may well account for their low incidence of extrapyramidal effects." PX 178 at 482 (emphasis added).

Neumeyer -- one of Defendants' experts -- reported in 1981: "The *most potent anticholinergics* should evoke the fewest extrapyramidal effects; conversely, drugs with the highest incidence of these side effects should be the weakest anticholinergics." PX 728 at 215 (emphasis added).

Chakrabarti -- an Eli Lilly researcher -- reported in 1982: "In fact, neuroleptics, which possess anticholinergic properties (clozapine, thioridazine), produce a reduced incidence of EPS in the clinic. . . . Thus, in order to achieve a maximum reduction in side effects, it is important to obtain a correct balance of the antidopaminergic and *anticholinergic activities.*" PX 753 at 1133 (emphasis added).

The anti cholinergic theory continued to be important well after 1985. For example, Neumeyer continued to emphasize it in 1989 and 1995 texts: "With the phenothiazines and butyrophenones, and virtually all other classes of antipsychotic dru gs, extrapyramidal side effects vary directly with the ratio of their anti-D-2; *anti-Achn [anti-acetylcholine] potency.*" PX 754 (1989) at 198 (emphasis added); PX 274 (1995) at 208; Wolff Tr. 629:21-630:1.

The anticholinergic theory was used by scientists such as Strupczewski and his co-workers at Hoechst-Roussel (Aventis) as well as Eli Lilly and Sandoz. Hoechst-Roussel based its drug design program in the 1980s on the anticholinergic theory. As part of this program, Hoechst-Roussel developed compounds disclosed in its *U.S. Patent No. 4,352,811* ("the *'811*

patent"), PX 81, and in the 1982 Strupczewski Abstract, PX 191. Strupczewski Dep. (11/16/2004) Tr. 151:14-152:15, 105:12-23. Eli Lilly and Sandoz followed the anticholinergic theory by working with its premiere example -- clozapine. Meltzer Tr. 249:22-250:17.

[**40]  The theory had strong intuitive appeal. For many years the medical community had used anticholinergic drugs to treat EPS. Patients were given antipsychotic drugs that were dopamine antagonists together with an anticholinergic drug to treat their EPS side effects. Meltzer Tr. 235:18-236:1.

Mylan and DRL were unable to effectively rebut Dr. Meltzer's testimony and the prior art in the record, which demonstrated that the anticholinergic theory was the conventional wisdom in 1985 for producing a compound with reduced EPS. See Wolff Tr. 631:4-10; McMillen Tr. 503:23-504:9. Neither Dr. Wolff nor Dr. McMillen was able to disagree with Dr. Meltzer's assessment that the anticholinergic theory was dominant and that the serotonin theory, which Defendants now claim the person of ordinary skill would have followed, was controversial. Id.

Pirenperone has no anticholinergic activity. Meltzer Tr. 242:10-12, 248:9-13, [*661] 267:10-11. Indeed, the anticholinergic theory discounted the relevance of serotonin. Meltzer Tr. 245:5-8; PX 36 at 988.

There were numerous other theories in 1985 in addition to the dominant anticholinergic theory. These included: (1) dopamine 1 (D1) receptor, (2) norepinephrine, [**41] (3) GABA, and (4) glutamate. The D1 receptor and chemicals in the brain (norepinephrine, GABA, glutamate) were viewed as potentially causative of schizophrenia and researchers tried to find drugs that would antagonize them in order to treat it. Meltzer Tr. 242:13-243:1; McMillen Tr. 504:4-6.

Defendants point to a few papers that suggested that serotonin may play some role in schizophrenia. In particular, Defendants rely on a 1978 study by Dr. Josee Leysen (a Janssen scientist) in support of the idea that serotonin antagonism was important to develop an antipsychotic with reduced EPS and that a dopamine-serotonin theory would be followed by one of ordinary skill in the art in 1985. PX 98. But as Dr. Wolff conceded, there is no basis for that idea in the Leysen article. Nowhere does Leysen say anything about EPS or whether serotonin is good, bad, or indifferent for EPS. Wolff Tr. 632:6-9.

As reported in that article, Dr. Leysen simply analyzed a large number of antipsychotics. PX 98 at Table 2; Wolff Tr. 631:18-20. She determined that many antipsychotic drugs had antiserotonin properties, but concluded that "[t]he precise significance of the anti-serotonergic component of neuroleptics,    [**42]

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 80 of 109

Page 12

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

however, requires assessment of its clinical implications." PX 98 at 171; Wolff Tr. 632:1-5; 634:2-6. As this passage makes clear, Dr. Leysen had no understanding of the clinical relevance of serotonin. Meltzer Tr. 245:12-19.

Defendants also point to a few papers that postulate that antiserotonin properties might contribute to the reduction of EPS and invite further investigation. But even the proponents of serotonin recognized the anticholinergic theory as attractive. Wolff Tr. 626:11-13. At best, these isolated papers invite further experimentation so that the effects of serotonin could also be considered. [12]

> 12  For example, Anthony Sulpizio, et al., PX 38, wrote that clozapine's antiserotonin properties might contribute to its overall pharmacological profile, but he did not discount the need for anticholinergic properties. Meltzer Tr. 246:5:-18. Rather, Sulpizio called the anti-cholinergic theory "important": "[S]ome authors have suggested that clozapine's potent muscarinic blocking activity explains its lack of EPS liability.... [I]nvestigations into the anti-dopamine and anti-cholinergic activity of clozapine are obviously important in elucidating its overall pharmacological profile, our data suggest that the study of clozapine's anti-serotonin activity is of equal importance." PX 38 at 1445.
>
> Similarly, Dr. Lai, PX 37, wrote that "[w]hile the intrinsic anticholinergic activity hypothesis offers an attractive explanation for the lower EPS of thioridazine and clozapine, the possible role of serotonergic mechanism in this phenomenon is also worthy of consideration." PX 37 at 347; Wolff Tr. 626:6-10.

[**43]  None of the developing theories on serotonin dislodged the anticholinergic theory as the dominant theory in 1985. Meltzer Tr. 246:24-247:1.

Unlike the anticholinergic theory, the serotonin theory had s ignificant limitations. While the serotonin theory postulated that serotonin antagonism would reduce EPS, typical antipsychotics caused EPS despite their potent serotonin antagonism. There was no explanation for these observations. For example, chlorpromazine, a typical antipsychotic with a high incidence of EPS, had strong serotonin antagonism. Meltzer Tr. 247:2-14, 260:23-261:2; PX 98, p. 170 at Table 2.

[*662]  As a result, there was skepticism in the pharmaceutical industry about the value of serotonin antagonism. For example, from 1982 to 1986 Bristol-Myers and Defendants' expert Dr. McMillen were developing a serotonin agonist, not antagonist. McMillen

Tr. 502:15-21, 504:12-19, 505:1-19, 506:20-23. Additionally, Hoechst-Roussel did not even investigate the serotonin activity of the benzisoxazole compounds from the Strupczewski patent, PX 81, that Defendants rely on. Strupczewski Dep. (11/16/2004) Tr. 113:23-114:6, 115:9-20, 116:7-19.

The prior art demonstrates that the serotonin theory [**44] was just one of numerous theories, and that it was considered controversial. The articles cited by Mylan and DRL invite further investigation into the role of serotonin in reducing EPS; however, this is not a sufficient reason to select pirenperone--a serotonin antagonist with no anticholinergic activity--as a lead compound. "The prior art must be considered as a whole for what it teaches." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1166 (Fed. Cir. 2006).

Further, even if the serotonin theory were selected, that was no reason to pick pirenperone among the many possible dopamine-serotonin antagonists. Rather, as noted above, pirenperone would not be selected since it was known neither as an antipsychotic nor as an agent that reduced EPS.

Instead, a person of ordinary skill in the art in 1985 would follow the "conventional wisdom in the art," *Standard Oil, 774 F.2d at 454,* and use the anticholinergic theory in order to develop an improved antipsychotic with reduced EPS. Meltzer Tr. 267:4-14. That person of ordinary skill in the art following t he dominant anticholinergic theory would select compounds such as clozapine or thioridazine to develop [**45] an antipsychotic drug with reduced EPS. These drugs were known antipsychotics with potent anticholinergic properties. Meltzer Tr. 249:22-250:2. On the other hand, pirenperone would never be selected. Unlike clozapine, pirenperone is not an anticholinergic. Meltzer Tr. 242:10-12, 248:3-13, 267:10-11.

(3) Defendants Admit Using Hindsight to Choose Pirenperone

To avoid using hindsight, a proper obviousness analysis asks whether a person having ordinary skill in the art when "confronted with the same problems as the inventor *and with no knowledge of the claimed invention,* would select the elements from the cited prior art references for combination in the manner claimed." *In re Rouffet, 149 F.3d 1350, 1357 (Fed. Cir. 1998)* (emphasis added).

Almost any invention, no matter how nonobvious at the time, will appear obvious when looking backward from the solution. It is for that reason that "[c]are must be taken to avoid hindsight reconstruction *by using 'the patent in suit as a guide through the maze of prior art references,* combining the right references in the right way so as to achieve the result of the claims in suit.'" *Grain Processing Corp. v. Am. Maize-Prods. Co., 840*

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

*F.2d 902, 907 (Fed. Cir. 1988)* [**46] (citation omitted, emphasis added).

Mylan and DRL's experts admit that they went straight to pirenperone solely to advance their theory of obviousness, not because a person of ordinary skill in the art would choose pirenperone. McMillen Tr. 508:12-20; Wolff Tr. 621:14-622:11, 637:9-11. Dr. McMillen did not consider the known antipsychotics in the prior art and did not purport to offer an opinion as to why a person of ordinary skill in the art would have focused on pirenperone. Instead, he focused on pirenperone alone because it was close to the claims in the [*663] *'663 patent.* McMillen Tr. 501:12-502:3, 508:12-20 ("Q. And one of the reasons that you didn't go and consider setoperone was that pirenperone was closer to all of the claims in the *'663 patent* and setoperone wasn't as close to all of the claims in the *'663 patent.* Correct? A. Correct.").

Dr. Wolff, Defendants only expert to offer an obviousness opinion, was no different. He admitted he did nothing to learn about antipsychotic drug research in the early 1980s. Wolff Tr. 603:18-604:20. This is despite the fact that the prior art includes thousands of actual antipsychotic compounds, falling into numerous broad classes. Meltzer Tr. [**47] 249:7-21; PX 16. Dr. Wolff also said he did not know what drugs researchers were looking for to reduce EPS. Wolff Tr. 605:20-606:24. Instead, he testified that his analysis began and ended with pirenperone "because of its relationship to the claims of the patent." Wolff Tr. 614:17-21, 612:10-13, 637:9-11 On cross examination, Dr. Wolff was asked:

> Q. To summarize your approach so far in reaching your conclusion [on selecting a lead compound for your obviousness analysis], you looked at the structure of compound 11, you looked at the structure of the compound pirenperone, and you did the structural analysis.
>
> A. That's correct.

Wolff Tr. 548:20-24.

This use of the *'663 patent* as a guide was improper because one of ordinary skill in the art in 1985 would not have the benefit of starting from the *'663 patent,* in order to choose pirenperone. See *Yamanouchi, 231 F.3d at 1345.*

Mylan and DRL's failure to prove by clear and convincing evidence that the person of ordinary skill in the art in 1985 would have selected pirenperone in attempting to create a safe and effective atypical antipsychotic alone is sufficient to defeat their claims of obviousness. Nevertheless, [**48] the Court will describe below why Mylan and DRL have failed to demonstrate, even assuming choosing pirenperone would have been obvious, that it was obvious to modify it in such a way as to result in compound 11.

c. A Person of Ordinary Skill in the Art in 1985 Would Not Have Been Motivated to Modify Pirenperone's Ketone Group to Make it Long-Lasting

(1) It Would Not Have Been Obvious That Pirenperone Had a Short-Duration Problem

After choosing pirenperone, Mylan and DRL argue it would have been obvious to one of ordinary skill in the art in 1985 that it was short-lasting, requiring a patient to take it three times per day. This would have been an obvious problem for an antipsychotic drug, Defendants claim, because a patient with schizophrenia, suffering from its cognitive impairments, may not remember to take the drug that often. See Wolff Tr. 560:15-561:6.

Defendants rely on papers by Meltzer, DX 113, and Green, PX 25, to support their assertion that pirenperone was short-lasting. Green found that at low doses, pirenperone's ability to affect a particular test result in a rat lasted less than six hours. From this, Green concluded that pirenperone was "fairly short-lasting. [**49] " PX 25 at 577. The Meltzer paper, another rat study, looked at pirenperone's effects on hormonal secretion, and said nothing about pirenperone's duration at all. McMillen Tr. 511:14-23; PX 25; DX 113.

The first problem with these articles is that they provide rat data, not human data. Dr. McMillen agreed that "the duration of action of a[n antipsychotic drug] may be very different in rat and man[.]" [*664] McMillen Tr. 511:24-512:14; Meltzer Tr. 280:4-10. This is supported by prior art. DX 62 at 2213 ("It is known that the duration of action and oral absorption of neuroleptics may be very different in the rat and man.").

There are other issues associated with the articles that would cause one of ordinary skill not to focus on them. As for the Meltzer article, it does not describe pirenperone as having a short duration, even in rats. DX 113. The Green article does comment on pirenperone's duration, but the Court agrees with Dr. Meltzer's assessment that it would have been discounted by one of ordinary skill for a few reasons. Specifically, Green did not (1) show the data, (2) show the standard error, (3) report how many animals were studied, or (4) study time intervals between 60 minutes [**50] and six hours. Given these defects, there was not much to be learned from Green -- and the person of ordinary skill would not have relied on it to conclude that pirenperone was short acting in humans. Meltzer 278:17-279:1, 279:15-280:3; PX 25 at 575.

The second problem with Defendants' approach is that it looks at the rat data to the exclusion of any other

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 82 of 109

Page 14

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

references, such as the extremely relevant and important *human* test data.

In examining the prior art to see what it teaches a person of ordinary skill, references cannot be read in isolation. Instead, they must be read in light of what they fairly teach in combination with the prior art as a whole. Mylan and DRL cannot pick and choose among the prior art references. See, e.g., *In re Merck & Co., 800 F.2d 1091, 1097 (Fed. Cir. 1986).*

When all of the prior art available in March 1985 -- and not just the rat data relied on by Defendants -- is considered, it shows that pirenperone was acceptable for human use without modification. Janssen was going forward with clinical studies of pirenperone in humans using three times a day dosing. Wolff Tr. 646:14-21; PX 202; PX 96; PX 22. No suggestion was made in any of Janssen's [**51] studies with pirenperone in humans that its duration was inadequate. No suggestion was made that pirenperone should be modified in any way.

This is not surprising considering, first, the fact that a drug is dosed three times a day in clinical trials does not indicate that it could not be dosed on a less frequent schedule after full testing, particularly in antianxiety drugs. Meltzer Tr. 281:9-20. Second, three times a day dosing has been shown to be perfectly acceptable for antipsychotic drugs. Testimony from the only two expert witnesses who are medical doctors that prescribe antipsychotics, stated that haloperidol, the leading antipsychotic drug at the time, was dosed three times a day. Meltzer Tr. 281:21-24; Tamminga Tr. 50:17-20, 72:17-19; see also Wolff Tr. 648:5-11.

Defendants' experts admitted they lacked the expertise to challenge this point. Wolff Tr. 647:16-23; McMillen Tr. 502:4-11. Dr. Wolff conceded that it was not a necessity, but only a choice, to change the dosing on a drug proven effective at three times a day. Wolff Tr. 649:17-20.

This is especially true given that compound modification is an uncertain process that can easily result in reduced efficacy or safety [**52] issues. Wolff Tr. 650:8-13, 651:4-8. By Dr. Wolff's own estimate, a compound modification results in a desirable change only five to 10 percent of the time. Wolff Tr. 651:16-24. With that level of risk and uncertainty and with three times a day dosing a medically acceptable alternative, Mylan and DRL failed to provide clear and convincing evidence that a person of ordinary skill would conclude that pirenperone [*665] had a short-duration problem that could only be solved by modifying its molecular structure.

In sum, it would not have been obvious to the person of ordinary skill in the art in 1985 that pirenperone was short-lasting and that this was a problem requiring a modification of its molecular structure.

**(2) Even if Pirenperone's Duration Was a Problem, It Would Not Have Been Obvious That Metabolism at its Ketone Group Was the Cause**

As stated above, pirenperone is structurally identical to compound 11 except pirenperone has a ketone group where compound 11 has a benzisoxazole group. Wolff Tr. 547:8-548:24. Mylan and DRL claim that it would have been obvious to the person of ordinary skill in 1985 that pirenperone's short duration was due to metabolism [13] at this ketone group. [**53]

> 13 The term "metabolism" comprises the sum of the physical and chemical processes in an organism by which its material substance is produced, maintained, and destroyed, and by which energy is made available. See Pl.'s FF&CL, app. A.
>
> The liver is responsible for metabolizing foreign substances that enter the body, like pharmaceuticals. The liver "[t]ries to get rid of drugs, anything foreign in the body. that is not normally, should be there, the job of the liver is to either make it more soluble, cut it apart, get rid of it, make it nontoxic, if possible." Abraham Tr. 387:22-25. Certain drugs are metabolized, and others are not. Id. at 388:3-4.

Again, the Court disagrees. Even were the Court to assume that pirenperone had a short-duration problem, and that modifying the compound was the solution, Mylan and DRL have failed to provide clear and convincing evidence that it would have been obvious that metabolism at the ketone was the problem.

It was not known in 1985 that pirenperone metabolized, let [**54] alone that it metabolized at the ketone. Abraham Tr. 386:5-10. Because there is no teaching in the prior art that pirenperone had a metabolism issue at the ketone, the person having ordinary skill who follows conventional wisdom would not assume the problem was at the ketone. See *Standard Oil, 774 F.2d at 454.*

If one concluded that pirenperone was short acting in humans, the problem could be due to any number of factors, such as absorption, distribution, metabolism, or excretion. Abraham Tr. 385:5-386:4. This point does not appear to be disputed. Defendants' expert Dr. McMillan agreed that short action could be due to at least either metabolism or excretion, if not also absorption and distribution. McMillen Tr. 494:12-22.

Green, PX 25, the principal reference upon which Defendants rely for pirenperone's alleged deficiencies, said nothing about the ketone in pirenperone. Abraham Tr. 384:15-22. Furthermore, it said nothing about pirenperone's metabolism. Abraham Tr. 384:19-22. From

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

Green, nothing at all can be concluded about the reasons for pirenperone's alleged short duration. Abraham Tr. 385:5-8.

If pirenperone's alleged short duration was due to metabolism, it [**55] is undisputed that it could metabolize at numerous places. Abraham Tr. 386:11-19, 387:14-20, 388:10-13; McMillen Tr. 495:19-496:14. Of the possible positions for metabolism, no position is more likely than any other. Abraham Tr. 388:14-20.

Mylan and DRL rely on the metabolism of other compounds to attempt to demonstrate the obviousness of pirenperone's alleged short activity. But none of the cited references provides the clear and convincing evidence Defendants need. For example, [*666] Defendants examine the metabolism of ketanserin and haloperidol to infer that pirenperone's ketone could be reduced to an alcohol and could result in a short acting compound. But there was no reason for one of skill in the art in 1985 to make that inference. As Dr. Wolff admitted, although the antipsychotic drug haloperidol and the hypertensive drug ketanserin had ketones that metabolized to an alcohol, they were both successful commercial products. Wolff Tr. 648:5-8, 652:20-653:3.

Moreover, although ketanserin metabolizes at the ketone to an alcohol, it is then metabolized back to the ketone, which makes ketanserin very long-acting. Abraham Tr. 390:23-391:9, 446:5-25; PX 174 at 342 ("In view of these results [**56] it is likely that the terminal ketanserin half-life of 15h is related to slow ketanserin regeneration from the metabolite ketanserin-ol.").

Similarly, Defendants rely on the Bachur article, PX 26, to contend that ketones metabolize. But Bachur does not predict which ketones are reduced to alcohols. It simply states that reduction to alcohols is a possibility. Abraham Tr. 389:4-8; PX 26. More importantly, Bachur emphasizes that when reduced to alcohols, most ketone-containing compounds usually retain pharmacological activity. Abraham Tr. 389:9-12, 389:22-390:2; PX 26 at 597 ("The alcohol metabolites resulting from carbonyl [ketone] reduction of drugs usually retain pharmacological activity."). Thus, after reading Bachur's conclusion that, if metabolized, drugs having ketones retain pharmacological activity, and considering the numerous successful drugs a person of ordinary skill in the art would be aware of that had ketones, that person would not conclude that pirenperone's ketone was necessarily a part of the molecule that needed to be removed or modified.

Taken as a whole, none of the cited references would convince the person of ordinary skill in the art that metabolism at the [**57] ketone was causing pirenperone to be short acting. For this reason as well, Mylan and DRL have failed to make out a clear and convincing case of obviousness.

d. Defendants' Solution to Pirenperone's Alleged Duration Problem Would Not Have Been Obvious to the Person of Ordinary Skill in the Art in 1985

A further flaw in Mylan and DRL's obviousness case is their proposed solution to pirenperone's alleged short-acting problem. If one of ordinary skill in the art wished to eliminate pirenperone's ketone to create a new, long-acting compound, that person would not have changed the ketone to a benzisoxazole.

(1) A Sustained Release Forumulation Would Have Been a More Obvious Solution

If there was a known problem with pirenperone's duration, one of ordinary skill in 1985 would have avoided modifying its chemical structure, because such modifications are risky and uncertain. It is undisputed that they can result in loss of efficacy or introduce safety issues. Wolff Tr. 650:8-13.

According to Defendants' expert Dr. Wolff, only three or four out of hundreds of modifications lead to a commercial product. Wolff Tr. 651:1-8. Dr. Wolff later described a reasonable expectation of success [**58] that a modification would result in a commercial product as on the order of five to 10 percent. Wolff Tr. 651:9-24. Even using Dr. Wolff's estimate, the expectation of success from structural modification was unreasonably low in 1985. [14]

> 14 Cf. Abraham Tr. 374:3-8 ("Q. So what would a person of ordinary skill in the art expect to happen if they made one of these changes, would they expect to have a successful drug? A. There would be ... no reasonable expectation you would come up with a drug using this method.").

[*667] Given these low odds, it is far more reasonable to expect the person of ordinary skill to pursue one of a number of other safer solutions then available to develop a longer-acting compound. These other solutions included controlled (or extended) release. Abraham Tr. 392:9-23; Wolff Tr. 649:8-16; Meltzer Tr. 282:10-12. By making a controlled or extended release formulation, one would use the same compound, thus avoiding the uncertain risk associated with compound modification.

A number of technologies [**59] existed in March 1985 for making controlled or extended release products: persons of ordinary skill in the art could develop a depot (long lasting) injection, a controlled release capsule (such as Contac) or a transdermal patch. Abraham Tr. 392:11-23; Wolff Tr. 649: 8-16; Meltzer Tr. 282:10-12.

Defendants do not dispute the availability of these other solutions. Moreover, Defendants offered no testimony to explain why one of ordinary skill in the art

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

would not pursue these solutions, instead of modifying pirenperone.

(2) It Would Not Have Been Obvious to Replace the Ketone With a Benzisoxazole

If the person of ordinary skill in the art wanted to modify pirenperone, he or she would have looked to the most common methods of altering a molecule: classical isosteric replacements.

Classical isosteric replacement follows Grimm's hydride displacement law. Abraham Tr. 370:12-371:2. Standard isosteric replacements for ketones were available and well-known in and prior to 1985. Abraham Tr. 372:2-6, 372:15-24, 394:20-395:18; Wolff Tr. 658:2-6. These standard replacements, when applied to pirenperone, would have resulted in changes well-recognized in the prior art, Strupczewski Dep. (11/16/2004) [**60] Tr. 155:8-24, and in standard textbooks, PX 141 at 75, PX 158 at 3151.

One of ordinary skill in the art would choose one of these standard replacements, not the replacement of a ketone with benzisoxazole. Abraham Tr. 395:24-396:11. Defendants' experts provided no testimony -- let alone clear and convincing evidence -- why these standard replacements would not be pursued first.

Alternatively, one could make "non-classical bioisosteric" replacements. Abraham Tr. 369:7-24. A bioisosteric replacement is a change that is believed to act with the same biological system. Such changes are much riskier than classical isosteric replacements. There is no guarantee that the changed compound will have the same activity as the original compound. Rather, the changed chemical compound could have the same activity, the opposite activity, or no activity at all. Abraham Tr. 369:25-370:10; PX 141 at 73.

There are numerous problems with bioisosteric replacement as an approach to drug modification. First, there was no reasonable expectation in 1985 that bioisosteric replacement would work. Abraham Tr. 374:3-8.

Second, there was no reasonable expectation in 1985 that bioisosteres would bind to the same [**61] receptor. Abraham Tr. 374:10-13.

Third, for bioisosteric replacements there are different degrees of binding even [*668] to the same receptor. Abraham Tr. 375:14-17. Or activity on the same receptor can be opposite after a bioisosteric change, such that one chemical compound is an agonist and a compound that is a bioisostere is an antagonist. Abraham Tr. 377:9-19.

Fourth, bioisosteric replacement can also cause issues with absorption, distribution, metabolism, and excretion ("ADME"). Abraham Tr. 377:20-379:6;

379:11-14. These ADME issues can come into play as soon as the drug is given, while the drug is on the receptor, or after it is on the receptor. Abraham Tr. 379:20-25.

Fifth, bioisosteric replacement can cause different results in different animals. Abraham Tr. 380:2-5.

Sixth, even knowing the three-dimensional structure of receptors, one cannot predict which bioisosteres will be active. Abraham Tr. 381:11-14.

Defendants' experts did not offer evidence that contradicted Professor Abraham's testimony on these problems that generally occur with bioisosteric replacement.

Notwithstanding these problems, there were in 1985 a few known and recognized bioisosteric replacements. Abraham [**62] Tr. 394:20-396:11, 425:10-426:7. Defendants ignore these recognized replacements and insist that it was obvious to use an unrecognized non-classical bioisosteric replacement, one that just happens to be the only replacement that modifies pirenperone to arrive at Defendants' desired result, compound 11. Such a decision is not based on the science; it is the result of inappropriate hindsight.

Defendants propose replacing the ketone with a benzisoxazole, a modification that requires that two extra atoms be added, and that a new ring be formed, to transform pirenperone into compound 11. Abraham Tr. 429:13-22.

As of March 1985, this substitution was not recognized in the art. Abraham Tr. 396:12-17. As of 1985, the benzisoxazole-for-ketone swap appeared in no standard reference as a bioisosteric replacement. Wolff Tr. 659:16-23, 661:8-12.

Instead of looking in standard texts, Mylan and DRL rely on inferences from publications that say nothing about bioisosteric replacement, most of which do not even involve antipsychotics. None of the cited literature describes benzisoxazole as a bioisosteric replacement for a ketone. Instead, Defendants merely infer it. Wolff Tr. 664:1-4, 667:9-16.

[**63] In fact, a person of ordinary skill would consider none of the cited references because (1) they do not discuss bioisosteric replacements, (2) they do not address the problem Defendants identify of making a compound longer-lasting, and/or (3) they are from the wrong field.

Defendants principally rely on the Strupczewski work at Aventis (then Hoechst-Roussel Pharmaceuticals). This work included an abstract, PX 191, and the '811 patent, PX 81. These references simply reported Hoechst's work on antipsychotic compounds. There is not a word in these references about modifying

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 85 of 109

Page 17
456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

the structures disclosed in them. Wolff Tr. 662:9-11, 663:9-15, 16-25; Abraham Tr. 398:1-15; PX 191; PX 81.

The other references cited by Defendants, the Saunders article, PX 195, and Shutske article, PX 192, are even less relevant. Those articles do not relate to antipsychotics. Abraham Tr. 396:21-25; Wolff Tr. 665:2-7. Instead, Shutske, PX 192, is about diuretics and Saunders, PX 195, concerns anti-inflammatory agents. Janssen argues that Saunders and Shutske are non-analogous references and thus, are [*669] not relevant. See e.g., *Litton Sys., Inc. v. Honeywell, Inc., 87 F.3d 1559, 1568 (Fed. Cir. 1996).* [**64]

The Court need not decide this question because even assuming these articles are analogous prior art, they still would not direct the person having ordinary skill in the art to make the change Mylan and DRL propose. As with the Strupczewski work, Saunders and Shutske, PX 195 and PX 192, contain no discussion on bioisosterism. Abraham Tr. 397:15-25; Wolff Tr. 664:21-23. Nor do they talk about benzisoxazoles being a bioisosteric replacement for a ketone. Wolff Tr. 664:24-665:1.

As stated earlier, when a chemical compound is at issue, "a prima facie case of obviousness requires 'structural similarity between claimed and prior art subject matter . . . where the prior art gives reason or motivation to make the claimed compositions.'" *Yamanouchi, 231 F.3d at 1343* (quoting *Dillon, 919 F.2d at 692*). Mylan and DRL have failed to demonstrate that the prior art would have motivated the person of ordinary skill in the art in 1985, with no knowledge of the *'663 patent,* to (1) choose pirenperone as his or her lead compound, (2) determine that pirenperone was deficient due to its alleged short duration, (3) determine that this problem was due to metabolism of a [**65] ketone, and (4) determine that this problem could be solved by replacing the ketone with a benzisoxisole with any kind of reasonable expectation of success. Accordingly, Defendants have failed to present a prima facie case of obviousness.

### 4. Secondary Considerations: Objective Evidence of Nonobviousness

An obviousness analysis requires a Court to also examine objective evidence of nonobviousness in the record. *Graham, 383 U.S. at 17-18; Ruiz v. A.B. Chance Co., 234 F.3d 654, 667 (Fed. Cir. 2000).* Such objective evidence includes, *inter alia,* commercial success, long felt, but unsolved need, the failure of others, copying, and unexpected results. *Graham, 383 U.S. at 17-18; Ruiz, 234 F.3d at 662-63, 667.*

Defendants insist that there is no need for them to refute the secondary considerations with respect to risperidone. Rather, Defendants insist that they can focus their obviousness case solely on compound 11.

This is legally incorrect. The fact that risperidone was chosen for further commercialization while compound 11 was left as a back-up drug does not mean that evidence regarding risperidone's commercial [**66] success is irrelevant. It is entirely appropriate, as the Federal Circuit has held, for the patent owner to point to secondary considerations with respect to any commercial embodiment of the claim. *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc., 98 F.3d 1563, 1570 (Fed. Cir. 1996);* see also See *Jackson Jordan, Inc. v. Plasser Am. Corp., 747 F.2d 1567, 1578 (Fed. Cir. 1984)* ("The claims [of a patent], not particular embodiments, must be the focus of the obviousness inquiry.").

Both parties agree that the commercial embodiment of the *'663 patent*, Risperdal, is risperidone and is encompassed by each and every claim of the *'663 patent* in addition to compound 11. SF 17. Thus, secondary considerations with respect to risperidone are relevant here.

Objective evidence of nonobviousness "may often be the most probative and cogent evidence in the record." *Stratoflex Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed Cir. 1983).* Indeed, secondary considerations "may be sufficient to overcome a prima facie case of obviousness." *In re Beattie, 974 F.2d 1309, 1313 (Fed. Cir.* [*670] *1992).* Of course, here, Mylan [**67] and DRL have failed to make out a prima facie case. Nevertheless, the Court will examine the secondary considerations, as it must.

### a. Commercial Success

Commercial success of an invention is evidence that it would not have been obvious. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd., 851 F.2d 1387, 1391-92 (Fed. Cir. 1988).* Risperidone, sold as Risperdal, is an incredible commercial success. Sales have increased every year since it was first sold in 1994, and it experienced double digit growth in most years. PX 414; PX 730; Vergis Tr. 77:6-10.

Within three years it became the most prescribed antipsychotic, quickly overtaking clozapine (sold as Clozaril) and haloperidol (sold as Haldol). PX 744; Vergis Tr. 78:17-79:9.

Today, a decade after launch, it is still the second most prescribed antipsychotic. PX 417; PX 673; Vergis Tr. 79:18-80:10; Tamminga Tr. 55:19-56:5; Meltzer Tr. 283:4-22.

Risperdal has been used to treat at least five million people. Meltzer Tr. 283:4-22. Last year, Risperdal was Johnson & Johnson's largest product, accounting for just under $ 3 billion in worldwide sales. Vergis Tr. 78:9-16.

### b. Long Felt, But Unsolved Need

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

Evidence of [**68] a long-felt but unsolved need in the industry for the solution offered by the patented invention supports a finding that the invention would not have been obvious at the time the invention was made. *Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH, 139 F.3d 877, 884 (Fed. Cir. 1998).* "[L]ong-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem." *Texas Instruments Inc. v. ITC, 988 F.2d 1165, 1178 (Fed. Cir. 1993).*

In this case it is undisputed that there was a long-felt but unsolved need for a safe, atypical antipsychotic that did not cause EPS or TD from at least the 1960s until 1985 and beyond. Tamminga Tr. 49:19-50:16, 51:1-52:5; Meltzer Tr. 283:4-22; Wolff Tr. 648:18-20.

The invention and eventual approval of Risperdal solved this long felt, but unfilled need. Risperidone was the first compound available to physicians for general use that safely combined the efficacy of a typical antipsychotic with reduced EPS. Its development "has been very exciting to the medical field." Tamminga Tr. 52:25-53:13, 53:23-54:2; Meltzer Tr. 253:17-20, 254:14-255:9.

c. Failure of Others

[**69] Evidence of failed attempts by others supports a finding that the patented invention would not have been obvious. *Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1285 (Fed. Cir. 2000).*

From the discovery of clozapine in the late 1960's through 1985, the scientific community was unsuccessful in developing an antipsychotic with reduced EPS for general use. Meltzer Tr. 253:13-16. During that time period, many pharmaceutical companies made such attempts. For example, Dr. McMillen worked with Bristol-Myers to develop an atypical antipsychotic. McMillen Tr. 504:12-25. Yet no approved drug resulted from those years of research.

Many pharmaceutical companies identified promising atypicals, such as fluperlapine, remoxipride, and serotonyl, that all failed to result in an approved drug -- until risperidone. Meltzer Tr. 282:22-283:3.

Most telling is the work of Hoechst-Roussel. Beginning in the 1970s, [*671] Hoechst-Roussel had a program to develop improved antipsychotic drugs with reduced EPS. Strupczewski Dep. (11/16/2004) Tr. 101:2-21, 151:2-12, 198:4-199:16.

As part of this program, Hoechst-Roussel developed compounds relied on by Defendants -- the Strupczewski [**70] *'811 patent,* PX 81, and abstract, PX 191. Strupczewski Dep. (11/16/2004) Tr. 151:14-152:15, 105:12-23, PX 81, PX 191.

One of the Hoechst-Roussel compounds that

Defendants rely on is HRP-913. Hoechst-Roussel filed an Investigational New Drug Application ("IND") with the FDA to conduct clinical trials on HRP-913, but those trials were a failure. Strupczewski Dep. (11/16/2004) Tr. 213:8-24, 188:16-21. HRP-913 caused marked adverse side effects in healthy volunteers on whom it was tested and had little useful therapeutic effect. Strupczewski Dep. (11/16/2004) Tr. 217:24-218:22; Strupczewski Dep. (11/17/2004) Tr. 27:8-18, 28:11-30:2. As a result, Hoechst-Roussel discontinued its development. Strupczewski Dep. (11/17/2004) Tr. 11:10-16, 21:2-13; Meltzer Tr. 252:22-253:12.

Similarly, in the early 1980s, Hoechst-Roussel developed a chemical compound it called HR 592. Strupczewski Dep. (11/17/2004) Tr. 39:11-23. Hoechst-Roussel believed that HR 592 would have useful antipsychotic properties and the company submitted an IND to investigate HR 592 in humans. Strupczewski Dep. (11/17/2004) Tr. 42:2-21, 47:13-48:10, 50:21-51:11. But, as with HRP-913, HR 592 was not effective against schizophrenia [**71] in patients. To the contrary, it exacerbated patients' symptoms, and one patient even committed suicide when administered HR 592. Strupczewski Dep. (11/17/2004) Tr. 61:10-18, 69:24-70:8. As a result, Hoechst-Roussel discontinued development of HR 592. Strupczewski Dep. (11/17/2004) Tr. 73:2-74:7.

To this day, Hoechst-Roussel (now Aventis) has never succeeded in bringing an antipsychotic drug to market. Strupczewski Dep. (11/16/2004) Tr. 108:9-15.

The evidence establishes that there was a failure of others to develop a safe, atypical antipsychotic prior to the time Janssen filed its risperidone patent application.

d. Copying

Copying the patented invention is also evidence that the invention would not have been obvious. *Dow Chem. Co. v. American Cyanamid Co., 816 F.2d 617, 622 (Fed. Cir. 1987).*

Janssen received certification letters from ten different generic manufacturers that they filed ANDAs with the FDA in order to market generic risperidone products. Vergis Tr. 82:2-15; Meltzer Tr. 283:4-22. There has been undisputed copying of risperidone, a compound covered by the claims of the *'663 patent.*

e. Respect by the Industry

Respect for the industry for [**72] the validity of the patent is also evidence of nonobviousness. E.g., *WMS Gaming, Inc. v. Int'l. Gaming Tech., 184 F.3d 1339, 1359 (Fed. Cir. 1999)* ("Objective evidence of nonobviousness may include . . . licenses showing industry respect.").

Of the ten companies that have sought permission from the FDA to market a generic risperidone product,

Page 19

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

six have respected the validity of the *'663 patent* and have not asked for permission to sell their products before the expiration of the patent. Vergis Tr. 82:9-13; PX 75, PX 76, PX 77, PX 78, PX 85; PX 396.

**[*672] f. Acclaim**

Appreciation of the invention is further evidence that the invention would not have been obvious. E.g., *Vulcan Eng'g Co. v. FATA Aluminum, Inc., 278 F.3d 1366, 1373 (Fed. Cir. 2002); In re Piasecki, 745 F.2d 1468, 1473-74 (Fed. Cir. 1984).*

Risperdal and its active ingredient risperidone have received numerous awards from the industry. Vergis Tr. 81:2-4. In 1995, Risperdal received the Prix Galien awards in Canada and France. Vergis Tr. 81:5-18. In 1996, Risperdal received the International Prix Galien. The International Prix Galien is the pharmaceutical industry's equivalent [**73] to the Nobel Prize. Vergis Tr. 81:5-18; Meltzer Tr. 283:4-22.

And in 2005, Kennis, one of the inventors of the *'663 patent*, was named a Hero of Chemistry by the American Chemical Society. The Heroes of Chemistry program recognizes "the vital role of industrial chemical scientists and their companies in improving human welfare through successful commercial innovations and products." Kennis received this award "for the development of Risperidal [sic], a standard in the treatment of psychosis, revolutionizing antipsychotic treatments." PX 309; Vergis Tr. 81:5-82:1.

Additionally, Risperdal has had a tremendous effect on the patients who have taken it, and their families. Risperdal gets schizophrenic patients back into the work place and allows them to reintegrate themselves into their families and society. Ken Steele authored a memoir, The Day the Voices Stopped, PX 68, in which he describes his struggle with schizophrenia and the dramatic impact Risperdal had on his life. Vergis Tr. 84:22-85:24; Tamminga Tr. 54:6-55:18. See also PX 67 at 381.

g. Unexpected Results

The final relevant secondary consideration is unexpected results. Unexpected superior properties of an invention [**74] support the conclusion that the invention was not obvious to one of ordinary skill in the art. *Knoll Pharm. Co. v. Teva Pharms. USA, Inc., 367 F.3d 1381, 1385 (Fed. Cir. 2004).* In making this determination, the Court should look at the evidence from both before and after the patent application was filed. Id.

Risperidone was the first antipsychotic drug available for general use whose antipsychotic activity was equivalent to a typical antipsychotic but that did not cause significant EPS. Meltzer Tr. 253:17-254:9.

Risperidone had a number of unexpected benefits:

(1) cognitive improvements, (2) improvement in negative symptoms, (3) reduction in tardive dyskinesia and (4) less metabolic side effects. Typical antipsychotic drugs either did not improve the cognition of schizophrenic patients or they made it worse. They also did not improve the negative symptoms of schizophrenia (social withdrawal, lack of motivation). By contrast, risperidone improved the cognition of schizophrenic patients. It also showed modest improvement of negative symptoms and did not have the disabling sedation of typical antipsychotic drugs. In addition, risperidone reduced both the frequency [**75] of tardive dyskinesia and its symptoms. Also, after subsequent atypical antipsychotic drugs were developed, it was discovered that they cause weight gain and increase the risk of diabetes and cardiovascular disease. Risperidone, by contrast, produces minimal side effects of this kind. Meltzer Tr. 254:14-255:9; PX 46; PX 50; PX 51; PX 54.

5. Defendants Have Failed to Prove Obviousness of the *'663 Patent*

In sum, Mylan and DRL have failed to demonstrate that the prior art gave reason or motivation to one of ordinary skill in the [*673] art to create the claimed compositions. In addition, the secondary considerations overwhelmingly demonstrate the nonobviousness of the *'663 patent* . Mylan and DRL have therefore failed to meet their burden of proving by clear and convincing evidence that the *'663 patent* is obvious under *35 U.S.C. § 103(a).*

IV. Inequitable Conduct

"Patent applicants and those substantively involved in the preparation or prosecution of a patent application owe a 'duty of candor and good faith' to the PTO." *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., 439 F.3d 1335, 1339 (Fed. Cir. 2006)* (quoting *37 C.F.R. § 1.56(a) (2004)* [**76] ). Breaching this duty can constitute "inequitable conduct," which renders the patent unenforceable. *Id. at 1340.*

There are three steps in the inequitable conduct analysis. See *Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1359 (Fed Cir. 2003).* First, there must have been a "misrepresentation or omission of a material fact." Id. Second, the misrepresentation or omission must have been made "with an intent to deceive the PTO." Id. Materiality and intent to deceive must be shown by clear and convincing evidence. Id. Third, assuming the first two requirements have been met, "the district court must determine whether the equities warrant a conclusion that the patentee has engaged in inequitable conduct." Id. (citing *Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).* [15]

> 15    See also 06-1002, *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro, Nos. 05-1479,*

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 88 of 109

Page 20

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

*1480, 464 F.3d 1339, 2006 U.S. App. LEXIS 24246, at *12 (Fed. Cir. Sept. 25, 2006)* ("Even when a court finds that the patentee failed to disclose material information to the PTO and acted with deceptive intent, the court retains discretion to decide whether the patentee's conduct is sufficiently culpable to render the patent unenforceable.").

[**77] Mylan [16] argues that Janssen withheld material information concerning the dopamine antagonism of pirenperone from the PTO during its prosecution of the *'663 patent*, and that it did so intentionally. Mylan's arguments focus on the representations made by Janssen patent attorney Geoffrey Dellenbaugh, who prosecuted the *'663 patent*, CEO Paul Janssen, and scientist Dr. Frans Awouters.

> 16 DRL does not join Mylan in alleging Janssen engaged in inequitable conduct.

A. Materiality

Under the regulations in place during prosecution of the *'663 patent*, "information is material where there is a substantial likelihood that a reasonable patent examiner would consider it important in deciding whether to allow the application to issue as a patent." *37 C.F.R. § 1.56(a) (1984)*. This is often referred to as "the *Rule 56* standard." *Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1363-64 (Fed. Cir. 2003); Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1313-19 (Fed. Cir. 2006).* [**78]

Materiality does not require that any withheld information, if it had been provided, would have resulted in a rejection of the patent claims by the patent examiner. On the contrary, information can be "material" even if a patent examiner would find the claimed invention to be patentable after considering such information. See *Digital Control Inc. v. Charles Machine Works, 437 F.3d 1309, 1313-19 (Fed. Cir. 2006).*

Mylan claims that prior art regarding the dopamine antagonism of pirenperone was material information that Janssen failed to disclose to the PTO during the *'663 patent* prosecution. While the *'870 patent* for pirenperone was disclose d [*674] to the PTO, and it only discloses pirenperone's activity as a serotonin antagonist. PX 81, Dellenbaugh Tr. 138:9-19. Specifically, Mylan points to seven prior art papers, three of which were co-authored by Dr. Janssen, and one which was co-authored by Dr. Awouters. These papers allegedly disclose pirenperone's effectiveness as a dopamine antagonist. DX 86, 89, 112, 120. Among these references are the results of Janssen's clinical trials of pirenperone performed in humans. DX 116, 102.

Mylan's assertion that pirenperone's dopamine

[**79] antagonism was material rests on communications between Janssen and the PTO during the *'663 patent's* prosecution. The PTO initially rejected the claims of the application as obvious over *U.S. Patent No. 4,335,127* ("the *'127 patent*" or "the Vandenberk patent"), PX 223, which disclosed a Janssen compound called ketanserin, in view of *U.S. Patent No. 4,352,811* ("the *'811 patent*" or "the Strupczewski patent"), a patent owned by Hoechst-Roussel, PX 81. PX 2 at 113; Dellenbaugh Tr. 129:15-20. The examiner claimed that it would have been obvious to combine the two in order to produce a compound within the claims of the pending application. Dellenbaugh Tr. 163:9-19, DX 173. Dellenbaugh, on behalf of Janssen, replied that a motivation to combine would not exist with respect to the Vandenberk patent because the compounds claimed therein did not possess antipsychotic activity. Dellenbaugh Tr. 165:21-25; DX 176, at 4-5. Dellenbaugh claimed that this was so, in part, because ketanserin "does not antagonize apomorphine [17]-induced agitation in rats . . . as do the compounds claimed" in the application that would eventually become the *'663 patent*. DX 176, at 5-6; see also DX 178, at 1.

> 17 Apomorphine is used in testing as a surrogate for dopamine because it is more chemically stable, but will still bind to dopamine receptors. Thus, a test compound that functions to inhibit the ability of apomorphine to bind to a dopamine receptor will also inhibit the ability of dopamine to bind to that same receptor, i.e., it will function as a dopamine antagonist. Wolff Tr. 543:2-544:13.

[**80] Additionally, Janssen submitted a declaration by Dr. Awouters comparing ketanserin's apomorphine test results with those of risperidone. DX 178. Janssen's submissions apparently satisfied the PTO, as it passed its application to issue, resulting in the *'663 patent*. PX 2. Mylan claims this interaction demonstrates the materiality of dopamine antagonism.

It is clear however, that the material issue for the examiner in the above correspondence was antipsychotic activity, not dopamine antagonism per se. The PTO's initial rejection of Janssen's application rested on its belief that the compounds of the *'127 and '811 patents* had antipsychotic activity: "Since the compounds of both the above references have 'antipsychotic' activity it would not be unreasonable to expect the product to also possess 'antipsychotic' activity." PX 2 at 114; Dellenbaugh Tr. 129:21-130:8. The PTO made no mention of pirenperone or dopamine antagonism. Dellenbaugh Tr. 130:9-11.

Dellenbaugh's response focused on Janssen's belief that the compounds in the *'127 patent* were not antipsychotics, PX 2 at 123-24, and submitted the data

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

contained in the Awouters declaration to corroborate this claim. PX 2 at 187; see [**81] also PX 2 at 195-197.

While it is true that this data relied on ketanserin's lack of dopamine antagonism to support this conclusion, dopamine antagonism with regard to pirenperone was not similarly relevant because pirenperone is demonstrably not an antipsychotic in humans.

[*675] As the examiner knew from the pirenperone patent itself, pirenperone was not claimed to be an antipsychotic compound. PX 80.

Defendants rely solely on the fact that pirenperone is a dopamine antagonist for their argument that pirenperone is an antipsychotic. But, as Dr. Meltzer testified, being a dopamine antagonist does not mean that a compound will be an antipsychotic. Instead, there are many reasons why a compound could act as a dopamine antagonist and not be an antipsychotic. Meltzer Tr. 275:25-276:17. It is for that reason that companies such as Janssen developed, used, and published additional tests to determine whether a compound would be an antipsychotic. Meltzer Tr. 271:18-272:19.

Janssen tested pirenperone with these additional tests. The studies and their published results demonstrated that pirenperone, in contrast to setoperone, was not effective as an antipsychotic. Meltzer Tr. 271:18-272:19, [**82] 273:12-275:5; McMillen Tr. 509:16-510:22; PX 94/DX 141; PX 388; PX 389.

Pirenperone had failed two standard tests for antipsychotics, it was being studied in humans for anti-anxiety, not as an antipsychotic, and it was reported in the literature not to be an antipsychotic. Wolff Tr. 638:23-639:5, 641:6-8, 641:18-20; McMillen Tr. 511:8-10; Meltzer Tr. 269:5-8; PX 22; PX 94; PX 96; PX 202; PX 388; PX 389.

Far from supporting any theory of obviousness, disclosure of more information about pirenperone would only have further demonstrated its lack of materiality. The additional pirenperone information teaches away from the invention, not towards it. *Halliburton, 925 F.2d 1435, 1441* (finding information in reference that taught away from the invention non-material).

Mylan has failed to present clear and convincing evidence that prior art regarding pirenperone's dopamine antagonism was material.

B. Intent to Deceive

Even if there were a material omission, there is no clear and convincing evidence that anyone acted with an intent to deceive the PTO. Without an intent to deceive, there can be no inequitable conduct. *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed. Cir. 1988).* [**83] Even grossly negligent failures

to disclose material information are not sufficient to render an otherwise valid patent unenforceable. *Id. at 876.*

In ascertaining intent, the court must consider the totality of the circumstances. Id. This includes any evidence of good faith, which militates against a finding of intent to deceive. Id.

"Intent need not, and rarely can, be proven by direct evidence." See *Merck & Co., Inc. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1422 (Fed. Cir. 1989).* Instead, an intent to deceive may be inferred from a failure to credibly explain a "*knowing* failure to disclose material information." *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1354 (Fed. Cir. 2005)* (emphasis added).

1. Dr. Paul Janssen

With respect to patents in which he was not an inventor -- such as the *'663 patent* -- Dr. Janssen's role was simply to request the Janssen patent department to begin preparing applications when the scientific research had reached the appropriate point. Dellenbaugh Tr. 106:1-7. He was not involved in the prosecution of patents filed on behalf of Janssen in the United [**84] States. Dellenbaugh Tr. 105:22-25, 106:8-11.

[*676] Nor is there any reason to believe that Dr. Janssen ever reviewed the application for the *'663 patent,* the prosecution history or the references that were disclosed to the Patent Office. Those activities fell outside the scope of Dr. Janssen's responsibilities and his normal practices at the time. Dellenbaugh Tr. 106:12-22.

Because Dr. Janssen was not substantively involved in the prosecution of the *'663 patent,* he had no disclosure obligations imposed on him by the United States Patent Office and could not have committed inequitable conduct. *37 C.F.R. § 1.56(a) (1985)* (only inventors, prosecuting attorneys, or people substantively involved in the prosecution owe a duty of candor to the PTO). [18]

> 18  See, e.g., *Schreiber Foods, Inc. v. Beatrice Cheese, Inc. 92 F. Supp. 2d 857, 872, fn. 16 (E.D. Wis. 2000),* rev'd on other grounds, *31 Fed. Appx. 727 (Fed Cir. 2002)* ("Any attempt by an alleged infringer to conflate an opponent's corporate actors with the opponent's applicant group represents a distortion of the patent law, and also signals to a court that clear and convincing evidence of materiality and intent may be lacking.").

[**85] 2. Dr. Frans Awouters

Second, Mylan accuses Dr. Awouters, [19] who, as mentioned above, submitted a declaration to the PTO

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

regarding the characteristics of the compound ketanserin. PX 2 at 195-197.

> 19  Dr. Awouters is a retired Janssen employee who was medically unable to participate in the trial. Declaration of Dr. Denis Wuyts dated June 19, 2006.

Mylan faults Dr. Awouters for not volunteering information about pirenperone. Under the circumstances--a rejection concerning ketanserin--there was no need whatsoever for him to do so. Dellenbaugh Tr. 136:19-23. There is no proof -- let alone clear and convincing proof -- that Dr. Awouters knew anything about the prosecution of the *'663 patent* other than the submission of his declaration. In particular, there is no proof that he ever saw the prosecution history (other than the '517 application itself, PX 2 at 4-28, which later published as the *'663 patent*) or the references that were cited, or knew whether information about pirenperone was, or was not, either [ **86] submitted or material. Dellenbaugh Tr. 135:9-136:7. All his declaration states is that he had read "the specification and claims of U.S. patent Application Serial No. 826,517 and fully underst[ood] the contents thereof." PX 2 at 176.

The undisputed evidence shows that in the normal course, Dr. Awouters would have not been shown any other information. When a declaration was needed from a non-inventor to support a technical point, it was the normal practice of Dellenbaugh and the Janssen patent department simply to explain to the declarant the objection raised by the PTO and to ask whether there was any evidence that would help to disprove it. Dellenbaugh Tr. 133:17-134:7. There was no reason to show the scientist all of the unrelated communicat ions with the PTO or the prior art that had been submitted during prosecution. There was certainly no reason to dis cuss with the declarant a reference the examiner had not relied upon. Dellenbaugh Tr. 134:8-135:8.

The only obligation that Dr. Awouters assumed was to submit a truthful declaration. *37 C.F.R. 1.56(a) (1985)* (the duty to the PTO is "commensurate with the degree of involvement in the preparation or prosecution [**87] of the application"). This he did, swearing to its truthfulness, and the accuracy of his declaration is unchallenged. PX 2 at 197. There is no evidence -- let alone clear and convincing evidence -- that Dr. Awouters ever was in a position to assess whether pirenperone data was even [*677] relevant to the prosecution of the patent, let alone that he formed an intent to deceive the PTO about such information. Without such knowledge, Dr. Awouters could not form an intent to deceive the PTO.

### 3. Geoffrey Dellenbaugh

Finally, Mylan accuses Dellenbaugh of harboring an intent to deceive. Dellenbaugh testified that he relied on Janssen counsel in Europe to prepare the application and that he had no reason to doubt the veracity or completeness of any statement contained therein. Dellenbaugh Tr. 107:16-108:2, 108:18-21, 117:12-118:11.

There is no evidence that he knew that pirenperone was a dopamine antagonist. [20]

> 20  Dellenbaugh testified that he had no knowledge of the references Mylan alleges were withheld from the PTO. Dellenbaugh Tr. 144:22-25 (no knowledge of DX 86), 145:19-146:3 (no knowledge of DX 89); 147:18-20 (no knowledge of DX 112), 149:2-8 (no knowledge of DX 120), 153:7-10 (no knowledge of DX 116), 193:14-194:6 (no knowledge of DX 203).
>
> Mr. Dellenbaugh did not have any discussions with any the authors of these references, including Dr. Awouters, Kennis, Dr. Janssen and Dr. Gelders, about dopamine activity of pirenperone. Dellenbaugh Tr. 154:14-25.
>
> Dellenbaugh had no recollection of meeting with or talking to Kennis, Dr. Awouters or Dr. Janssen during the time period the *'663 patent* was prosecuted and it would have been contrary to his normal practice to have done so. Dellenbaugh Tr. 109:8-19, 117:8-11; 105:22-25.
>
> Mr. Dellenbaugh had no knowledge of whether pirenperone was an antipsychotic, was a dopamine antagonist or passed apomorphine tests. Dellenbaugh Tr. 114:12-20. Nor was he likely to have learned of that information since he did not follow the literature or Janssen's research. Dellenbaugh Tr. 108:22-109:4.
>
> Mr. Dellenbaugh's knowledge of pirenperone was based solely on the pirenperone patent itself, which contained no information about dopamine antagonism, apomorphine tests, and antipsychotic ability. PX 80; Dellenbaugh Tr. 113:3-14. Had he been aware of any of that information, he testified that he would have included it in the pirenperone's patent application. Dellenbaugh Tr. 112:3-23.

[**88] "[T]here can not have been culpable intent in withholding information that the inventor did not have." *Hebert v. Lisle Corp., 99 F.3d 1109, 1115-16 (Fed. Cir. 1996)* (quoting *Therma-Tru Corp. v. Peachtree Doors, Inc., 44 F.3d 988, 996 (Fed. Cir. 1995))*.

While there is no evidence of an intent to deceive, there is affirmative evidence of Dellenbaugh's good faith. *Kingsdown, 863 F.2d at 876* (evide nce of good faith

456 F. Supp. 2d 644, *; 2006 U.S. Dist. LEXIS 74582, **

must be considered). Most notably, Dellenbaugh cited the examiner to the setoperone patent -- the closest prior art. During the prosecution of the *'663 patent*, Mr. Dellenbaugh expressly disclosed the '451 patent, which describes setoperone and includes both its dopamine and serotonin antagonism. He discussed the setoperone '451 patent in the *'663 patent* as well. PX 1 at 8:20-29. If Dellenbaugh or other Janssen employees were seeking to conceal from the PTO that prior art Janssen patents described antipsychotic compounds with dopamine and serotonin antagonism, the setoperone patent would never have been disclosed. Yet the setoperone patent was disclosed and it prompted no comments from the PTO.

## C. Balancing

Had Mylan **[**89]** proved both materiality and intent, the Court would then balance the degree of materiality and degree of intent to make an equitable judgment as to whether the conduct was so culpable that

the patent should be barred from enforcement. See *Life Techs., 224 F.3d at 1324.* **[*678]** Mylan, however, has failed to carry its burden. Thus, the *'663 patent* is not unenforceable for inequitable conduct.

## V. Conclusion

For the foregoing reasons, the Court finds that Mylan and DRL have failed to prove by clear and convincing evidence that the *'663 patent* is obvious or that Janssen engaged in inequitable conduct. Thus, the *'663 patent* is neither invalid nor unenforceable, and as a result, Mylan and DRL have infringed that patent under *35 U.S.C. § 271(e)(2)*.

/s/ John C. Lifland, U.S.D.J.

Dated: October 13, 2006

223 Fed. Appx. 999, *; 2007 U.S. App. LEXIS 11686, **

LEXSEE 2007 U.S. APP. LEXIS 11686



Analysis
As of: Apr 04, 2008

**JANSSEN PHARMACEUTICA N.V. and JANSSEN PHARMACEUTICA PRODUCTS, L.P. (now known as Janssen, L.P.), Plaintiffs-Appellees, v. MYLAN PHARMACEUTICALS, INC., Defendant-Appellant.**

**2007-1021, -1055**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*223 Fed. Appx. 999; 2007 U.S. App. LEXIS 11686*

**May 11, 2007, Decided
May 11, 2007, Filed**

**NOTICE:** [**1] DECISION WITHOUT PUBLISHED OPINION

**SUBSEQUENT HISTORY:** Rehearing denied by, Rehearing, en banc, denied by *Janssen Pharmaceutica N.V. v. Mylan Pharms., 2007 U.S. App. LEXIS 16041 (Fed. Cir., June 19, 2007)*

**PRIOR HISTORY:** ON APPEAL from the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY. In CASE NO(S). 03-CV-6220 and 03-CV-6185.
*Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc., 2007 U.S. Dist. LEXIS 20807 (D.N.J., Mar. 23, 2007)*

**COUNSEL:** For Dr. Reddy's Laboratories, Inc. (1021), Defendant: POLLACK, ALAN HENRY, OF COUNSEL ATTORNEY, Budd Larner, P.C., Short Hills, NJ.

For Janssen Pharmaceutica Products, L.P. (nka Janssen, L.P.), Janssen Pharmaceutica, N.V. (1021), Plaintiff-Appellees: DISKANT, GREGORY L., PRINCIPAL ATTORNEY, HOWARD, SCOTT BARRY, POLLACK, STUART E., ROYZMAN IRENA, AKBAR, WENDY KEMP, MANDRGOC MELISSA, OF COUNSEL ATTORNEYS, Patterson, Belknap Webb & Tyler LLP, New York, NY.

For Mylan Pharmaceuticals, Inc. (1021, 1055), Defendant-Appellant: GREEN, ROBERT F., PRINCIPAL ATTORNEY, ROSENQUIST, JOHN E., GRIFFITH, CHRISTOPHER T., DOMER, PETER H., OF COUNSEL ATTORNEYS, Leydig, Voit & Mayer,

Ltd., Chicago, IL.

For Janssen Pharmaceutica Products, L.P. (1055), Plaintiff-Appellee: HOWARD, SCOTT BARRY, PRINCIPAL ATTORNEY, DISKANT, GREGORY L., OF COUNSEL ATTORNEY, Patterson, Belknap Webb & Tyler LLP, New York, NY.

For Janssen Pharmaceutica, N.V. (1055), Plaintiff-Appellee: HOWARD, SCOTT BARRY, PRINCIPAL ATTORNEY, DISKANT, GREGORY L., [**2] OF COUNSEL ATTORNEY, Patterson, Belknap Webb & Tyler LLP, New York, NY.

**JUDGES:** GAJARSA, PROST, Circuit Judges and OTERO, District Judge. *

> * Honorable S. James Otero, District Judge, United States District Court for the Central District of California, sitting by designation.

**OPINION**

**Judgment**

[*999] This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

Per Curiam

*AFFIRMED. See Fed. Cir. R. 36.*

**APPROVED DRUG PRODUCTS**
with
**THERAPEUTIC EQUIVALENCE EVALUATIONS**

**21ST EDITION**

**Cumulative Supplement 1**

**January 2001**

**CONTENTS**

*PAGE*

| | | |
|---|---|---|
| 1.0 | INTRODUCTION | iii |
| 1.1 | How to Use the Cumulative Supplement | iii |
| 1.2 | Applicant Name Changes | iv |
| 1.3 | Availability of the Edition | v |
| 1.4 | Report of Counts for the Prescription Drug Product List | vii |
| 1.5 | Cumulative Supplement Change Legend | |

DRUG PRODUCT LISTS

| | |
|---|---|
| Prescription Drug Product List | 1-1 |
| OTC Drug Product List | 2-1 |
| Drug Products with Approval under Section 505 of the Act Administered by the Center for Biologics Evaluation and Research List | 3-1 |
| Orphan Product Designations and Approvals List | 4-1 |
| Drug Products Which Must Demonstrate in vivo Bioavailability Only if Product Fails to Achieve Adequate Dissolution | 5-1 |

PATENT AND EXCLUSIVITY INFORMATION ADDENDUM

| | |
|---|---|
| A. Patent and Exclusivity Lists | A-1 |
| B. Patent and Exclusivity Terms | B-1 |

000091

changed, respectively, to Merck Sharp Dohme or Zenith Labs [New Abbreviated Names]). When this occurs, each product involved (either currently in the Cumulative Supplement or in the following year's edition) will reflect the new abbreviated name. Consequently, it will not appear as an applicant name change entry in the Cumulative Supplement nor will the cumulation of these name changes appear in this section

## APPLICANT NAME CHANGES

FORMER APPLICANT NAME
(FORMER ABBREVIATED NAME)

NEW APPLICANT NAME
(NEW ABBREVIATED NAME)

No applicant name changes for January 2001.

## 1.3 AVAILABILITY OF THE EDITION

The 21st Edition of the Orange Book and its monthly cumulative supplements are available by subscription from the Government Printing Office:

Superintendent of Documents
Government Printing Office
P.O. Box 371954
Pittsburgh, PA 15250-7954

The telephone number to charge your subscription is 202-512-1800. The cost is $101.00 annually.

The Approved Drug Products with Therapeutic Equivalence Evaluation (Orange Book) and related drug information is also available on the Internet at the Food and Drug Administration, Center for Drug Evaluation and Research, Drug Info page.

There is an Electronic Orange Book Query (EOB) at http://www.fda.gov/cder/ob. The Query provides searching of the approved drug list by active ingredient, proprietary name, applicant holder or applicant number. Product search categories are: prescription, over-the-counter, discontinued drugs. There are links to patent and exclusivity information that may be applicable to each product. The data is updated concurrently with the publication of the annual edition or monthly cumulative supplements.

The Internet version of the hard copy Orange Book annual edition is at
http://www.fda.gov/cder/orange/adp.htm.

v

The Internet version of the hard copy monthly supplement is at
http://www.fda.gov/cder/orange/supplement/cspreface.htm.  Changes to the annual edition are listed
separately by month.

There are ASCII text files of the Orange Book drug product data at
http://www.fda.gov/cder/orange/obreadme.htm.  The drug product text files are zipped into zipobtxt.exe. The
files are updated concurrently with the publication of the annual edition or monthly cumulative supplements.
Appendix A and Appendix B are updated quarterly.

The 20th annual edition of the 1999 Orange Book Patent and Exclusivity List is at
http://www.fda.gov/cder/orange/20bookpub.pdf.

The current year Patent and Exclusivity cumulative supplement list that denotes the current month additions
is at http://www.fda.gov/cder/orange/supplement/patents.pdf.

The Drug Price Competition and Patent Term Restoration Act requires that patent information be
filed with all newly submitted Section 505 drug applications.  To facilitate industry submission of
the information, a patent submission sample format is available in HTML and PDF format at:
http://www.fda.gov/cder/orange/patdecl.pdf
http://www.fda.gov/cder/orange/patdecl.html

The current listing of the Orphan Product Designations and Approvals is available at
http://www.fda.gov/orphan/designat/list.htm.

000093

459 F. Supp. 2d 1, *; 2006 U.S. Dist. LEXIS 24612, **

LEXSEE 459 F. SUPP. 2D 1



Positive
As of: Apr 04, 2008

**RANBAXY LABORATORIES LTD., et al., Plaintiffs, v. MICHAEL O. LEAVITT, et al., Defendants.**

**Civil Action No. 05-1838 (RWR)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*459 F. Supp. 2d 1; 2006 U.S. Dist. LEXIS 24612*

**April 30, 2006, Decided**
**May 1, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion granted by *Ranbaxy Labs., Ltd. v. Leavitt, 2006 U.S. App. LEXIS 14082 (D.C. Cir., June 1, 2006)*
Affirmed by *Ranbaxy Labs. Ltd. v. Leavitt, 469 F.3d 120, 2006 U.S. App. LEXIS 28133 (D.C. Cir., Nov. 14, 2006)*

**COUNSEL:** **[**1]** For RANBAXY LABORATORIES LIMITED, RANBAXY INC., RANBAXY PHARMACEUTICALS, INC., Plaintiffs: Kate Cumming Beardsley, Carmen Mercedes Shepard, BUC & BEARDSLEY, Washington, DC.

For IVAX PHARMACEUTICALS, INC., Plaintiff: Doublas B. Farquhar, John Robert Fleder, HYMAN, PHELPS & MCNAMARA, P.C., Washington, DC; Jay B. Shapiro, Samuel O. Patmore, STEARNS WEAVER MILLER WEISSLER ALHADEFF & SIHERSON PA, Miami, FL.

For MICHAEL O. LEAVITT, Secretary of Health and Human Services, DEPARTMENT OF HEALTH AND HUMAN SERVICES, LESTER M. CRAWFORD, Commissioner of Food and Drugs, FOOD AND DRUG ADMINISTRATION, Defendants: Drake S. Cutini, DEPARTMENT OF JUSTICE, Office of Consumer Litigation, Washington, DC.

**JUDGES:** RICHARD W. ROBERTS, United States District Judge.

**OPINION BY:** RICHARD W. ROBERTS

**OPINION**

**[*1] MEMORANDUM OPINION**

Ranbaxy Laboratories Limited [1] ("Ranbaxy") and IVAX Pharmaceuticals, Inc. ("IVAX") each sued the Food and Drug Administration ("FDA") under *5 U.S.C. § 706* claiming that the FDA improperly nullified Ranbaxy and IVAX's rights to a 180-day period of exclusive marketing of a generic drug. Ranbaxy and IVAX moved for summary judgment against the FDA seeking to vacate **[**2]** the FDA's decision. The FDA filed a cross-motion for summary judgment. Because the FDA failed to give full effect to the unambiguous intent of Congress, Ranbaxy and IVAX's motions for summary judgment will be granted, and the FDA's cross-motion for summary judgment will be denied.

> 1    Ranbaxy Laboratories Limited, an Indian Corporation, Ranbaxy Inc., a Delaware corporation, and Ranbaxy Pharmaceuticals, Inc., also a Delaware Corporation, are named as plaintiffs. All three organizations are commonly owned and operated. For convenience, these organizations will be collectively referred to as "Ranbaxy."

BACKGROUND

I. FDA STATUTORY AND REGULATORY SCHEME

A. FDA drug approval process and the Hatch-Waxman Amendments

The FDA regulates all drugs under the Federal Food, Drug, and Cosmetic Act **[*2]** ("FDCA"), *21 U.S.C. § 301 et seq. (2000)*. In 1984, Congress amended the FDCA in passing the Drug Price Competition and Patent Term Restoration Act, known as the Hatch-Waxman

**000094**

459 F. Supp. 2d 1, *; 2006 U.S. Dist. LEXIS 24612, **

Amendments, in [**3] order to "make available more low cost generic drugs[.]" [2] H.R. Rep. No. 98-857, pt. 1, at 14 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2647. The Hatch-Waxman Amendments attempt to balance the conflicting policy objectives of "inducing name-brand pharmaceutical firms to make the investments necessary to research and develop new drug products, while simultaneously enabling competitors to bring cheaper, generic copies of those drugs to the market." *Abbott Labs. v. Young, 287 U.S. App. D.C. 190, 920 F.2d 984, 991 (D.C. Cir. 1990)* (Edwards, J., dissenting).

> 2 The Medicare Modernization Act ("MMA") of 2003 amended the Hatch-Waxman Amendment provisions dealing with rights to 180-day periods of exclusive marketing of generic drugs. Because Ranbaxy and IVAX filed their generic drug applications at issue here prior to the MMA's effective date, the pre-2003 version of the FDCA applies here. Unless otherwise noted, all references to the FDCA or the Hatch-Waxman Amendments refer to the pre-2003 version. Amendments

[**4] To accomplish these ends, the amendments established new guidelines for the approval of both name-brand and generic drugs. First, for pioneer drugs, a drug manufacturer must submit a new drug application ("NDA") to the FDA for approval. *21 U.S.C. § 355(a), (b)*. The NDA must contain studies demonstrating that the drug is safe and effective and must also include the patent number and expiration date of any patents claiming the drug. *21 U.S.C. § 355(b)(1)*. When the NDA is approved, the FDA lists the patent information in the "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book." *21 U.S.C. § 355(c)(2)*. Once the NDA is approved, the NDA holder may market the new name-brand, pioneer drug.

With the Hatch-Waxman Amendments, Congress also created a streamlined procedure for the FDA to approve quickly generic versions of the name-brand drug. Drug manufacturers are required to file an abbreviated new drug application ("ANDA"), which incorporates the data that the name-brand producer had already submitted to the FDA. In order to obtain the FDA's approval, the ANDA must demonstrate that [**5] a generic drug is "bioequivalent" to a name-brand drug. *21 U.S.C. § 355(j)(2)(A)(iv)*. The applicant must also certify that the generic drug will not infringe any patents listed in the Orange Book which claim the name-brand drug. *21 U.S.C. § 355(j)(2)(A)(vii)*. An ANDA applicant must certify for each patent listed in the Orange Book:

> (I) that such patent information has not been filed, (II) that such patent has expired, (III) ...the date on which such patent will expire, or (IV) that such patent

is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

Id.

In a "paragraph IV" certification, the applicant must allege that the patent for the name-brand drug is either (1) invalid, or (2) will not be infringed by the marketing of the generic drug. *21 U.S.C. § 355(j)(2)(A)(vii)*. The ANDA applicant who files a paragraph IV certification must give notice of such certification to both the patent owner and the holder of the NDA for the drug that is claimed by the patent. *21 U.S.C. § 355(j)(2)(B)(i)*. The ANDA applicant [**6] is required to include in this notice "a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be [*3] infringed." *21 U.S.C. § 355(j)(2)(B)(ii)*. The name-brand producer then has 45 days to sue the ANDA applicant. *21 U.S.C. § 355(j)(5)(B)(iii)*. If the name-brand producer sues, the FDA must wait 30 months before approving the generic manufacturer's ANDA or until a court finds that the patent is invalid or not infringed, whichever is earlier. Id. If no suit is brought within 45 days, than the FDA may immediately approve the ANDA. Id.

Because filing a paragraph IV certification is an act of infringement under *35 U.S.C. § 271(e)(2)(A)*, the Hatch-Waxman Amendments give the first ANDA holder to file a paragraph IV certification 180 days of exclusive marketing of the generic product. *21 U.S.C. § 355(j)(5)(B)(iv)*. This provision states:

> If the application contains a [paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection [containing] [3] such a certification, [**7] the application shall be made effective not earlier than one hundred and eighty days after--
>
> (I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
>
> (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 98 of 109

459 F. Supp. 2d 1, *; 2006 U.S. Dist. LEXIS 24612, **

Page 3

Id. The exclusivity period is triggered by a court decision in a patent infringement suit, or the commercial marketing of the generic drug. Id. This period of exclusivity is an important component of the Hatch-Waxman Amendments because it "encourages generic drug makers to incur the potentially substantial litigation costs association with challenging pioneer drug makers' patents" and brings generic drugs to the market faster. *Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 33 (D.D.C. 2000)*.

> 3   The statute literally reads "continuing," but the D.C. Circuit has interpreted this wor d to be a typographical error meant to be "containing." *Mova Pharm. Corp. v. Shalala, 329 U.S. App. D.C. 341, 140 F.3d 1060, 1064 n. 3 (D.C. Cir. 1998)*.

[**8]   Initially, the FDA proposed a requirement that the ANDA holder be sued in order for that holder to be eligible for the 180-day exclusivity. Guidance for Industry: 180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act 3 (June 1998) available at www.fda.gov/cder/guidance/2576fnl.pdf. The final rule, however, required that an ANDA holder successfully defend against a patent infringement suit to be eligible for the 180-day exclusivity. See *21 C.F.R. § 314.107(c) (1994).* [4] The FDA thought this rule would eliminate an incentive for frivolous claims. The D.C. Circuit, however, rejected this interpretation as contrary to the statute, holding that the successful defense requirement's "practical effect is to write the commercial-marketing trigger out of the statute." *Mova Pharm. Corp. v. Shalala, 329 U.S. App. D.C. 341, 140 F.3d 1060, 1069 (D.C. Cir. 1998)*; see also *Inwood Labs., Inc. v. Young, 723 F. Supp. 1523, 1525 (D.D. C.),* vacated as moot, *310 U.S. App. D.C. 61, 43 F.3d 712 (D.C. Cir. 1989)* (holding that the [*4] FDA's interpretation that "the 180-day exclusivity commences only when the primary [**9] ANDA has been sued for patent infringement" is contrary to the clear statutory language) (internal quotation marks omitted). The FDA subsequently amended *§ 314.107(c)* by removing the language that required an ANDA applicant to have won a patent infringement suit to be eligible for the 180-days of exclusivity. See *21 C.F.R. § 314.107(c) (2000)*.

> 4   The FDA required a showing that "the applicant submitting the first application has successfully defended against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice" under paragraph IV before being eligible for the exclusivity. *Abbreviated New Drug Applications Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg. 50338, 50367 (Oct. 3, 1994)*.

B. The Orange Book and the patent listing regulatory scheme

NDA patent information appears in the Orange Book because Congress included in the Hatch-Waxman Amendments a provision requiring the publication of such information to [**10] facilitate the new ANDA process. *21 U.S.C. § 355(c)(2).* "Upon the submission of patent information [in the NDA], the Secretary shall publish it." Id. The statute does not address, however, how the FDA is to remove patents from this list. See id. The FDA has interpreted the Hatch-Waxman Amendments to afford the agency a ministerial role in listing and delisting patents in the Orange Book. (Defs.' Summ. J. Mot. at 5.) This scheme consists of a challenge process, whereby a third party can "dispute[] the accuracy or relevance of patent information ...published by FDA in the list." *21 C.F.R. § 314.53(f).* The FDA then confirms with the NDA holder whether the patent information listed in the Orange Book is correct. Id. If the NDA holder requests that the patent be removed from the Orange Book, o r "delisted," the FDA will do so. (Defs.' Summ. J. Mot. at 5.) If the NDA holder does not elect to alter the listing, the FDA will not remove the patent from the Orange Book. *21 C.F.R. § 314.53(f).* (See Defs.' Summ. J. Mot. at 5.) The FDA "believes that the general rule of deference to the NDA holder's views [**11] on the scope of a patent and its appropriateness for listing should apply equally to the decision to list a patent and to delist a patent from the Orange Book." (Defs.' Summ. J. Mot at 5-6.)

The FDA has established one exception to this general rule. When the disputed patent is subject to litigation brought by the patent owner against the first ANDA applicant [5], such a patent "shall not be removed from the list." *21 C.F.R. § 314.94(a)(12)(viii)(B).* [6] The FDA explains that allowing a NDA holder to withdraw the patent during or after litigation and nullify the 180-day exclusivity would provide an "unjust result" if the ANDA applicant had invested heavy resources into defending the litigation and then was denied the benefit of the 180-day exclusive marketing period. (Defs.' Summ. J. Mot. at 11 (quoting *Abbreviated New Drug Applications Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg. 50338, 50348 (Oct. 3, 1994)*).) Any other ANDA applicant, including [*5] the first ANDA applicant to file a paragraph IV certification who has not been sued within 45 days of notice, however, must amend the paragraph IV certification. *21 C.F.R. § 314.94(a)(12) (viii)(B)* [**12] . "Once an amendment or letter for the change has been submitted, the application will no longer be considered to be one containing a certification under paragraph [IV,]" id., and thus no longer eligible for the 180-day exclusivity.

> 5   The FDA has interpreted the reference in *21*

Page 4

459 F. Supp. 2d 1, *; 2006 U.S. Dist. LEXIS 24612, **

C.F.R. § 314.94(a)(12)(viii)(B) to a "lawsuit under § 314.107(c)" to refer to a lawsuit brought against an ANDA applicant within the first 45 days after the patent owner and the NDA holder received notice. (Admin. R., Tab 23 at 12 n. 17.) This definition of litigation appeared in the version of § 314.107(c) before it was amended to remove the "successful defense" requirement. (Id.) Section 314.94(a)(12)(viii)(B) was promulgated simultaneously with the "successful defense" regulation, 21 C.F.R. § 314.107(c) (1994).

6   The section states that "[a] patent that is the subject of a lawsuit under § 314.107(c) shall not be removed from the list until FDA determines either that no delay in effective dates of approval is required under that section as a result of the lawsuit, that the patent has expired, or that any such period of delay in effective dates of approval is ended." 21 C.F.R. § 314.94(a)(12)(viii)(B).

**[**13]** II. ANDA APPLICATIONS OF RANBAXY AND IVAX

Both IVAX and Ranbaxy sought to take advantage of the 180-day exclusivity under the Hatch-Waxman Amendments to market generic versions of Zocor. Merck holds the NDA for Zocor, a pioneer drug that reduces cholesterol and is among the most widely prescribed drugs in the United States. (Ranbaxy's Statement of Material Facts as to Which There Is No Genuine Issue ("Ranbaxy's Statement of Facts") P1.) Currently, Merck is the sole marketer of Zocor in the 5 mg, 10 mg, 20 mg, 40 mg, and 80 mg strengths. (Ranbaxy's Statement of Facts P1; see also Admin. R., Tab 6 (confirming that Merck's NDA includes the 20 mg strength).) Merck holds three patents for simvastatin, the active ingredient in Zocor --U.S. Patent No. 4,444,784 ("the '784 patent"), which expires on June 23, 2006; U.S. Patent No. Reissued 36481 ("the '481 patent"); and U.S. Patent No. Reissued 36520 ("the '520 patent"). (Ranbaxy's Statement of Facts P2.) At the time the plaintiffs filed their ANDAs, these patents were listed in the Orange Book.

On December 14, 2000, IVAX submitted an ANDA for a generic version of Zocor in the 5-mg, 10-mg, 20-mg, and 40-mg strengths. (IVAX's Statement **[**14]** of Material Facts as to Which There Is No Genuine Dispute ("IVAX's Statement of Facts") P3.) Ranbaxy submitted an ANDA in November 2001 seeking to approve a generic version the 10 mg, 20 mg, 40 mg and 80-mg strengths of simvastatin. (Ranbaxy's Statement of Facts P3.) Ranbaxy and IVAX certified under paragraph IV that the '481 and '520 patents were invalid or unenforceable, or that their drugs will not infringe those patents (Admin. R., Tab 1 at 12; Supp. Admin. R., Tab 1 at 15), and they certified under paragraph III that

the '784 patent expires in June 2006. (Id.) The FDA gave tentative approval to Ranbaxy because "all scientific and procedural conditions for approval have been met, but the application cannot be fully approved because approval is blocked by a 30-month stay, some form of marketing exclusivity, or some other barrier. ..." (Admin. R., Tab 4.) The FDA did not grant tentative approval to IVAX. [7] (Defs.' Summ. J. Mot. at 12.) Plaintiffs gave the required notice to Merck of certification under paragraph IV, detailing the factual and legal basis for their belief that their generic drug would not infringe the patents, or that the patents are invalid or unenforceable. **[**15]** (Admin. R., Tab 1 at 1; Supp. Admin. R., Tab 1 at 15.) Merck did not sue either applicant within the 45-day period. (Admin. R., Tab 2; Supp. Admin. R., Tab 3.)

7   Plaintiffs believe that IVAX is entitled to exclusivity for 5 mg, 10 mg, 20 mg, and 40 mg strengths and Ranbaxy is entitled to exclusivity for the 80 mg strength. (Admin. R., Tab 12 at 12; Admin. R. Tab 13 at 1-2; see also Admin. R., Tab 23 at 2.)

On October 10, 2003, Merck submitted a letter to the FDA requesting that the '481 and '520 patents be delisted from the Orange Book. (Admin. R., Tab 6.) The following month, the FDA received a letter from an intellectual property law firm challenging the listing of those patents pursuant to the agency's challenge process, [*6] and noting that the '481 and '520 patents are not properly listed in the Orange Book under a new FDA regulation issued on June 18, 2003. [8] (Admin. R., Tab 7.) The FDA forwarded the letter to Merck, which renewed its request that the patents be withdrawn. (Admin. R., Tab 8.) In June **[**16]** 2004, Merck sent a third request to the FDA to delist the patents. (Admin. R., Tab 10.) In September 2004, IVAX and Ranbaxy learned that the FDA had delisted the '481 and '520 patents from the Orange Book. (IVAX's Statement of Facts P10; Ranbaxy's Statement of Facts P 11). [9]

8   The challenge letter is from the law firm Kenyon and Kenyon, which did not claim to be writing the letter on behalf of a client. (Admin. R., Tab 7.)

9   Ranbaxy believes that Merck requested these patents to be delisted after it was prompted to do so by another generic applicant, Teva Pharmaceuticals ("Teva"), which had not filed an ANDA before IVAX and Ranbaxy and would thus have to wait 180 days to introduce its generic version of Zocor. (Ranbaxy Compl. P41.) The FDA does not dispute, or address, the allegation that Teva and Merck were in cahoots. The FDA does, however, state that Teva submitted and then withdrew comments in support of the FDA's delisting approach. (Defs.' Summ. J. Mot. at 15.)

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 100 of 109

Page 5

459 F. Supp. 2d 1, *; 2006 U.S. Dist. LEXIS 24612, **

The FDA also points out that Teva and IVAX are in the process of merging. See Teva and IVAX Shareholders Approve Pending Merger (Oct. 27 2 0 0 5 ) , a t http://www.tevapharm.com/pr/2005/pr_554. asp.

[**17] In early 2005, Ranbaxy and IVAX each submitted citizen petitions, requesting that the FDA confirm that it would not approve subsequent ANDAs until after the 180-day period and that the FDA relist the patents in the Orange Book. (Admin. R., Tab 12 & 13.) The FDA denied both petitions on October 24, 2005, deciding that it would not relist the disputed patents, that no applicant will be eligible for 180-day exclusivity for those patents, and that it will approve all subsequent ANDAs for simvastatin when they are otherwise eligible for approval. (Ranbaxy's Statement of Fact PP16, 17; IVAX's Statement of Fact PP12, 14; Admin. R., Tab 23.)

In its denial of the plaintiffs' citizen petitions, the FDA first noted that because the effect of a delisted patent on the 180-day exclusivity is not addressed in § 355(j)(5)(B)(iv), the silence is ambiguous and subject to the FDA's reasonable interpretation. (Admin. R., Tab 23 at 8.) The FDA, therefore, asserted that it is free to choose how to handle delisting requests. The FDA explained that they could address this problem in one of three ways: (1) refuse to delist a patent once a paragraph IV certification has been submitted; (2) always delist [**18] a patent immediately upon request; or (3) delist in some situations, but not others. (Id.) The FDA asserted that the first option would be wrong under the statute because an ANDA application does not have a "vested" right to exclusivity just by filing a paragraph IV submission. (Id. at 9.) In support of this assertion, the FDA cites several changes of circumstance which would require an ANDA filer to amend its paragraph IV certification. An ANDA filer must change a paragraph IV certification to a paragraph III certification if the ANDA filer loses an infringement suit brought by the NDA holder. (Id.) An ANDA filer must change a paragraph IV certification to a paragraph II certification if the certified patent expires. (Id.) The FDA recognizes that the second option would be unfair in cases where the ANDA applicant won a lawsuit but the FDA later delisted the disputed patent, nullifying the 180-day exclusivity period. (Id. at 11.) The FDA adopted the third position that the patent should be delisted at the request of the NDA holder except in the limited circumstance when it is the subject of litigation. [*7] (Id. at 13.) The FDA asserts that subsequent events can [**19] affect an ANDA filer's entitlement to exclusivity. (Id. at 14.)

The FDA acknowledges that the first ANDA holder to file a paragraph IV certification "could become eligible for exclusivity" and "eligibility did not require that the applicant be sued as a result." (Id. at 14.) The FDA notes that "even though successful defense of a patent infringement lawsuit is not a factor in eligibility for exclusivity, ...it is reasonable to interpret the patent listing and 180-day exclusivity provisions of the Act to permit the [FDA] to leave a patent listed only when a lawsuit has been filed as a result of a paragraph IV certification." (Id. at 13.)

The FDA stated that listed patents are barriers to generic drugs and that delisting furthers the goals of competition and the entry of generic drugs into the market. (Id. at 15.) Under Ranbaxy and IVAX's approach, the FDA notes that the patent challenge process would become "largely ineffective." (Id. at 15.) The FDA also does not believe that the current delisting process provides an incentive to NDA holders to delist patents in order to undermine the 180-day exclusivity, as Ranbaxy and IVAX claimed. (Id. at 15-16.) Finally, [**20] the "FDA has determined that as general rule, the benefit derived from maintaining exclusivity does not justify the delay in generic drug approvals that would arise from leaving a patent listed when the NDA holder requested that the patent be withdrawn." (Id. at 16.)

Ranbaxy and IVAX separately sued the FDA, challenging the FDA's refusal to relist the '481 and '520 patents for Zocor and refusal to grant any ANDA applicant eligibility for 180-day exclusivity for the generic version of Zocor. These civil actions were consolidated and all three parties moved for summary judgment, contending that there are no genuine issues of material fact and that each is entitled to judgment as a matter of law.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; see also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

To determine if agency action is arbitrary and capricious, district courts employ the two-part test of *Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*. [**21] First, a court must determine "if 'Congress has directly spoken to the precise question at issue.'" *New York v. Envtl. Prot. Agency, 370 U.S. App. D.C. 239, 443 F.3d 880, 2006 U.S. App. LEXIS 6598, No. 03-1380, 2006 WL 662746, at *2 (D.C. Cir. Mar. 17, 2006)* (quoting *Chevron, 467 U.S. at 842*). If Congress clearly expressed its intent, then "' that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" Id. (quoting *Chevron, 467 U.S. at 842-43*). "When the statute is clear on its face, resort to the legislative history, much less to the agency's interpretation, is not necessary." *Inwood Labs., Inc., 723 F.3d at 1525* (citing *Eagle-Picher Indus. Inc. v. Envtl. Prot. Agency, 245 U.S. App. D.C. 196, 759 F.2d 922*

Case 1:08-cv-00395-RCL    Document 23-2    Filed 04/09/2008    Page 101 of 109

Page 6
459 F. Supp. 2d 1, *; 2006 U.S. Dist. LEXIS 24612, **

*(D.C. Cir. 1985))*. However, if the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Mova Pharms. Corp., 140 F.3d at 1067* (quoting *Chevron, 467 U.S. at 843*) (internal quotations omitted).

Courts [**22] rely on "traditional tools of statutory construction" to determine Congressional intent and the meaning of the statute. *Automated Power Exch., Inc. v.* [*8] *FERC, 340 U.S. App. D.C. 256, 204 F.3d 1144, 1151 (D.C. Cir. 2000)*. Chevron analysis often begins and ends with the statutory text because "the language of the statute itself is always the best indication of congressional intent." *Abbott Labs., 920 F.2d at 987*. The first canon of statutory construction is that courts must presume that the legislature meant what it said in a statute. *Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)*. "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id. at 254*.

If Congress has not clearly expressed its intent on the precise issue, considerable weight is due an agency's reasonable construction of a statutory scheme it is entrusted to administer. *Chevron, 467 U.S. at 844*. "Judicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well-settled principle of federal law." [**23] *U.S. Postal Serv. v. NLRB, 297 U.S. App. D.C. 64, 969 F.2d 1064, 1069 (D.C. Cir. 1992)* (quoting *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 417, 112 S. Ct. 1394, 118 L. Ed. 2d 52 (1992))*. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Southern Co. Services, Inc. v. FCC, 354 U.S. App. D.C. 124, 313 F.3d 574, 579-80 (D.C. Cir. 2002)* (internal quotation marks omitted). A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. (internal quotations marks omitted).

The exclusivity provision of the Hatch-Waxman Amendments "is far from a model of legislative draftsmanship" and "the legislative history of *section 355(j)(5)(B)(iv)* is limited." *Mova Pharms. Corp., 140 F.3d at 1069, 1072.* [10] *Section 355(j)(5)(B)(iv)* is, however, clear and unambiguous in "explicitly providing that a primary generic manufacturer may qualify for the 180 day exclusivity in one of two ways." *Inwood Labs., Inc., 723 F. Supp. at 1526;* [**24] see also *Granutec, Inc. v. Shalala, 139 F.3d 889, 1998 WL 153410, at *3 (4th Cir. 1998)* (unpublished disposition) ("The language of the statute may be complex, and even cumbersome, but it is plain and unambiguous. It does not include a 'successful defense' requirement, and indeed it does not

even require the institution of patent litigation."). Of the two methods Congress has provided by which the first ANDA applicant's 180-day period of exclusivity is triggered, one requires litigation and one does not. *21 U.S.C. § 355(j)(5)(B)(iv)*. Congress referenced litigation under subpart iii explicitly, indicating "Congress' presumably deliberate decision not to incorporate the lawsuit requirement in [the first] subpart." *Inwood Labs., Inc., 723 F. Supp. at 1526*.

> 10    Judges of this court have found some portions to be ambiguous and others unambiguous. Compare *Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30 (D.D.C. 2000)* (Roberts, J.) (finding the "court-trigger" sub-clause to unambiguously include a decision from any type of court), with *Apotex Inc. v. FDA, 414 F. Supp. 2d 61 (D.D.C. 2006)* (Bates, J.) (finding that the provision as to how many exclusivity periods can be awarded for one drug is ambiguous).

[**25] Despite the cumbersome structure of the statute, there is no dispute among the parties about Congress's intent on a number of fronts. It is undisputed that Congress intended to make bioequivalent generic drugs available on the market for consumers more quickly. *In re Barr Labs., Inc., 289 U.S. App. D.C. 187, 930 F.2d 72, 76 (D.C. Cir. 1991)*. It is undisputed that to protect patent holders, Congress allowed abbreviated approval [*9] for those generic drugs that implicated no patents listed in the Orange Book, and delayed abbreviated approval until after any implicated listed patents expired. See *21 U.S.C. § 355(j)(2)(A)(vii)*. There is also no dispute that Congress treated specially the first ANDA applicant willing to certify legitimately that any implicated unexpired patents listed in the Orange Book were invalid or would not be infringed by the generic drug.

The parties also agree that Congress made a paragraph IV certification an act for which patent holders could sue for infringement, and intended to reward the generic manufacturer for incurring the substantial risks and expense of defending an infringement suit and/or designing around the [**26] patent. See *Teva Pharm. Indus. Ltd. v. Crawford, 366 U.S. App. D.C. 203, 410 F.3d 51, 54 (D.C. Cir. 2005)*. The parties agree that Congress's chosen reward was to bar approval of successive applications for that generic drug until after the paragraph IV ANDA holder enjoyed a period of exclusive marketing. *21 U.S.C. § 355(j)(5)(B)(iv)*. Finally it is undisputed that Congress did not restrict this reward to only those ANDA holders who have been sued for infringement, or successfully defended such a suit, *Mova Pharms. Corp., 140 F.3d at 1069; Inwood Labs., Inc., 723 F. Supp. at 1526*, just as Congress did not restrict the reward to those ANDA holders who avoided suit by

459 F. Supp. 2d 1, *; 2006 U.S. Dist. LEXIS 24612, **

persuasion or effectively designing around the patent or otherwise.

The issue here, then, is whether the FDA can effectively restrict the reward to only a sued ANDA holder by delisting a patent after the ANDA holder successfully avoided suit. Here, both plaintiffs gave Merck detailed factual and legal submissions about how their generic drugs would not infringe the listed patents, or how the patents were invalid or unenforceable. (Admin. R., Tab 1 [**27] at 1; Supp. Admin. R., Tab 1 at 15.) Merck chose not to sue either ANDA filer. Had the FDA not delisted here, the plaintiffs would have been entitled to a period of marketing exclusivity triggered by their notice to the FDA of their first commercial marketing of the generic drug once the FDA approved their ANDAs.

Here, however, the FDA agreed to requests by Merck and a third party to delist the patents after the ANDA filers successfully avoided suit. (Admin. R., Tabs 6-10.) The FDA delisting of these patents about which Ranbaxy and IVAX had previously filed paragraph IV certifications arguably vitiated those certifications and no subsequent ANDA for simvastatin need include a certification for those patents. (See Admin. R., Tab 23 at 15.) Upon the expiration of the '784 patent in June 2006, the FDA plans to approve any complete ANDA for simvastatin otherwise eligible for approval, denying Ranbaxy and IVAX the 180 days of exclusive marketing, which they would have enjoyed upon their ANDAs' final approval. (See id.)

But, the FDA refuses to delist a patent when litigation has ensued. See 21 C.F.R. § 314.94(a)(12)(viii)(B). The FDA recognizes "that [**28] if an ANDA applicant were successful in challenging a patent [in litigation], withdrawing the patent fr om the [Orange Book] immediately would destroy any exclusive benefit by permitting all other ANDAs for the drug product to be approved immediately." (Admin. R., Tab 23 at 12.) It would be "quite perverse[] to use an ANDA applicant's *success* in such an infringement action as the basis for *denying* exclusivity to that applicant." *Torpharm, Inc. v. Thompson, 260 F. Supp. 2d 69, 83 n. 15 (D.D.C. 2003).* If Merck had sued plaintiffs because of their paragraph IV certifications, plaintiffs would have been in danger of losing their [*10] right to 180-day exclusivity period upon final FDA approval only if the patents were found to be enforceable or infringed. In this case, however, the FDA delisted the patents from the Orange Book, disregarding the plaintiffs' success in avoiding suit. That disparate treatment here contravened the plain and undisputed intent of Congress. The delisting practice as applied here effectively eliminated

Congress's "first commercial marketing" trigger, in violation of the clear command of Congress.

The FDA here was not preventing an unfair [**29] windfall to an ANDA applicant who lost in patent litigation, cf. *21 U.S.C. § 355(j)(5)(B)(iv)(II)* (stating that a court decision "holding the patent which is the subject of the certification to be invalid or not infringed" triggers the exclusivity period), or barring exclusivity because the challenged patent had already expired, see, e.g., *Dr. Reddys Labs., Inc. v. Thompson, 302 F. Supp. 2d 340, 355 (D.N.J. 2003)* (upholding the FDA's decision to delist a patent that had expired and not to award exclusivity to an ANDA applicant who had filed a paragraph IV certification for that patent prior to the patent's expiration), or dealing with a challenged patent that should never have been listed, see e. g., *Purepac Pharm. Co. v. TorPharm, Inc., 359 U.S. App. D.C. 319, 354 F.3d 877, 886-88 (D.C. Cir. 2003)* (upholding the FDA's decision to delist a patent that was erroneously listed for the wrong drug and therefore would not provide the ANDA applicant with exclusivity even if the applicant won an infringement suit), or otherwise preventing some injustice that would have thwarted Congress's plain will. Although the FDA is due much deference in interpreting gaps [**30] or ambiguity in its statute, it cannot accord disparate treatment to the statute's equal triggers which reflect the clear command of Congress. See *21 U.S.C. § 355(j)(5)(B)(iv)*(stating that the two triggers of the exclusivity period are a court decision or commercial marketing). The delisting scheme the FDA chooses to implement cannot favor one of two equal statutory provisions over the other. See, e.g., *Sierra Club v. Envtl. Prot. Agency, 360 U.S. App. D.C. 1, 356 F.3d 296, 301-03 (D.C. Cir. 2004)* (holding that an agency cannot nullify clear statutory language in one part by relying on statutory silence in another).

CONCLUSION

The FDA has acted contrary to the clear intent of Congress in its decision to deny the plaintiffs' citizen petitions. The plaintiffs' motions for summary judgment will be granted and the FDA's motion for summary judgment will be denied. The decision will be remanded to the FDA. An appropriate order accompanies this Memorandum Opinion.

SIGNED this 30th day of April, 2006.

/s/

RICHARD W. ROBERTS

United States District Judge

373 U.S. App. D.C. 377; 469 F.3d 120, *;
2006 U.S. App. LEXIS 28133, **; 80 U.S.P.Q.2D (BNA) 1764

LEXSEE



Analysis
As of: Apr 04, 2008

RANBAXY LABORATORIES LIMITED, ET AL., APPELLEES v. MICHAEL O.
LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL.,
APPELLANTS

No. 06-5154

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA
CIRCUIT

*373 U.S. App. D.C. 377; 469 F.3d 120; 2006 U.S. App. LEXIS 28133; 80 U.S.P.Q.2D
(BNA) 1764*

September 12, 2006, Argued
November 14, 2006, Decided

**PRIOR HISTORY:**    [**1] Appeal from the United
States District Court for the District of Columbia. (No.
05cv01838).
*Ranbaxy Labs., Ltd. v. Leavitt, 459 F. Supp. 2d 1, 2006
U.S. Dist. LEXIS 24612 (D.D.C., Apr. 30, 2006)*

**DISPOSITION:**  Affirmed.

**COUNSEL:** Howard S. Scher, Attorney, U.S.
Department of Justice, argued the cause for appellants.
With him on the briefs were Peter D. Keisler, Assistant
Attorney General, Kenneth L. Wainstein, U.S. Attorney,
Douglas N. Letter, Attorney, and Eric M. Blumberg,
Deputy Chief Counsel, U.S. Department of Health and
Human Services. Drake S. Cutini, Attorney, U.S.
Department of Justice, entered an appearance.

Simon E. Dance was on the brief for amicus curiae Blue
Cross & Blue Shield Association, Inc. in support of
appellants.

Carmen M. Shepard argued the cause for appellees
Ranbaxy Laboratories Limited, et al. With her on the
brief were Kate C. Beardsley and William B. Schultz.

Jay P. Lefkowitz argued the cause for appellee Teva
Pharmaceuticals, USA, Inc. With him on the brief were
John C. O'Quinn and Michael D. Shumsky.

Theodore Case Whitehouse was on the brief for amicus
curiae Generic Pharmaceutical Association in support of
appellees.

**JUDGES:** Before: GINSBURG, Chief Judge, and
GRIFFITH and KAVANAUGH, Circuit Judges. Opinion
for the Court filed by Chief Judge GINSBURG.

**OPINION BY:** GINSBURG.

**OPINION**

    [**2]   [*121]    GINSBURG, *Chief Judge* : The
Hatch-Waxman Amendments to the Food, Drug, &
Cosmetic Act provide a period of marketing exclusivity
to the first drug manufacturer that either successfully
challenges a patent listed by the Food and Drug
Administration for an approved, branded drug and
markets an approved generic version of that drug or
prevails in litigation establishing that the patent is valid
or not infringed. Ranbaxy Laboratories Limited and Ivax
Pharmaceuticals, Inc., the latter since acquired by Teva
Pharmaceuticals, USA, Inc., applied for approval of
drugs to compete with an approved drug manufactured
by Merck & Co. and challenged two patents covering it.
Thereafter, at Merck's request, the FDA removed the
challenged patents from the "Orange Book," its listing of
patents covering approved drugs, thereby depriving the
generic manufacturers of an opportunity to have a period
of marketing exclusivity.

    Ranbaxy and Teva each filed a "citizen petition"
asking the FDA to relist the two patents. The FDA
denied the petitions because Merck had not sued
Ranbaxy or Teva for patent infringement. Ranbaxy and
Teva then repaired to the district court, which entered a
summary judgment for [**3] the plaintiffs, and the FDA

373 U.S. App. D.C. 377; 469 F.3d 120, *;
2006 U.S. App. LEXIS 28133, **; 80 U.S.P.Q.2D (BNA) 1764

appealed.

We hold the FDA's requirement that a generic manufacturer's patent challenge give rise to litigation as a condition of retaining exclusivity when a patent is delisted is inconsistent with the Act, which provides that the first generic manufacturer to file an approved application is entitled to exclusivity when it either begins commercially to market its generic drug or is successful in patent litigation. Accordingly, we affirm the judgment of the district court.

I. Background

Before marketing a new "branded" drug, the manufacturer must file with the FDA a New Drug Application (NDA), including evidence the drug is safe and effective, **[*122]** and the identifying number and expiration date of any patent or patents covering the drug. *21 U.S.C. § 355(a)-(b)(1).* When it approves the NDA, the FDA must publish the patent information, *id. § 355(b)(1), (c)(2)*, which it does in *Approved Drug Products with Therapeutic Equivalence Evaluations*, better known as the Orange Book.

Before marketing a "generic drug," which is bioequivalent to a branded drug previously approved pursuant to an NDA, the manufacturer may submit an Abbreviated **[**4]** New Drug Application (ANDA). Unlike an NDA, an ANDA need not contain evidence of the drug's safety or efficacy. *See 21 U.S.C. § 355(j)(2).* Each ANDA, however, must contain:

> a certification ... with respect to each patent which claims [a drug or a method of using a drug listed in the Orange Book] for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c) of this section--

>> (I) that such patent information has not been filed,

>> (II) that such patent has expired,

>> (III) [that] such patent will expire [on a specified date], or

>> (IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted[.]

*Id. § 355(j)(2)(A)(vii).* The Act rewards the first manufacturer to file an approved ANDA containing the certification in paragraph IV by giving it a 180-day period of marketing exclusivity, which begins with the earlier of the applicant's first commercial marketing of the generic drug or when the applicant prevails in a suit over infringement or the validity **[**5]** of the patents covering the branded drug. *Id. § 355(j)(5)(B)(iii)-(iv).*

> *

> If the [ANDA] contains a certification described in [paragraph] (IV) ... and is for a drug for which a previous [ANDA] has been submitted under this subsection [containing] such a certification, the [ANDA] shall be made effective not earlier than one hundred and eighty days after--

>> (I) the date the Secretary receives notice from the applicant under the previous [ANDA] of the first commercial marketing of the drug under the previous [ANDA], or

>> (II) the date of a decision of a court in an action ... holding the patent which is the subject of the certification to be invalid or not infringed,

> whichever is earlier.

*Id. § 355(j)(5)(B)(iv).*

This provision was amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), Pub. L. No. 108-173, tit. XI, § 1102(a)(2)(D)(i)(I)(bb)(CC), (a)(2)(D)(ii), 117 Stat. 2066, 2457-59 (Dec. 8, 2003) (codified at *21 U.S.C. §*

373 U.S. App. D.C. 377; 469 F.3d 120, *;
2006 U.S. App. LEXIS 28133, **; 80 U.S.P.Q.2D (BNA) 1764

355(j)(5)(D)(i)(I)(bb)(CC), (j)(5)(D)(ii) (2003)). The decisions of the FDA and of the district court were made pursuant to the Act as it stood before the MMA and, because the MMA was not made retroactive, § 1102(b)(1), 117 Stat. at 2460, this decision is also geared to the Act pre-MMA.

[**6] When a patent is removed from the Orange Book (or, in the parlance of the agency is "delisted"), the FDA by regulation requires the sponsor of the corresponding ANDA to delete its paragraph IV certification with respect to the delisted patent. 21 C.F.R. § 314.94(a)(12)(viii)(B). " If no patent [*123] covering the branded drug remains listed, then the generic applicant must file a paragraph I certification, and the FDA treats the ANDA as though it had never contained a paragraph IV certification. As a result, the generic applicant that was first to file an approved application does not get the 180-day period of exclusivity. See id.

**

> If a patent is removed from the [Orange Book], any applicant ... who has made a certification with respect to such patent shall amend its certification. The applicant shall certify ... that no patents [required to be listed in the Orange Book] claim the drug or, if other relevant patents claim the drug, shall amend the certification to refer only to those relevant patents .... Once an amendment ... has been submitted, the application will no longer be considered to be one containing a [paragraph IV certification].

*21 C.F.R. § 314.94(a)(12)(viii)(B).*

[**7] Merck, which marketed simvastatin under the brand name Zocor , submitted to the FDA information with respect to three patents covering the drug: *U.S. Patent Nos. 4,444,784* (the 784 Patent), *RE 36,481* (the 481 Patent), and *RE 36,520* (the 520 Patent). Teva and Ranbaxy each filed an ANDA to market generic simvastatin. The two ANDAs -- both of which were eligible for a 180-day period of marketing exclusivity because they involved different dosages -- each contained a paragraph IV certification with respect to the *481* and *520* Patents. With respect to the *784 Patent*, Ranbaxy and Teva each filed a paragraph III certification that it would expire in December 2005.

Merck, however, did not sue Ranbaxy or Teva for patent infringement based upon their paragraph IV

certifications. Instead, before their ANDAs were approved, Merck asked the FDA to delist the *481* and *520 Patents* from the Orange Book, which the agency did in 2004. Consequently, under *21 C.F.R. § 314.94(a)(12)(viii)(B)*, Ranbaxy and Teva were required to delete the paragraph IV certifications from their ANDAs and thereby lost their eligibility for a period of marketing exclusivity. Ranbaxy and Teva accordingly [**8] petitioned the FDA to relist the *481* and *520 Patents* in the Orange Book, restore their period of exclusivity, and refrain from approving any other manufacturer's ANDA for generic simvastatin until their period of exclusivity expired.

In a letter ruling denying the petitions, the FDA said it had considered three possible methods of handling the request of a manufacturer with an approved NDA to delist a patent. First, the FDA could always delist the patent, but that could unfairly deny a period of marketing exclusivity to the generic manufacturer that would later be the first to file an approved ANDA by depriving it of the opportunity to prevail in patent litigation. Second, it could refuse to delist the patent only if a generic manufacturer had filed an ANDA containing a paragraph IV certification with respect to the patent, but the agency rejected that possibility on the ground that "eligibility for exclusivity does not vest with a patent challenge," that is, upon the filing of a paragraph IV certification. Finally, the FDA could delist a patent only if a generic manufacturer had filed an ANDA containing a paragraph IV certification with respect to the patent *and* the NDA holder [**9] had not filed a lawsuit to contest the certification. The FDA chose the last option on the ground that it best balanced, on the one hand, the pro-competitive effect of the incentive for a generic drug manufacturer to be the first to challenge a patent listed in the Orange Book and thereby introduce generic competition to a branded drug and, on the other, the loss of competition among generic manufacturers caused by the 180-day period of marketing exclusivity for the first to file an approved ANDA containing a paragraph IV certification.

Ranbaxy and Teva then brought this action in the district court, which held the FDA's delisting policy was inconsistent with the Act because, by requiring the first generic manufacturer that filed a paragraph IV certification to remove that certification before its ANDA could be approved, it deprived the generic applicant of the opportunity to obtain a period of exclusivity pursuant to *21 U.S.C. § 355(j)(5)(B)(iv)(I)* [*124] by commercially marketing its drug. The court entered judgment for Ranbaxy and Teva and the FDA appealed.

## II. Analysis

We review the FDA's interpretation of the Act it administers under the two-step analysis in [**10]

373 U.S. App. D.C. 377; 469 F.3d 120, *;
2006 U.S. App. LEXIS 28133, **; 80 U.S.P.Q.2D (BNA) 1764

*Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). See Teva Pharm. Indus. Ltd. v. Crawford, 366 U.S. App. D.C. 203, 410 F.3d 51, 53 (D.C. Cir. 2005)* (reviewing under *Chevron* FDA ruling on citizen petition). First, we ask whether the "Congress has directly spoken to the precise question at issue." *Chevron, 467 U.S. at 842*. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id. at 842-43*. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question ... is whether the agency's answer is based on a permissible construction of the statute." *Id. at 843*.

Ranbaxy and Teva claim this case can be resolved at *Chevron* step one. Ranbaxy argues that *21 U.S.C. § 355(j)(5)(B)(iv)* on its face entitles the company to a period of marketing exclusivity, and Teva contends the FDA's distinction between filers of paragraph IV certifications that are sued and those that are not has no basis in the Act.

Under the rubric **[**11]** of *Chevron* step two, Ranbaxy and Teva argue the FDA's policy of delisting a patent in the absence of litigation is unreasonable for a variety of reasons. Upon examination, however, we believe their arguments are better considered at *Chevron* step one. More specifically, Teva contends the requirement of litigation is inconsistent with the text and structure of the statute and with its purpose, as elucidated in circuit precedent. Here it refers in particular to *Mova Pharmaceutical Corp. v. Shalala, 329 U.S. App. D.C. 341, 140 F.3d 1060, 1069 (D.C. Cir. 1998)*, in which we held *21 U.S.C. § 355(j)(5)(B)(iv)* precludes the FDA from conditioning marketing exclusivity upon the first to file an ANDA prevailing in patent litigation, and to *Purepac Pharmaceutical Co. v. Friedman, 333 U.S. App. D.C. 294, 162 F.3d 1201, 1204-05 (D.C. Cir. 1998)*, in which we held the FDA reasonably gave a period of marketing exclusivity to the first generic drug manufacturer to file a paragraph IV certification even though it never litigated the infringement or validity of the patent. Based upon these cases, Teva argues that the Act precludes the FDA from predicating exclusivity **[**12]** upon a patent infringement suit being brought by the NDA holder. Ranbaxy suggests the FDA's policy is inconsistent with the Act for two other reasons: first, the policy diminishes the incentive the Congress provided for a generic manufacturer to challenge a patent by reducing the certainty of its getting a period of marketing exclusivity; and second, by balancing anew the costs and benefits of the exclusivity provided by the Congress, the policy exceeds the authority of the agency.

In response, the FDA argues that its regulation requiring the filer of an ANDA to amend its certification when a patent is delisted, *21 C.F.R. §*

*314.94(a)(12)(viii)(B)*, is not inconsistent with the Act because *21 U.S.C. § 355(j)(5)* is silent with regard to the withdrawal of patent information previously submitted for listing in the Orange Book. The FDA points out that a generic applicant's exclusivity does not vest upon the filing of a paragraph IV certification; otherwise, it asserts, the filer's eligibility for exclusivity would not be lost when, for example, the patent subject to the paragraph IV certification expires, *see Dr. Reddys* **[*125]** *Labs., Inc. v. Thompson, 302 F. Supp. 2d 340, 354-55 (D.N.J. 2003)* **[**13]** (holding FDA reasonably interpreted *21 U.S.C. § 355(j)(5)(B)(iv)* not to extend exclusivity to ANDA approved after patent had expired), or the generic applican t loses in patent litigation, *see Mylan Labs., Inc. v. Thompson, 363 U.S. App. D.C. 440, 389 F.3d 1272, 1282-84, 1283 n.10 (D.C. Cir. 2004)*.

The FDA then argues its policy is reasonable because it allows an NDA holder to eliminate the patent as a barrier to approval of an ANDA when that patent does not cover the drug or method of use for which it was listed in the Orange Book. At the same time the policy preserves the ministerial nature of the FDA's role in maintaining the patent listings in the Orange Book because, when an NDA holder asks it to delist a patent, the agency need not determine whether the NDA holder is acting strategically to deny the generic applicant a period of marketing exclusivity or the patent actually does not cover the drug for which it was submitted -- the interpretation of patent listings being outside the agency's expertise.

The "precise question at issue" at *Chevron* step one is, in our view, whether the FDA may delist a patent upon the request of the NDA **[**14]** holder after a generic manufacturer has filed an ANDA containing a paragraph IV certification so that the effect of delisting is to deprive the applicant of a period of marketing exclusivity. The Congress unquestionably provided two ways in which a generic drug manufacturer may begin a 180-day period of exclusivity: (1) by marketing its drug commercially, or (2) by convincing a court that the patent subject to its paragraph IV certification is either invalid or not infringed. *21 U.S.C. § 355(j)(5)(B)(iv)*. When the NDA holder asks the FDA to delist the patent, however, the FDA's policy of acquiescence prevents the generic manufacturer that has filed an ANDA containing a paragraph IV certification from beginning its period of exclusivity.

We have previously rejected at *Chevron* step one the FDA's attempt to add to the statutory requirements for exclusivity by making it contingent upon success in litigation. In *Mova* we held the "successful defense" rule, which afforded exclusivity only to the generic applicant that both filed the first approved ANDA with a paragraph IV certification and successfully defended an infringement suit, was inconsistent with the **[**15]** text

373 U.S. App. D.C. 377; 469 F.3d 120, *;
2006 U.S. App. LEXIS 28133, **; 80 U.S.P.Q.2D (BNA) 1764

and structure of the Act because it permitted the FDA to approve a later ANDA before either the first to file began to market its drug commercially or a court held the subject patent invalid or not infringed; the rule thereby "[wrote] the commercial-marketing trigger out of the statute." *140 F.3d at 1069-70*. Later we upheld as reasonable at *Chevron* step two the FDA's decision to grant a generic applicant a period of marketing exclusivity even though its paragraph IV certification did not result in litigation precisely because the FDA's approach "basically duplicat[ed] the statute." *Purepac, 162 F.3d at 1204-05*.

Not only does the statute not require litigation to preserve a generic applicant's eligibility for exclusivity, as those precedents make clear; such a requirement is inconsistent with the structure of the statute because, if the patent is delisted before a pending ANDA is approved, then the generic manufacturer may not initiate a period of marketing exclusivity. The FDA's observation that the generic applicant's right to a period of marketing exclusivity does not vest upon its filing a paragraph IV certification is beside the point, **[**16]** which is that the Act makes the generic applicant eligible for exclusivity while the **[*126]**   FDA's policy makes it ineligible for exclusivity. ···

> \*\*\*   We need not address the question of patent expiration in this case. We note, however, as Ranbaxy and Teva acknowledged at oral argument, the text and structure of the statute suggest a distinction between expiration and delisting such that the first generic applicant may no longer retain exclusivity when the patent has expired. *See 21 U.S.C. § 355(j)(5)(B)(i); see also Dr. Reddys Labs., 302 F. Supp. 2d at 354-55.*

In addition, the FDA's policy allows an NDA holder,

by delisting its patent, to deprive the generic applicant of a period of marketing exclusivity. By thus reducing the certainty of receiving a period of marketing exclusivity, the FDA's delisting policy diminishes the incentive for a manufacturer of generic drugs to challenge a patent listed in the Orange Book in the hope of bringing to market a generic competitor **[**17]** for an approved drug without waiting for the patent to expire. The FDA may not, however, change the incentive structure adopted by the Congress, for the agency is bound "not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT & T Co., 512 U.S. 218, 231 n.4, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994).* Therefore, we hold unlawful the FDA's policy requiring that the first filer of a paragraph IV certification be sued in order to preserve its statutory exclusivity when the NDA holder seeks to delist the patent rather than to litigate.

### III. Conclusion

In sum, the FDA's policy conditioning a generic applicant's period of marketing exclusivity upon the generic applicant being sued for patent infringement by the NDA holder is inconsistent with the text and structure of the Act and, because it diminishes the incentive the Congress gave manufacturers of generic drugs, is inconsistent with the purpose of the Act. Therefore, we conclude the FDA improperly denied Ranbaxy and Teva a period of marketing exclusivity by delisting Merck's patents. For the foregoing reasons, the **[**18]** judgment of the district court is

*Affirmed.*

**50338    Federal Register / Vol. 59, No. 190 / Monday, October 3, 1994 / Rules and Regulations**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Food and Drug Administration**

**21 CFR Part 314**

[Docket No. 85N–0214]

RIN 0905–AB63

### Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is issuing regulations on certain requirements governing the submission, review, and approval of abbreviated new drug applications (ANDA's). Specifically, these new regulations pertain to patent issues, certification and notice of certification of invalidity or noninfringement of a patent by ANDA applicants, effective date of approval of an application under the Federal Food, Drug, and Cosmetic Act (the act), and new drug product exclusivity. These regulations are intended to complete FDA's implementation of Title I of the Drug Price Competition and Patent Term Restoration Act of 1984.

**EFFECTIVE DATE:** November 2, 1994.

**FOR FURTHER INFORMATION CONTACT:** Sharon M. Sheehan, Center for Drug Evaluation and Research (HFD–600), Food and Drug Administration, 7500 Standish Pl., Rockville, MD 20855, 301–594–0340.

**SUPPLEMENTARY INFORMATION:**

### I. Background

On September 24, 1984, the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98–417) (the 1984 amendments) was enacted. The law consisted of two different titles. Title I authorized the approval of duplicate versions of approved drug products (other than those reviewed and approved under section 507 of the act (21 U.S.C. 357)) under an ANDA procedure. Title II authorized the extension of patent terms for approved new drug products (including antibiotics and biological drug products), some medical devices, food additives, and color additives. Congress intended these provisions to provide a careful balance between promoting competition among brand-name and duplicate or "generic" drugs and encouraging research and innovation.

Title I also amended section 505 of the act (21 U.S.C. 355) by requiring all

New Drug Application (NDA) applicants and holders to provide certain patent information, requiring ANDA applicants to certify as to the status of patents claiming the drug product they intend to copy, providing for the submission and approval of applications for which the investigations relied on by the applicant to satisfy the "full reports" of safety and effectiveness requirements were not conducted by the applicant or for which the applicant had not obtained a right of reference or use from the person who conducted the investigations, establishing rules for disclosure of safety and effectiveness data submitted as part of an NDA, and providing specific time periods during which an NDA or an ANDA cannot be submitted or approved. The 1984 amendments also required FDA to promulgate new regulations implementing the statute. In the **Federal Register** of July 10, 1989 (54 FR 28872), FDA published a proposed rule on Title I. In the **Federal Register** of April 28, 1992 (57 FR 17950), FDA published a final rule on some aspects of Title I, such as ANDA content and format, approval and nonapproval of an application, and suitability petitions. In that final rule, FDA stated that it was still examining issues concerning patents and market exclusivity, and would issue a final rule once it had completed its deliberations. This document now finalizes those provisions.

In the **Federal Register** of March 7, 1988 (53 FR 7298), FDA published a final rule implementing Title II. That rule is codified at 21 CFR part 60.

### II. Highlights of the Final Rule

#### A. Patent Information, Certification, and Notice of Certification to Patent Owner and Certain Application Holders

The statute prohibits the agency from making effective the approval of an ANDA or an application described by section 505(b)(2) of the act (referred to as a 505(b)(2) application) before all relevant product and use patents for the listed drug (a drug product listed in an approved drug product list published by the agency) have expired, except where the generic applicant asserts either that its product will not infringe the patent or that the patent is invalid. In the latter case, approval of the ANDA or the 505(b)(2) application may not be made effective until the patent owner and the NDA holder have been notified and have had an opportunity to litigate the issue of patent infringement or validity. To facilitate the patent protection provisions, the statute requires that applications submitted under section

505(b) of the act include the patent number and expiration date of all relevant patents that claim the drug (including product and formulation patents) in the application or use patents that claim a method of using the drug. The agency publishes this patent information in its approved drug product list ("Approved Drug Products With Therapeutic Equivalence Evaluations," also known as the "Orange Book") for each listed drug for which patent information has been submitted.

A generic drug applicant submitting an ANDA that refers to a listed drug must include a certification as to the status of all patents applicable to the listed drug. Similarly, an applicant submitting a 505(b)(2) application must make certifications with respect to patents claiming any listed drug or claiming a use for such listed drug. If a generic applicant certifies that a relevant patent expires on a specified date, the effective date of approval of the ANDA or 505(b)(2) application will be delayed until the expiration of the patent. Thus, for example, if the patent expired on January 1, 1995, the effective date of approval of the ANDA or 505(b)(2) application would be January 1, 1995. The agency regards drug products with delayed effective dates as having tentative approvals; it does not consider the approval to be final until the effective date and the issuance of a final approval letter (see 57 FR 17950 at 17956). When a generic applicant certifies that any product or use patent is invalid or will not be infringed, the applicant must give notice of such certification to the patent owner and appropriate approved application holder for the listed drug. The generic applicant must include in the notice the factual and legal basis for the applicant's opinion that the patent is invalid or will not be infringed. Finally, a patent owner has 45 days from receipt of the notice of certification to file suit against the generic applicant to defend the patent. If the patent owner files suit within 45 days, the effective date of approval of the ANDA or 505(b)(2) application may be delayed up to 30 months pending resolution of the lawsuit.

The final rule describes: (1) The requirements for the submission of patent information by an NDA holder or applicant, (2) the patent certification requirements applicable to generic applicants, and (3) the content of a patent certification notice. The final rule also specifies: (1) When and to whom the notice is to be sent, and (2) the effect of each type of patent certification on

**50346    Federal Register** / Vol. 59, No. 190 / Monday, October 3, 1994 / Rules and Regulations

This change reflects current FDA operations.

*D. Section 314.54—Procedure for Submission of an Application Requiring Investigations for Approval of a New Indication for, or Other Change From, a Listed Drug*

Proposed § 314.54(a)(1)(vii) would require an applicant seeking approval of a drug product that represents a modification of a listed drug, to provide certain information regarding marketing exclusivity if the applicant believed the modification would be entitled to such exclusivity.

The agency received no comments on this provision and has finalized it without change.

*E. Section 314.70—Supplements and Other Changes to an Approved Application*

Proposed § 314.70(e) (now renumbered as § 314.70(f)) would require applicants submitting a supplement to an approved application to provide certain marketing exclusivity information if the applicant intended to seek market exclusivity.

The agency received no comments on this provision and has finalized it without change.

*F. Section 314.94—Content and Format of an Abbreviated Application (21 CFR 314.94)*

Proposed § 314.94(a)(12) contained the patent certification requirements for ANDA's. For example, under proposed § 314.94(a)(12)(i), an ANDA applicant would provide a patent certification with respect to each patent that claims the reference listed drug or that claims a use of the reference listed drug for which the ANDA applicant is seeking approval. Proposed § 314.94(a)(12)(ii) would permit an ANDA applicant to certify that there are no relevant patents that claim the listed drug or a method of use of the listed drug. Proposed § 314.94(a)(12)(iii) would permit an ANDA applicant to state that the use for which the applicant is seeking approval is not covered by a patent claiming a use for the listed drug.

40. One comment claimed that proposed § 314.94(a)(12)(i)(A) was inconsistent with the statute because the statute only requires ANDA applicants to make certifications for listed patents rather than patents issued by the United States Patent and Trademark Office. Two comments added that the suggestion regarding patent searches that FDA made in the preamble to the proposed rule was irrational and legally insupportable. One company, however, agreed that ANDA applicants should

submit patent certifications with respect to all patents, including those that had not been submitted to FDA for listing.

The rule simply paraphrases the statutory language in section 505(j)(2)(A)(vii) of the act. The rule does not require ANDA applicants to conduct patent searches. If the applicant believes that no patent exists, the applicant is to submit a patent certification under § 314.94(a)(12)(ii) that no relevant patents exist. If the applicant believes that a patent exists but that the patent owner has not filed patent information at FDA, the ANDA applicant would certify that, "in its opinion and to the best of its knowledge," no patent information has been submitted (i.e., make a paragraph I certification). FDA, however, believes it would be prudent for applicants to conduct patent searches if possible. A patent search could reveal the existence of an unlisted, but valid, patent and thus prevent an unnecessary expenditure of resources by applicants and FDA on a product that might not be marketable. A patent search might also enable ANDA applicants to avoid unnecessary patent infringement litigation.

41. One comment suggested that FDA publish all patent information, including descriptions of the patents and patent numbers, in the Orange Book.

The Orange Book already contains an addendum listing both patent and exclusivity information. This section provides patent numbers and patent expiration dates as well as exclusivity codes and expiration dates. In addition, for a use patent, FDA includes in the Orange Book a code identifying the indication covered by the patent. As for patent descriptions, FDA lacks the expertise to review and summarize patents and individual patent claims and does not believe that expanding the Orange Book to include patent descriptions would be an efficient use of FDA resources. However, persons who wish to obtain a synopsis of a particular patent can consult the Official Gazette for Patents, which is published by the United States Patent and Trademark Office. The Official Gazette for Patents contains short descriptions of patents and is publicly available.

42. One comment asserted that FDA should list patents that claim drug products for which the patent owner is not seeking or has not obtained approval. The comment explained that the statute requires NDA holders and applicants to submit information on "any patent which claims the drug for which the applicant submitted the application" (section 505(b)(1) of the act). The comment, citing § 314.50(d)(1),

claimed that "drug" means the active ingredient while "drug product" denotes a marketed product composed of active and inactive ingredients. Thus, because section 505(b)(1) of the act uses the term "drug," the comment continued, any patent that claims the active ingredient is a patent that claims the drug for which the applicant submitted the application and should be listed.

FDA disagrees with the comment's interpretation of section 505(b)(1) of the act. The statutory provision states that patent information is to be filed on patents that claim the drug "for which the applicant submitted the application." Similarly, the House Report accompanying the Drug Price Competition and Patent Term Restoration Act indicates that the patent information to be filed "includes the patent number and the expiration date of any patent which claims the drug *in the NDA* or which claims *a method of using such drug* with respect to which a claim of patent infringement could reasonably be asserted * * *." H. Rept. 857, 98th Cong., 2d sess. 31–32 (1984) (emphasis added). Thus, both the statute and its legislative history reveal that Congress intended the term "drug" to mean "drug product" rather than "active ingredient" because NDA's are granted only for drug products and not for active ingredients. FDA's interpretation of this provision has been upheld by a United States magistrate in *Pfizer* v. *FDA*, No. HM–88–1019, slip op. at 10–13 (D. Md. October 2, 1989) and adopted by a Federal district court (see *Pfizer, Inc.* v. *Food and Drug Administration*, 753 F.Supp. 171 (D. Md. 1990)).

43. Several comments sought clarification regarding the interaction between proposed § 314.94(a)(12)(i)(A)(4) and § 314.94(a)(12)(v), 180-day exclusivity periods under section 505(j)(4)(B)(iv) of the act, and licensees.

Because patent licensees are subject to 180-day exclusivity that has been granted to another applicant, the only instance in which proposed § 314.94(a)(12)(v) would apply would be where a patent licensee would seek to have an effective approval of its ANDA or 505(b)(2) application within 45 days of its receipt or filing (because the patent holder has 45 days to file a lawsuit against an ANDA applicant making a paragraph IV certification). Because the agency does not anticipate approving an ANDA or 505(b)(2) application in 45 days, FDA, on its own initiative, removed the provisions in § 314.94(a)(12)(v) and § 314.107(b)(1)(iv) related to consent by a patent owner to